| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| JAMES R. FELTON, ESQ. (State Bar No. 138767)<br>jfelton@gblawllp.com<br>JEREMY H. ROTHSTEIN, ESQ. (State Bar No. 316140)<br>jrothstein@gblawllp.com<br>MICHAEL J. CONWAY, ESQ. (State Bar No. 180604)<br>mconway@gblawllp.com<br>G&B LAW, LLP<br>16000 Ventura Boulevard, Suite 1000<br>Encino, California 91436<br>Tel: (818) 382-6200 • Fax: (818) 986-6534 | |
| ☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Creditor JKO Group, LLC | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - NORTHERN DIVISION**

| In re:<br><br>GLOBAL PREMIER REGENCY PALMS OXNARD, LP<br><br><br><br><br><br>Debtor(s). | CASE NO.: 9:22-bk-10626-RC<br>CHAPTER: 11<br><br><br>**NOTICE OF OPPOSITION AND REQUEST FOR A HEARING** |
|---|---|

1.  TO (*specify name*): Debtor Global Premier Regency Palms Oxnard, LP

2.  NOTICE IS HEREBY GIVEN that Creditor JKO Group, LLC ,
    a party in interest, hereby opposes the following request (*specify that which is opposed*):

    Application to Employ Willshire Pacific Capital Advisors, LLC as its Financial Advisors [Doc. 23]

3.  This opposition is based upon the following grounds (*specify grounds*):
    See attached Memorandum.

This form is optional.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012*                    Page 1                    **F 9013-1.3.OPPOSITION.REQ.HEARING**

4. Attached hereto are the following documents in support of this opposition which are admissible under the Federal Rules of Evidence (*specify declarations and exhibits by name or description*):

   Declaration of Michael J. Conway and attached exhibits.

5. ☒ *(Optional)* Attached hereto is a Memorandum of Points and Authorities upon which opposing party will rely.

6. Total number of attached pages of supporting documentation: __185__

Any reply to this opposition must be filed with the court and served on this opposing party not later than 7 days prior to the hearing on the motion.

WHEREFORE, the undersigned prays that this court deny the subject request and set this matter for a hearing.

Date: __09/26/2022_____

Respectfully submitted,

__G&B LAW, LLP_____
Printed name of law firm

_____
Signature

__Jeremy H. Rothstein_____
Printed name

Attorney for: __Creditor JKO Group, LLC_____

This form is optional.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012*                    Page 2                    **F 9013-1.3.OPPOSITION.REQ.HEARING**

### MEMORANDUM OF POINTS AND AUTHORITIES

JKO Group, LLC ("**JKO**") submits this Memorandum of Points and Authorities in support of its Opposition to the *Application of Debtor and Debtor-in-Possession for Authority to Employ Wilshire Pacific Capital Advisors, LLC, as its Financial Advisor* (the "Application"). Capitalized terms used but not defined herein have the meanings ascribed to them in the Application.

**A.      JKO's Claim and Lack of Adequate Protection**

The Debtor currently owes JKO not less than $28 million. JKO is the holder of a promissory note secured by a deed of trust in the Debtor's owned real property, 1020 Bismark Way, Oxnard, California, 93033 (the "Property"), and a commercial security agreement providing a security interest substantially all of the Debtor's personal property. Conway Decl. Exs. A-B. The deed of trust includes an assignment of rents; however, as discussed below, the Debtor has never collected any rent from its wholly owned non-debtor subsidiary Global Regency Oxnard Senior Care Services, LLC (the "Lessee Subsidiary").

The Debtor values the Property at $40.6M, based on an appraisal. *See Schedule A/B: Assets- Real and Personal Property* ("Schedule A/B") [Doc. 17]. The Debtor appears to rely on an appraisal (the "Appraisal") provided by BBG, Inc., dated December 14, 2021. Conway Decl. Ex C. But the Appraisal has proven overly optimistic, to say the least. The appraiser used two approaches for valuation, the sales comparison approach and the income capitalization approach. Of the two, the income capitalization approach is more reliable and "most often relied upon by market participants when valuing senior housing properties in this market." Appraisal, 90. For the income capitalization approach, the appraiser assumed an occupancy rate of 95% of 121 beds by December 2022— meaning approximately 115 residents. Appraisal, 78, 88-89. At the time of the Appraisal, the occupancy level was 25%, or 30 residents. *Id.* at 88-89. According to the testimony of CEO Christine Hanna ("Hanna") at the meeting of creditors, the Property had approximately 55 residents on September 15, 2022. Conway Decl. ¶ 4. So, the Property has gained only 25 of the expected 85 residents, and the Property is likely worth considerably less than the appraised value. Accordingly, it is highly doubtful that JKO is adequately protected by an equity cushion.

1    Worse, the Debtor is failing to collect rent from the Lessee Subsidiary, depriving the estate

2    and JKO of all cash collateral. The Lessee Subsidiary operates the assisted living facility at the

3    Property. The Debtor's stated gross revenue for January 1, 2022, through the Petition Date is

4    $342,549.00, but that is "based on accrued revenue." *Statement of Financial Affairs for Non-*

5    *Individuals Filing for Bankruptcy* [Doc. 17]. The Debtor disclosed the total accounts receivable of

6    $340,707.50 as of the Petition Date. Schedule A/B. This represents all rent payments owing from the

7    Lessee Subsidiary, as Hanna confirmed at the meeting of creditors. Conway Decl. ¶ 4. At the same

8    time, the Debtor had less than $100 cash on hand. Perhaps, owing to this game of keep away, the

9    Debtor has made no motions or disclosures with respect to cash collateral. And rent is the Debtor's

10    only disclosed source of possible post-petition cash.

11    **B.    Objectionable Terms of The Firm's Employment**

12    In light of the Debtor's failure to adequately protect JKO and collect cash collateral, the

13    Debtor's proposed compensation of Wilshire Pacific Capital Advisors LLC (the "Firm") is

14    unacceptable. The Debtor asks to immediately pay the Firm a $20,000 retainer, compensation for

15    fees and expenses every month, and a success fee immediately upon closing of a transaction. In the

16    Application, the Debtor justifies that arrangement on the grounds that: "[t]he Firm will need to

17    devote substantial time and resources to the Debtor's case, and, without monthly payment

18    procedures, the Firm's fees will be 'at risk.' The Firm should not be required to effectively finance

19    the administration of the Debtor's case." The Debtor concedes that there is a high risk of

20    administrative insolvency, but wants to pay the Firm first.

21    So, the Debtor tries to shift the risk of administrative insolvency to JKO, its senior secured

22    lender. The Debtor cannot do this over JKO's objection. Secured creditors must be protected from a

23    diminution in the value of their security interest, and the risk of administrative insolvency must be

24    borne by administrative creditors.[1] The Debtor cites *In re Knudsen Corp.*, 84 B.R. 668 (B.A.P. 9th

25    Cir. 1988) and *In re Lotus Props. LP*, 200 B.R. 388, 389 (Bankr. C.D. Cal. 1996) in support of their

26

27    _____

28    [1] Also, the Firm's opportunity to reap a substantial success fee is a sufficient reward for taking on the risk
of failure. The Debtor has offered JKO nothing but delay and risk.

G&B LAW

1   proposed compensation arrangement. But the *Knudsen* and *Lotus* courts each considered objections

2   from the United States Trustee under Sections 327-31 of the Bankruptcy Code, not from a secured

3   creditor.[2] Nothing in those cases or the Bankruptcy Code negates the absolute priority rule or the

4   property rights of secured creditors.

5       Simply put, the Debtor should not be permitted to pay any cash to the Firm until JKO is paid

6   in full.

7       **C.     Because the Debtor is Playing Keep Away with Cash Collateral, There Must Be**

8       **Far More Disclosure than the Application Provides**

9       The Debtor's failure to collect rent from the Lessee Subsidiary raises significant doubts about

10  its ability to be a fiduciary to the estate.  This concern may implicate the Firm as well. Because of the

11  uncollected rent, there is a clear adversity of interest between the estate and the Lessee Subsidiary.

12  There may also be ways that their interests are aligned, but this alignment cannot simply be assumed

13  absent significant disclosure.

14      And the Firm may well be working for the benefit of the Lessee Subsidiary instead of or in

15  addition to the Debtor. The Application suggests that the Firm will be providing both financial

16  advisory and investment banking services. The utility of investment banking services for the Debtor is

17  clear enough, but not the utility of financial advisory services. The Debtor has no cash flow, and its

18  only significant assets are the Property and the equity in the Lessee Subsidiary.

19      A financial advisor is a more natural fit for the Lessee Subsidiary, the operating entity. A

20  financial advisor would naturally advise on how to manage cash flow, and the Lessee Subsidiary is

21  managing its cash flow by withholding rent from the Debtor. How is the Firm navigating this conflict?

22  The onus is on the Debtor and the Firm to disclose and address this conflict—and any others—but they

23  have simply ignored it. Over a month into the case, the Debtor has not provided any budget or

24  projections. And even though the Debtor's management has essentially conscripted creditors into

25

26

27  _____

28  [2] In fact, the secured creditor in *Knudsen* had agreed to fund administrative expenses. *Knudsen*, 84 B.R.
    at 669.

3

G&B LAW

1  funding the operations of the Lease Subsidiary, its assets, liabilities, and financial affairs remain a

2  complete mystery.

3       Also, the Debtor has not disclosed where it will get the cash to pay the Firm's retainer and

4  monthly payments (or other ongoing expenses, for that matter). Under *In re Lotus Props. LP*, 200

5  B.R. 388, 393 (Bankr. C.D. Cal. 1996) (cited by the Debtor), enhanced disclosure requirements

6  apply where Debtor's insiders will pay a professional. Among other things,

> 7     (4) the factual and legal relationship between the third-party payor/insider, the
> 8     debtor, the respective attorneys, and their contractual arrangement concerning
> 9     the fees, must be fully disclosed to the Court at the outset of the debtor's
>     bankruptcy representation;
>
> 10     (5) the debtor's attorney/applicant must demonstrate and represent to the
> 11     Court's satisfaction the absence of facts which would otherwise create non-
>     disinterestedness, actual conflict, or impermissible potential for a conflict of
> 12     interest. *Id.*

13  The Firm would presumably be paid either by insiders or from the Lessee Subsidiary's[3] rent (ie.,

14  JKO's cash collateral), but the Debtor has not made the necessary disclosures for either option. The

15  Firm cannot be employed until the necessary disclosures are made.

16       And even if insiders propose to contribute cash, that cash may well have come from the Lessee

17  Subsidiary, facilitated by the Debtor's failure to collect rent. If so, that would be an unacceptable back-

18  door use of JKO's cash collateral to pay estate expenses without proper authorization or accountability.

19  The Debtor cannot evade its disclosure and adequate protection obligations in this manner. Instead, the

20  Debtor should be required to fully disclose the finances of the Lessee Subsidiary, including payments

21  to insiders within one year of the Petition Date.

22       Until those disclosures are made and the conflicts above are addressed, the Court should not

23  approve the Firm's employment or compensation.

24  ///

25  ///

26  ///

27  _____

28  [3] The Lessee Subsidiary is also an insider of the Debtor. *See* 11 U.S.C. §§ 101(2)(B); 101(31)(E).

4

### III.

### <u>CONCLUSION</u>

For those reasons, JKO respectfully requests that the Court deny the Application.

Dated:  September 26, 2022                    G&B LAW, LLP

By:_____
JAMES R. FELTON, ESQ.
MICHAEL J. CONWAY, ESQ.
JEREMY H. ROTHSTEIN, ESQ.
Attorneys for Movant
JKO Group, LLC

G&B LAW

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION

2282270.3 - 32572.0001

# DECLARATION OF MICHAEL J. CONWAY

I, Michael J. Conway, declare as follows:

1.    I am an attorney with the law firm of G&B Law, a Registered Limited Liability Partnership, attorneys of record herein for JKO Group, LLC ("JKO"), senior secured creditor of the debtor and debtor-in-possession in the above-captioned action (the "Debtor"). I am an attorney at law licensed to practice before all of the Courts of the State of California and before the United States District Court, Central District of California.  If called as a witness, I am competent to testify of my own personal knowledge, to the best of my recollection, as to the matters set forth in this Declaration.

2.    JKO is the holder of a promissory note secured by a deed of trust in the Debtor's owned real property 1020 Bismark Way, Oxnard, California, 93033 (the "Property') and a commercial security agreement providing a security interest substantially all of the Debtor's personal property. True and correct copies of the deed of trust and assignment to JKO are attached hereto as **Exhibit A**. True and correct copies of the security agreement and assignment to JKO are attached hereto as **Exhibits B**.

3.    A true and correct copy of the appraisal by BBG, Inc., dated December 14, 2021, is attached hereto as **Exhibit C**.

4.    I attended the Debtor's meeting of creditors on September 15, 2022. The Debtor's CEO, Christine Hanna, testified the Property had approximately 55 residents at that time. She also testified that the Debtor has never collected any rent from its wholly owned non-debtor subsidiary Global Regency Oxnard Senior Care Services, LLC, and that the accounts receivable on the Debtor's Schedules relates to this uncollected rent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 26, 2022 in Los Angeles, California.

MICHAEL J. CONWAY

DECLARATION OF MICHAEL J. CONWAY

2282270.3 - 32572.0001

# EXHIBIT A

FIDELITY NATIONAL TITLE
ORANGE COUNTY

#280326

RECORDATION REQUESTED BY:

WHEN RECORDED MAIL TO:
    Nano Banc
    Irvine Office
    7700 Irvine Center Dr., Suite 700
    Irvine, CA  92618

SEND TAX NOTICES TO:
    Global Premier Regency Palms Oxnard, LP
    2010 Main St., Suite 1250
    Irvine, CA  92614

FOR RECORDER'S USE ONLY

221·0·063·185

## DEED OF TRUST

THIS DEED OF TRUST is dated March 23, 2020, among Global Premier Regency Palms Oxnard, LP, a California Limited Partnership, whose address is 2010 Main St., Suite 1250, Irvine, CA 92614. ("Trustor"); Nano Banc, whose address is Irvine Office, 7700 Irvine Center Dr., Suite 700, Irvine, CA  92618 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and Nano Banc, whose address is 25220 Hancock Avenue, Suite 140, Murrieta, CA  92562 (referred to below as "Trustee").

CONVEYANCE AND GRANT.  For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary, all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property")** located in Ventura County, State of California:

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF OXNARD, IN THE COUNTY OF VENTURA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 20 TO 27 INCLUSIVE, OF TRACT NO. 1570-1, IN THE CITY OF OXNARD, COUNTY OF VENTURA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 43 PAGES 57, 58 AND 59 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OF THE OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, WITHOUT HOWEVER, ANY RIGHT OF ENTRY ON THE SURFACE OF SAID PROPERTY OR THE SUBSURFACE THEREOF TO A DEPTH OF 500 FEET MEASURED VERTICALLY FROM SAID SURFACE.

The Real Property or its address is commonly known as  1020 Bismark Way, Oxnard, CA  93033.  The Assessor's Parcel Number for the Real Property is 221-0-063-185.

Trustor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Trustor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  This is an absolute assignment of Rents made in connection with an obligation secured by real property pursuant to California Civil Code Section 2938.  In addition, Trustor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF ANY AND ALL OBLIGATIONS OF THE TRUSTOR UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE.  Except as otherwise provided in this Deed of Trust, Trustor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Trustor's obligations under the Note, this Deed of Trust, and the Related Documents.

POSSESSION AND MAINTENANCE OF THE PROPERTY.  Trustor agrees that Trustor's possession and use of the Property shall be governed by the following provisions:

Possession and Use.  Until the occurrence of an Event of Default, Trustor may  (1)  remain in possession and control of the Property; (2)  use, operate or manage the Property; and  (3)  collect the Rents from the Property.

Duty to Maintain.  Trustor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**DEED OF TRUST**
(Continued)

Loan No: 7000273600

Page 2

**Compliance With Environmental Laws.** Trustor represents and warrants to Lender that: (1) During the period of Trustor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Trustor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Trustor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Trustor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Trustor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Trustor or to any other person. The representations and warranties contained herein are based on Trustor's due diligence in investigating the Property for Hazardous Substances. Trustor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Trustor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Trustor's ownership or interest in the Property, whether or not the same was or should have been known to Trustor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Trustor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Trustor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Trustor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Trustor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Trustor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Trustor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Trustor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Trustor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Trustor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Trustor agrees neither to abandon or leave unattended the Property. Trustor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any restructuring of the legal entity (whether by merger, division or otherwise) or any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Trustor shall pay when due (and in all events at least ten (10) days prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Trustor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Trustor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Trustor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Trustor has notice of the filing, secure the discharge of the lien or, if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Trustor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Trustor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

## DEED OF TRUST
### (Continued)

**Evidence of Payment.** Trustor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Trustor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Trustor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Trustor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Trustor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Trustor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Trustor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Notwithstanding the foregoing, in no event shall Trustor be required to provide hazard insurance in excess of the replacement value of the improvements on the Real Property. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Trustor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Trustor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Trustor agrees to obtain and maintain flood insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan. Flood insurance may be purchased under the National Flood Insurance Program, from private insurers providing "private flood insurance" as defined by applicable federal flood insurance statutes and regulations, or from another flood insurance provider that is both acceptable to Lender in its sole discretion and permitted by applicable federal flood insurance statutes and regulations.

**Application of Proceeds.** Trustor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Trustor fails to do so within fifteen (15) days of the casualty. If in Lender's sole judgment Lender's security interest in the Property has been impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If the proceeds are to be applied to restoration and repair, Trustor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Trustor from the proceeds for the reasonable cost of repair or restoration if Trustor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Trustor as Trustor's interests may appear.

**Trustor's Report on Insurance.** Upon request of Lender, however not more than once a year, Trustor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Trustor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Trustor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Trustor's failure to discharge or pay when due any amounts Trustor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Trustor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Trustor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Trustor warrants that: (a) Trustor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Trustor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Trustor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Trustor's title or the interest of Trustee or Lender under this Deed of Trust, Trustor shall defend the action at Trustor's expense. Trustor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Trustor will deliver, or cause to be delivered, to Lender such instruments as Lender may

**DEED OF TRUST**
**(Continued)**

Loan No: 7000273600                                                                                        Page 4

request from time to time to permit such participation.

**Compliance With Laws.** Trustor warrants that the Property and Trustor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Trustor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Trustor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to eminent domain and inverse condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any eminent domain or inverse condemnation proceeding is commenced affecting the Property, Trustor shall promptly notify Lender in writing, and Trustor shall promptly take such steps as may be necessary to defend the action and obtain the award. Trustor may be the nominal party in any such proceeding, but Lender shall be entitled, at its election, to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Trustor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If any award is made or settlement entered into in any condemnation proceedings affecting all or any part of the Property or by any proceeding or purchase in lieu of condemnation, Lender may at its election, and to the extent permitted by law, require that all or any portion of the award or settlement be applied to the Indebtedness and to the repayment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation proceedings.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Trustor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Trustor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Trustor which Trustor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Trustor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Trustor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Trustor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. Trustor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Trustor shall not remove, sever or detach the Personal Property from the Property. Upon default, Trustor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Trustor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Trustor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Trustor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Trustor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Trustor. Unless prohibited by law or Lender agrees to the contrary in writing, Trustor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Trustor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Trustor and at Trustor's expense. For such purposes, Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Trustor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Trustor

# DEED OF TRUST
## (Continued)

under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Trustor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Lender may charge Trustor a reasonable reconveyance fee at the time of reconveyance.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Trustor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Trustor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Trustor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Trustor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

**Default in Favor of Third Parties.** Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Deed of Trust or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Trustor or on Trustor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Trustor's existence as a going business or the death of any partner, the insolvency of Trustor, the appointment of a receiver for any part of Trustor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Trustor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trustor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Trustor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Trustor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Trustor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Trustor under the terms of any other agreement between Trustor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Trustor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Trustor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Trustor under this Deed of Trust, after Trustor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Foreclosure by Sale.** Upon an Event of Default under this Deed of Trust, Beneficiary may declare the entire Indebtedness secured by this Deed of Trust immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold the Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the Note, other documents requested by Trustee, and all documents evidencing expenditures secured hereby. After the lapse of such time as may then be required by law following the recordation of the notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell the Property at the time and place fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement in accordance with applicable law. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary may purchase at such sale. After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

**DEED OF TRUST**

**(Continued)**

**Judicial Foreclosure.** With respect to all or any part of the Real Property, Lender shall have the right in lieu of foreclosure by power of sale to foreclose by judicial foreclosure in accordance with and to the full extent provided by California law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including without limitation the right to recover any deficiency in the manner and to the full extent provided by California law.

**Collect Rents.** Lender shall have the right, without notice to Trustor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Trustor irrevocably designates Lender as Trustor's attorney-in-fact to endorse instruments received in payment thereof in the name of Trustor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Trustor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Trustor, Trustor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Notice of Sale.** Lender shall give Trustor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Trustor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Trustor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Trustor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of Ventura County, State of California. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Trustor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed

# DEED OF TRUST
## (Continued)

Loan No: 7000273600                                                            Page 7

of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Acceptance by Trustee.** Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**NOTICES.** Any notice required to be given under this Deed of Trust shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Trustor requests that copies of any notices of default and sale be directed to Trustor's address shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Trustor agrees to keep Lender informed at all times of Trustor's current address. Unless otherwise provided or required by law, if there is more than one Trustor, any notice given by Lender to any Trustor is deemed to be notice given to all Trustors.

**STATEMENT OF OBLIGATION FEE.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Trustor's residence, Trustor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Trustor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law. This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of California.**

**Choice of Venue.** If there is a lawsuit, Trustor agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Trustor, shall constitute a waiver of any of Lender's rights or of any of Trustor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Trustor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Trustor, Lender, without notice to Trustor, may deal with Trustor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Trustor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means Nano Banc, and its successors and assigns.

**Borrower.** The word "Borrower" means Global Premier Regency Palms Oxnard, LP and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Trustor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**DEED OF TRUST
(Continued)**

Loan No: 7000273600                                                                                                      Page 8

=====================================================================================

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Trustor's obligations or expenses incurred by Trustee or Lender to enforce Trustor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means Nano Banc, its successors and assigns.

**Note.** The word "Note" means the promissory note dated March 23, 2020, **in the original principal amount of $23,000,000.00** from Trustor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. **NOTICE TO TRUSTOR:   THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Trustor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness; except that the words do not mean any guaranty or environmental agreement, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future leases, rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property together with the cash proceeds of the Rents.

**Trustee.** The word "Trustee" means Nano Banc, whose address is 25220 Hancock Avenue, Suite 140, Murrieta, CA  92562 and any substitute or successor trustees.

**Trustor.** The word "Trustor" means Global Premier Regency Palms Oxnard, LP.

**TRUSTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND TRUSTOR AGREES TO ITS TERMS, INCLUDING THE VARIABLE RATE PROVISIONS OF THE NOTE SECURED BY THIS DEED OF TRUST.**

|  | **DEED OF TRUST** |  |
|---|---|---|
| Loan No: 7000273600 | **(Continued)** | Page 9 |

TRUSTOR:

**GLOBAL PREMIER REGENCY PALMS OXNARD, LP**

**GLOBAL PREMIER AMERICA #3, LLC**, General Partner of Global Premier Regency Palms
Oxnard, LP

By: _____
    Andrew Hanna, Manager of Global Premier America #3, LLC

By: _____
    Christine Hanna, Manager of Global Premier America #3, LLC

## CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF _California_               )
                                    ) SS
COUNTY OF _Orange_              )

On _03/24_____, 20 _20_ before me, _Kwang Soo Kim, Notary Public_
                                                  (here insert name and title of the officer)

personally appeared **Andrew Hanna and Christine Hanna**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

                                                 KWANG SOO KIM
                                              COMM. #2229335
                                           Notary Public - California
                                           Orange County
                                 My Comm. Expires Jan. 25, 2022

Signature _____                 (Seal)

**DEED OF TRUST**
**(Continued)**

Loan No: 7000273600                                                     Page 10

---

**(DO NOT RECORD)**
## REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To: _____, Trustee

The undersigned is the legal owner and holder of all indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

Date: _____     Beneficiary: _____

                                             By: _____

                                             Its: _____

---

LaserPro, Ver. 19.3.0.038 Copr. Finastra USA Corporation 1997, 2020.    All Rights Reserved.    - CA  Z:\LaserPro\CFI\LPL\G01.FC
TR-1358 PR-17

Electronically Recorded in Official Records
County of Ventura County
Mark A. Lunn
Ventura County Clerk-Recorder

**Simplifile**

Recording Requested by
Fidelity National Title

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

JKO GROUP LLC
2549 Eastbluff Drive, # 720
Newport Beach, CA 92660

*30083-4/4/6-TC*

DOC# 2022000049962

04/22/2022
Titles: 1   Pages:  4
10:36 AM
Total Fees: $108.00
REYELA

THIS SPACE ABOVE FOR RECORDER'S USE

## ASSIGNMENT OF DEED OF TRUST

THIS ASSIGNMENT OF DEED OF TRUST (the "Assignment"), effective as of April 15, 2022, from NANO BANC, a California state-chartered bank, having an address at 7755 Irvine Center Drive, Third Floor, Irvine, CA 92618 (the "Assignor"), to JKO GROUP LLC, a Delaware limited liability company, having an address at 2549 Eastbluff Dr. #720, Newport Beach, CA 92660 (the "Assignee").

RECITALS

WHEREAS, Global Premier Regency Palms Oxnard, LP, a California limited partnership (the "Debtor"), executed that certain Deed of Trust (the "Deed of Trust"), dated as of March 23, 2020, and recorded in Official Records in the County Recorder's office of Ventura County, California ("Recorder's Office"), as Instrument #20200327-00043822-0, and that certain Modification of Deed of Trust, dated as of November 19, 2020, and recorded in Official Records in the Recorder's Office as Instrument #20201204-00208378-0 in connection with a loan from Assignor to Debtor, to secure payment of an aggregate amount of $25,500,000 according to the terms and provisions of that certain Promissory Note dated March 23, 2020, in the original principal amount of $23,000,000, and that certain Change in Terms Agreement dated November 19, 2020 (as further amended, supplemented, extended, restated, replaced or otherwise modified from time to time, collectively, the "Note").

WHEREAS, pursuant to that certain Loan Purchase and Sale Agreement dated as of March 31, 2022, between Assignee and Assignor (the "Sale Agreement"), the Note has been endorsed by Assignor to Assignee, and Assignee is the holder thereof.

NOW THEREFORE, for value received, the sufficiency of which is hereby acknowledged, Assignor hereby assigns unto Assignee, without recourse except as set forth in the Sale Agreement, the Deed of Trust and all other documents executed by Debtor in connection with the Note, together with all sums now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all powers, covenants and provisos therein contained. The Deed of Trust encumbers that certain property situated in the County of Ventura, State of California, more particularly described in Exhibit A attached hereto and incorporated herein by this reference.

-1-

401072429.3

DOC #2022000049962  Page 2 of 4

TO HAVE AND TO HOLD, the Deed of Trust and the property therein and hereinafter described, unto Assignee forever, subject to the terms and conditions thereof.

This Assignment and the covenants herein shall inure to the benefit of and extend to and be binding upon the successors and assigns of the respective parties hereto.

[SIGNATURE PAGE TO FOLLOW]

-2-

401072429.3

IN WITNESS WHEREOF, Assignor has executed this Assignment as of the day and year first above written.

NANO BANC,
a California state-chartered bank

By: _Dr McG_

Name: _Dan McGregor_

Title: _Chief Credit Officer_

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF CALIFORNIA          )
                             )
COUNTY OF _Orange_           )

On _April 20, 2022_, before me, _Daniel W. Chen_, a Notary Public, personally appeared _Dan McGregor_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

DANIEL W. CHEN
Notary Public - California
Los Angeles County
Commission # 2391877
My Comm. Expires Feb 23, 2026

S-1

401072429.3

**EXHIBIT A**
**PROPERTY - LEGAL DESCRIPTION**

THE LAND REFERRED TO HEREIN IS SITUATED IN THE CITY OF OXNARD, IN THE COUNTY OF VENTURA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 20 TO 27 INCLUSIVE, OF TRACT NO. 1570-1, IN THE CITY OF OXNARD, COUNTY OF VENTURA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 43 PAGES 57, 58 AND 59 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OF THE OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, WITHOUT HOWEVER, ANY RIGHT OF ENTRY ON THE SURFACE OF SAID PROPERTY OR THE SUBSURFACE THEREOF TO A DEPTH OF 500 FEET MEASURED VERTICALLY FROM SAID SURFACE.

APN # 221-0-063-185

401072429.3

# EXHIBIT B



*HLP0323*

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $23,000,000.00 | 03-23-2020 | 03-23-2030 | 7000273600 | | *** | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Global Premier Regency Palms Oxnard, LP
2010 Main St., Suite 1250
Irvine, CA 92614

**Lender:** Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

**THIS COMMERCIAL SECURITY AGREEMENT dated March 23, 2020, is made and executed between Global Premier Regency Palms Oxnard, LP ("Grantor") and Nano Banc ("Lender").**

**GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.**

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the partners of the partnership, including the addition of new partners or the departure of current partners from the partnership Grantor;

# COMMERCIAL SECURITY AGREEMENT

**Loan No: 7000273600**                    **(Continued)**                                    **Page 2**

---

(4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name, state or organization, or principal office address will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its partnership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, including without limitation all environmental laws, ordinances, rules and regulations, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

## COMMERCIAL SECURITY AGREEMENT

(Continued)

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 7000273600                                                                                      Page 4

in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business or the death of any partner, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

**Loan No: 7000273600**                                                     Page 5

and exercise its remedies.

**MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Agreement:

**Amendments.**  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**  Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.**  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.  This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.  This Agreement has been accepted by Lender in the State of California.**

**Choice of Venue.**  If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**Preference Payments.**  Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.**  Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement.  Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address.  Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.**  Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties.  Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement.  Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.**  If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.**  If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Agreement.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.**  Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.  If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.**  All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.**  Time is of the essence in the performance of this Agreement.

**DEFINITIONS.**  The following capitalized words and terms shall have the following meanings when used in this Agreement.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.**  The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.**  The word "Borrower" means Global Premier Regency Palms Oxnard, LP and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.**  The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Environmental Laws.**  The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances

 

U220190181022



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
|---|
| **-FILED-** |
| File No.: U220190181022 |
| Date Filed: 5/4/2022 |

B0701-8668 05/04/2022 9:49 AM Received by California Secretary of State

**Submitter Information:**

| | |
|---|---|
| Contact Name | James R. Felton, Esq. |
| Organization Name | G&B Law, LLP |
| Phone Number | (818) 382-6200 |
| Email Address | pstruntz@gblawllp.com |
| Address | 16000 Ventura Boulevard Suite 1000 Encino, CA 91436 |

**Amendment Action Information:**

| | |
|---|---|
| Initial Financing Statement File Number | 187666383947 |
| Date Filed | 08/30/2018 |
| Amendment Action | Assignment |

**Secured Party Assignee:**

| Secured Party Name | Mailing Address | Assignee |
|---|---|---|
| JKO Group, LLC | 2549 EASTBLUFF DRIVE # 720 NEWPORT BEACH, CA 92660 | ☒ Assignee |

| Indicate how documentation of Collateral is provided: | Entered as Text |
|---|---|

Description:
All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and  performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | NANO BANC |
|---|---|

Optional Filer Reference Information:
32572.0001

Miscellaneous Information:

# EXHIBIT C



# BBG

**Third-party reports by a true third party**

Appraisal Report

## Regency Palms Oxnard

An Assisted Living and Memory Care Residence Facility
2700 Bismark Way
Oxnard, Ventura County, California 93003
BBG File No. 0121021598

## Prepared For

Nano Banc
7755 Irvine Center Drive, Suite 300
Irvine, California 92618

## Report Date

*Date of Report: December 14, 2021*
*Date of Value As Is: November 15, 2021*
*Date of Value At Stabilization: December 1, 2022*

## Prepared By

BBG, Inc.
3070 Bristol Street, Suite 615
Costa Mesa, CA 92626
Client Manager: Mark Haskell
Email: mhaskell@bbgres.com

 VALUATION   ADVISORY   ASSESSMENT   ZONING



December 14, 2021

Nano Banc
7755 Irvine Center Drive, Suite 300
Irvine, California 92618

**Re: Regency Palms Oxnard**
    **An Assisted Living and Memory Care Residence Facility**
    **2700 Bismark Way**
    **Oxnard, Ventura County, California 93003**
    **BBG File No. 0121021598**

To Whom it May Concern:

We have performed an appraisal on the above referenced property, the conclusions of which are set forth in the attached Appraisal Report, subject to the general underlying assumptions and limiting conditions cited herein.

The subject property represents an existing assisted living care facility that is currently lease up phase which is expected to be completed by December 1, 2022. The subject property will represent a 121 unit, 121 bed, 2-story assisted living facility located at 2700 Bismark Way in Oxnard, California. The site is 2.36 acres. The building was originally constructed in 1960. The property was gutted and renovated to be in good overall condition as of June 2020 with typical assisted living amenities upon completion.  However, due to the Covid-19 pandemic, initial occupancy did not occur until January 2021.

In view of the following facts and data in conjunction with this appraisal, it is our opinion that the Market Value of the Fee Simple interest of the subject property subject to the general underlying assumptions and limiting conditions was:

| MARKET VALUE CONCLUSION | | | |
| --- | --- | --- | --- |
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Fee Simple | November 15, 2021 | $40,600,000 |
| Prospective at Stabilization | Fee Simple | December 1, 2022 | $42,700,000 |
| *Compiled by BBG* | | | |

**ORANGE COUNTY**

P + 714.415.4750
F + 714.415.4755

3070 BRISTOL STREET + STE. 615
COSTA MESA, CA 92626

BBGRES.COM

| EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS |
|---|
| An extraordinary assumption  is uncertain information accepted as fact.  If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value concldusions. The value conclusions are subject to the following extraordinary assumptions: |
| It is an assumption of the report that the facility stabilizes by the prospective date of stabilization |
| It is an assumption of the report that today's market conditions prevail through both prospective dates of value |
| A hypothetical condition is a fact that is known to be false, but  presumed to be true for the purposes of the appraisal. The value conclusions are subject to the following hypothetical conditions: |
| None noted |
| Compiled form Various Sources by BBG, Inc. |

*The use of extraordinary assumptions and/or hypothetical conditions might have affected the assignment results.*

**Value Allocation Conclusion**

Based on the foregoing, the value allocation of the subject has been concluded as follows:

| ALLOCATION OF VALUE - AT STABILIZATION | | | |
|---|---|---|---|
| **Assumptions** | | | |
| Total Management Fee (Stabilization) | | | $411,144 |
| Mangement Fee for Business Operations | @ | 50% | $205,572 |
| Mangement Fee for Real Property Operations | @ | 50% | $205,572 |
| **Allocation of FF&E Value** | | | |
| Replacement Cost New of FF&E | | | $870,000 |
| Average Total Useful Life (Years) | | | 20 |
| Remaining Useful Life (Years) | | | 20 |
| Depreciation (%) | | | 0% |
| Depreciated Cost of FF&E | | | $870,000 |
| **Income Attributable to Business/Intangibles** | | | |
| Management Fee for Business Operations | | | $205,572 |
| Franchise Fees | | | $0 |
| Total | | | $205,572 |
| **Income Attributable to Business/Intangibles** | | | |
| Value Attributable to Business/Intangibles | @ | 40.00% | $513,929 |
| Rounded | | | $510,000 |
| **Final Allocation (Rounded)** | | | |
| Final Value of the Total Assets of the Business | | | $42,700,000 |
| Value Attributable to FF&E | | | $870,000 |
| Value Attributable to Business/Intangibles | | | $510,000 |
| Value Attributable to Real Estate | | | $41,320,000 |
| *Compiled from Various Sources by BBG* | | | |

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were developed based on, and this report has

December 14, 2021
Page 3

been prepared in conformance with, the guidelines and recommendations set forth in the 2018-2019 Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute. It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

Our firm appreciates the opportunity to have performed this appraisal assignment on your behalf. If we may be of further service, please contact us.

Respectfully submitted,
**BBG, Inc.**

Alireza Khoshbin
Senior Appraiser
Certified General Real Estate Appraiser
Certificate # AG044624
Phone: 714-415-0154
Email: akhoshbin@bbgres.com

## CERTIFICATION

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- Alireza Khoshbin has made a personal inspection of the property that is the subject of this report.

- No one provided significant real property appraisal assistance to the persons signing this report.

- The appraisers signing this certification have provided appraisal-related services for the property that is the subject of this report within the three-year period preceding acceptance of this assignment.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- The appraiser involved in this assignment has considerable experience in appraising assisted living and memory care residence properties in the State of California and nationwide. The appraisers have historically been engaged in appraisal work in the geographical area of the subject property. The company maintains a database on this area for similar properties.

Alireza Khoshbin
Senior Appraiser
Certified General Real Estate Appraiser
Certificate # AG044624
Phone: 714-415-0154
Email: akhoshbin@bbgres.com

## TABLE OF CONTENTS

CERTIFICATION ............................................................................................................................... I

SUBJECT PHOTOGRAPHS ........................................................................................................... 1

SUMMARY OF SALIENT FACTS ................................................................................................... 4

INTRODUCTION ............................................................................................................................ 7

AREA ANALYSIS........................................................................................................................... 10

NEIGHBORHOOD ANALYSIS...................................................................................................... 13

INTRODUCTION TO SENIOR CARE/HOUSING INDUSTRY....................................................... 18

PRIMARY MARKET ANALYSIS.................................................................................................... 43

SITE ANALYSIS............................................................................................................................. 45

IMPROVEMENT ANALYSIS ......................................................................................................... 50

ZONING ANALYSIS....................................................................................................................... 56

REAL ESTATE TAX ANALYSIS .................................................................................................... 58

HIGHEST AND BEST USE ............................................................................................................ 59

APPRAISAL PROCESS ................................................................................................................. 61

LAND VALUE ................................................................................................................................. 63

SALES COMPARISON APPROACH ............................................................................................ 67

INCOME CAPITALIZATION APPROACH..................................................................................... 72

RECONCILIATION AND FINAL VALUE CONCLUSION .............................................................. 90

VALUE ALLOCATION ................................................................................................................... 92

ASSUMPTIONS AND LIMITING CONDITIONS........................................................................... 95

EXHIBITS....................................................................................................................................... 99

BBG



REGENCY PALMS OXNARD

PAGE 1

BBG

AERIAL PHOTO

SUBJECT PHOTOGRAPHS

### SUBJECT PHOTOS



**Front View**



**Back View**

SUBJECT PHOTOGRAPHS



**Representative Room**



**Representative Bathroom**

# SUMMARY OF SALIENT FACTS

| | | |
|---|---|---|
| **Subject Name** | Regency Palms Oxnard | |
| **Location** | 2700 Bismark Way | |
| | Oxnard, California 93003 | |
| **APN** | 221-0-063-185 | |
| **Date of Inspection** | November 15, 2021 | |
| **Date of Report** | December 10, 2021 | |
| **Property Rights Appraised** | Fee Simple | |
| **Highest and Best Use** | | |
| As If Vacant | Assisted Living | |
| As Proposed | Assisted Living | |
| **Estimated Exposure Time** | 6 Months | |
| **Estimated Marketing Time** | 6 Months | |

| Physical Data | | |
|---|---|---|
| | Assisted Living and Memory | Senior Care Facility |
| **Property Type** | Care Residence | |
| Land Area (AC) (SF) | 2.36 AC | 102,946 SF |
| Gross Leasable Area (GLA) (SF) | 59,650 SF | |
| Year Built | 1960 (Reno 2019) | |
| Number of Units | 121 | |
| Number of Beds | 121 | |
| Number of Buildings | 1 | |
| Number of Stories | 2 | |
| Conditions/Building Class | Good | D |

| Financial Profile | |
|---|---|
| Buyer Profile | Investor-National |
| Stabilized Occupancy | 95.0% |
| Stabilized Vacancy | 5.0% |
| Stabilized Credit Loss | 0.0% |
| Overall Capitalization Rate | 6.25% |

| Income & Expense Pro Forma | Total | Per SF | Per Bed |
|---|---|---|---|
| Effective Gross Income | $8,222,872 | $137.85 | $67,958 |
| Operating Expenses | $5,553,085 | $93.09 | $45,893 |
| Expense Ratio | 67.53% | | |
| Net Operating Income | $2,669,787 | $44.76 | $22,064 |

| Value Indications | | Total | Per SF | Per Bed |
|---|---|---|---|---|
| **Land Value** | | $3,200,000 | $31.08 | |
| **Market Value As Is on** | **November 15, 2021** | | | |
| Sales Comparison Approach | | $40,200,000 | $673.93 | $332,231 |
| Income Capitalization Approach | | $40,600,000 | $680.64 | $335,537 |
| **Market Value As Stabilized on** | **December 1, 2022** | | | |
| Sales Comparison Approach | | $42,200,000 | $707.46 | $348,760 |
| Income Capitalization Approach | | $42,700,000 | $715.84 | $352,893 |
| **Insurable Value** | | $15,610,000 | $261.69 | $129,008 |

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Fee Simple | November 15, 2021 | $40,600,000 |
| Prospective at Stabilization | Fee Simple | December 1, 2022 | $42,700,000 |
| *Compiled by BBG* | | | |

**Exposure/Marketing Time**

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use.  It is not an isolated estimate of time alone.

Based on exposure times of comparable sales and interviews with active participants in the local market, the above Market Value conclusion could be achieved with an exposure time of six months.  Furthermore, it is our opinion that a sale could be consummated at the Market Value conclusion stated herein within a 6-month marketing period of the effective date of appraisal.

The sales used in the Sales Comparison Approach were formally marketed and purchased after being exposed to the market in a range from two weeks to twelve months.

## INTRODUCTION

| PROPERTY IDENTIFICATION | |
|---|---|
| **Property Name** | Regency Palms Oxnard |
| **Address** | 2700 Bismark Way |
| | Oxnard, California 93003 |
| **Assessor's Parcel Number** | 221-0-063-185 |
| *Compiled by BBG* | |

### Intended Use

It is our understanding that this appraisal will be used by Nano Banc.

### Intended User

It is our understanding that this appraisal will be used for a secured credit transaction.

### Property Rights Appraised

The Market Value of the subject property is appraised assuming Fee Simple ownership, subject to the underlying lease, easements and restrictions, as noted herein.

### History of the Subject Property

Current title to the property is held by Global Premier Regency Palms Oxnard, LP. The property was acquired on October 4, 2016 from California REO Acquisition Partners II, LP for a price of $5,500,000 or $92.20 PSF of GLA, a recorded to the county of Ventura record 20161012-00149450-0. The property went under contract in April 2014 between two parties with a familial relationship. The property was not exposed to the market. The purchase price according to the developer, was a "low ball" figure and was intentionally below market. The figure was not based on any metric like price per square foot of building or land. This transaction is not considered to be an arm's length transaction or a market price. The property was vacant at the time of sale. Since acquisition, the property was gutted and has been completely renovated to a 121-bed assisted living facility. During the escrow period and time after acquisition, the developer worked with the city of Oxnard to approve planning and building permits. Additionally, a management agreement has been signed with Meridian Senior Living, the nation's 5th largest provider of senior living properties.

To the best of our knowledge, there has been no other ownership transfer of the property during the previous three years per the Ventura County Assessor's Office. Please note, however, that this information is included only to satisfy the requirements of USPAP. It is not intended as a guarantee to the chain of title and a title search should be performed by a title company should a definitive abstract be desired. The property is not currently listed for sale.

### Definition of Value

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.   buyer and seller are typically motivated;

2.   both parties are well informed or well advised, and acting in what they consider their own best interests;

3.   a reasonable time is allowed for exposure in the open market;

4.   payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5.   the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [1]

**Scope of Appraisal**

The procedures and methodologies employed in these approaches are outlined in the Appraisal Process section of this report. Following is a summary of steps completed by the appraisers in this assignment.

1.   The subject site was inspected by Scott Pfyl, MAI on August 1, 2019. This report was supplemented with client provided property specific information, assessment records and other public information when necessary.

2.   Gathered information from various secondary data sources regarding regional and local economic and demographic data specifically relating to the regional, city and neighborhood analyses.

3.   Analyzed trends in the market utilizing data compiled through confirmation of the comparable rents. Numerous brokers and developers active in this market were also interviewed relative to new construction and projects in the planning stages.

4.   Researched the flood plain reference relative to the surveys provided. Interviewed zoning personnel relative to the subject's zoning and development restrictions.

5.   Analyzed the highest and best use of the site "as if vacant" and the property "as improved". Supply, demand and absorption potential as well as construction costs and required yields were analyzed relative to the subject market and specifically the subject property. Alternative uses were also analyzed relative to their financial feasibility.

6.   Confirmed improved sales of similar use properties to compare to the subject.

[1] Interagency Appraisal and Evaluation Guidelines; December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472.

7.  Researched and analyzed comparable rentals in the regional market area by interviewing the leasing agents at each respective property. This data was utilized to estimate market rent in the Income Capitalization Approach. An inspection of each rental comparable was not made or relied on secondary sources including parties immediately involved with each property.

8.  Analyzed the data to arrive at conclusions of value via the Sales Comparison and Income Capitalization Approaches to Value.

9.  Reconciled the results of these approaches into a probable range of value and Market Value opinion of the going concern.

10. Estimated the reasonable exposure time and marketing period inherent in the Market Value conclusion.

11. Prepared an Appraisal report.

The client or property representative provided the appraisers with the following information with which to complete the appraisal assignment:

- Floor plans;
- Five-year pro forma income and expense schedule;
- Rent Schedule;
- Property Elevations;
- Construction budget.

**AREA ANALYSIS**

### Introduction

The subject is located in the city of Oxnard, Ventura County, California. Oxnard is part of the Oxnard-Thousand Oaks-Ventura metropolitan area. The MSA has an estimated population of more than 860,000 people.



Economy.com provides the following Oxnard-Thousand Oaks-Ventura metropolitan area economic summary as of July 2021. The full Economy.com report is presented in the Addenda.

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | INDICATORS | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45.8 | 46.6 | 46.8 | 47.3 | 47.7 | 49.1 | Gross metro product (C09$ bil) | 50.5 | 51.4 | 52.7 | 54.3 | 55.6 | 56.9 |
| 2.8 | 1.7 | 0.4 | 1.2 | 0.8 | 2.8 | % change | 2.9 | 1.8 | 2.5 | 3.0 | 2.5 | 2.3 |
| 289.5 | 293.7 | 296.5 | 300.4 | 305.3 | 309.2 | Total employment (ths) | 311.2 | 314.3 | 313.9 | 316.5 | 318.8 | 320.6 |
| 2.3 | 1.5 | 0.9 | 1.3 | 1.6 | 1.3 | % change | 0.7 | 1.0 | -0.1 | 0.8 | 0.7 | 0.6 |
| 7.9 | 6.6 | 5.6 | 5.2 | 4.5 | 3.8 | Unemployment rate (%) | 4.2 | 4.2 | 5.3 | 5.9 | 6.0 | 6.0 |
| 1.5 | 5.7 | 5.6 | 2.5 | 4.5 | 3.8 | Personal income growth (%) | 3.8 | 4.6 | 4.0 | 5.1 | 4.8 | 4.6 |
| 76.3 | 78.7 | 79.2 | 81.3 | 82.9 | 84.9 | Median household income ($ ths) | 87.8 | 91.6 | 94.7 | 98.0 | 101.5 | 105.0 |
| 838.7 | 843.1 | 847.2 | 849.2 | 851.3 | 854.2 | Population (ths) | 857.6 | 861.1 | 865.0 | 869.7 | 874.6 | 879.6 |
| 0.6 | 0.5 | 0.5 | 0.2 | 0.2 | 0.3 | % change | 0.4 | 0.4 | 0.5 | 0.5 | 0.6 | 0.6 |
| -0.3 | -0.6 | -0.6 | -2.4 | -1.7 | -0.5 | Net migration (ths) | -0.2 | -0.3 | 0.0 | 0.7 | 1.1 | 1.1 |
| 430 | 536 | 678 | 669 | 1,070 | 1,037 | Single-family permits (#) | 845 | 1,191 | 1,591 | 1,818 | 1,845 | 1,782 |
| 571 | 778 | 755 | 940 | 1,495 | 765 | Multifamily permits (#) | 704 | 831 | 1,019 | 1,088 | 1,093 | 1,062 |
| 225.0 | 250.1 | 262.5 | 278.0 | 296.0 | 310.9 | FHFA house price (1995Q1=100) | 319.4 | 332.0 | 349.0 | 368.4 | 391.1 | 417.8 |

## Recent Performance

Oxnard-Thousand Oaks-Ventura's recovery is picking up the pace but remains a laggard. Just over 60% of jobs lost last year are back, well behind the U.S. average. Healthcare has led the employment recovery, while leisure/hospitality has driven the acceleration in 2021. The unemployment rate is down to 5.9%, but the labor force is yet to mount a strong rebound since last year's losses. Average hourly earnings have been ticking upward over the past few months after sliding at the beginning of the year. House prices have continued to soar, outpacing even the heady national average. Residential housing permits are edging higher, but the pace is only slightly stronger than at the end of the last business cycle.

## High Tech

Oxnard-Thousand Oaks-Ventura's tech industry will regain the lion's share of lost positions early next year, but further gains will be muted. Tech employment's recovery already lags that of the state and the U.S., which have both eclipsed prerecession levels. The tech core is dominated by computer systems design and pharmaceutical manufacturing. While Oxnard-Thousand Oaks-Ventura has a cost advantage relative to the Bay Area, living and business costs are well above those of the U.S. Without the Bay Area's entrepreneurial culture and legacy of tech dominance, high costs are a deterrent to workers and firms alike. The once outsize tech industry has been waning for decades, and the pandemic has hastened the contraction. High costs and the rise of telecommuting, particularly among tech firms, will result in subpar job growth. Tech will remain a key driver but will not provide the robust gains seen in other tech hubs. Long term, dwindling high-wage jobs will weigh on local consumer services and housing.

## Military

The presence of Ventura Naval Base and the Channel Islands Air National Guard Station will lend stability to the metro area as tech's dominance wanes. Near term, defense spending will hover around a decade-long high, which bodes well for military-reliant metro areas such as Oxnard-Thousand Oaks-Ventura. The steady presence of military personnel will provide a key support to local consumer industries as the civilian populations wanes. Federal government employment accounts for a slightly above-average share of total employment, and although job growth will underwhelm, Uncle Sam is a key source of mid- and high-wage jobs. Contractors will also benefit from the flow of federal defense spending.

## Demographics

Bleak population trends will improve somewhat, but growth will be sluggish compared with the regional and national pace. The population shrank for the third consecutive year in 2020. Losing residents to the rest of the U.S. is nothing

new to Oxnard-Thousand Oaks-Ventura, but several years of weak immigration weighed heavily on the local headcount. However, President Biden is reversing Trump's restrictive immigration policies and international arrivals will resume. However, headwinds to stronger growth remain. Housing affordability is among the lowest in the country. High costs combined with several years of weak high-wage job growth have spurred out-migration and will continue to do so. The brunt of the burden will be felt by consumer-facing industries such as retail, which will face a longer than average road to recovery.

## Major Employers

The following table lists the major employers within the Oxnard-Thousand Oaks-Ventura MSA.

### TOP EMPLOYERS

| | |
|---|---|
| Ventura Naval Base | 19,000 |
| Amgen Inc. | 5,125 |
| Bank of America | 3,800 |
| WellPoint Health Networks Inc. | 3,056 |
| Ventura County Health Care Agency | 2,675 |
| Anthem Blue Cross & Blue Shield | 2,500 |
| The Oaks | 2,345 |
| Community Memorial Hospital of San Buenaventura | 2,015 |
| California Lutheran University | 1,772 |
| Los Robles Regional Medical Center | 1,670 |
| Ventura County Community College District | 1,567 |
| Kavlico | 1,550 |
| St. John's Regional Medical Center | 1,286 |
| Channel Islands Air National Guard Station | 1,255 |
| Haas Automation Inc. | 1,200 |
| Baxter | 1,150 |
| PennyMac Loan Services LLC | 1,000 |
| Adventist Health | 1,000 |
| California State University Channel Islands | 946 |
| Farmers Insurance | 890 |

Sources: City of Oxnard, 2017, City of Thousand Oaks, 2017, Pacific Coast Business Times, 2017

## Conclusion

Oxnard-Thousand Oaks-Ventura's recovery will progress slowly. Employment will not fully rebound until 2023, behind the regional and national average. High tech will recover, but growth will pale compared with the state's other tech hubs. Federal and military employment will lend stability. Further out, population growth will limit upside potential. Look for Oxnard-Thousand Oaks-Ventura to be at best an average performer relative to the region.

## NEIGHBORHOOD ANALYSIS



## Location

The subject is located in Oxnard, California, located along the coast of Southern California. It is the 19th most populous city in California and the most populous in Ventura County. The city lies approximately 60 miles northwest of downtown Los Angeles and is part of the larger Greater Los Angeles area. The population of Oxnard was 207,906 as of 2017.

## Boundaries

The subject's primary market area is located generally within the city of Oxnard, California. The formal primary market area boundaries include the Santa Clara River, which separates the city of Ventura from Oxnard, to the north, the city of Camarillo to the east and the Pacific Ocean to the west and the city of Port Hueneme and the Pacific Ocean to the south. The subject is located essentially in the center of the defined primary market area.

## Land Use

In a three-mile radius surrounding the subject homes have a median year built of 1971 and a median value of $409,876.

## *Naval Base Ventura County*

Naval Base Ventura County (NBVC) is a United States Navy base located near Oxnard, California. The base was formed in 2000 through the merger of Naval Air Station Point Mugu and Naval Construction Battalion Center Port Hueneme.

NBVC is a diverse installation comprising three main facilities—Point Mugu, Port Hueneme and San Nicolas Island—and serving as an all-in-one mobilization site, deep water port, railhead, and airfield. NBVC supports more than 100 tenant commands with a base population of more than 19,000 personnel, making it the largest employer in Ventura County.

### Port of Hueneme

The Port of Hueneme in California, United States, is the only deep-water harbor between Los Angeles and the San Francisco Bay area. Located in Ventura County on the Santa Barbara Channel, the port complex not only serves international shipping businesses but is an operating facility of Naval Base Ventura County (NBVC). The Oxnard Harbor District (OHD) owns and operates the port. The port has five deep-water berths. As a shared port between NBVC and the Oxnard Harbor District, the U.S. Navy has over 4,500 feet of berthing space for various ship platforms for use by tenant commands of NBVC: Port Hueneme and transient government contract/military shipping. The Port of Hueneme has five deep-water berths and two cranes but does not have the infrastructure to handle large container ships. The ability to handle a diverse breadth of business is one way the port distinguishes itself from the much larger nearby ports such as Long Beach and Los Angeles.

### California State University Channel Islands

California State University Channel Islands is a four-year public comprehensive university located outside Camarillo, California in Ventura County. CSUCI opened in 2002, as the 23rd campus in the California State University system, succeeding the Ventura County branch campus of CSU Northridge. CSUCI is located midway between Santa Barbara and Los Angeles in Camarillo, at the intersection of the Oxnard Plain and northern most edge of the Santa Monica Mountain range. The Channel Islands are nearby where the university operates a scientific research station on Santa Rosa Island. Channel Islands offers 53 types of Bachelor's degrees, 6 different graduate (Master's) degrees, 19 teaching credentials, and a Ed.D degree. In the Fall of 2016, the university enrolled the largest number of students in its history with 6,611 undergraduate and postgraduate students. Since its establishment, the university has awarded nearly 7,000 degrees.

### Beaches

The city of Oxnard is home to over 20 miles of scenic, relatively uncrowded coastline. The beaches in Oxnard are large and the sand is exceptionally soft. The sand dunes in Oxnard, which were once much more extensive, have been used to recreate Middle-Eastern desert dunes in many movies. There are very few rocks or driftwood piles at most beaches, but Oxnard is known to have dangerous rip-currents at certain beaches. Oxnard has good surfing at many of its beaches.

### Agriculture

According to the Camarillo General Plan: "The areas studied showed a high percentage of Group I soils, primarily located on the relatively flat Oxnard Plain. The Oxnard Plain, because of these high-quality agricultural soils, coupled with a favorable climate, is considered one of the most fertile areas in the world."

Oxnard has been known for several different crops over the years, including cucumbers, sugar beets, lima beans, Stock (the cut flower), and strawberries. In the years of Oxnard's growth during the 1970s and 80s, many farms and ranches were annexed for development, and many new development plans threatened much of the plain's farmland. In 1995, a

grassroots effort known as SOAR (Save Open Space and Agricultural Resources) was initiated by farmers, ranchers and citizens of Ventura County in an effort to save the vast agricultural asset of the Oxnard Plain.

The Oxnard Plain is well known for its strawberries. According to the USDA, Oxnard is California's largest strawberry producer, supplying about one-third of the State's annual strawberry volume. From the end of September through the end of October, strawberries are planted and harvesting occurs from mid-December through mid-July in Oxnard. The peak harvesting season in California runs from April through June, when up to 10 million pint baskets of strawberries are shipped daily. The state of California supplies over 85% of U.S. strawberries, with the U.S. supplying for a quarter of total world production of strawberries.

Each year Oxnard hosts the California Strawberry Festival during the summer at College Park next to Oxnard College, featuring vendors as well as food items based on the fruit such as strawberry nachos, strawberry pizza, strawberry funnel cake, strawberry sundaes, and strawberry champagne.

### Dallas Cowboys Training
The Dallas Cowboys hosts their training camp in July and August at River Ridge Playing Fields. Many practices are open to the public, giving residents and guests the opportunity to interact with players and coaches as they step away from AT&T Stadium in Arlington to train for the upcoming football season.

### Life Stages and Trends
Oxnard is a typical seaside town with historic districts located in downtown Oxnard, which is located just southwest of the subject property. The historic areas consist of restored homes along manicured, landscaped streets.

The City of Oxnard was incorporated in 1903 and was primarily used for grazing cattle, growing sugar beets and beans to eventually servicing the defense industry and then developing industrial housing and commercial developments. The population of Oxnard has increased significantly in the last 50 years which has led to an extensive development plan and an expansion from the central business district.

Property values have stabilized over the past few years within the market area and are modestly increasing. New construction activity is increasing in the market area as well as the population of the area modestly grows. Oxnard is the most populous city in Ventura County and development is occurring to satisfy demand within the immediate area. The primary market area is considered to be in the mature stage of its life cycle, but is currently experiencing some redevelopment.

### Access
The market area has average access with respect to major and minor arteries. The U.S. Highway 101 is the major highway running through Oxnard, connecting the primary market area to Ventura and Santa Barbara to the northwest, and Camarillo and Los Angeles to the southeast. Additionally, State Route 1, known as Oxnard Boulevard within the city of Oxnard, runs mostly in a north-south direction within the market area and merges with U.S. Highway 101 in the northern portion of the market area and heads south down the coast to Malibu. Additionally, Highway 232, known as Vineyard Avenue within the city of Oxnard, heads northeast from the market area, provides connections to Saticoy and Santa Paula. Other north-south arterials through the area are Victoria Avenue, Ventura Boulevard and Rose Avenue.

East-west arterials through the area are Pleasant Valley Road, Channel Islands Boulevard, Wooley Road, 5th Street and Gonzalez Road.

The Oxnard Transportation Center is served by Amtrak's Pacific Surfliner and Coast Starlight train routes, as well as Metrolink's Ventura County Line. Ventura Intercity Service Transit Authority (VISTA) operates buses between Oxnard and several nearby cities.

Oxnard is home to Oxnard Airport, which is located within has a central location within Oxnard along 5th Street, west of Oxnard Boulevard. However, the airport is mostly used for general aviation and has not had scheduled passenger service since June 8, 2010, when United Express ended service from Oxnard to Los Angeles International Airport. For passenger service, the closest airports include Santa Barbara Municipal Airport, Bob Hope Airport in Burbank and Los Angeles International Airport. These passenger service airports are between 45 and 65 miles from the market area.

## Demographics

Selected neighborhood demographics in 1, 3 and 5-mile radii from the subject, are shown in the following table:

| COMPARATIVE DEMOGRAPHIC ANALYSIS FOR PRIMARY TRADE AREA | | | | |
|---|---|---|---|---|
| **Description** | **1 Mile Radius Totals** | **3 Mile Radius Totals** | **5 Mile Radius Totals** | **Oxnard MSA Totals** |
| **Population** | | | | |
| 2024 Projection | 35,311 | 167,902 | 247,191 | 885,895 |
| 2019 Estimate | 34,476 | 163,195 | 239,994 | 859,967 |
| 2010 Census | 33,653 | 157,572 | 229,649 | 823,318 |
| 2000 Census | 31,218 | 144,458 | 204,321 | 753,454 |
| 2019 Est. Median Age | 31.58 | 31.80 | 33.11 | 38.30 |
| 2019 Est. Average Age | 33.74 | 33.86 | 34.97 | 39.10 |
| **Households** | | | | |
| 2024 Projection | 7,254 | 39,781 | 64,012 | 286,997 |
| 2019 Estimate | 7,095 | 38,644 | 62,170 | 278,583 |
| 2010 Census | 6,968 | 37,364 | 59,599 | 266,920 |
| 2000 Census | 6,667 | 34,755 | 54,357 | 243,333 |
| **2019 Est. Average Household Size** | 4.83 | 4.19 | 3.83 | 3.05 |
| **2019 Est. Households by Household Income** | | | | |
| Income Less than $15,000 | 5.9% | 7.2% | 6.2% | 5.6% |
| Income $15,000 - $24,999 | 9.0% | 8.5% | 7.8% | 6.4% |
| Income $25,000 - $34,999 | 8.7% | 9.2% | 8.4% | 6.6% |
| Income $35,000 - $49,999 | 14.1% | 13.5% | 12.6% | 9.8% |
| Income $50,000 - $74,999 | 21.4% | 21.1% | 20.9% | 15.6% |
| Income $75,000 - $99,999 | 14.7% | 14.3% | 13.7% | 13.0% |
| Income $100,000 - $124,999 | 10.7% | 10.4% | 10.9% | 11.5% |
| Income $125,000 - $149,999 | 6.1% | 6.0% | 6.9% | 8.3% |
| Income $150,000 - $199,999 | 5.7% | 5.5% | 6.6% | 9.6% |
| Income $200,000 - $249,999 | 2.1% | 2.2% | 2.8% | 4.8% |
| Income $250,000 - $499,999 | 1.3% | 1.6% | 2.4% | 5.7% |
| Income $500,000 and more | 0.3% | 0.5% | 0.8% | 3.1% |
| **2019 Est. Average Household Income** | $78,402 | $79,289 | $87,339 | $118,112 |
| **2019 Est. Median Household Income** | $63,677 | $63,035 | $67,314 | $86,194 |
| **2019 Est. Tenure of Occupied Housing Units** | | | | |
| Owner Occupied | 61.6% | 53.2% | 54.4% | 65.0% |
| Renter Occupied | 38.4% | 46.8% | 45.6% | 35.0% |
| **2019 Est. Median All Owner-Occupied Housing Value** | $378,229 | $409,876 | $451,751 | $628,814 |
| *Source: 2019 Claritas, Inc.* | | | | |

**Conclusion**

The market area has average access to highways and support facilities. Although major employers are located within the immediate area, the most significant employment opportunities are located further south, within Los Angeles County. The primary market area is considered to be in a slow growth stage of its life cycle. It benefits from its location along the coast that features the only deep-water port between the Port of Long Beach and the Port of San Francisco. The population has been slowly growing throughout the market area. Additionally, the subject benefits from its proximity to major retail and transportation centers within the region. Overall, the market area should continue to benefit from its location and supportive development in the immediate area and continue to grow at a modest pace in the near term.

# INTRODUCTION TO SENIOR CARE/HOUSING INDUSTRY

**Introduction**

The following definitions of the Seniors Housing Classifications were jointly developed by the American Seniors Housing Association (ASHA) and the National Investment Center (NIC).

*Active Adult Community:* For-sale single-family homes, townhomes, cluster homes and condominiums with no specialized services, restricted to adults at least 55 years of age or older. Rental housing is not included in this category. Residents generally lead an independent lifestyle, and projects are not equipped to provide increased care as the individual ages. It may include amenities such as clubhouse, golf course and recreational spaces. Outdoor maintenance is normally included in the monthly homeowner's association or condominium fee.

*Senior Apartment Community:* Multifamily residential rental properties restricted to adults at least 55 years of age or older. These properties do not have central kitchen facilities and generally do not provide meals to residents but may offer community rooms, social activities, and other amenities.

*Independent Living Facility (ILF):* Age-restricted multifamily rental properties with central dining facilities that provide residents, as part of their monthly fee, access to meals and other services such as housekeeping, linen service, transportation, and social and recreational activities. Such properties do not provide, in a majority of the units, assistance with activities of daily living (ADLs) such as supervision of medication, bathing, dressing, or toileting. There are no licensed skilled nursing beds in the property.

*Assisted Living Facility (ALF):* State regulated rental properties that provide the same services as independent living communities listed above, but also provide, in a majority of the units, supportive care from trained employees to residents who are unable to live independently and require assistance with ADLs including management of medications, bathing, dressing, toileting, ambulating and eating. These properties may have some skilled nursing beds, but the majority of units are licensed for assisted living. Many of these properties include wings or floors dedicated to residents in need of memory care. A property that specializes in the care of residents with memory care issues should be considered an assisted living property.

*Independent and Assisted Living Facility (IALF):* Single communities offering both independent and assisted living within the same building or on the same campus.

*Nursing Facility (NF):* Licensed daily rate or rental properties that are technically referred to as skilled nursing facilities (SNF) wherein the majority of individuals require 24-hour nursing and/or medical care. In most cases, these properties are licensed for Medicaid and/or Medicare reimbursement. These properties may include a minority of assisted living and/or memory care units.

*Continuing Care Retirement Communities (CCRCs):* Age-restricted properties that include a combination of independent living, assisted living and skilled nursing services (or independent living and skilled nursing) available to residents all on one campus. Resident payment plans vary and include entrance fee, condo/co-op and rental programs. The majority of the units are not licensed skilled nursing beds.

BBG

The following are additional terms that are used in describing and analyzing seniors housing properties:

*Licensed beds:* The number of beds a facility is licensed to operate by the appropriate state licensing agency.

*Living units:* The number of living units, consisting of one or more rooms, designed to accommodate residents of the facility.

*Medicaid:* Provides health coverage for people of all ages whose incomes are low. To qualify for Medicaid, an individual, couple, or family must meet income and resource guidelines. Income includes money received each month from Social Security, employment, or other sources. Resources refer to the value of items owned such as cash and savings. Some resources, such as the family home and one car, are not counted in determining Medicaid eligibility. To qualify, individuals must be U.S. citizens, with some exceptions for certain categories of non-citizens. Medicaid pays for basic health services and for some services not covered by Medicare such as medicine, nursing home care, eye exams, glasses, transportation for medical care, and other medical services. Medicaid is funded and regulated by both federal and state governments. As a result, Medicaid rules vary from state to state.

*Medicaid Waiver:* Under Section 1915(c) of the Social Security Act, Medicaid law authorizes the Secretary of the U.S. Department of Health and Human Services to waive certain Medicaid statutory requirements. These waivers enable states to cover a broad array of home and community-based services (HCBS) for targeted populations as an alternative to institutionalization. Waiver services may be optional state plan services which either are not covered by a particular state or which enhance the state's coverage. Waivers may also include services not covered through the state plan such as respite care, environmental modifications, or family training. Many states have waiver programs in place to provide for assisted living care.

*Medicare:* A federal health insurance program. Passed in 1965 as Title XVIII of the Social Security Act, Medicare was intended to pay the cost of some health care services in order to ensure access to a basic level of health care for the aged and other eligible persons. Medicare will cover the first 20 days of nursing facility care and will partially pay for the next 80 days for a total benefit not to exceed 100 days. A three-day hospital stay is required to qualify for this benefit.

*Medicare Part A:* Provides payment for post-hospital care in a Medicare certified nursing home. Medicare Part A may provide payment for post-hospital care in a nursing home for up to 100 days if Medicare coverage requirements (the 5 rules) are met. A resident is entitled to full coverage for the first 20 days. From the 21st day through the 100th day, Medicare pays for all covered services except a daily co-pay amount for which the resident is responsible. That means the resident has to pay the co-pay either with his or her own money or, if eligible, through Medicaid, or through private insurance (i.e. medi-gap policy). A nursing home resident will not be entitled to any Medicare Part A coverage unless he or she is admitted to a nursing home within 30 days following a 3-day hospital stay. Medicare certified nursing homes are reimbursed for providing nursing homes stays based upon the Prospective Payment System (PPS).

*Medicare Part B:* Seniors are required to enroll in Medicare Part B. Medicare Part B pays for doctor's services, outpatient hospital care, and some other medical services that Part A does not cover, such as the services of physical and occupational therapists, and some home health care. Part B helps pay for these covered services and supplies when they are medically necessary.

***Medicare Prospective Payment System (PPS):*** Section 4432(a) of the Balanced Budget Act (BBA) of 1997 modified how payment is made for Medicare skilled nursing facility (SNF) services. Effective with cost reporting periods beginning on or after July 1, 1998, SNFs were no longer paid on a reasonable cost basis or through low volume prospectively determined rates, but on the basis of the PPS. The PPS rates are adjusted for case mix and geographic variation in wages and covers all costs of furnishing covered SNF services (routine, ancillary, and capital-related costs). The amount of reimbursement for each resident is based upon the Resource Utilization Groups (RUG) III case mix system.

***Operating Beds:*** The number of beds a facility actually operates. This may be less than the number of licensed beds.

***Private Bed:*** A bed situated in a room with no other beds/residents.

***Private Pay:*** Refers to a resident whose charges are funded by: personal funds, assistance from relatives or other private individuals or groups, or long term care insurance.

***Resident Day:*** A day for which services are rendered and billable, or a day for which a bed or unit is held and billed. For example, if a resident rents and occupies a unit for a full calendar year, that resident would have occupied the bed or unit for 365 resident days.

***RUG-IV:*** RUG IV is a 66-group model for classifying nursing home residents into homogenous groups according to common health characteristics and the amount and type of resources they use. Residents are classified based on residents' clinical conditions, extent of services used, and functional status. The groups are in seven general categories (in general order of costs associated with caring for residents): rehabilitation plus extensive services, extensive services, clinically complex, special care high, special care low, behavioral symptoms and cognitive performance and reduced physical function.

***Semi-private Bed:*** A bed situated in a room with one other bed/resident.

***Ward Bed:*** A bed situated in a room with two or more other nursing beds/residents.

## Licensing Requirements

Skilled Nursing is subject to some level of regulation in every state in the nation. The following summarizes the regulations in the state of California.

| | |
|---|---|
| License Type: | Skilled Nursing Facility (SNF) |
| Regulatory Agency: | California Department of Public Health |
| License Required: | Yes |
| Opening Statement: | California's oversight of long-term care facilities is the most rigorous in the nation and the most comprehensive for any category of provider in the state. The California Department of Public Health, the Department of Social Services, the |

Department of Mental Health and the Department of Developmental Services each plays a role in licensing and regulating care providers.

Providers must meet state licensure standards, and in the skilled setting, are also governed by a stringent set of federal requirements. In addition, several other federal, state and local agencies – including the federal Centers for Medicare and Medicaid, state departments of Aging, Justice and Consumer Affairs and the Office of the State Fire Marshal – also review facility services in California.

Facilities must demonstrate compliance with hundreds of very detailed regulations. To ensure compliance with these standards, CDPH surveyors annually conduct thorough inspections of each facility.

Definition:                    Also called nursing homes, convalescent hospitals, and skilled nursing and rehab centers, these facilities provide comprehensive nursing care for chronically ill or short-term residents of all ages, along with rehabilitation and specialized medical programs.

Facility Scope of Care:        Care which can only be provided by or under the supervision or licensed nursing personnel. Skilled rehabilitation care must be provided or supervised by licensed therapy personnel. All care is under the general direction of a physician and necessary on a daily basis. Therapy that is needed only occasionally, such as twice a week, or where the skilled services that are needed do not require inpatient care, do not qualify as skilled level of care.

Senior housing operators remain optimistic as the nation advances through the health crisis. Skilled nursing is considered needs based, and many consumers find the ability to pay for skilled nursing even in hard times. Operators are focused on navigating the current challenges while prioritizing frontline healthcare workers needs in order to keep seniors safe and healthy. Large operators that can leverage economies of scale are better positioned to manage increased equipment, cleaning and operating costs. The full financial impact of COVID 19 still remains unclear, but providers have responded rapidly to enhance staff, boost infection control measures and stocking inventories of PPE. The broad outlook for skilled nursing providers remains positive with a demographic wave on the horizon that ensures strong demand for aging based businesses.

The skilled nursing segment faces unique challenges as the virus has gripped facilities across the nation and the residents are the most vulnerable due to existing underlying conditions. However, demand for nursing care remains strong as the needs of the population make the possibility of in home care or telehealth care impossible.

## Nursing Care in the US- IBIS July 2021

INDUSTRY DEFINITION-This industry provides living quarters, inpatient nursing and rehabilitation services for people with a chronic illness or disability. Care is usually provided for an extended period to individuals who require help with day-to-day activities but do not need to be in a hospital.

## Supply Chain



### SIMILAR INDUSTRIES



### RELATED INTERNATIONAL INDUSTRIES

# Industry at a Glance

## Key Statistics

 **$129.8bn**
Revenue

| Annual Growth 2015-2020 | Annual Growth 2020-2025 | Annual Growth 2015-2025 |
|---|---|---|
| 0.5% | 2.5% | |

**$11.8bn**
Profit

| Annual Growth 2015-2020 | Annual Growth 2015-2025 |
|---|---|
| -2.9% | |

**9.1%**
Profit Margin

| Annual Growth 2015-2020 | Annual Growth 2015-2025 |
|---|---|
| -1.7% | |

**24,963**
Businesses

| Annual Growth 2015-2020 | Annual Growth 2020-2025 | Annual Growth 2015-2025 |
|---|---|---|
| 2.1% | 2.0% | |

**2m**
Employment

| Annual Growth 2015-2020 | Annual Growth 2020-2025 | Annual Growth 2015-2025 |
|---|---|---|
| -0.2% | 2.0% | |

 **$56.5bn**
Wages

| Annual Growth 2015-2020 | Annual Growth 2020-2025 | Annual Growth 2015-2025 |
|---|---|---|
| 0.4% | 2.1% | |

## Key External Drivers
% = 2015-2020 Annual Growth

**2.8%** Per capita disposable income
**1.3%** Federal expenditure on disability benefits
**-0.5%** Number of people with private health insurance
**3.7%** Federal funding for Medicare and Medicaid
**3.2%** Number of adults aged 65 and older

## Industry Structure

⊘ **POSITIVE IMPACT**

| Revenue Volatility Low | Capital Intensity Low |
|---|---|
| Industry Assistance High | Concentration Low |
| Technology Change Low | Globalization Low |

⊖ **MIXED IMPACT**

| Life Cycle Mature | Barriers to Entry Medium |
|---|---|

⚠ **NEGATIVE IMPACT**

| Regulation Heavy | Competition High |
|---|---|

## Key Trends

- Nursing care facilities have been one of the epicenters of the pandemic
- Rising levels of adult obesity has presented new demand challenges and opportunities for operators
- Providers have been rethinking partnerships and reviewing opportunities to diversify services
- The growing population of senior adults is expected to increase government spending
- Tougher pricing negotiations from private insurance companies will likely offset revenue growth
- Managing facility sizes by maintaining fewer beds will likely help operators keep occupancy rates high
- Revenue has grown steadily alongside the continued aging of the baby boomer population

**Products & Services Segmentation**



| 33.0% | 7.8% | 4.7% | 43.6% | 10.3% | 0.6% |
|---|---|---|---|---|---|
| For-profit nursing homes | Nonprofit nursing homes | Government nursing homes and skilled nursing facilities | For-profit skilled nursing facilities | Nonprofit skilled nursing facilities | Hospice centers |

Nursing Care Facilities
Source: IBISWorld

**Major Players**        % = share of industry revenue



100.0% There are no major players in this ind...

Nursing Care Facilities
Source: IBISWorld

**SWOT**

**S  STRENGTHS**

Low Volatility
Low Imports
High Profit vs. Sector Average
Low Customer Class Concentration
Low Capital Requirements
High & Increasing Level of Assistance

**W  WEAKNESSES**

High Competition
High Product/Service Concentration
Low Revenue per Employee

**O  OPPORTUNITIES**

High Revenue Growth (2020-2025)
High Performance Drivers
Federal funding for Medicare and
Medicaid

**T  THREATS**

Low Revenue Growth (2005-2020)
Low Revenue Growth (2015-2020)
Low Outlier Growth
Number of people with private health
insurance

## Industry Performance

**Revenue for the Nursing Care Facilities industry has grown at an annualized rate of 0.5% to $129.8 billion over the five years to 2020.**

Revenue has grown steadily during most of the period alongside the continued aging of the baby boomer population, which spurred demand for much needed industry services. The number of adults aged 65 and older has increased an annualized 3.2% over the five years to 2020.

## Industry Performance



Since the elderly are more prone to injury and illness, they therefore require more assistance with daily activities, and thus, the growing share of senior adults has propelled demand for services offered by nursing care facilities. In 2020 alone, industry revenue is expected to decline 1.0% as a result of the COVID-19 (coronavirus) pandemic. Nursing care facilities have been one of the epicenters of the pandemic, accounting for more than 40.0% of all related deaths across the United States. However, the industry has been aided by the Coronavirus Aid, Relief and Economic Security (CARES) Act, which included $4.9 billion in relief funds for skilled nursing facilities.

According to data from the US Census Bureau and IBISWorld estimates, the number of adults aged 65 and older is forecast to increase at an annualized rate of 3.1% to 65.0 million over the five years to 2025. To account for these demographic changes and the rising cost of healthcare, federal funding for Medicare and Medicaid is slated to rise an annualized 4.2% to $1.3 trillion over the five years to 2025. However, an unstable federal reimbursement model amid an uncertain regulatory environment for the Healthcare and Social Assistance sector (IBISWorld report 62) as a whole is likely to present challenges for operators during the outlook period, specifically for nonprofit and government-funded facilities. Nevertheless, the industry is expected to continue expanding, as the growing number of adults aged 65 and older will likely drive growth. These favorable demographic trends are expected to outweigh potential impediments to growth, and consequently, revenue is expected to increase, rising at an annualized rate of 2.5% to $147.1 billion over the five years to 2025. However, declining reimbursement rates are expected to mute industry profit growth during the outlook period.

### Key External Drivers

### Federal funding for Medicare and Medicaid

Most nursing homes are certified to provide services under Medicare and Medicaid programs. Medicare and Medicaid reimbursements account for 75.0% of industry revenue. Federal funding and terms of access to these programs affect industry demand and the price charged for those services. Although federal funding for

Medicare and Medicaid is expected to increase in 2020, continuing reimbursement pressure and regulatory uncertainty pose a potential threat to the industry.

### Number of adults aged 65 and older

More than 84.0% of all nursing home residents are older than 65, while 41.6% are 85 or older. Therefore, the rate of growth in these age groups affects demand for nursing home care. The number of adults aged 65 and older is expected to increase in 2020, representing a potential opportunity for the industry.

### Federal expenditure on disability benefits

The US Census Bureau defines disability as a long-lasting sensory, physical, mental or emotional condition. These conditions may make it difficult for a person to perform daily activities, meaning individuals may require nursing care in a facility. As disability expenditure increases, demand for industry services also rises. Federal expenditure on disability benefits is expected to increase in 2020.

### Number of people with private health insurance

Private insurance can reduce patients' out-of-pocket costs, as people are more likely to use services when they are covered by insurance, therefore boosting demand for industry services. Nonetheless, payments made through private health insurance make up only a small portion of total industry revenue. The number of people with private health insurance is expected to decline slightly in 2020.

### Per capita disposable income

As household income rises, consumers are more likely to purchase insurance and can afford out-of-pocket expenses. In addition, households become better able to pay for their elderly family members' stay in nursing facilities. Consequently, a rise in disposable income can result in greater demand for industry services. Per capita disposable income is expected to increase in 2020.



# Current Performance

The aging of the population, in particular, has helped to sustain revenue expansion as baby boomers have reached retirement age. Despite this favorable demographic trend, fluctuating Medicare and Medicaid

reimbursement at the state level continued to present challenges to operators. In response, many companies active in the industry have adopted progressive acquisition strategies and leveraged a multitude of cost mitigation techniques in an effort to boost both efficiency and occupancy rates. As the industry has shifted to for-profit facilities, many operators have been able to capitalize on an increase in per capita disposable income in the United States as well. Consequently, IBISWorld estimates that industry revenue has grown at an annualized rate of 0.5% to $129.8 billion over the five years to 2020.

However, 2020 is expected to be among the most challenging in the industry's history as a result of the COVID-19 (coronavirus) pandemic. Nursing care facilities have been one of the epicenters of the pandemic, accounting for more than 40.0% of all related deaths across the United States. In at least 18 states, nursing homes account for more than 50.0% of all coronavirus deaths across the state. As a result, occupancy rates have declined substantially in 2020, as individuals have increasingly sought to avoid industry facilities. In response to the substantial financial challenges, the Coronavirus Aid, Relief and Economic Security (CARES) Act included $4.9 billion in relief funds directly for skilled nursing facilities, which was released in May 2020. This is expected to mitigate the industry's decline, with revenue projected to fall 1.0% in 2020. However, the average industry profit margin, measured as earnings before interest and taxes, has declined during the period, accounting for 9.1% of revenue in 2020.

## Changing demands

IBISWorld estimates that the number of adults aged 65 and older has increased at an annualized rate of 3.2% over the five years to 2020. As this sizable demographic continues to age, industry operators have pivoted to providing more specialized care for illnesses, particularly those pertaining to dementia, such as Alzheimer's disease. Indeed, leading providers, including HCR ManorCare, cater programs for residents with various stages of dementia.

In addition, incoming residents now typically arrive with more complex medical issues than in previous decades, requiring more extensive care and specialist services. For example, rising levels of adult obesity, a condition that typically lends numerous comorbidities, has presented new demand challenges and opportunities for nursing care operators. Additionally, to appropriately care for short-stay patients that have higher levels of acuity and a frailer and more unstable long-stay resident population, operators have taken steps to improve the delivery of clinical and hospitality services for short-stay patients that have higher levels of acuity as well as unstable long-stay residents. Facilities are able to achieve this by adjusting staffing levels, assisting physician oversight through the help of nurse practitioners, partnering with specialty clinics and enhancing nursing skills via ongoing education and improving clinical case management.

Nonetheless, reimbursement rate challenges have caused industry employment to decline, which has fallen an annualized 0.2% to 1.7 million workers over the five years to 2020. However, industry wages have grown at an annualized rate of 0.4% to $56.5 billion during the same period.

## *Uncertain government reimbursement rates*

Government funding for nursing care facilities is provided primarily through Medicare and Medicaid.

Combined, these programs account for an estimated 77.8% of industry-relevant revenue for the average nursing care facility in the United States. Medicare is a federal system of health insurance for people over 65 years of age and select younger demographics with disabilities, whereas Medicaid is a joint state and federal health insurance program that provides health coverage for low-income individuals. Medicare and Medicaid payments to nursing care facilities are based on changeable payment rates determined by the Centers for Medicaid and Medicare Services, which provides various reimbursement levels according to patient acuity. As a result, any changes, cuts or potentially volatility in terms of sources of federal funding represent a potential threat to industry operators.

## Changing landscape

As a result, providers have been rethinking partnerships and reviewing opportunities to diversify services to maintain profit while keeping occupancy high. Over the past five years, there has been a shift away from nursing homes and toward managed care at-home, adult daycare centers and visits to specialists, since many elderly individuals prefer to remain in their homes. In fact, many nursing facility residents do not require 24-hour nursing care, and services provided several times a week by a home-care attendant often suffice. To expand community-based long-term care services, federal funding has been used to assist states in rebalancing their services.

Furthermore, companies have begun expanding other business segments to diversify their revenue streams. For example, industry operators have started offering specialized services that attract patients with workers' compensation or private insurance, and have also moved into community-based services that have multiple funding streams. This strategy, coupled with many industry operators leaving the industry, has contributed to sluggish growth in the total number of industry operators. IBISWorld estimates that the number of industry enterprises, including non-employers, has increased at an annualized rate of 2.1% to 24,963 operators over the five years to 2020.

## Demand Determinants

Demand for the Nursing Care Facilities industry is influenced by the size and age distribution of the population; the level of and changes in household incomes and wealth; and the scope, availability, effectiveness and cost of both nursing care facilities and alternative or substitute services.

As the population ages, more individuals require the services of nursing care facilities because older adults are more susceptible to injuries and illnesses that prevent the performance of daily activities.

**Demand for nursing care facilities is influenced by the affordability of services.**

**Major Markets**



Major Market Segmentation

2020 INDUSTRY REVENUE

**$129.8bn**

Nursing Care Facilities
Source: IBISWorld

Over the five years to 2020, there has also been an increasing availability of alternatives to nursing facilities (e.g. assisted living) and a rising use of community services (e.g. home healthcare), resulting in significant changes to the profile of the typical Nursing Care Facilities industry resident.

### Age

The proportion of elderly adults in nursing homes has declined over the past two decades, most noticeably over the past five years. Reasons for this trend include reductions in disability rates among elderly people, improvements in mechanisms for coping with disability and changes in the residential and long-term care options available to elderly people with disabilities. Nonetheless, an estimated 41.6% of nursing care residents are aged over 85 in any given year. In contrast, 15.5% of residents are aged younger than 65.

Four-fifths of elderly people in nursing care facilities are long-stay residents (90 days or longer) and nearly half of elderly residents can be considered permanent residents (one year or longer). The typical long-stay resident is over age 85 (53.0%), female (76.0%) and widowed (60.0%).

Disease prevalence is higher among elderly nursing home residents today than they were five years ago, and they are more likely to suffer from multiple conditions, indicating a sicker population within facilities. This is likely attributable to the rising availability of alternatives to nursing care facilities, which causes people to use nursing care only when it is most necessary. More than two-thirds of long-stay residents have multiple physical conditions and close to 40.0% have both physical and cognitive conditions. The percentage of long-stay residents who receive help from another person in five activities of daily life (ADLs) has also been on the upswing. An estimated 41.0% of these residents do not walk, and only 18.0% walk independently without help or supervision.

# Competitive Landscape

**Market Share Concentration in this industry is  Low**

Despite recent mergers within the Nursing Care Facilities industry and consolidation over the five years to 2020, the industry is still highly fragmented, characterized by several local and regional providers. Census data indicates that the top four companies in the industry generated less than one-fourth of total industry revenue. Moreover, a majority of the businesses in the industry are single facilities and privately owned. Based on data from the Centers of Medicare and Medicaid Services, for-profit operators of nursing home facilities account for an estimated 65.0% of nursing homes, 30.0% are operated as voluntary nonprofit facilities and the remaining 5.0% are owned by the government and other facilities.

The fragmented nature of the industry provides opportunity for aggressive and complementary healthcare companies to acquire smaller facilities to establish a foothold in new regional markets. However, some of the industry's largest chains have been divesting beds over the past five years. As a result of high liability costs in numerous states, several national chains have divested facilities across the United States.

## PROFIT

Profit, defined as earnings before interest and taxes, is estimated to account for 9.1% of total revenue for the average industry operator in 2020. Profitability in the Nursing Care Facilities industry is affected by several factors, including occupancy rates, sources of payment, terms of reimbursement, the acuity level of patients and facility ownership or lease terms. The types of patient stay and care provided have affected profit margins greatly over the five years to 2020, and these trends are expected to continue. Treatment in nursing care facilities has broadened to include subacute admissions and short-stay residents who typically provide lower profit due to high operator expenses at the beginning and end of stays. While rising operating costs strained some companies during the period, several operators were able to implement cost-saving techniques to buoy their profit margins.

Occupancy rates measure the degree to which facilities are fully using the number of beds that are available for patients. Occupancy varies between states and regions. If beds are in demand, which goes hand-in-hand with high occupancy, nursing homes in that region can refuse fixed-payment, government-reimbursed residents in favor of those with private insurers. In contrast, in areas of low occupancy, operators are forced to accept a greater number of low-paying Medicaid and Medicare residents, and private-pay rates will be competitive because payers will bid facilities against each other for services. As a result, profitability in low-occupancy areas tends to be lower. In 2020, industry profitability is projected to decline as a result of falling occupancy rates stemming from concerns about the COVID-19 (coronavirus) pandemic. Nursing homes have been hard hit by coronavirus, accounting for more than 40.0% of all coronavirus deaths across the country, including rates of more than 50.0% in individual states.



*Wages*

Employee-related expenses make up the largest expense category in the industry. Based on data from the US Census Bureau and IBISWorld estimates, annual payroll accounts for an estimated 43.5% of industry revenue in 2020, representing a slight decline from 43.7% in 2015. Although the industry has grown, pressure from spending cuts related to the sequestration and lower reimbursement rates have caused employment to grow at a slower pace over the past five years. As a result, wages' share of revenue has fallen slightly over the past five years, despite overall wage growth.

When expressed as a percentage of revenue, employee-related expenses can vary by company depending on several factors, including the size of the portfolio of facilities, the type of facilities in the portfolio, the location of facilities and the extent to which some facility-based and corporate functions may be outsourced. Nonprofit operators typically spend slightly more on wages than for-profit companies.



*Purchases*

Purchases comprise an estimated 6.4% of total industry revenue in 2020. Purchases include anything that is required on a daily basis to keep the nursing care facility running, including food, beverages, medications, medical equipment and supplies and other goods. Over the past five years, purchases have increased to accommodate the rising needs of nursing care facility residents, although their share of industry revenue has remained relatively stable.

*Depreciation*

Operators incur costs to develop and own facilities, and depreciation and interest expenses can be significant. IBISWorld estimates that depreciation will account for 2.4% of industry revenue in 2020.





# MARKETING

IBISWorld estimates that marketing costs will consume 0.2% of total revenue in 2020.



## *Rent*

Rent is expected to account for an estimated 5.0% of industry revenue in 2020. If facilities are leased, rent can be a significant expense. Instead of owning nursing homes, many industry operators lease facilities, including from

real estate investment trusts. Rental expenditure has risen slightly as a share of industry revenue over the past five years.

*Utilities*

Electricity costs have declined as operators have increasingly adopted energy-efficient technologies in nursing homes. In 2020, utilities are expected to account for an estimated 1.2% of industry revenue.

*Other costs*

Direct nursing care expenses primarily include patient care salaries, payroll taxes, employee benefits, pharmaceuticals, medical equipment and suppliers and other inpatient costs. Length of stay affects direct care expenses because if lengths of stay decline, care expenses increase, Expenses are often highest during the earliest and later days of a stay because of increased labor expense to evaluate the patient and determine the medical and social services needs of the family. Expenses are also normally higher during the last days of care because patients generally require greater services (especially for hospice care) including drugs, medical equipment and nursing care for deteriorating medical conditions or preparation for a patient's transition to another setting.

Other major costs include repair and maintenance of facilities and equipment, various professional and business fees, as well as patient care liability insurance costs. Professional liability costs have been declining to an extent over the past five years. This trend is driven by a reduction in the average severity of claims and stabilization in the frequency of claims.

# Industry Outlook

In addition, growth in per capita disposable income is expected to accelerate during the outlook period, enabling families to purchase better private healthcare and nursing care services for their loved ones. Nonetheless, growing



Industry Outlook
2020–2025

Nursing Care Facilities
Source: IBISWorld

demand for industry services is expected to be partially offset by decreasing government reimbursement.

the continued movement toward at-home managed care services as the government explores opportunities to contain rising healthcare costs. Thus, industry revenue is forecast to rise at an annualized rate of 2.5% to $147.1 billion over the five years to 2025.

### Elderly population grows

The number of adults aged 65 and older is expected to increase at an annualized rate of 3.1% over the five years to 2025. Given that the elderly people are more prone to injuries that require assistance with daily living, demand for nursing care facilities is expected to rise along with the older population. Although spending on industry services from private sources is expected to increase, the growing population of senior adults is expected to increase government spending through Medicare and Medicaid. Medicare and Medicaid are expected to increase spending on industry services at an annualized rate of 4.2% over the five years to 2025, according to IBISWorld estimates. Similarly, the Centers for Medicare and Medicaid Services (CMS) forecasts that Medicaid, the joint state and federal health insurance program that provides health coverage to low-income individuals, will increase spending on nursing care facilities during the same period.

### Managed care and declining reimbursement rates

Although Medicare and Medicaid will likely continue to constitute most funding for industry services over the next five years, uncertainty surrounding healthcare legislation under a new administration is expected to present challenges to nursing facilities, hospitals, hospices and other long-term care providers. Despite these expected obstacles, the CMS reimbursement rate to skilled nursing facilities is expected to rise between 2020 and 2021, contributing to an increase in industry revenue.

Fluctuating Medicare and Medicaid reimbursement rates and tougher pricing negotiations from private insurance companies are expected to partially offset revenue growth. Over the next five years, states are expected to trim benefits and turn to private insurance companies to provide managed care, a trend encouraged by previous healthcare legislation. Managed care companies will likely attempt to reduce costs by keeping Medicaid patients at home whenever possible and are expected to negotiate reimbursement rates downward.

### Consolidation redefines landscape

Over the coming years, industry consolidation is expected to continue, with the number of operators expected to rise an annualized 2.0% to 27,577 enterprises over the five years to 2025, well below the rate of industry revenue projections. Industry operators that opt to consolidate are expected to benefit from shared operational expenses and economies of scale. In addition, merged companies are expected to be more capable of achieving economies of scale by offering more complete nursing care services, enabling individual providers to simultaneously offer skilled nursing care, long-term residential care and specialized healthcare services. This trend is expected to complement trends among the industry's patient base, since the number of patients with complex medical conditions that require multiple service and treatment sites is expected to rise.

Short-stay, post-acute patients are more profitable for nursing homes than traditional custodial care of Medicaid patients. Given the higher intensity of care required, Medicare and managed-care payments are up to three times higher than the average Medicaid reimbursement. By growing their short-stay patient base, nursing care facilities are able to offset losses on other Medicaid patients. These modifications are expected to lead to slow profit growth over the next five years. The average industry profit margin, measured as earnings before interest and taxes, is expected to increase slightly over the next five years, accounting for 9.3% of revenue in 2025.

In addition, managing facility sizes by maintaining fewer beds will likely help operators keep occupancy rates high, promote advancement in high-quality treatment, which has become a necessity in this highly regulated industry, and support increasing private fees. Stalled growth in facilities will likely enable owners, residents and capital markets to focus on strengthening the nursing care model. Employment growth is expected to outpace the growth of new facilities. Thus, industry employment will likely rise at

### Performance Outlook Data

| Year | Revenue | IVA | Estab. | Enterprises | Employment | Exports | Imports | Wages | Domestic Demand | Number of senior adults - 65 years and older |
|------|---------|-----|--------|-------------|------------|---------|---------|-------|-----------------|-----------------------------------------------|
|      | ($m) | ($m) | (Units) | (Units) | (People) | ($m) | ($m) | ($m) | ($m) | (Million) |
| 2020 | 129,790 | 71,388 | 33,193 | 24,963 | 1,670,289 | N/A | N/A | 56,463 | N/A | |
| 2021 | 134,140 | 73,417 | 33,884 | 25,469 | 1,709,990 | N/A | N/A | 57,915 | N/A | |
| 2022 | 137,991 | 75,291 | 34,592 | 25,995 | 1,747,226 | N/A | N/A | 59,256 | N/A | |
| 2023 | 139,763 | 76,225 | 35,157 | 26,432 | 1,768,111 | N/A | N/A | 59,975 | N/A | |
| 2024 | 141,507 | 77,190 | 35,745 | 26,889 | 1,789,839 | N/A | N/A | 60,714 | N/A | |
| 2025 | 147,144 | 79,922 | 36,687 | 27,577 | 1,845,700 | N/A | N/A | 62,714 | N/A | |

### Industry Life Cycle

The life cycle stage of this industry is ⊖ Mature

LIFE CYCLE REASONS

Nursing care facilities have long been part of US communities; drastic development is not expected

The industry relies on funding from government programs, limiting expansion

There are less expensive substitutes for nursing home care

Growth in the aged population will boost revenue



Indicative Industry Life Cycle

Nursing Care Facilities
Source: IBISWorld

an annualized rate of 2.0% to 1.8 million workers over the five years to 2025.

The Nursing Care Facilities industry is in the mature stage of its life cycle. Over the 10 years to 2025, industry value added (IVA), which measures the industry's contribution to the US economy, is expected to grow at an annualized rate of 1.1%. This growth rate indicates that the industry will expand at a similar pace as the US GDP, which is projected to increase at an annualized rate of 1.9% during the same period. While demographic trends will continue to promote industry growth, nursing care facilities have been part of US communities since the early 20th century. Although facilities have experienced changes in licensing and funding models, the industry has not been subject to major transformation. In recent years, the industry's leading operators have expanded by acquiring other facilities to grow their geographic footprint. Consolidation of this nature is indicative of a mature industry.

The number of adults aged 65 and older has been expanding and will continue to increase as a portion of the total population. This will bolster demand for industry services but is unlikely to spur a dramatic rise in demand. This is particularly true given current healthcare legislation, which encourages individuals to choose at-home care and community care services instead of nursing home services. Additionally, the positive effects of an aging population on industry demand will be softened by improvements in medical treatments and procedures, which are likely to result in later onset of frailty.

BBG

**Marcus Millichap**

The following analysis was compiled utilizing information from *the* Marcus & Millichap National Report on Seniors Housing Research Second Half 2021.

*Mass Vaccination Efforts Quell Fear-Induced Headwinds*

**Unique disruption dislodged historically stable sector**

Seniors housing has been resistant to economic downturns in the past, as there are few alternatives to the care-based services. The pandemic, however, put the sector in the eye of the storm as vulnerable population groups comprise virtually all of the resident pool. Early outbreaks at several facilities led to a surge in move-outs and stalled move-ins. Headwinds lingered into the early months of this year, prior to the widespread vaccine rollout. According to NIC MAP® Data Service, year-over-year occupancy declines as of March spanned from 730 basis points for CCRC/LPC to 960 basis points for memory care. There is light at the end of the tunnel, however, with two-thirds of U.S. adults at least partially inoculated and few outbreaks at seniors housing communities in recent months. A demand tailwind may emerge as more people return to offices and are unable to provide in-home care. Still, occupancy will likely take beyond this year to recover, with intense competition for residents as many facilities are competing to fill units simultaneously.

**Industry grapples with oversight and workforce dynamics**

Influenced by the pandemic and political transition, the seniors housing sector faces heightened regulations. Adapting to these ordinances may be costly for operators, especially as many wrestle with significant revenue declines. It was estimated that seniors housing providers had incurred financial losses of $22.5 billion in the 12 months following the onset of the pandemic. Contributing to this was an uptick in operational expenses and insurance premiums. Many buildings had to upgrade infrastructure or implement systems to combat the spread of the virus, while insurance coverage became historically stringent. Underlying costs could remain elevated as a labor shortage, which was already a concern before the health-crisis exacerbation, requires operators to utilize aggressive compensation to lure workers.



**Strained assets face inflection point; buyers coming off the sidelines**

Many operators were able to stay afloat over the past 15 months, buoyed by government assistance. As the economy recovers, the likelihood of additional support will dwindle. The second half of this year will be a crucial point for some facilities. Generally, assets that were in good financial standing prior to the pandemic are in a position to overcome challenges and move toward recovery. Struggling properties, however, could come to market and some may be redeveloped. Removal of this stock, alongside a construction pipeline that has contracted 25 percent since March of last year, could support occupancy. Listings of quality assets should improve as well, with many who were waiting on the sidelines for the most difficult stretch to pass now more confident in the investment landscape. Meanwhile, capital has accumulated and both private investors and institutions are eager to acquire seniors housing assets as many view the current dynamic as a short-term interruption rather than a long-term fracture.



**Robust demand will materialize in the Sunbelt**

An accelerated expansion of the older adult population driven by the aging baby boomer generation and longer life expectancies will buoy demand for seniors housing over the long term. Sunbelt markets will lure a heavy share of this subset as retirees frequently prioritize quality-of-life considerations such as cost of living and climate when relocating. The 65-plus cohorts in the 10 most populous markets in Florida and Texas are each projected to grow by at least 35 percent over the next decade. Combined, these 10 metros will add 2.1 million residents over the age of 65 by 2030, accounting for one-eighth of national growth. The older adult populations of Phoenix and Las Vegas are poised to expand even more, swelling by an estimated 45 percent or more this decade.



* Forecast
Source: NIC Map® Data and Analysis Service (www.nicmap.org)

## Independent Living

**Unbalanced conditions will produce an uneven recovery.** Independent living facilities fared better than some other levels of care during the health crisis, with lockdown provisions less disruptive to operations. Still, negative net absorption of at least 2,500 units in each of the past four quarters, combined with 10,250 new units, led to a 70 percent increase in total vacant stock. As such, the occupancy rate in the U.S. fell 850 basis points year over year to 77.7 percent in March. Declines ranged from more than 1,000 basis points in high-density primary markets like Los Angeles and New York City to under 500 basis points in fast-growing Sunbelt markets such as Nashville and Raleigh. Despite lower occupancy nationally, the average rent grew 1.3 percent to $3,315 per month. Incoming supply could impede recovery momentum in 2021 as 21,680 units, or 8.3 percent of inventory, was under construction in March.

## Assisted Living

**Construction slowdown welcomed after widespread disruption.** Assisted living was one of the most impacted levels of care during the health crisis. Negative net absorption of 28,000 units during the past four quarters compounded a national stock expansion of 3.2 percent, or 12,600 units. This curtailed occupancy by 950 basis points to 75.5 percent in March. Every U.S. market with an inventory larger than 2,000 units posted a decline of at least 400 basis points. Nevertheless, rent sustained a positive trajectory, growing 1.0 percent to $5,144 per month. Recuperating occupancy and returning to the pre-crisis pace of rent growth will take multiple years, though waning supply-side pressure should aid the recovery. As of the first quarter 18,490 units were under construction, the lowest total since 2014.

## Memory Care

**Steep occupancy hurdles fail to impede rent growth.** The initial impact during the pandemic was weighty, a result of memory care communities' shorter lengths of stay and usually rapid turnover. More than 40 percent of the 3,750 units that returned to market in the past year transpired in just the second quarter of 2020. Meanwhile national inventory expanded by 2.3 percent annually as 1,100 units opened. Occupancy fell 960 basis points to 73.2 percent in March, though declines were less dramatic in areas experiencing strong retiree in-migration like the Mountain and Gulf Coast regions. Despite the segment's occupancy hurdles, rent grew by 2.2 percent to $6,850 per month, beating the previous year's 0.4 percent rise. As of March, roughly 1,570 units were under construction, the lowest quarter-ending volume in almost a decade.

## CCRC/LPC

**Occupancy less disrupted in CCRC/LPC communities.** In the past 12 months negative net absorption totaled 25,000 units, though 17,200 of those were released during the strenuous second and third quarters of last year. The occupancy rate was 84.3 percent in the first quarter of 2021, down 730 basis points annually, assisted by national stock growing by less than 1 percent. The average rent moved up 1.9 percent to $3,527 per month and a handful of secondary and tertiary markets, which have been garnering a larger share of household growth, had notable jumps. Louisville, Milwaukee, Phoenix and Charlotte posted year-over-year gains larger than 7 percent. Limited construction should help accelerate the recovery with only 6,650 units under construction as of March, a seven-year low for the segment.

## 2021 Forecast

| | CONSTRUCTION: | OCCUPANCY: | RENT: |
|---|---|---|---|
| **INDEPENDENT LIVING** | 4.0% of stock ⌄ 10,380 units will be completed | 78.9% ⌄ 50 BASIS POINT decrease in occupancy | $3,355 per month ⌃ 2.0% increase in average rent |
| **ASSISTED LIVING** | 2.6% of stock ⌄ 10,390 units will be completed | 77.2% ⌄ 70 BASIS POINT decrease in occupancy | $5,205 per month ⌃ 1.8% increase in average rent |
| **MEMORY CARE** | 2.4% of stock ⌃ 1,130 units will be completed | 74.8% ⌄ 70 BASIS POINT decrease in occupancy | $6,935 per month ⌃ 2.3% increase in average rent |
| **CCRC/LPC** | 0.6% of stock ⌄ 2,170 units will be completed | 85.6% ⌄ 10 BASIS POINT decrease in occupancy | $3,585 per month ⌃ 2.7% increase in average rent |

## 2021 Investment Outlook

- **Private buyers find opportunities as REITs await clarity.** Over the past four quarters ending in March, trading activity was nearly cut in half compared with the previous yearlong period. Public entities such as REITs stepped on the brakes. Acquisitions within this segment were down more than 60 percent year over year. Some private investors with longer-term objectives seized the window to obtain assets in a less-competitive bidding environment. Preliminary data shows that REITs are steadily coming off the sidelines as conditions improve, though, which will expand competition for quality-assets in the second half of this year.

- **Average pricing dipped as cap rates inched up.** Seniors housing properties that changed hands during the past 12 months ending in the first quarter had a five-year-low average price of $153,000 per unit, a result of lower-quality assets comprising a bigger share of overall deal flow. The average initial yield was 6.5 percent, up 20 basis points from the trough recorded in 2019. Reduced NOI as a result of higher vacancy and greater expenses is a factor behind the uptick in cap rates.

- **Deal flow down in most of the country, with a few scattered exceptions.** Within the continental U.S. all but six states recorded year-over-year contractions in trading activity. Among the outliers, Washington and Montana posted the most notable improvements. Conversely, a handful of East Coast states including Connecticut, Massachusetts, Maryland and Pennsylvania recorded transaction velocity moderations of at least two-thirds. The three most prominent states for seniors housing activity — Florida, Texas and California — each recorded slower deal flow annually but combined for 32 percent of trades that took place in the U.S. over the past year.



*Through 1Q*
*Ownership structure as of 2019*
*Source: NIC Map® Data and Analysis Service (www.nicmap.org)*

**INTRODUCTION TO SENIOR CARE/HOUSING INDUSTRY**

### Fed positions for temporary higher inflation period

Applying lessons learned from the global financial crisis, Congress and the Federal Reserve acted swiftly to preserve market liquidity and support borrowers amid the pandemic last year. As U.S. infections recede and the economy reopens, attention is shifting to the potential longer-term ramifications of these actions. The rapid increase in money supply from multiple stimulus provisions paired with low interest rates and disrupted supply chains has led to higher inflation, with core CPI climbing 3.8 percent annually in May. While above earlier expectations, the Federal Open Market Committee (FOMC) still considers this a transitory concern and intends to allow inflation to stay above the traditional 2 percent growth target for longer than it has in the past. The Fed also expects to keep the overnight lending rate low for the near future, citing still-high unemployment as one reason to hold off. More committee members are now open to the prospect of raising rates in 2023, however. Current quantitative easing practices will also remain in effect for the time being. The FOMC will wait for more substantial economic progress before tapering asset purchases, although some pandemic period programs have already expired.



Inflation and Interest Rate Trends

— Core Inflation    — 10-Year Treasury Rate

*Through May
Sources: BLS; Federal Reserve; Real Capital Analytics

2020 Seniors Housing Lender Composition

■ CMBS
□ Investor-Driven
■ Private/Other
▣ Government Agency
▤ Insurance
□ International Bank
▦ National Bank
■ Regional/Local Bank

### Capital available for well-performing seniors housing assets as marketplace reopens.

Following significant disruptions last year, the majority of lenders are now active and anticipating larger volume after 2020's slowdown. Sentiment is improving, aided by greater population mobility that will help properties in commercial and travel hubs that were disproportionately affected by lockdowns. Lenders are nevertheless favoring borrowers with whom they have an established and positive relationship. A borrower's credit worthiness and track record bear considerable weight when accessing capital, as does recent property performance. The acute health threat poised by COVID-19 challenged numerous seniors housing facilities. Properties that have stabilized operations and are well positioned to capture future demand from changing demographics can obtain financing. Government-sponsored agencies are the primary lenders to seniors housing assets in the current marketplace. Other financiers, including banks and debt funds, may provide capital on a case-by-case basis. Overall, while lending volume is not anticipated to recover to 2019 levels, the impact of the health crisis on capital availability is expected to be less severe than that of the global financial crisis. The external nature of the health problem and critical efforts taken by Congress and the Federal Reserve have maintained and are improving liquidity in the market.

BBG

## PRIMARY MARKET ANALYSIS

### *Competitive Properties*

We searched for smaller facilities similar to the subject property. We were able to locate several facilities; however, most were significantly inferior in regards of development, age, services offered and overall investment profile. All the properties are presented on the following map. We later present only the properties considered direct comparables in the Income Capitalization section of this report with more detail.



The majority of these assisted living facilities are for 6 beds or less, and the subject will offer multiple amenities including exercise/yoga room, game room, beauty salon, dining room, courtyard, etc. The following are the facilities located in the subject's primary market area which will compete with the subject.

| Name | ALF Beds MC Beds IL Beds | YOC | Occup. |
|---|---|---|---|
| **PRIMARY MARKET SUPPLY** | | | |
| **Pacifica Senior Living** | 60 | 1990 | 86% |
| 2211 East Gonzales Road | 40 | Ren | |
| Oxnard, CA | 0 | 2017 | |
| | 100 | | |
| **Atria Los Posas** | 50 | 1997 | 98% |
| 24 Las Posas Road | 40 | | |
| Camarillo, CA | 50 | | |
| | 140 | | |
| **AlmaVia of Camarillo** | 64 | 2002 | 96% |
| 2500 Ponderosa Drive North | 24 | | |
| Camarillo, CA | 0 | | |
| | 88 | | |
| **The Palms at Bonaventure** | 86 | 2006 | 88% |
| 111 North Wells Road | 20 | | |
| Ventura, CA | 0 | | |
| | 106 | | |
| **The Lexington Assisted Living** | 101 | N/A | 80% |
| 5440 Ralston Street | 14 | | |
| Ventura, CA | 0 | | |
| | 115 | | |
| **Total** | **499** | | |

In the analysis to follow we will examine current market conditions for supply and demand of memory care levels of care. Based upon interviews with facility administrators within the market and our experience with seniors housing supply and demand analysis; we determine the subject's market area to be the area within a five-mile radius of the subject site. The primary market area is the area from which a majority of the subject's tenants will come from and will provided a basis for demand for the subject's services, however it is not meant to indicate tenants will be drawn exclusively from this area. Refer to the map of the primary market area in the previous page.

We will use population demographic information from the 2021 report from Spotlight.

**NOTE: IT IS IMPORTANT TO UNDERSTAND LICENSING OF "BEDS".** State licensing per each facility is listed by number (Capacity) of "beds" licensed. This is often confusing as to how many actual rental units there are. "Beds" may include a number, in excess of actual units, to allow for the addition of spouses in some units. In other places, all units are assumed to be able to be double-occupied although in actual practice they are not. When we do our survey for the full market study, we note capacities by "beds" only when we do not have the actual number of units/apartments available.

REGENCY PALMS OXNARD

PAGE 45

BBG

Plat Map

SITE ANALYSIS

SUBJECT

CITY OF OXNARD
Ventura County Assessor's Map.

RANCHO EL RIO DE
SANTA CLARA O'LA
COLONIA
PORTION SUB. 44

Tract 2269 M.R. Bk.63 Pg.35 (Reversion)
Tract 2158 M.R. Bk.56 Pg.14 (Condominium)
Tract 2137 M.R. Bk.55 Pg.58 (Reversion)
Rancho Colonia M.R. Bk.4 Pg.14
Tract 1570 M.R. Bk.43 Pg.57
Tract 2238 M.R. Bk.59 Pg.42 (Reversion)

Tax Rate Area
03033

221-06

AUTUMN YEARS

PAGE 46

SITE ANALYSIS

BBG

SITE ANALYSIS

| LAND DESCRIPTION | | | |
| --- | --- | --- | --- |
| **Physical Description** | | | |
| **Gross Site Area (SF)** | 102,946 | | |
| **Gross Site Area (Acres)** | 2.36 | | |
| **Assessor Parcel Number** | 221-0-063-185 | | |
| **Shape** | Generally rectangular | | |
| **Topography** | Generally level | | |
| **Street, Access, and Frontage** | | | |
| **Street** | Bismark Way | Albany Drive | Concord Drive |
| **Frontage Feet** | 650 Feet | 60 Feet | 50 Feet |
| **Curbs** | Yes | Yes | Yes |
| **Sidewalks** | Yes | Yes | Yes |
| **Lanes** | Two | Two | Two |
| **Direction of Traffic** | East/West | North/South | North/South |
| **Signals/Traffic Control** | Yes | Yes | Yes |
| **Access/Curb Cuts** | None | One | One |
| **Visibility** | Average | Average | Average |
| **Zoning** | Garden Apartment Planned Development | | |
| **Flood Area Panel No. & Date** | 06111C0916E | January 20, 2010 | |
| **Flood Zone** | X | | |
| **Type** | **Evaluation** | | |
| **Visibility** | Average | | |
| **Functional Utility** | Assumed Adequate | | |
| **Adequacy of Utilities** | Assumed Adequate | | |
| **Landscaping** | Average | | |
| **Drainage** | Assumed Adequate | | |
| **Utilities** | | | |
| **Water** | City of Oxnard | | |
| **Sewer** | City of Oxnard | | |
| **Electricity** | Southern California Edison | | |
| **Public Transportation** | Gold Coast Transit | | |
| **Other** | | | |
| **Detrimental Easements** | Unknown | | |
| **Encroachments** | No | | |
| **Reciprocal Parking Rights** | No | | |
| **Deed Restrictions** | Unknown | | |
| *Compiled from Various Sources By BBG, Inc.* | | | |

## Environmental Issues

The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site. The existence of hazardous materials or underground storage tanks may affect the value of the property. For this appraisal, we have specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

A Phase I Environmental Site Assessment was performed by Environmental & Regulatory Specialists, Inc. on March 7, 2014. The report had the following conclusions: "The Property was not listed in any environmental database searched by EDR. However, one report flagged during the database search indicates that hazardous contamination has migrated

in the groundwater to under the Subject Property. Based on the records searches, interviews, aerial photos, and Site Reconnaissance, this assessment revealed no evidence of recognized environmental conditions on the Property with the exception of groundwater contamination below the Property."

**Floodplain**

According to the Federal Emergency Management Agency, the subject is located on flood panel 06111C0916E dated January 20, 2010. According to the flood map, the subject is located within Flood Insurance Zone X (shaded). Zone X (shaded) is not located in the 100-year flood plain.



**Soil/Subsoil Conditions**

A geo-technical analysis describing the soil and subsoil conditions at the site was not furnished to the appraiser, however based on surrounding development; it appears that soil/subsoil stability is adequate for development.

**Conclusion**

The site is well located and afforded average access and visibility from roadway frontage.  The size of the site is typical for the area and use, and there are no known detrimental uses in the immediate vicinity. The net site area for development is approximately 102,946 SF, or 2.36 acre site. Overall, there are no known factors which are considered to prevent the site from development to its highest and best use, as if vacant, or adverse to the existing use of the site.

**Site Plan**

**IMPROVEMENT ANALYSIS**



## Floor Plan – 1st Floor

MC-2D
MC-2B
(N) MC-2B
MC-2C
STOR
MC-2E
MC-2A
MC-1A
(N) MC-2A
LIVING
KITCH.
DINING
BOIL.
CARE OFFICE/MED RM
OFFICE
MC OFF.
SPRINK.
SALON
ADULT DAYCARE
RESPITE
REHAB THERAPY
RECEPT.
LOBBY
DINING ROOM
VESTIBULE
KITCHEN
CATERING OFFICE
FRIDGE
STOR.
MECH.
MC LAUNDRY
CLUB ROOM
BISTRO
MED. STOR.
CARE OFFICE
LIN.
AL- 0D
AL- 0B
AL- 0C
AL- 0A
AL- 0E
FITNESS CENTER
LIVING/ART STUDIO
LINEN

| UNIT MIX | | | | | |
|---|---|---|---|---|---|
| Unit Type | Unit Name | Beds | Qty | Area (SF) | Total (SF) |
| ASSISTED LIVING - STUDIO EXIST | AL- 0A | 2 | 41 | 285 | 11,685 |
| ASSISTED LIVING - STUDIO EXIST | AL- 0B | 2 | 6 | 295 | 1,770 |
| ASSISTED LIVING - STUDIO EXIST | AL- 0C | 2 | 3 | 280 | 840 |
| ASSISTED LIVING - STUDIO EXIST | AL- 0D | 2 | 1 | 315 | 315 |
| ASSISTED LIVING - STUDIO EXIST | AL- 0E | 2 | 1 | 291 | 291 |
| MEMORY CARE - 1 BED | MC-1A | 1 | 8 | 93 | 1,272 |
| MEMORY CARE - 2 BED | (N) MC- 2B | 2 | 2 | 285 | 589 |
| MEMORY CARE - 2 BED | (N) MC-2A | 2 | 1 | 285 | 285 |
| MEMORY CARE - 2 BED | MC-2A | 2 | 32 | 285 | 9,120 |
| MEMORY CARE - 2 BED | MC-2B | 2 | 6 | 285 | 1,770 |
| MEMORY CARE - 2 BED | MC-2C | 2 | 2 | 285 | 518 |
| MEMORY CARE - 2 BED | MC-2D | 2 | 1 | 280 | 280 |
| MEMORY CARE - 2 BED | MC-2E | 2 | 1 | 315 | 315 |
| | | 202 | 105 | | 29,050 sq ft |

1 FIRST FLOOR
SCALE: 1/16" = 1'-0"

IMPROVEMENT ANALYSIS

Floor Plan — 2nd Floor

IMPROVEMENT ANALYSIS

## IMPROVEMENTS SUMMARY AND ANALYSIS

| | |
|---|---|
| **Property Type** | Assisted Living and Senior Care Facility |
| **Number of Buildings** | 1 |
| **Number of Stories** | 2 |
| **Gross Building Area** | 59,650 SF |
| **Net Leasable Area** | 36,852 SF |
| **Site Coverage** | 54.20% |
| **Land-to-Building Ratio** | 1.73:1 |
| **Parking Spaces:** | 41 |
| **Year Built** | 1960 |
| **Year Remodeled** | 2019 |
| **Actual Age** | 57 Years |
| **Effective Age** | 1 Years |
| **Total Economic Life** | 55 Years |
| **Remaining Economic Life** | 54 Years |
| **Total Number of Units** | 121 |
| **Number of Beds** | 121 |
| **Functional Utility** | Typical |

| Improvement Summary | Description | Condition |
|---|---|---|
| Foundation | Poured-in-place reinforced concrete | Good |
| Frame | Reinforced wood beams | Good |
| Exterior Walls | Wood/stucco | New |
| Interior Walls | Wood studs | New |
| Roof | Pitched roof | New |
| Ceiling | Painted Drywall and acoustic tile ceilings | New |
| HVAC System | Roof mounted HVAC units | New |
| Exterior Lighting | LED fixtures | New |
| Interior Lighting | Recessed fluorescent & LED fixtures | New |
| Flooring | Commercial grade wood laminate, carpet, and tile | New |
| Plumbing | Assumed adequate | New |
| Elevators/Stairwells | 1 elevators/2 stairwells | New |
| Life Safety and Fire Protection | Sprinklered and smoke detectors | New |
| Furnishings | Furnishings for lobby, dining room, activity rooms, fully equiped commercial kitchen, etc. | New |
| Parking | Surface | New |
| Landscaping | Trees and shrubs | New |
| Project Amenities | Common lounges, arts & crafts studio, beauty salon, bistro, physical therapy room, fitness room, private/group dining rooms, multimedia theater | New |

*Source:  Various sources collected by BBG, Inc.*

The subject property is an assisted living facility that was originally constructed in 1960 and was completely remodeled, with a completed date in June 2020. The property was previously one story. As part of the renovation, the subject added 3,850 SF to a second floor adding a theater, conference room and two offices. The main floor contains common lounges, arts & crafts studio, beauty salon, bistro, physical therapy room, fitness room, kitchen and private and group dining rooms. The west wing contains the memory care units with additional living and dining rooms. The memory care

wing can be closed off from the rest of the facility, and includes private courtyards. The east wing includes the assisted living units with a fitness room and additional living rooms.

## Units

The subject features a mix of Studio and 1-Bedroom units for assisted living and shared bedroom units for memory care. The units include all-inclusive with all meals, utilities included. Weekly housekeeping included, concierge and valet services, month to month rent. Assisted Living Units have a kitchenette consisting of sink, microwave and refrigerator.

| UNIT SUMMARY | | | | |
|---|---|---|---|---|
| No Units | Type | No Beds | Size (SF) | NRA (SF) |
| **Assisted Living Unit Mix** | | | | |
| 22 | AL - Studio 1A | 22 | 302 | 6,644 |
| 38 | AL - Studio 1B | 38 | 283 | 10,754 |
| 1 | AL - Studio 2A | 1 | 339 | 339 |
| 2 | AL - 1-Bedroom 1C | 2 | 519 | 1,038 |
| 1 | AL - 1-Bedroom 2D | 1 | 565 | 565 |
| 1 | AL - 1-Bedroom 3E | 1 | 480 | 480 |
| **65** | | **65** | **305** | **19,820** |
| **Memory Care Unit Mix** | | | | |
| 40 | MC - SP Conpanion | 40 | 308 | 12,320 |
| 3 | MC - Private 1B | 3 | 283 | 849 |
| 12 | MC - Private 2B | 12 | 301 | 3,612 |
| 1 | MC - Private 5A | 1 | 251 | 251 |
| **56** | | **56** | **304** | **17,032** |
| **121** | **Total/Avg** | **121** | **305** | **36,852** |
| Source: Developer | | | | |

## Quality/Condition

The subject is rated as good in regard to quality of construction for assisted living and memory care residence buildings within the immediate area. The subject improvements are constructed in a manner that are consistent with alternative, directly competitive, substitute properties. Access and visibility of the center are good to the subject's location. Overall, the subject improvements appear they are adequately designed and functional for their intended use as an assisted living and memory care residence building.

## Developer's Budget

The developer provided the following budget for costs to renovate the subject property.

| DEVELOPER'S BUDGET | | | |
|---|---|---|---|
| Item | Budget | Paid to Date | Remaining Costs |
| Total Hard Costs | $12,693,894 | $10,145,134 | $2,548,760 |
| Indirect Costs | $7,478,712 | $7,478,712 | $0 |
| FF&E | $723,498 | $706,598 | $16,900 |
| Financing, Permits & Fees | $2,239,148 | $1,700,287 | $538,861 |
| **Grand Total** | **$23,135,252** | **$20,030,731** | **$3,104,521** |
| *Source: Developer* | | | |

**Economic Age and Life**

The subject improvements effective age and remaining economic life is depicted in the following chart.

| ECONOMIC AGE AND LIFE | |
|---|---|
| Actual Age | 57 Years |
| Effective Age | 1 Years |
| MVS Expected Life | 55 Years |
| Remaining Economic Life | 54 Years |
| Accrued Physical Incurable Depreciation | 1.82% |
| *Compiled by BBG* | |

No functional obsolescence is considered to be present, nor is the subject impacted by external obsolescence.

**Conclusion**

The functional utility and design of the subject building is rated as good and suitable for market conditions within this assisted living and memory care residence market. The layout and design of the improvements on the site is good and conducive to occupancy by assisted living and memory care residence tenants. For more information, please refer to the photographs presented in the Exhibits section of this report.

**ZONING ANALYSIS**





| Residential Planned Development Zones | |
|---|---|
| RPD | Residential Planned Development |
| R-1-PD | Single Family Residential Planned Development |
| R1-7PD | Single Family Residential Planned Development |
| R-1-8PD | Single Family Residential Planned Development |
| R-2-PD | Multiple-Family Residential Planned Development |
| R-3-PD | Garden Apartment Planned Development |
| R-4-PD | High-Rise Residential Planned Development |
| R-10-PD | Single Family Residential Planned Development |
| MH-PD | Manufactured Home Planned Development |

The subject is zoned Garden Apartment Planned Development by the city of Oxnard. The primary building restrictions under the "R-3-PD" zoning classification are located within the following table.

| ZONING ANALYSIS | |
|---|---|
| Zoning Jurisdiction | City of Oxnard |
| Current Zoning | Garden Apartment Planned Development |
| Purpose | This zone shall provide a district of moderate density multiple-family dwellings as well as emergency shelters for families, transitional housing and supportive housing pursuant to statutory requirements, suitable for locations abutting commercial centers and in other locations where moderate density is warranted. |
| Uses Permitted | Multiple, including assisted living |
| Legally Conforming | Yes |
| Zoning Change | Not Likely |
| **Zoning Requirements** | |
| Max Height | 3 stories/ 35 feet |
| Min Setbacks | |
|   Front Yard | 15 Feet |
|   Street Side Yard | 7.5 Feet |
| Interior Yard Space | 30% of lot area with min. dimension of 15' x 15' |
| Parking Requirements | 1.0 spaces per 2 units plus 1 shuttle van parking space |
| Required Parking | 61 Spaces |
| Subject's Actual Parking | 41 Spaces |
| Legally Conforming | No |
| *Source: City of Oxnard Planning and Zoning* | |

**Conclusion**

Oxnard is against growth and intentionally makes development difficult and timely. The entitlement process for the subject has been lengthy and construction has been drawn out because of this. The subject' entitlements are now complete, and construction can complete.

The improvements appear to comply with the existing zoning district with regard to use. Based upon the survey, the on-site parking accommodates 41 spaces, which does meets the parking requirement of 61 spaces as mandated by the zoning ordinance. Therefore, the property appears to be a legal, non-conforming use of the site.

A letter from the City of Oxnard on January 7, 2016 approves the subject's minor modification request. The letter identifies that "The proposal maintains 41 off-street parking spaces approved by SUP 460. While the Code requires 61 parking spaces for the proposed uses, the legal-nonconforming status of parking is not intensified by this request. Staffing is not increasing, and the number of rooms and tenants is decreasing. Per Code Section 16-615, current parking requirements do not apply to requests for new construction or changes of use *unless* additional parking spaces are required. Condition of Approval No. 16 requires additional parking in the event that increased staffing or additional rooms are proposed." Further, the letter identifies that the interior yard space minimum requirement of 30% of lot area is nonconforming but complies with conditions.

Nevertheless, we are not experts in the interpretation of complex zoning ordinances, and the determination of compliance is beyond the scope of this real estate appraisal.

## REAL ESTATE TAX ANALYSIS

**Property Taxes and Assessment Data**

The property tax structure in California underwent a tremendous change in 1978 when the voters approved the Jarvis-Gann Amendment, popularly known as "Proposition 13". Under this law, the property tax for any property cannot exceed one percent of the sale price plus any bonded indebtedness for special assessments (road improvements, sewer lines, or other previously-existing or voter-approved debt). Another provision of the law was the reduction of the assessed value for all properties to the levels of 1975. The maximum annual increase in assessed value, under the law, is limited to two percent of the assessed value for the previous year and properties are reassessed to current market value only at times of construction or sale. ***In California, properties are reassessed to current market value only at times of construction or sale.***

**Subject Property**

The subject represents an existing building that has been vacant. The historical assessments and tax liabilities for the previous year is calculated in the following table. To project the subject's assessed value and real estate tax liability, we utilized the subject's As Stabilized Value and the subject's tax rate. The As Stabilized Value is determined later in the report via the sales and income approaches.

| AD VALOREM TAX INFORMATION | | |
|---|---|---|
| **APN** | **2021-2022 Property Value** | **BBG Proforma Property Value (As Stabilized)** |
| 221-0-063-185 | $7,837,974 | $42,700,000 |
| Total Value | $7,837,974 | $42,700,000 |
| Assessment Rate | 100.0% | 100.0% |
| Assessed Values | $7,837,974 | $42,700,000 |
| Tax Rate per 100 | 1.195731 | 1.195731 |
| General Tax Totals | $93,721 | $510,577 |
| Special Assessments | $674 | $674 |
| **Total Taxes** | **$94,395** | **$511,251** |
| **Per Bed** | **$780** | **$4,225** |
| *Source: County Assessor and Treasurer Offices* | | |

**Conclusion**

The definition of market value used in this report assumes a sale of the subject property. If the subject property were sold, it would be reassessed according to the County Assessor's opinion of its market value, which is typically the sale price. Our projection assumes that the subject would be reassessed at the concluded value in this report. Therefore, taxes would be calculated using the current tax rate, plus direct assessments. This analysis assumes any outstanding property tax liability is paid. BBG assumes all taxes are current.

## HIGHEST AND BEST USE

**Analysis of Site as if Vacant**

*Legally Permissible*

Except for a legally nonconforming property, the first step in determining what is legally permissible is to analyze private restrictions, zoning, building codes, historic district controls, and environmental regulations.

The current zoning of the subject site is Garden Apartment Planned Development as indicated by the City of Oxnard. This zoning is conducive to a range of commercial uses, one of which is an assisted living and memory care residence. No restrictive covenants are known to exist that might preclude or limit use of the site in an assisted living and memory care residence capacity. Additionally, there are no known restrictions, historic district controls, or environmental regulations that restrict the subject in any unreasonable manner.

*Physically Possible*

The physical characteristics of a site can affect the uses. These characteristics include: (1) size; (2) shape; (3) terrain or topography; (4) soil condition; (5) utilities; (6) access characteristics; and (7) surrounding land uses. Each of these site characteristics was described and discussed in the Site Analysis section of this report. Several uses are physically possible on the subject site. The 2.36 acre development site is level and is at street grade with the fronting roadways. Soil and subsoil conditions appear adequate for development as evidenced by area construction. From a development standpoint, the location of the site is good for assisted living and memory care residence development. The subject site is of ample size and configuration to support multiple users, and is apt to be developed as such.

*Financially Feasible*

There have not been any recently constructed senior care facilities in the subject's neighborhood in the last couple of years, however, a former hotel was recently converted into an assisted living facility opening in 2017: Pacifica Senior Living at 2211 East Gonzales Road. Further, the neighborhood's 65 and over population is expected to grow 14.8% in the next five years. It appears that it is financially feasible to develop a new an assisted living and memory care residence at this time.

*Maximally Productive*

The final test of highest and best use of the site as if vacant is that the use be maximally productive, yielding the highest return to the land. In the case of the subject as if vacant, the analysis has indicated that a new assisted living and memory care residence project would be appropriate at this time.

*Conclusion: Highest and Best Use As If Vacant*

Immediate development of an assisted living and memory care residence use property is the only use that meets the four tests of highest and best use. Therefore, it is concluded to be the highest and best use of the property as if vacant.

*Most Probable Buyer*

Taking into account the size and characteristics of the property and its assisted living and memory care residence use potential, the likely buyer is a developer.

BBG

**Analysis as Improved**

*Legally Permissible*

The site is improved with an assisted living and memory care residence development that is a legal, non-conforming use, due to parking (but approved by the City of Oxnard).

*Physically Possible*

The layout and positioning of the improvements are considered functional for assisted living and memory care residence use. While it would be physically possible for a wide variety of uses, based on the legal restrictions and the design of the improvements, the proposed use of the property for assisted living and memory care residence users would be the most functional use.

*Financially Feasible*

The financial feasibility of an assisted living and memory care residence property is based on the amount of rent which can be generated, less operating expenses required to generate that income; if a residual amount exists, then the land is being put to a productive use. Based upon the income capitalization approach conclusion, the subject will produce a positive net cash flow and the proposed utilization of the improvements for assisted living and memory care residence purposes is considered financially feasible.

*Maximally Productive*

As shown in the applicable valuation sections, buildings that are similar to the subject have been acquired or continue to be used by assisted living and memory care residence owner-users. None of the comparable buildings have been acquired for conversion to an alternative use.

*Conclusion: Highest and Best Use As Improved*

Based on the foregoing, the highest and best use of the property, as proposed, is consistent with the proposed use as a assisted living and memory care residence development.

*Most Probable Buyer*

Considering the size and characteristics of the property, the likely buyer is a regional or national investor.

BBG

## APPRAISAL PROCESS

**Overview**

The three traditional approaches to valuing improved properties are,

1.  Sales Comparison Approach - a comparison of the property appraised with reasonable similar, recently conveyed properties for which the price, terms and conditions of sale are known.

2.  Income Approach - the processing of a projected net income into a valuation estimate via one or more capitalization techniques.

3.  Cost Approach - an estimate of the replacement cost of all structural improvements as if new, less loss in value attributable to depreciation from all causes plus the value of the land as if vacant.

The Sales Comparison Approach is founded upon the principle of substitution that holds that the cost to acquire an equally desirable substitute property without undue delay ordinarily sets the upper limit of value. At any given time prices paid for comparable properties are construed by many to reflect the value of the property appraised. The validity of a value indication derived by this approach is heavily dependent upon the availability of data on recent sales of properties similar in location, size, and utility to the appraised property.

The Income Capitalization Approach is based on the principle of anticipation that recognizes the present value of the future income benefits to be derived from ownership in a particular property. The Income Approach is most applicable to properties that are bought and sold for investment purposes, and is considered very reliable when adequate income and expense data are available. Since, income-producing real estate is most often purchased by investors, this approach is valid and is generally considered the most applicable when the property being appraised was designed for, or is easily capable of producing a rental income.

The Cost Approach is based on the premise that the value of a property can be indicated by the current cost to construct a reproduction or replacement for the improvements minus the amount of depreciation evident in the structures from all causes plus the value of the land and entrepreneurial profit. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

The Appraisal Process is concluded by a review and re-examination of each of the approaches to value that was employed. Consideration is given to the type and reliability of data used, the applicability of each approach to the type of property being appraised and the value being sought.

| APPROACHES TO VALUE | | |
| --- | --- | --- |
| Approach | Applicability to Subject | Use in Assignment |
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Applicable | Utilized |
| Compiled by BBG | | |

The Cost Approach was not utilized as the subject was originally constructed in 1960 and estimating depreciation is difficult. Further, most investors do not rely on the Cost Approach when making purchasing decisions for a property of this type and age. However, we have provided a land value for the subject.

## LAND VALUE

The following map and table summarize the comparable data used in the valuation of the subject site. The comparables chosen were based on size, location, and proposed use. A detailed description of each transaction is included in the Exhibits.



BBG

LAND VALUE

| Comp. No. | Property Name | Type | Date | Proposed Use | Actual Sale Price | Size (AC) | Size (SF) | Price Per SF | Zoning |
|---|---|---|---|---|---|---|---|---|---|
| SUMMARY OF COMPARABLE LAND SALES | | | | | | | | | |
| 1 | 1100 West Gonzales Road, Oxnard, CA | Sale | Apr-19 | Medical/ Dental Office | $2,475,000 | 1.68 | 73,181 | $33.82 | COPD |
| 2 | 1210 South Oxnard Boulevard, Oxnard, CA | Sale | Mar-19 | (Unknown) | $2,100,000 | 1.56 | 68,045 | $30.86 | CMPD |
| 3 | 950 Warwick Avenue, Thousand Oaks, CA | Sale | Sep-18 | Multi Family - Units (Senior) | $3,400,000 | 2.08 | 90,766 | $37.46 | RPD |
| 4 | 13950 Peach Hill Road, Moorpark, CA | Sale | Aug-18 | Multi Family - Units (Senior) | $3,126,500 | 2.79 | 121,376 | $25.76 | SP 92-1 |
| 5 | 3110 Royal Avenue, Simi Valley, CA | Sale | Oct-17 | Multi Family - Units (Senior) | $3,035,000 | 3.18 | 138,669 | $21.89 | RL-1.3 |
| Subj. | 2700 Bismark Way, Oxnard, California | --- | --- | Senior Care Facility | --- | 2.36 | 102,946 | --- | R-3-PD |

*Compiled from Various Sources by BBG*

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| ADJUSTMENT FACTORS | |
|---|---|
| Effective Sale Price | Accounts for atypical economics of a transaction, such as excess land, non-realty components, expenditures by the buyer at time of purchase, or other similar factors. Usually applied directly to sale price on a lump sum basis. |
| Real Property Rights | Leased fee, fee simple, leasehold, partial interest, etc. |
| Financing Terms | Seller financing, or assumption of existing financing, at non-market terms. |
| Conditions of Sale | Extraordinary motivation of buyer or seller, such as 1031 exchange transaction, assemblage, or forced sale. |
| Market Conditions | Changes in the economic environment over time that affect the appreciation and depreciation of real estate. |
| Location | Market or submarket area influences on sale price; surrounding land use influences. |
| Size | Inverse relationship that often exists between building size and unit value. |
| Shape | Effective age; physical condition. |
| Orientation | The relationship between land and its surroundings. |
| Access/Exposure | Convenience to transportation facilities; ease of site access; visibility from main thoroughfares; traffic counts. |
| Topography | The relief features or surface configuration of an area, e.g., hills, valleys, slopes, lakes, rivers. Surface gradations are classified as compound slope, gently sloping land, hilly land, hogwallows, hummocks, rolling land, steep land, steep land, undulating land, and very steep land. |
| Zoning/Density | The public regulation of the character and extent of real estate use through police power; accomplished by establishing districts or areas with uniform restrictions relating to improvements; structural height, area, and bulk; density of population; and other aspects of the use and development of private property. |
| Utilities | Services rendered by public utility companies, e.g., telephone, electricity, gas, water. |

*Compiled from Various Sources by BBG*

## Market Conditions

The sales chosen were within the last two years. A CoStar rate of change study indicated there was a small increase in land values around 3% per year. Furthermore, brokers confirmed that land values have increased between 3% and 5% annually. Therefore, we made a 3.00%/Yr. market conditions adjustment.

| LAND SALES ADJUSTMENT GRID | | | | | | |
|---|---|---|---|---|---|---|
| Comparable Number | Subject | 1 | 2 | 3 | 4 | 5 |
| Property Name | Regency Palms Oxnard | 1100 West Gonzales Road | 1210-1246 S Oxnard Boulevard | 950 Warwick Avenue | 13950 Peach Hill Road | 3110 Royal Avenue, Simi Valley, CA |
| Sale Date | --- | Apr-19 | Mar-19 | Sep-18 | Aug-18 | Oct-17 |
| Land Area (AC) | 2.36 | 1.68 | 1.56 | 2.08 | 2.79 | 3.18 |
| Land Area (SF) | 102,946 | 73,181 | 68,045 | 90,766 | 121,376 | 138,669 |
| Actual Sale Price | --- | $2,475,000 | $2,100,000 | $3,400,000 | $3,126,500 | $3,035,000 |
| Sale Price per SF | $33.82 | $30.86 | $37.46 | $25.76 | $21.89 | |
| Property Rights Conveyed | | 0% | 0% | 0% | 0% | 0% |
| Financing Terms | | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% | 0% |
| Market Conditions | | 8% | 8% | 10% | 10% | 12% |
| | | Improving market conditions | Improving market conditions | Improving market conditions | Improving market conditions | Improving market conditions |
| Adjusted Sales Price | | $36.53 | $33.33 | $41.20 | $28.33 | $24.51 |
| Size | | -5% | -5% | 0% | 0% | 5% |
| | | Smaller | Smaller | Similar | Similar | Larger |
| Shape | | 0% | 0% | 0% | 0% | 5% |
| | | Generally Rectangular | Generally Rectangular | Generally Rectangular | Generally Rectangular | Generally Rectangular | Irregular |
| Frontage/Exposure | | 0% | 0% | 0% | 0% | 0% |
| Topography | | 0% | 0% | 0% | 0% | 0% |
| Location | | 0% | 0% | -10% | -5% | -5% |
| | | Similar | Similar | Superior | Superior | Superior |
| Zoning/Density | | 0% | 0% | 0% | 0% | 0% |
| Utilities | | 0% | 0% | 0% | 0% | 0% |
| Highest & Best Use | | 0% | 0% | 0% | 0% | 0% |
| | Senior Care Facility | Medical Office | Unknown | Senior Care Facility | Senior Care Facility | Senior Care Facility |
| Subtotal Net Adjustments | | -5% | -5% | -10% | -5% | 5% |
| Final Indicated Value | | $34.70 | $31.66 | $37.08 | $26.92 | $25.74 |

| Value Summary | Unadjusted | Adjusted |
|---|---|---|
| Minimum | $21.89 | $25.74 |
| Maximum | $37.46 | $37.08 |
| Mean | $29.96 | $31.22 |
| Deviation | $6.22 | $4.88 |

*Compiled from Various Sources by BBG*

## Market Participants

We interviewed several market participants that are knowledgeable and have either sold, purchased or are currently listing properties in the Ventura County market. These participants from CBRE and JLL indicated that if vacant, the subject's underlying land could expect a listing price around $30.00 per square foot.

## Conclusion

After adjustments the sales indicated a range of $25.74 to $37.08 PSF, with an average of $31.22 PSF. The adjustments resulted in a reasonably tight range having a variance of 31% between the high and the low. More weight was given to the recent transactions, which are located in Oxnard. The following table presents the valuation conclusion:

| LAND VALUE CONCLUSION | | | | |
|---|---|---|---|---|
| **$ Per SF** | | **Subject Size (SF)** | | **Total** |
| $25.74 | x | 102,946 | = | $2,649,696 |
| $37.08 | x | 102,946 | = | $3,817,688 |
| **Concluded Value** | | | | **$3,200,000** |
| **$ Per SF** | | | | **$31.08** |
| *Composed by BBG* | | | | |

BBG

## SALES COMPARISON APPROACH

The subject is an 161-bed assisted living and memory care residence facility located in Oxnard, California. The sales chosen were based on location, size, sale date, and utility. The following map and table summarize the comparable data used in the valuation of the subject.  A detailed description of each transaction is included in the addenda.



SALES COMPARISON APPROACH

| SUMMARY OF COMPARABLE ASSISTED LIVING SALES | | | | | | |
|---|---|---|---|---|---|---|
| Comp. No. | 1 | 2 | 3 | 4 | 5 | Sub. |
| Prop. Name | Estancia Senior Living | Merrill Gardens at Bankers Hill | Pacifica Senior Living Hillsborough | Regency Grand at West Covina | Cypress Place Retirement Home | Regency Palms Oxnard |
| Street | 1735 South Mission Road | 2567 2nd Avenue | 11918 Central Avenue | 150 South Grand Avenue | 1200 Cypress Point Lane | 2700 Bismark Way |
| City, State | Fallbrook, CA | San Diego, CA | Chino, CA | West Covina, CA | Ventura, CA | Oxnard |
| Zip | 92028 | 92103 | 86409 | 85044 | 93003 | 93003 |
| Bldg. (SF) | 88,892 | 89,748 | 111,012 | 116,598 | 49,500 | 59,650 |
| Investment Class | Class A | Class A | Class A | Class A | Class A | Class A |
| Yr. Blt. | 2021 | 2011 | 1999 | 2000 | 2003 | 1960 |
| Condition | good | good | good | good | good | good |
| No. Units | 104 | 84 | 144 | 129 | 76 | 121 |
| No. Beds | 104 | 104 | 144 | 160 | 96 | 121 |
| Care Levels | ALF, MC | ALF, MC | ALF, MC | ALF, MC | ALF, MC | AL, MC |
| Date of Sale | Oct-21 | Sep-20 | Dec-19 | Jun-19 | Jun-19 | --- |
| Sale Price | $35,000,000 | $34,423,000 | $39,000,000 | $43,454,500 | $17,750,000 | --- |
| Price per SF | $393.74 | $383.55 | $351.31 | $372.69 | $358.59 | --- |
| Price per Unit | $336,538 | $409,798 | $270,833 | $336,857 | $233,553 | --- |
| Price per Bed | $336,538 | $330,990 | $270,833 | $271,591 | $184,896 | --- |
| NOI Per Bed | N/A | $16,881 | N/A | N/A | $11,279 | --- |
| Cap. Rate | N/A | 5.10% | N/A | N/A | 6.10% | --- |

*Compiled by BBG*

## Adjustment Factors

The sales were compared to the subject and adjusted to account for material differences that affect value. Adjustments were considered for the following factors, in the sequence shown below.

| ADJUSTMENT FACTORS | |
|---|---|
| Effective Sale Price | Accounts for atypical economics of a transaction, such as excess land, non-realty components, expenditures by the buyer at time of purchase, or other similar factors. Usually applied directly to sale price on a lump sum basis. |
| Real Property Rights | Leased fee, fee simple, leasehold, partial interest, etc. |
| Financing Terms | Seller financing, or assumption of existing financing, at non-market terms. |
| Conditions of Sale | Extraordinary motivation of buyer or seller, such as 1031 exchange transaction, assemblage, or forced sale. |
| Market Conditions | Changes in the economic environment over time that affect the appreciation and depreciation of real estate. |
| Location | Market or submarket area influences on sale price; surrounding land use influences. |
| Size of Units | Average size of units |
| Age/Condition | Effective age; physical condition. |
| Construction Quality | Construction quality, amenities, market appeal, functional utility. |
| Ammenities | Unit and project ammenities |
| No. of Units | Inverse relationship that often exists between number of units and unit value. |
| Levles of Care | Independent living, assisted living, memory care, skilled nursing, etc |

*Compiled from Various Sources by BBG*

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

### Market Conditions

A search of comparable assisted living properties in CoStar was inconclusive. However, discussions with local real estate brokers confirmed that the trend has been on the upswing. The sales chosen were within the last 18 months, thus a 3.00%/Yr. upward adjustment was made.

| IMPROVED SALES ADJUSTMENT GRID | | | | | | |
|---|---|---|---|---|---|---|
| Comparable Number | Subject | 1 | 2 | 3 | 4 | 5 |
| Property Name | Regency Palms Oxnard | Estancia Senior Living | Merrill Gardens at Bankers Hill | Pacifica Senior Living | Regency Grand at West Covina | Cypress Place Retirement Home |
| Sale Date | --- | Oct-21 | Sep-20 | Dec-19 | Jun-19 | Jun-19 |
| GLA (SF) | 59,650 | 88,892 | 89,748 | 111,012 | 116,598 | 49,500 |
| Actual Sale Price | --- | $35,000,000 | $34,423,000 | $39,000,000 | $43,454,500 | $17,750,000 |
| Price Per SF | --- | $393.74 | $383.55 | $351.31 | $372.69 | $358.59 |
| Price per Bed | --- | $336,538 | $330,990 | $270,833 | $271,591 | $184,896 |
| NOI Per SF | --- | N/A | $16,881 | N/A | N/A | $11,279 |
| OAR | --- | N/A | 5.10% | N/A | N/A | 6.10% |
| Sale Price per Bed | | $336,538 | $330,990 | $270,833 | $271,591 | $184,896 |
| Rights Conveyed | | 0% | 0% | 0% | 0% | 0% |
| Financing Terms | | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% | 0% |
| Market Conditions | | 0% | 3% | 6% | 7% | 7% |
| | | Improving market conditions | Improving market conditions | Improving market conditions | Improving market conditions | Improving market conditions |
| Adjusted Sales Price Per Bed | | $336,538 | $340,920 | $287,083 | $290,602 | $197,839 |
| Location | | 0% | -5% | 5% | 5% | 5% |
| | | Similar | Superior | Inferior | Inferior | Inferior |
| Size of Units | | 0% | 0% | 0% | 0% | 0% |
| | | Similar | Similar | Similar | Similar | Similar |
| Age/Condition | | 0% | 5% | 5% | 5% | 5% |
| | 1960; Ren 2020 | 2021 | 2011 | 1999 | 2000 | 2003 |
| Quality of Construction | | 0% | 0% | 0% | 0% | 0% |
| | Class A | Class A | Class A | Class A | Class A | Class A |
| Amenities | | 0% | 0% | 0% | 0% | 0% |
| | | Similar | Similar | Similar | Similar | Similar |
| No. of Beds | | 0% | 0% | 0% | 0% | 0% |
| | 121 | 104 | 104 | 144 | 160 | 96 |
| Levels of Care | | 0% | 0% | 0% | 0% | 5% |
| | AL, MC | ALF, MC | ALF, MC | ALF, MC | ALF, MC | ALF, MC |
| Other | | 0% | 0% | 0% | 0% | 0% |
| | | | | | | |
| Subtotal Net Adjustments | | 0% | 0% | 10% | 10% | 15% |
| Final Indicated Value | | $336,538 | $340,920 | $315,792 | $319,662 | $227,514 |

| Value Summary | Unadjusted | Adjusted | | | | |
|---|---|---|---|---|---|---|
| Minimum | $184,896 | $227,514 | | | | |
| Maximum | $336,538 | $340,920 | | | | |
| Mean | $278,970 | $308,085 | | | | |
| Deviation | $61,219 | $46,295 | | | | |

*Compiled from Various Sources by BBG*

## Market Participants

We interviewed several market participants that are knowledgeable and have either sold, purchased or are currently listing properties in the assisted living market. These participants from CBRE and HFF indicated that a newly constructed Class A assisted living community could expect a listing price north of $300,000 per bed.

**Sales Price Per Bed Conclusion**

After adjustments, the comparable sales ranged from $227,514 to $340,920 per bed with a mean of $308,085 per bed. The adjustments resulted in a reasonably tight range having a variance of 33% between the high and the low. We gave consideration to the two most recent sales. The total value via the Sales Comparison Approach is calculated as follows:

| IMPROVED SALE VALUE CONCLUSION | | | | |
|---|---|---|---|---|
| $/Bed | | Subject No. Beds | | Total |
| $315,792 | x | 121 | = | $38,210,792 |
| $340,920 | x | 121 | = | $41,251,332 |
| Concluded "As If Stabilized" Value | | | | $41,000,000 |
| $ Per Bed | | | | $338,843 |
| Annual Compound Growth at 3% | | | | $1,230,000 |
| Prospective at Stabilization Value | | | | $42,230,000 |
| Rounded | | | | $42,200,000 |
| Less: Lease-Up Discount | | | | ($2,065,511) |
| Prospective at Completion Value | | | | $40,164,489 |
| Rounded | | | | $40,200,000 |
| $ Per Bed | | | | $332,231 |
| *Compiled by BBG* | | | | |

The value indicated by the comparables is $41,000,000 or $338,843 per bed, "as if stabilized today. We then grow this figure at a 3% annual rate for approximately two years (one year, ten months) to arrive at a prospective at stabilization value of $42,200,000 . Finally, we deducted a lease-up discount (discussed next) to arrive at a prospective at completion value of $40,200,000

**Lease Up Discount**

In order to estimate a stabilization discount, we subtracted the rent loss presented and analyzed later in this report. This figure will be deducted from the sales comparison and cost approaches to value and our direct capitalization.

*Absorption Timeline*

The developer projects to reach a stabilized occupancy in Month 11 from the date of inspection at 95%. NIC reports average monthly move-in rates for assisted living facilities at 4.8 per month, or 26-28 months for the subject. The subject is essentially new upon completion and is at the top of the competitive properties in terms of quality. Therefore, we expect a slightly more aggressive absorption timeline.

Based upon this data and considering the prevailing market occupancy level, we are forecasting that the subject will require 12 Months to reach stabilized occupancy, at a pace of 5.5 beds per month. This is slightly above the national averages, but in line with the developer and appears reasonable due to the other new facility in Oxnard.

SALES COMPARISON APPROACH

| INCOME LOSS DURING ABSORPTION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Pro Forma EGI | $8,222,872 | | | | | | | |
| Pro Forma Expenses | $5,553,085 | | | | | | | |
| Pro Forma NOI | $2,669,787 | | | | | | | |
| Starting Occupancy Level | 25.00% | | | | | | | |
| Absorption Period | 12 Months | | | | | | | |

| Month | Forecast % of EGI Earned | Pro Forma EGI | Projected EGI | Forecast % of Expenses Incurred | Pro Forma Expenses | Forecast Expenses | Forecast NOI | Pro Forma NOI | Income Loss |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 25.00% | $685,239 | $171,310 | 70% | $462,757 | $323,930 | ($152,620) | $222,482 | $375,102 |
| 2 | 31.82% | $685,239 | $218,031 | 72% | $462,757 | $333,185 | ($115,154) | $222,482 | $337,637 |
| 3 | 38.64% | $685,239 | $264,752 | 74% | $462,757 | $342,440 | ($77,689) | $222,482 | $300,171 |
| 4 | 45.45% | $685,239 | $311,472 | 76% | $462,757 | $351,695 | ($40,223) | $222,482 | $262,705 |
| 5 | 52.27% | $685,239 | $358,193 | 78% | $462,757 | $360,951 | ($2,757) | $222,482 | $225,239 |
| 6 | 59.09% | $685,239 | $404,914 | 80% | $462,757 | $370,206 | $34,709 | $222,482 | $187,774 |
| 7 | 65.91% | $685,239 | $451,635 | 82% | $462,757 | $379,461 | $72,174 | $222,482 | $150,308 |
| 8 | 72.73% | $685,239 | $498,356 | 84% | $462,757 | $388,716 | $109,640 | $222,482 | $112,842 |
| 9 | 79.55% | $685,239 | $545,077 | 86% | $462,757 | $397,971 | $147,106 | $222,482 | $75,377 |
| 10 | 86.36% | $685,239 | $591,798 | 88% | $462,757 | $407,226 | $184,571 | $222,482 | $37,911 |
| 11 | 93.18% | $685,239 | $638,518 | 90% | $462,757 | $416,481 | $222,037 | $222,482 | $445 |
| | | | | | | | Total | | $2,065,511 |

*Compiled from Various Source by BBG*

## INCOME CAPITALIZATION APPROACH

**Subject Unit Mix and Rental Rates As Proposed**

The subject's proposed Assisted Living Facility offers 121 beds in either studio, 1-bedroom or shared 1-bedroom floor plans for both assisted living and memory care patients. The property contains a unit mix as shown below.

| UNIT MIX SUMMARY | | | | |
|---|---|---|---|---|
| Unit Mix | # of Beds | Average SF | Asking Rent | Rent Per SF |
| ALF - Studio | 61 | 291 | $4,600 | $15.82 |
| ALF - 1 Bed | 4 | 511 | $5,295 | $10.36 |
| MC - Shared | 40 | 308 | $3,450 | $22.40 |
| MC - Private | 16 | 295 | $4,900 | $33.28 |
| **Total/Average** | **121** | **253** | **$4,282** | **$16.90** |

*Market Rental Analysis*

The rates of like properties for senior assisted care facilities vary greatly. There are varying levels of care and a myriad of other factors that go into pricing.



**INCOME CAPITALIZATION APPROACH**

| | ASSISTED LIVING RENTAL COMPARABLES | | | | | |
|---|---|---|---|---|---|---|
| Name | ALF Beds MC Beds IL Beds | YOC | Occup. | # of Bedrooms | Inclusive Rent per Mo. | Levels of Care |
| **Pacifica Senior Living** | 60 | 1990 | 86% | ALF Studio | $3,295 | None |
| 2211 East Gonzales Road | 40 | Ren | | ALF 1 BR | $3,595 | None |
| Oxnard, CA | 0 | 2017 | | ALF 2 BR | $4,895 | None |
| | 100 | | | | | |
| | | | | MC Shared | $3,950 | None |
| | | | | MC Private | $5,350 | None |
| | | | | *ALF Levels of Care* | *$400 - $2,500* | |
| | | | | *MC Levels of Care* | *$1,000 - $2,500* | |
| | | | | *Second Person Fee* | *$1,000* | |
| | | | | *One Time Community Fee* | *$3,000* | |
| **Atria Los Posas** | 50 | 1997 | 98% | ALF Private | $3,895 | None |
| 24 Las Posas Road | 40 | | | MC Private | $8,395 | Inclusive |
| Camarillo, CA | 50 | | | | | |
| | 140 | | | *ALF Levels of Care* | *$670 -$4,020* | |
| | | | | *Second Person Fee* | *$1,095 - $2,095* | |
| | | | | *One Time Community Fee* | *$3,000* | |
| **AlmaVia of Camarillo** | 64 | 2002 | 96% | ALF Studio | $4,750 | None |
| 2500 Ponderosa Drive North | 24 | | | ALF 1 Bedroom | $5,995 | None |
| Camarillo, CA | 0 | | | MC Shared | $5,950 | None |
| | | | | MC Private | $6,850 | None |
| | | | | *ALF Levels of Care* | *$675 - $3,375* | |
| | | | | *MC Levels of Care* | *$1,145 - $2,050* | |
| | | | | *Second Person Fee* | *$1,350* | |
| | | | | *One Time Community Fee* | *$4,000* | |
| **The Palms at Bonaventure** | 86 | 2006 | 88% | ALF - Studio | $4,035 | None |
| 111 North Wells Road | 20 | | | ALF - 1 BR | $4,800 | None |
| Ventura, CA | 0 | | | ALF - 2 BR | $5,420 | None |
| | | | | MC Studio | $5,810 | None |
| | 106 | | | MC Shared | $5,085 | None |
| | | | | *ALF Levels of Care* | *$525 - $2,275* | |
| | | | | *MC Levels of Care* | *$525 - $2,275* | |
| | | | | *Second Person Fee* | *$750* | |
| | | | | *One Time Community Fee* | *$1,500* | |
| **The Lexington Assisted Living** | 101 | N/A | 80% | ALF Studio | $2,575 - $3,300 | None |
| 5440 Ralston Street | 14 | | | ALF 1 Bedroom | $3,700 | None |
| Ventura, CA | 0 | | | MC Shared | $4,600 | Inclusive |
| | 115 | | | MC Private Studio | $5,150 - $5,700 | Inclusive |
| | | | | MC Private 1 Bedroom | $6,600 | Inclusive |
| | | | | *ALF Levels of Care* | *$600 - $2,000* | |
| | | | | *MC Levels of Care* | *All Inclusive* | |
| | | | | *Second Person Fee* | *$500* | |
| | | | | *One Time Community Fee* | *$1,500* | |
| | | | | **ALF Studio Average** | **$3,653** | |
| | | | | **ALF 1 Bedroom Average** | **$4,378** | |
| | | | | **MC Private Average** | **$6,209** | |
| | | | | **MC Shared Average** | **$4,826** | |

## *ALF Studio Units*

The subject property is projecting $4,600 per month for assisted living studio units. The comparables ranged from $2,575 to $4,750 per month, averaging $3,653 per month. The subject is essentially a brand new property and can

expect a rate above the average of the comparables.  The subject's rate for private one-bedroom units is within the range and considered reasonable.

## ALF Private 1-Bedroom Units

The subject property offers four private 1-bedroom assisted living units at an average of $5,295 per month per bed for the shared assisted living 1-bedroom units. The comparables ranged from $3,595 to $5,995 per month, averaging $4,378 per month. The subject is essentially a brand new property and can expect a rate above the average of the comparables. The subject's rate for private one-bedroom units is within the range and is deemed reasonable.

## MC Shared Units

The subject property is projecting $3,450 per month per bed for its shared memory care units. The comparables ranged from $3,950 to $5,950, averaging $4,826 per month. It appears that the subject property is underestimating the monthly rent for the shared memory care units. We estimate a rate more in line with the comparables.

## MC Private Units

The subject property is projecting $4,900 per month per bed for its shared memory care units. The comparables ranged from $5,150 to $8,395 per month, averaging $6,209 per month. However, the top end of the range is an inclusive rate. It appears that the subject property is underestimating the monthly rent for the private memory care units. We estimate a rate more in line with the comparables.

## Market Rent Conclusion

The comparables show that the subject's pro forma asking rates are slightly below market, thus we estimate a figure closer and in-line to the comparables. Overall, market rent is estimated as shown below. This figure is a driving factor in deriving an annual Potential Gross Rental Income that is presented next.

| ALF & MC POTENTIAL GROSS INCOME ESTIMATE | | | | | | |
|---|---|---|---|---|---|---|
| Unit Mix | # of Beds | Avg. Size (SF) | Asking Rent (At Completion) | Comparable Average (Today) | Concluded Rent (Today) | PGR (Today) |
| ALF - Studio | 61 | 291 | $4,600 | $3,994 | **$4,600** | **$3,367,200** |
| ALF - 1 Bed | 4 | 511 | $5,295 | $3,653 | **$5,295** | **$254,160** |
| MC -Shared | 40 | 308 | $3,450 | $4,826 | **$4,000** | **$1,920,000** |
| MC - Private | 16 | 295 | $4,900 | $6,209 | **$5,500** | **$1,056,000** |
| Total | 121 | | | | **Estimated PGR** | **$6,597,360** |
| | | | | | **Per Bed** | **$54,524** |

## Market Rent Conclusion – As Stabilized

The concluded market rent represents rents as of today. To estimate market rents as of the dates of completion and stabilization, we have grown the concluded market rents at an annual rate. Based on the market analysis of rent growth, have projected an annual growth rate of 3.00%. The following chart summarizes the Potential Gross Revenue as of November 15, 2021 and December 1, 2022.

| Unit Mix | # of Units | # of Beds | Avg SF | BBG Concluded Rent - Today | Asking Rent Per Bed - At Completion | BBG Concluded Rent - At Completion | BBG Concluded Rent - At Stabilization | PGR Today | PGR - At Completion | PGR - At Stabilization |
|---|---|---|---|---|---|---|---|---|---|---|
| ALF POTENTIAL GROSS INCOME ESTIMATE - AT STABILIZATION | | | | | | | | | | |
| ALF - Studio | 61 | 61 | 291 | $4,600 | $4,600 | $4,600 | $4,738 | $3,367,200 | $3,367,200 | $3,468,216 |
| ALF - 1 Bed | 4 | 4 | 511 | $5,295 | $5,295 | $5,295 | $5,454 | $254,160 | $254,160 | $261,785 |
| MC -Shared | 20 | 40 | 308 | $4,000 | $3,450 | $4,000 | $4,120 | $1,920,000 | $1,920,000 | $1,977,600 |
| MC - Private | 16 | 16 | 295 | $5,500 | $4,900 | $5,500 | $5,569 | $1,056,000 | $1,069,200 | $1,069,200 |
| Total | 101 | 121 | | | | | | | | |
| | | | | | | Estimated PGR - ALF | | $3,621,360 | $3,621,360 | $3,730,001 |
| | | | | | | Estimated PGR - MC | | $2,976,000 | $2,989,200 | $3,046,800 |
| | | | | | | Estimated PGR - Total | | $6,597,360 | $6,610,560 | $6,776,801 |
| | | | | | | Per Unit | | $54,524 | $54,633 | $56,007 |
| | | | | | | Per Bed | | $54,524 | $54,633 | $56,007 |

## Level of Care Fees

The comparables have level of care fees ranging from a la carte at $400 to $4,020 per month to levels of care from $1,000 to $3,250 per month. The subject projects level of care fees at $1,500 per month for assisted living, and $2,500 per month for memory care. The subject projects 74% of Assisted Living patients and 84% of Memory Care patients will need levels of care.

| LEVELS OF CARE | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $381,580 | 23.1% | $23.61 |
| Year 2 | $1,435,338 | 24.2% | $34.21 |
| Year 3 | $2,044,653 | 24.5% | $48.73 |
| **BBG Estimate - As If Stabilized Today** | **$1,663,200** | **20.8%** | **$39.64** |
| **BBG Estimate - Prospective at Stabilization** | **$1,713,096** | **20.8%** | **$40.83** |
| *Compiled by BBG* | | | |

Our analysis assumes $1,500 per month for assisted living, and $2,500 per month for memory care at 60% of residents, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

## Community Fees

The comparables have one time community entrance fees ranging from $1,500 to $4,000 per month, and averages $2,600. The subject is projecting a one time $3,000 entrance fee, with 38% turnover. The State of Seniors Housing 2017 Report indicates the median annual turnover rate is 38%. The subject's entrance rate appears reasonable, and we project a rate of $3,000 per new resident at 38%, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

| COMMUNITY ENTRANCE FEES | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $89,100 | 5.4% | $5.51 |
| Year 2 | $149,903 | 2.5% | $3.57 |
| Year 3 | $32,638 | 0.4% | $0.78 |
| **BBG Estimate - As If Stabilized Today** | **$160,930** | **2.0%** | **$3.84** |
| **BBG Estimate - Prospective at Stabilization** | **$165,758** | **2.0%** | **$3.95** |
| *Compiled by BBG* | | | |

BBG

**Vacancy and Collection Loss Allowance**

Although in high demand, vacancy in these facilities does exist. The facilities also have to deal with collection loss which occurs from non-payment or if a bed is held for a resident who goes to the hospital and does not return. There are no market reports compiled to assist with the estimate of this allowance. We referenced the operations of several comparable facilities, which ran at around 0-10% for the better facilities.

| OCCUPANCY PROJECTION | | |
|---|---|---|
| Name | YOC | Occup. |
| Pacifica Senior Living | 1990; Ren 2017 | 86% |
| Atria Las Posas | 1997 | 98% |
| AlmaVia of Camarillo | 2002 | 96% |
| The Palms at Bonaventure | 2006 | 88% |
| Lexington Assisted Living | N/A | 80% |
| Average Occpancy - Stabilized Properties | | 90% |
| **BBG Estimate** | | **95%** |

The vacancy and collection loss factor estimated herein is intended to reflect the property on a stabilized basis over a typical 5 to 10 year holding period. During a typical investment hold period the vacancy rate will fluctuate in large part due to cyclical economic conditions. We have projected a 5.00% vacancy rate.

**Developer's Pro Forma Income and Expense**

Operating expenses are cash outflows incurred by the owner of an income-producing property as a necessary cost in generating the income stream that it is expected to produce. Given that there is no operating history, the expense projections for the subject are based in large part on the recent historical experience of competing properties we are familiar with, as well as the owner's pro-forma expenses.

| SUBJECT PRO FORMA OPERATING BUDGET | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Year 1 | | | Year 2 | | | Year 3 | | |
| Operating Units | 121 | | | 121 | | | 121 | | |
| Potential Resident Days | 44,165 | | | 44,165 | | | 44,165 | | |
| Total Actual Resident Days | 16,164 | | | 41,957 | | | 41,957 | | |
| Occupancy | 37% | | | 95% | | | 95% | | |
| | Total | % of EGI | $/PRD | Total | % of EGI | $/PRD | Total | % of EGI | $/PRD |
| **Income** | | | | | | | | | |
| Net AL & MC Rental Income | $1,178,180 | 71.5% | $72.89 | $4,346,117 | 73.3% | $103.59 | $6,279,186 | 75.1% | $149.66 |
| Level of Care Fees | $381,580 | 23.1% | $23.61 | $1,435,338 | 24.2% | $34.21 | $2,044,653 | 24.5% | $48.73 |
| 2nd Resident Fees | $0 | 0.0% | $0.00 | $0 | 0.0% | $0.00 | $0 | 0.0% | $0.00 |
| Community Fees | $89,100 | 5.4% | $5.51 | $149,903 | 2.5% | $3.57 | $32,638 | 0.4% | $0.78 |
| *Effective Gross Income* | *$1,648,860* | *100%* | *$102.01* | *$5,931,358* | *100%* | *$141.37* | *$8,356,477* | *100%* | *$199.17* |
| | | | | | | | | | |
| **Expenses** | | | | | | | | | |
| Real Estate Taxes | $85,980 | 5.2% | $5.32 | $87,700 | 1.5% | $2.09 | $89,454 | 1.1% | $2.13 |
| Property Insurance | $95,529 | 5.8% | $5.91 | $101,456 | 1.7% | $2.42 | $103,485 | 1.2% | $2.47 |
| Utilities | $191,090 | 11.6% | $11.82 | $187,906 | 3.2% | $4.48 | $191,699 | 2.3% | $4.57 |
| Operating & Maintenance | $129,590 | 7.9% | $8.02 | $221,692 | 3.7% | $5.28 | $277,830 | 3.3% | $6.62 |
| Advertising & Promotion | $190,522 | 11.6% | $11.79 | $172,318 | 2.9% | $4.11 | $267,185 | 3.2% | $6.37 |
| Administrative | $639,068 | 38.8% | $39.54 | $629,025 | 10.6% | $14.99 | $646,924 | 7.7% | $15.42 |
| Dietary Services | $477,088 | 28.9% | $29.51 | $955,501 | 16.1% | $22.77 | $1,228,634 | 14.7% | $29.28 |
| Housekeeping | $181,624 | 11.0% | $11.24 | $349,343 | 5.9% | $8.33 | $418,064 | 5.0% | $9.96 |
| Activites and Social Services | $186,688 | 11.3% | $11.55 | $175,617 | 3.0% | $4.19 | $176,638 | 2.1% | $4.21 |
| Resident Care | $846,764 | 51.4% | $52.38 | $1,577,357 | 26.6% | $37.59 | $2,046,375 | 24.5% | $48.77 |
| Therapy & Contract Services | | 0.0% | $0.00 | | 0.0% | $0.00 | | 0.0% | $0.00 |
| Management Fee | $180,000 | 10.9% | $11.14 | $296,568 | 5.0% | $7.07 | $417,824 | 5.0% | $9.96 |
| Replacement Reserve | $44,820 | 1% | $2.77 | $44,820 | 1% | $1.07 | $44,820 | 1% | $1.07 |
| *Operating Expenses* | *$3,248,763* | *197%* | *$200.98* | *$4,799,303* | *81%* | *$114.39* | *$5,908,932* | *71%* | *$140.83* |
| | | | | | | | | | |
| **Net Operating Income** | ($1,599,903) | -97% | ($98.98) | $1,132,055 | 19% | $26.98 | $2,447,545 | 29% | $58.33 |
| Source: Developer Pro Forma Income & Expenses | | | | | | | | | |

## Expense Comparables

The following charts summarize income and expenses taken from regional revenue/expense comparables.

BBG

| EXPENSE COMPARABLES | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Comp No. | | 1 | | | 2 | | | 3 | |
| Location | | Peoria, AZ | | | Los Angeles, CA | | | Los Angeles, CA | |
| Year Built | | 2003 | | | 2012 | | | 2001 | |
| Levels of Care | | IL, AL | | | AL, MC | | | AL | |
| No. Beds | | 195 | | | 79 | | | 105 | |
| Potential Resident Days | | 71,175 | | | 28,835 | | | 38,325 | |
| Actual Resident Days | | 66,514 | | | 27,163 | | | 34,914 | |
| Occupancy | | 93.5% | | | 94.2% | | | 91.1% | |
| Revenues | TOTAL | %EGI | $PRD | TOTAL | %EGI | $PRD | TOTAL | %EGI | $PRD |
| Net Rental Income | $5,977,000 | 83% | $89.86 | $5,330,383 | 90% | $196.24 | $5,523,756 | 84% | $158.21 |
| Other Income | $1,252,000 | 17% | $18.82 | $594,317 | 10% | $21.88 | $1,054,697 | 16% | $30.21 |
| Effective Gross Income | $7,229,000 | 100% | $108.68 | $5,924,700 | 100% | $218.12 | $6,578,453 | 100% | $188.42 |
| | | | | | | | | | |
| Expenses | | | | | | | | | |
| Real Estate Taxes | $339,000 | 4.7% | $5.10 | $176,459 | 3.0% | $6.50 | $127,087 | 1.9% | $3.64 |
| Property Insurance | $53,000 | 0.7% | $0.80 | $79,965 | 1.3% | $2.94 | $101,251 | 1.5% | $2.90 |
| Utilites | $520,000 | 7.2% | $7.82 | $144,505 | 2.4% | $5.32 | $224,498 | 3.4% | $6.43 |
| Operating & Maintenance | $403,000 | 5.6% | $6.06 | $263,749 | 4.5% | $9.71 | $283,153 | 4.3% | $8.11 |
| Advertising and Promotion | $289,000 | 4.0% | $4.34 | $140,974 | 2.4% | $5.19 | $185,743 | 2.8% | $5.32 |
| Administrative | $586,000 | 8.1% | $8.81 | $472,085 | 8.0% | $17.38 | $553,388 | 8.4% | $15.85 |
| Dietary Servicees | $1,125,000 | 15.6% | $16.91 | $464,208 | 7.8% | $17.09 | $557,927 | 8.5% | $15.98 |
| Housekeeping | $158,000 | 2.2% | $2.38 | $157,271 | 2.7% | $5.79 | $182,601 | 2.8% | $5.23 |
| Activites and Social | $146,000 | 2.0% | $2.20 | $187,965 | 3.2% | $6.92 | $158,859 | 2.4% | $4.55 |
| Care Services | $771,000 | 10.7% | $11.59 | $1,285,333 | 21.7% | $47.32 | $1,791,790 | 27.2% | $51.32 |
| Management Fee | $361,000 | 5.0% | $5.43 | $296,235 | 5.0% | $10.91 | $328,923 | 5.0% | $9.42 |
| Reserves for Replacement * | $78,000 | 1.1% | $1.17 | $39,500 | 0.7% | $1.45 | $52,500 | 0.8% | $1.50 |
| Operating Expenses | $4,829,000 | 67% | $72.60 | $3,852,754 | 65.0% | $141.84 | $4,733,462 | 72.0% | $135.57 |
| * Reserves added by Appraiser | | | | | | | | | |
| Compiled from Various Sources by BBG | | | | | | | | | |

We gave primary weight to the developer's budget in the majority of the expense line items with the exception of real estate taxes, discussed in the Ad Valorem Tax section of the report.

## Real Estate Tax Expense

Real estate taxes were discussed in the Ad Valorem Tax section of this report.

| REAL ESTATE TAXES | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $85,980 | 5.2% | $5.32 |
| Year 2 | $87,700 | 1.5% | $2.09 |
| Year 3 | $89,454 | 1.1% | $2.13 |
| Expense Comparable 1 | $339,000 | 4.7% | $5.10 |
| Expense Comparable 2 | $176,459 | 3.0% | $6.50 |
| Expense Comparable 3 | $127,087 | 1.9% | $3.64 |
| **BBG Estimate - As If Stabilized Today** | **$497,420** | **6.0%** | **$11.86** |
| **BBG Estimate - Prospective at Stabilization** | **$511,251** | **6.2%** | **$12.19** |
| Compiled by BBG | | | |

We projected real estate taxes based on the concluded stabilized market value. Please refer to the Ad Valorem tax section of the report.

**PL/GL Insurance Expense**

PL/GL Insurance, which is the cost of professional and general liability insurance for the property. The reports indicated the following:

| PROPERTY INSURANCE | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $95,529 | 5.8% | $5.91 |
| Year 2 | $101,456 | 1.7% | $2.42 |
| Year 3 | $103,485 | 1.2% | $2.47 |
| Expense Comparable 1 | $53,000 | 0.7% | $0.80 |
| Expense Comparable 2 | $79,965 | 1.3% | $2.94 |
| Expense Comparable 3 | $101,251 | 1.5% | $2.90 |
| **BBG Estimate - As If Stabilized Today** | **$104,892** | **1.3%** | **$2.50** |
| **BBG Estimate - Prospective at Stabilization** | **$108,039** | **1.3%** | **$2.58** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and concluded to $2.50 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

**Utilities**

The utilities expense covers the cost of electricity, natural gas, water, sewer, and cable television.

| UTILITIES | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $191,090 | 11.6% | $11.82 |
| Year 2 | $187,906 | 3.2% | $4.48 |
| Year 3 | $191,699 | 2.3% | $4.57 |
| Expense Comparable 1 | $520,000 | 7.2% | $7.82 |
| Expense Comparable 2 | $144,505 | 2.4% | $5.32 |
| Expense Comparable 3 | $224,498 | 3.4% | $6.43 |
| **BBG Estimate - As If Stabilized Today** | **$209,784** | **2.6%** | **$5.00** |
| **BBG Estimate - Prospective at Stabilization** | **$216,077** | **2.6%** | **$5.15** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and the expense comparables and concluded to $5.00 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

**Operating and Maintenance**

This expense relates to the repair of and maintenance of the physical plant. It includes contracted services such as landscaping, and also includes salaries and benefits for the maintenance staff, as well as supplies used by the maintenance staff.

INCOME CAPITALIZATION APPROACH

| OPERATING & MAINTENANCE | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $129,590 | 7.9% | $8.02 |
| Year 2 | $221,692 | 3.7% | $5.28 |
| Year 3 | $277,830 | 3.3% | $6.62 |
| Expense Comparable 1 | $403,000 | 5.6% | $6.06 |
| Expense Comparable 2 | $263,749 | 4.5% | $9.71 |
| Expense Comparable 3 | $283,153 | 4.3% | $8.11 |
| **BBG Estimate - As If Stabilized Today** | **$251,741** | **3.1%** | **$6.00** |
| **BBG Estimate - Prospective at Stabilization** | **$259,293** | **3.2%** | **$6.18** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and the expense comparables and concluded to $6.00 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

## Marketing

The Marketing expense includes the wages for the marketing personnel as well as signage, marketing materials, media advertising, and promotional events.

| MARKETING | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $190,522 | 11.6% | $11.79 |
| Year 2 | $172,318 | 3.7% | $5.28 |
| Year 3 | $267,185 | 3.2% | $6.37 |
| Expense Comparable 1 | $289,000 | 4.0% | $4.34 |
| Expense Comparable 2 | $140,974 | 2.4% | $5.19 |
| Expense Comparable 3 | $185,743 | 2.8% | $5.32 |
| **BBG Estimate - As If Stabilized Today** | **$209,784** | **2.6%** | **$5.00** |
| **BBG Estimate - Prospective at Stabilization** | **$216,077** | **2.6%** | **$5.15** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and the expense comparables and concluded to $5.00 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

## Admin & General

The Administrative and General expense includes a broad range of expenses for expenditures needed to operate the facility, but not directly related to the care or providing of services to residents, or the maintenance and operation of the building. Administrative and General expenses include administrative salaries, office salaries, legal expenses, office supplies, dues and subscriptions, licenses, office equipment rental, bank charges, educational costs, telephone, and advertising and marketing costs. This expense is somewhat variable.

| ADMINSTRATIVE & GENERAL | | | |
|---|---|---|---|
| **Year** | **Total** | **% of EGI** | **$/PRD** |
| Year 1 | $639,068 | 38.8% | $39.54 |
| Year 2 | $629,025 | 10.6% | $14.99 |
| Year 3 | $646,924 | 7.7% | $15.42 |
| Expense Comparable 1 | $586,000 | 8.1% | $8.81 |
| Expense Comparable 2 | $472,085 | 8.0% | $17.38 |
| Expense Comparable 3 | $553,388 | 8.4% | $15.85 |
| **BBG Estimate - As If Stabilized Today** | **$629,351** | **7.7%** | **$15.00** |
| **BBG Estimate - Prospective at Stabilization** | **$648,232** | **7.9%** | **$15.45** |
| *Compiled by BBG* | | | |

We gave weight to developer's budget and concluded to $15.00 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

## Dietary Services

Dietary expenses include wages and benefits for the food preparation and serving staff, wages and benefits for dishwashers, raw food, and supplies such as utensils and napkins. These expenses are highly variable, and are best analyzed on a per resident day basis.

| DIETARY SERVICES | | | |
|---|---|---|---|
| **Year** | **Total** | **% of EGI** | **$/PRD** |
| Year 1 | $477,088 | 28.9% | $29.51 |
| Year 2 | $955,501 | 16.1% | $22.77 |
| Year 3 | $1,228,634 | 14.7% | $29.28 |
| Expense Comparable 1 | $1,125,000 | 15.6% | $16.91 |
| Expense Comparable 2 | $464,208 | 7.8% | $17.09 |
| Expense Comparable 3 | $557,927 | 8.5% | $15.98 |
| **BBG Estimate - As If Stabilized Today** | **$755,222** | **9.2%** | **$18.00** |
| **BBG Estimate - Prospective at Stabilization** | **$777,878** | **9.5%** | **$18.54** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and the expense comparables and concluded to $18.00 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

## Housekeeping and Laundry

Items in this department include wages and benefits for the housekeeping and laundry staff, cleaning supplies, and linens. These expenses are variable, and are best analyzed on a per resident day basis.

| HOUSEKEEPING & LAUNDRY | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $181,624 | 11.0% | $11.24 |
| Year 2 | $349,343 | 5.9% | $8.33 |
| Year 3 | $418,064 | 5.0% | $9.96 |
| Expense Comparable 1 | $158,000 | 2.2% | $2.38 |
| Expense Comparable 2 | $157,271 | 2.7% | $5.79 |
| Expense Comparable 3 | $182,601 | 2.8% | $5.23 |
| **BBG Estimate - As If Stabilized Today** | **$209,784** | **2.6%** | **$5.00** |
| **BBG Estimate - Prospective at Stabilization** | **$216,077** | **2.6%** | **$5.15** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and the expense comparables and concluded to $5.00 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

## Activities and Social Services

Activities and Recreation expenses include the cost of activities and recreation, and the costs for staff associated with this department.

| ACTIVITIES & SOCIAL SERVICES | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $186,688 | 11.3% | $11.55 |
| Year 2 | $175,617 | 3.0% | $4.19 |
| Year 3 | $176,638 | 2.1% | $4.21 |
| Expense Comparable 1 | $146,000 | 2.0% | $2.20 |
| Expense Comparable 2 | $187,965 | 3.2% | $6.92 |
| Expense Comparable 3 | $158,859 | 2.4% | $4.55 |
| **BBG Estimate - As If Stabilized Today** | **$188,805** | **2.3%** | **$4.50** |
| **BBG Estimate - Prospective at Stabilization** | **$194,470** | **2.4%** | **$4.64** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and the expense comparables and concluded to $4.50 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

## Care Expense

Care expense includes wages and benefits for care attendants (may include LPNs and RNs) in providing residents of the facility assistance with activities of daily living. Also included are supplies used by the care staff. The subject's pro forma expense relative to the comparables, expressed on a per resident day basis, is as follows:

| CARE EXPENSE | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $846,764 | 51.4% | $52.38 |
| Year 2 | $1,577,357 | 26.6% | $37.59 |
| Year 3 | $2,046,375 | 24.5% | $48.77 |
| Expense Comparable 1 | $771,000 | 10.7% | $11.59 |
| Expense Comparable 2 | $1,285,333 | 21.7% | $47.32 |
| Expense Comparable 3 | $1,791,790 | 27.2% | $51.32 |
| **BBG Estimate - As If Stabilized Today** | **$1,888,054** | **23.0%** | **$45.00** |
| **BBG Estimate - Prospective at Stabilization** | **$1,944,695** | **23.6%** | **$46.35** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and expense comparables and concluded to $45.00 per resident day, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure

## Management Fees

Management fees are fees paid to management companies that are responsible for the operations of a nursing facility. Management company responsibilities vary from facility to facility; however, some of the typical responsibilities of management companies are financial performance, occupancy, profitability of the business, compliance with government regulations, business activities such as billing and collection of receivables, marketing, documentation, and assistance in budgeting. The management is also responsible for the maintenance and repairing of the subject property and grounds, supervision of day-to-day operations, and providing monthly or quarterly reports on occupancy cash flow, operating expenses, and capital accounts.

| MANAGEMENT FEE | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $180,000 | 10.9% | $11.14 |
| Year 2 | $296,568 | 5.0% | $7.07 |
| Year 3 | $417,824 | 5.0% | $9.96 |
| Expense Comparable 1 | $361,000 | 5.0% | $5.43 |
| Expense Comparable 2 | $296,235 | 5.0% | $10.91 |
| Expense Comparable 3 | $328,923 | 5.0% | $9.42 |
| **BBG Estimate - As If Stabilized Today** | **$400,021** | **5.0%** | **$9.53** |
| **BBG Estimate - Prospective at Stabilization** | **$411,144** | **5.0%** | **$9.80** |
| *Compiled by BBG* | | | |

We gave weight to the developer's budget and market norms and concluded to 5.0% of EGI. The subject property will be managed by Meridian, a major operator in the assisted living market. The management fee stipulated by the contract is 5.0% of EGI.

## Reserves for Replacements

The Realty Rates Investor Survey from the 2nd Quarter of 2019 indicated reserve requirements ranging from $260 to $715 per unit, averaging $399 per unit. We estimate **$400** per unit, as if stabilized today. We then grew that figure at the same rate of the rental rates to arrive at a prospective at stabilization figure.

BBG

**Total Expenses**

Total forecast expenses are as follows, in comparison to the developer's pro forma and expense comparables.

| OPERATING EXPENSE CONCLUSION | | | |
|---|---|---|---|
| Year | Total | % of EGI | $/PRD |
| Year 1 | $3,248,763 | 197.0% | $200.98 |
| Year 2 | $4,799,303 | 80.9% | $114.39 |
| Year 3 | $5,908,932 | 70.7% | $140.83 |
| Expense Comparable 1 | $4,829,000 | 66.8% | $72.60 |
| Expense Comparable 2 | $3,852,754 | 65.0% | $141.84 |
| Expense Comparable 3 | $4,733,462 | 72.0% | $135.57 |
| BBG Estimate - As If Stabilized Today | $5,393,256 | 67.4% | $128.54 |
| BBG Estimate - Prospective at Stabilization | $5,553,085 | 67.5% | $132.35 |
| *Compiled by BBG* | | | |

Our projections run closely in line with the developer's budget. The Senior Care Acquisition Report indicates that average expense ratios for assisted living is 65%. Our projection is close to this expense ratio, and is within range on a per resident day.

**Direct Capitalization Technique**

Capitalization is a process of converting a net income stream into an indication of value. This approach to valuation can be accomplished by the following methods: 1) by dividing a single year's net operating income by an appropriate overall capitalization rate, i.e. Direct Capitalization, or 2) by discounting to present value a net income stream and property reversion over a projected holding periods, i.e. Discounted Cash Flow Analysis. The selection of the most appropriate overall rate ($R_o$) in Direct Capitalization can be accomplished by several methods. Extraction from comparable sales and a real estate investment survey were employed to determine an appropriate overall rate.

*Derivation from Comparable Sales*

Overall capitalization rates (OARs) confirmed for comparable sales are presented next. A summary of each of these transactions with regards to the Income Capitalization Technique is as follows:

| COMPARABLE CAPITALIZATION RATES | | | |
|---|---|---|---|
| Comp. | Sale Date | Sale Price Per SF | OAR Basis | OAR |
| 1 | Oct-21 | $393.74 | Existing | N/A |
| 2 | Sep-20 | $383.55 | Existing | N/A |
| 3 | Dec-19 | $351.31 | Existing | 5.00% |
| 4 | Jun-19 | $372.69 | Existing | 6.00% |
| 5 | Jun-19 | $358.59 | Existing | 6.10% |
| OAR Range | | | 5.00%  -  6.10% |
| Indicated OAR | | | 6.00% |
| *Compiled by BBG* | | | |

INCOME CAPITALIZATION APPROACH

*Investor Survey*

As additional support, we have included the data from 2nd Quarter 2021 Realty Rates. The survey is presented in the following table:

| RealtyRates.com INVESTOR SURVEY - 2nd Quarter 2021* HEALTH CARE & SENIOR HOUSING - ASSISTED LIVING FACILITIES | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Item** | **Input** | | | | | | **OAR** |
| **Minimum** | | | | | | | |
| Spread Over 10-Year Treasury | 1.52% | **DCR Technique** | | 1.12 | 0.042934 | 0.90 | **4.34** |
| Debt Coverage Ratio | 1.12 | **Band of Investment Technique** | | | | | |
| Interest Rate | 2.78% | Mortgage | | 90% | 0.042934 | 0.038641 | |
| Amortization | 38 | Equity | | 10% | 0.075317 | 0.007532 | |
| Mortgage Constant | 0.042934 | OAR | | | | | **4.62** |
| Loan-to-Value Ratio | 90% | **Survey** | | | | | **4.39** |
| Equity Dividend Rate | 7.53% | | | | | | |
| **Maximum** | | | | | | | |
| Spread Over 10-Year Treasury | 3.50% | **DCR Technique** | | 2.02 | 0.093402 | 0.60 | **11.31** |
| Debt Coverage Ratio | 2.02 | **Band of Investment Technique** | | | | | |
| Interest Rate | 4.76% | Mortgage | | 60% | 0.093402 | 0.056041 | |
| Amortization | 15 | Equity | | 40% | 0.163458 | 0.065383 | |
| Mortgage Constant | 0.093402 | OAR | | | | | **12.14** |
| Loan-to-Value Ratio | 60% | **Surveyed Rates** | | | | | **11.54** |
| Equity Dividend Rate | 16.35% | | | | | | |
| **Average** | | | | | | | |
| Spread Over 10-Year Treasury | 2.51% | **DCR Technique** | | 1.57 | 0.060043 | 0.75 | **7.07** |
| Debt Coverage Ratio | 1.57 | **Band of Investment Technique** | | | | | |
| Interest Rate | 3.77% | Mortgage | | 75% | 0.060043 | 0.045033 | |
| Amortization | 26 | Equity | | 25% | 0.114980 | 0.028745 | |
| Mortgage Constant | 0.060043 | OAR | | | | | **7.38** |
| Loan-to-Value Ratio | 75% | **Surveyed Rates** | | | | | **7.19** |
| Equity Dividend Rate | 11.50% | | | | | | |

*1st Quarter 2021 Data                                Copyright 2021 RealtyRates.com ™

We can expect a rate below the averages of the surveys due to the subject's Class A construction and remodeled condition in a major metropolitan area.

### Band of Investment

The band of the investment technique has been utilized as a crosscheck to the foregoing techniques.  The Mortgage Interest Rate and the Equity Dividend Rate (EDR) are based upon current market yields for similar investments.  The analysis is shown in the following table.

| BAND OF INVESTMENT | | | | |
|---|---|---|---|---|
| Loan to Value Ratio | 75% | | | |
| Interest Rate | 4.5% | | | |
| Amortization (Yrs.) | 30 | | | |
| Mortgage Constant | 0.0608 | | | |
| Equity Ratio | 25% | | | |
| Equity Dividend Rate (EDR) | 8% | | | |
| **Weighted Average of Mortgage and Equity Requirements** | | | | |
| Mortgage Requirement | 75% | x | 0.0608 | = | 4.56% |
| Equity Requirement | 25% | x | 0.08000 | = | 2.00% |
| Indicated Capitalization Rate | | | | | 6.56% |
| **Rounded** | | | | | **6.60%** |
| *Compiled from Various Sources by BBG* | | | | | |

### Debt Coverage Ratio

The debt coverage ratio (DCR) is the ratio of net operating income to annual debt service and measures the ability of a given property to meet its debt service out of net operating income. Utilizing data obtained from knowledgeable mortgage finance professionals, the subject's projected NOI can be tested for reasonableness against the market's typical loan parameters to determine whether or not the DCR is positive.  This analysis is shown in the following table.

| DEBT COVERAGE RATIO ANALYSIS | |
|---|---|
| Estimate At Stabilization Value | $42,700,000 |
| Mortgage Ration (LTV) | 75% |
| Estimated Mortgage Loan Amount | $32,025,000 |
| Mortgage Interest Rate | 4.5% |
| Amortization Period (Yrs.) | 30 |
| Mortgage Constant (Monthly Payments) | 0.0608 |
| Annual Debt Service (Monthly Payments) | $1,947,192 |
| Estimated NOI | $2,669,787 |
| Estimated Debt Coverage Ratio (DCR) | 1.37 |
| Market Debt DCR | 1.25 |
| Postive DVR (Yes or No) | Yes |
| *Compiled from Various Sources by BBG* | |

### Capitalization Rate Conclusion

The following chart summarizes the OAR conclusions.

| OVERALL CAPITALIZATION RATE CONCLUSION | |
| --- | --- |
| | Indicated OAR |
| Comparable Sales | 5.00% - 6.00% |
| Published Reports | 6.30% - 7.99% |
| Band of Investments | 6.60% |
| **BBG Estimate** | **6.25%** |
| *Compiled from Various Sources by BBG* | |

We gave primary consideration to the comparable sales and the interviews with active market participants. This data tends to provide the most accurate depiction of both buyers' and sellers' expectations within the market.

**Direct Capitalization Summary**

A summary of the direct capitalization is illustrated in the following chart.

## DIRECT CAPITALIZATION METHOD - PROSPECTIVE AT STABILIZATION

| | | |
|---|---|---|
| **No. Licensed Beds** | | **121** |
| AL Potential Resident Days | | 23,725 |
| MC Potential Resident Days | | 365 |
| **Total Potential Resident Days** | | **44,165** |
| **Total Projected Actual Resident Days** | | **41,957** |
| **Occupancy** | | **95%** |

| Income | | $/PRD | Total |
|---|---|---|---|
| **Potential Rental Income** | | | |
| Assisted Living Units | | $165.49 | $3,730,001 |
| Memory Care Units | | $8,786.73 | $3,046,800 |
| Specialized Care Fees | | $40.83 | $1,713,096 |
| Second Resident Fees | | $0.00 | $0 |
| Community Entrance Fee | | $3.95 | $165,758 |
| **Total** | | **$206.30** | **$8,655,655** |
| **Vacancy** | 5.00% | ($10.31) | ($432,783) |
| **Effective Gross Income** | | **$195.98** | **$8,222,872** |

| Expenses | Percentage of EGI | $/PRD | Total |
|---|---|---|---|
| Real Estate Taxes | 6.2% | $12.19 | $511,251 |
| Property Insurance | 1.3% | $2.58 | $108,039 |
| Utilites | 2.6% | $5.15 | $216,077 |
| Operating & Maintenance | 3.2% | $6.18 | $259,293 |
| Advertising and Promotion | 2.6% | $5.15 | $216,077 |
| Administrative | 7.9% | $15.45 | $648,232 |
| Dietary Services | 9.5% | $18.54 | $777,878 |
| Housekeeping | 2.6% | $5.15 | $216,077 |
| Activities and Social Services | 2.4% | $4.64 | $194,470 |
| Care Services | 23.6% | $46.35 | $1,944,695 |
| Management Fee @ | 5.0% | $9.80 | $411,144 |
| Reserves for Replacement | 0.6% | $1.19 | $49,852 |
| **Operating Expenses** | | **$132.35** | **$5,553,085** |
| **Operating Expense Ratio** | | | 67.53% |
| | | | |
| **Net Operating Income (NOI)** | | **$63.63** | **$2,669,787** |
| **OAR** | | | **6.25%** |

| Value Conclusions | Per SF | Per Bed | Total |
|---|---|---|---|
| **At Stabilization Going Concern Value** | $716 | $353,030 | $42,716,596 |
| **Rounded** | **$716** | **$352,893** | **$42,700,000** |
| Less: Lease-Up Discount | ($35) | ($17,070) | ($2,065,511) |
| **At Completion Going Concern Value** | $681 | $335,822 | $40,634,489 |
| **Rounded** | **$681** | **$335,537** | **$40,600,000** |
| **Value Per Unit** | | | **$335,537** |
| **Value Per SF** | | | **$681** |

*Compiled from Various Sources by BBG*

INCOME CAPITALIZATION APPROACH

**Lease Up Discount**

In order to estimate a stabilization discount, we subtracted the rent loss presented and analyzed later in this report. This figure will be deducted from the sales comparison and cost approaches to value and our direct capitalization.

*Absorption Timeline*

The developer projects to reach a stabilized occupancy in Month 12 from completion at 95%. NIC reports average monthly move-in rates for assisted living facilities at 4.8 per month, or 26-28 months for the subject. The subject is essentially new upon completion and is at the top of the competitive properties in terms of quality. Therefore, we expect a slightly more aggressive absorption timeline.

Based upon this data and considering the prevailing market occupancy level, we are forecasting that the subject will require 12 Months to reach stabilized occupancy, at a pace of 5.5 beds per month. This is above national averages, but in line with the developer and appears reasonable due to the other new facility in Oxnard.

| INCOME LOSS DURING ABSORPTION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Pro Forma EGI | $8,222,872 | | | | | | | |
| Pro Forma Expenses | $5,553,085 | | | | | | | |
| Pro Forma NOI | $2,669,787 | | | | | | | |
| Starting Occupancy Level | 25.00% | | | | | | | |
| Absorption Period | 12 Months | | | | | | | |

| Month | Forecast % of EGI Earned | Pro Forma EGI | Projected EGI | Forecast % of Expenses Incurred | Pro Forma Expenses | Forecast Expenses | Forecast NOI | Pro Forma NOI | Income Loss |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 25.00% | $685,239 | $171,310 | 70% | $462,757 | $323,930 | ($152,620) | $222,482 | $375,102 |
| 2 | 31.82% | $685,239 | $218,031 | 72% | $462,757 | $333,185 | ($115,154) | $222,482 | $337,637 |
| 3 | 38.64% | $685,239 | $264,752 | 74% | $462,757 | $342,440 | ($77,689) | $222,482 | $300,171 |
| 4 | 45.45% | $685,239 | $311,472 | 76% | $462,757 | $351,695 | ($40,223) | $222,482 | $262,705 |
| 5 | 52.27% | $685,239 | $358,193 | 78% | $462,757 | $360,951 | ($2,757) | $222,482 | $225,239 |
| 6 | 59.09% | $685,239 | $404,914 | 80% | $462,757 | $370,206 | $34,709 | $222,482 | $187,774 |
| 7 | 65.91% | $685,239 | $451,635 | 82% | $462,757 | $379,461 | $72,174 | $222,482 | $150,308 |
| 8 | 72.73% | $685,239 | $498,356 | 84% | $462,757 | $388,716 | $109,640 | $222,482 | $112,842 |
| 9 | 79.55% | $685,239 | $545,077 | 86% | $462,757 | $397,971 | $147,106 | $222,482 | $75,377 |
| 10 | 86.36% | $685,239 | $591,798 | 88% | $462,757 | $407,226 | $184,571 | $222,482 | $37,911 |
| 11 | 93.18% | $685,239 | $638,518 | 90% | $462,757 | $416,481 | $222,037 | $222,482 | $445 |
| | | | | | | | Total | | $2,065,511 |

*Compiled from Various Source by BBG*

## RECONCILIATION AND FINAL VALUE CONCLUSION

**Reconciliation**

Reconciliation and correlation of market value is performed when more than one approach to value is used to value real property. It weighs the relative significance, applicability, and defensibility of each value indication and relies most heavily on the one that is most appropriate to the purpose of the appraisal. The conclusion drawn in the reconciliation is based on the appropriateness, the accuracy, and the quantity of the evidence in the entire appraisal.

The reconciled values for the subject, via the two utilized approaches to value, are as follows.

| SUMMARY OF VALUE CONCLUSIONS | | |
|---|---|---|
| | As Is November 15, 2021 | At Stabilization on December 1, 2022 |
| Sales Comparison Approach | $40,200,000 | $42,200,000 |
| Income Capitalization Approach | $40,600,000 | $42,700,000 |
| **Reconciled Value** | **$40,600,000** | **$42,700,000** |
| *Compiled by BBG* | | |

In the sales comparison approach, the subject is compared to similar properties that have been sold recently for which sale prices are known. Market participants are currently analyzing purchase prices on investment properties as they relate to available substitutes in the market. Therefore, the sales comparison approach is considered to provide a reliable value indication, but has been given secondary emphasis in the final value reconciliation.

The Income Capitalization Approach was considered a reliable indicator of value because it reflects current economic conditions in the marketplace that affect the subject property. This approach is most often relied upon by market participants when valuing senior housing properties in this market. Furthermore, the results of the income capitalization approach were supported by comparing the subject's projected income and expenses to those of comparable properties and published reports. Therefore, we have given primary consideration to the income capitalization approach.

Based on the foregoing, the Fee Simple Market Values of the subject have been concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion** |
| As Is | Fee Simple | November 15, 2021 | $40,600,000 |
| Prospective at Stabilization | Fee Simple | December 1, 2022 | $42,700,000 |
| *Compiled by BBG* | | | |

**EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS**

An extraordinary assumption  is uncertain information accepted as fact.  If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value concldusions. The value conclusions are subject to the following extraordinary assumptions:

It is an assumption of the report that the facility stabilizes by the prospective date of stabilization

It is an assumption of the report that today's market conditions prevail through both prospective dates of value

A hypothetical condition is a fact that is known to be false, but  presumed to be true for the purposes of the appraisal. The value conclusions are subject to the following hypothetical conditions:

None noted

*Compiled form Various Sources by BBG, Inc.*

***The use of extraordinary assumptions and/or hypothetical conditions might have affected the assignment results.***

## VALUE ALLOCATION

There are potentially three components that constitute the total value of an asset: real property, personal property including furniture, fixtures & equipment (FF&E) and intangibles (goodwill, business values).

Many theories have been developed over the years in an attempt to isolate these components of a senior housing asset. The most prevalent method has been known widely as the "Rushmore Approach" where a deduction for both management and franchise fees from the cash flows remove the intangibles or business value component. However, some opine that management and franchise fees were merely operating expenses that are necessary to run the business and the return on and of these fees should be taken into consideration to account for the intangible components.

A more prudent approach in separating the real property, personal property and intangible components is presented herein. The income attributable to the three components is separately calculated as shown in the following tables. The overall rate applied to the NOI for the going concern is not applicable to the return on the intangibles or the personal tangible property. The income attributable to the intangibles is significantly riskier than the income attributable to the going concern which is largely attributable tangible real property. A significantly higher capitalization rate is required for the intangibles than that used for the going concern. A review of business listings for sale indicate that the asking capitalization rates for an assortment of businesses range from 25% to 69% with the majority falling between 25% and 40%. Discussions with senior housing buyers and investors indicate that appropriate capitalization rate for a senior housing's business component would fall within this range. A rate of 40.00% would typically be used herein.

With respect to the personal property, the capitalization rate should be higher than that used for the going concern but much lower than the rate used for the intangibles. This is due to the fact that the personal property has a much shorter life than the real property which comprises the majority of the going concern value as well as the fact that personal property is tangible and is more marketable than the intangible assets. A rate of 15% is used for the personal property. The rates used herein are reflective of the risks associated with each component and the marketability of each component.

Several methods are used to determine the market value of the furniture, fixtures, and equipment. A recommended approach is to use the depreciated replacement cost. As senior housing is typically sold with the FF&E in place, a sale of just the FF&E usually takes place as a salvage or liquidation sale, which results in substantially less value than if in place and contributing to the senior housing operation. The estimation of the market value of the tangible personal property is an allocation of the total value and is not likely to be a distinct component of a typical real estate transaction of an ongoing operation.

**Value Allocation Conclusion**

Based on the foregoing, the value allocation of the subject has been concluded as follows:

| ALLOCATION OF VALUE - AT STABILIZATION | | | |
|---|---|---|---|
| **Assumptions** | | | |
| Total Management Fee (Stabilization) | | | $411,144 |
| Mangement Fee for Business Operations | @ | 50% | $205,572 |
| Mangement Fee for Real Property Operations | @ | 50% | $205,572 |
| **Allocation of FF&E Value** | | | |
| Replacement Cost New of FF&E | | | $870,000 |
| Average Total Useful Life (Years) | | | 20 |
| Remaining Useful Life (Years) | | | 20 |
| Depreciation (%) | | | 0% |
| Depreciated Cost of FF&E | | | $870,000 |
| **Income Attributable to Business/Intangibles** | | | |
| Management Fee for Business Operations | | | $205,572 |
| Franchise Fees | | | $0 |
| Total | | | $205,572 |
| **Income Attributable to Business/Intangibles** | | | |
| Value Attributable to Business/Intangibles | @ | 40.00% | $513,929 |
| Rounded | | | $510,000 |
| **Final Allocation (Rounded)** | | | |
| Final Value of the Total Assets of the Business | | | $42,700,000 |
| Value Attributable to FF&E | | | $870,000 |
| Value Attributable to Business/Intangibles | | | $510,000 |
| Value Attributable to Real Estate | | | $41,320,000 |
| *Compiled from Various Sources by BBG* | | | |

**FF&E Estimate**

For the estimate of FF&E, we have utilized actual cost comparisons, Marshall & Swift, and the developer's budget.

| FF&E COST ESTIMATE | | |
|---|---|---|
| **Comp** | **No.** | **Per Unit** |
| Hillsboro, TX | 46 | $2,989 |
| Fort Worth, TX | 93 | $7,183 |
| Merrillville, IN | 46 | $3,696 |
| Richmond, IN | 42 | $4,048 |
| Lakewood Ranch, FL | 40 | $11,500 |
| Mt. Dora, FL | 84 | $3,592 |
| Titusville, FL | 46 | $8,587 |
| Midlletown, OH | 36 | $5,833 |
| Santa Monica, CA | 80 | $7,588 |
| Tustin, CA | 52 | $9,904 |
| Min | | $2,989 |
| Max | | $11,500 |
| MVS Range (Per Unit) | | $1,030-$2,140 |
| Developer Budget | | $5,979 |
| **BBG Estimate Per Unit** | | **$7,200** |
| **Indicated FF&E Replacement Cost** | | **$871,200** |
| **Rounded** | | **$870,000** |
| *Compiled from Various Sources by BBG* | | |

The developer is projecting $7,163 per unit, which is what we placed our emphasis on.

| FF&E DEPRECIATED COST ESTIMATE | |
|---|---|
| FF&E Effective Age (Weighted) | 0 |
| MVS Expected Life (Weighted) | 7 |
| FF&E Physical Depreciation | 0.0% |
| MVS Salvage Value of FF&E | 10% |
| FF&E Replacement Cost New | $870,000 |
| Less: Salvage Value @ 10% | ($87,000) |
| Depreciable Cost | $783,000 |
| Less: Depreciation @ 0% | $0 |
| Plus Salvage Value | $87,000 |
| Depreciated FF&E Cost | $870,000 |
| **Rounded** | **$870,000** |
| **Depreciated FF&E Cost Per Unit** | **$7,190** |
| *Compiled from Various Sources by BBG* | |

## ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report has been made with the following general assumptions:

1) Notwithstanding that Appraiser may comment on, analyze or assume certain conditions in the appraisal, BBG, Inc. shall have no monetary liability or responsibility for alleged claims or damages pertaining to: (a) title defects, liens or encumbrances affecting the property; (b) the property's compliance with local, state or federal zoning, planning, building, disability access and environmental laws, regulations and standards; (c) building permits and planning approvals for improvements on the property; (d) structural or mechanical soundness or safety; (e) contamination, mold, pollution, storage tanks, animal infestations or other hazardous conditions affecting the property; and (f) other conditions and matters for which licensed real estate appraisers are not customarily deemed to have professional expertise. Accordingly:

    a) The Appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the Appraiser or the Appraiser's staff or was obtained or taken from referenced sources and is considered reliable. The Appraiser and BBG, Inc. shall not be monetarily liability or responsible for or assume the costs of preparation or arrangement of geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.

    b) Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment. Further, unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Further, unless otherwise stated, it is assumed that there are no rights associated with extraction or exploration of such elements considered. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

    c) Any legal description or plats reported in the appraisal are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. BBG, Inc. has made no survey of the property and assumes no monetary liability or responsibility in connection with such matters.

    d) Title is assumed to be good and marketable, and in fee simple, unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated. Further, BBG, Inc. assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.

    e) The appraisal report is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the appraisal report; additionally, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the appraisal report. Further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate. Moreover, unless otherwise stated herein, it is assumed that there are no encroachments or violations of any zoning or other regulations affecting the subject property, that the utilization of the land and improvements is within the boundaries or property lines of the property described, and that there are no trespasses or encroachments.

    f) The American Disabilities Act (ADA) became effective January 26, 1992. The Appraiser has not made a specific compliance survey or analysis of the property to determine whether or not it is in conformity with e various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with

one or more of the requirements of the Act. If so, this fact could have a negative impact upon the value of the property. Since the Appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

g) No monetary liability or responsibility is assumed for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.

h) It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein. Further, it is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.

i) Unless otherwise stated within the appraisal report, the depiction of the physical condition of the improvements described therein is based on visual inspection. No monetary liability or responsibility is assumed for (a) the soundness of structural members since no engineering tests were conducted; (b) the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made; and (c) hidden, unapparent or masked property conditions or characteristics that were not clearly apparent during the Appraiser's inspection.

j) If building improvements are present on the site, it is assumed that no significant evidence of termite damage or infestation was observed during physical inspection, unless so stated in the appraisal report. Further, unless so stated in the appraisal report, no termite inspection report was available. No monetary liability or responsibility is assumed for hidden damages or infestation.

k) Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No monetary liability or responsibility is assumed for such conditions or for engineering which may be required to discover them.

l) BBG, Inc. is not an expert in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. BBG, Inc. assumes no monetary liability or responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraiser is not qualified to detect such substances. The Client is urged to retain an expert in this field; however, Client retains such expert at Client's own discretion, and any costs and/or expenses associated with such retention are the responsibility of Client.

m) BBG, Inc. is not an expert in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. BBG, Inc. assumes no monetary liability or responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The Appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions contained within the appraisal repot based upon any subsequent endangered species impact studies, research, and investigation that may be provided. However, it is assumed that no environmental impact studies were either requested or made in conjunction with this analysis, unless otherwise stated within the appraisal report.

2) If the Client instructions to the Appraiser were to inspect only the exterior of the improvements in the appraisal process, the physical attributes of the property were observed from the street(s) as of the inspection date of the appraisal. Physical characteristics of the property were obtained from tax assessment records, available plans, if any, descriptive information, and interviewing the client and other knowledgeable persons. It is assumed the interior of the subject property is consistent with the exterior conditions as observed and that other information relied upon is accurate.

3) If provided, the estimated insurable value is included at the request of the Client and has not been performed by a qualified insurance agent or risk management underwriter. This cost estimate should not be solely relied upon for insurable value purposes. The Appraiser is not familiar with the definition of insurable value from the

insurance provider, the local governmental underwriting regulations, or the types of insurance coverage available. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The Appraiser is not a cost expert in cost estimating for insurance purposes.

4) The dollar amount of any value opinion herein rendered is based upon the purchasing power and price of the United States Dollar as of the effective date of value. This appraisal is based on market conditions existing as of the date of this appraisal.

5) The value estimates reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value estimates, unless such proration or division of interests is set forth in the report. Any division of the land and improvement values estimated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

6) Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are BBG, Inc.'s best estimate of current market thinking of what future trends will be. No warranty or representation is made that such projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

7) The Appraiser assumes no monetary liability or responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.

8) Any proposed or incomplete improvements included in the appraisal report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.

9) If the appraisal report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the Appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

10) Although the Appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the Appraiser either by the Client or others. If for any reason, future investigations should prove any data to be in substantial variance with that presented in this report, the Appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or estimates of value.

11) The right is reserved by the Appraiser to make adjustments to the analyses, opinions, and conclusions set forth in the appraisal report as may be required by consideration of additional or more reliable data that may become available. No change of this report shall be made by anyone other than the Appraiser. The Appraiser shall have no monetary liability or responsibility for any unauthorized change(s) to the report.

The submission of the appraisal report constitutes completion of the services authorized and agreed upon. Such appraisal report is submitted on the condition the Client will provide reasonable notice and customary compensation, including expert witness fees, relating to any subsequent required attendance at conferences, depositions, or judicial or administrative proceedings. In the event the Appraiser is subpoenaed for either an appearance or a request to produce documents, a best effort will be made to notify the Client immediately. The Client has the sole responsibility for obtaining a protective order, providing legal instruction not to appear with the appraisal report and related work

files, and will answer all questions pertaining to the assignment, the preparation of the report, and the reasoning used to formulate the estimate of value. Unless paid in whole or in part by the party issuing the subpoena or by another party of interest in the matter, the Client is responsible for all unpaid fees resulting from the appearance or production of documents regardless of who orders the work.

# BBG

**Third-party reports by a true third party.**

## BBG OVERVIEW

BBG is one of the nation's largest real estate due diligence firms with more than 35+ offices across the country serving more than 2,700 clients. We deliver best-in-class valuation, advisory and assessment services with a singular focus of meeting our clients' needs.

Our professional team offers broad industry expertise and deep market knowledge to help clients meet their objectives throughout the real estate life cycle.

BBG clients include commercial real estate professionals, investors, lenders, attorneys, accountants and corporations.

## THE BBG DIFFERENCE

**National Footprint.** BBG is one of only two national firms offering in-house valuation and environmental and property condition assessment services for all commercial property types.

**Customer-focused Growth.** BBG is one of the largest national due diligence firms because we deliver best-in-class work product and provide excellent customer care.

**Qualified Team.** Over 50 percent of BBG appraisers are MAI designated and offer deep industry expertise gained through real-world experience.

**Unbiased Independence.** By focusing exclusively on due diligence services, BBG guarantees an independent perspective free from potential conflicts of interest.

**Innovative Technology.** BBG has made significant analytics and IT investments to continually improve our data and report quality.

## SERVICES

**Valuation**
+ Single Asset Valuation
+ Portfolio Valuation
+ Institutional Asset Valuation
+ Appraisal Review
+ Appraisal Management
+ Lease and Cost Analysis
+ Insurance Valuation
+ Arbitration & Consulting
+ Feasibility Studies
+ Highest and Best Use Studies
+ Evaluation
+ Investment analysis
+ Tax appeals
+ Litigation Support
+ Manufactured Housing and Campgrounds

**Advisory**
+ ASC 805 Business combinations
+ ASC 840 Leases
+ Purchase Price Allocations
+ Portfolio Valuations for reporting net asset values (NAV)
+ Public and non-traded REIT valuations
+ Valuations for litigation and litigation support
+ Sale-leaseback valuation analysis
+ Valuations for bankruptcy/fresh start accounting
+ Cost segregation analysis

**Assessment**
+ Environmental due diligence
+ Property condition consulting
+ Small loan services
+ Energy consulting
+ Environmental consulting
+ Zoning
+ ALTA Surveys

 **VALUATION**    **ADVISORY**    **ASSESSMENT**    **ZONING**

## EXHIBITS

**GLOSSARY** ..................................................................................................................... **A**

**CLIENT ENGAGEMENT LETTER** ...................................................................................... **B**

**SUBJECT PICTURES** ....................................................................................................... **C**

**COMPARABLE LAND SALES** ............................................................................................ **D**

**COMPARABLE IMPROVED SALES** ....................................................................................**E**

**SUBJECT DATA** ...............................................................................................................**F**

**PROFESSIONAL QUALIFICATIONS** ..................................................................................**G**

## GLOSSARY

**Assessed Value:** The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value. [1]

**Asset:**
1. Any item, the rights to which may have economic value, including financial assets (cash or bonds), business interests, intangible assets (copyrights and trademarks), and physical assets (real estate and personal property).
2. In general business usage, something owned by a business and reflected in the owner's business sheet.

**Asset:** A resource controlled by the entity as a result of past events and from which future economic benefits are expected to flow to the entity. [2]

**Capital Expenditure:** Investments of cash (or the creation of liability) to acquire or improve an asset, e.g., land, buildings, building additions, site improvements, machinery, equipment; as distinguished from cash outflows for expense items that are normally considered part of the current period's operations. [1]

**Cash Equivalency**: An analytical process in which the sale price of a transaction with nonmarket financing or financing with unusual conditions or incentives is converted into a price expressed in terms of cash or its equivalent. [1]

**Client:**
1. The individual, group, or entity who engages a valuer to perform a service (USPAP)
2. The party or parties who engage, by employment or contract, an appraiser in a specific assignment. Comment: The client may be an individual, group, or entity, and may engage and communicate with the appraiser directly or through an agent (USPAP, 2016-17-ed).
3. Generally the party or parties ordering the appraisal report. It does not matter who pays for the work (CUSPAP, 2014-ed). [1]

**Condominium Ownership:** A form of fee ownership of separate units or portions of multiunit buildings that provides for formal filing and recording of a divided interest in real property. [3]

**Cost Approach:** A set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive, deducting depreciation from the total cost, and adding the estimated land value. Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised. [1]

**Credible**:
1. Worthy of belief, supported by analysis of relevant information. Creditability is always measured in the context of intended use. (SVP)
2. Worthy of belief. Comment: Creditable assignment results require support, by relevant evidence and logic, to the degree necessary for the intended use. (USPAP, 2016-2017-ed.). [1]

**Deferred Maintenance:** Needed repairs or replacement of items that should have taken place during the course of normal maintenance. [1]

**Disposition Value:** The most probable price that a specified interest in real property should bring under the following conditions: 1) Consummation of a sale within a specific time, which is short than the typical exposure time for such a property in that market. 2) The property is subjected to market conditions prevailing as of the date of valuation. 3) Both the buyer and seller are acting prudently and knowledgeably. 4) The seller is under compulsion to sell. 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) An adequate marketing effort will be made during the exposure time. 8) Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration of the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms. [1]

**Economic Life:** The period over which improvements to real property contribute to property value. [1]

**Effective Date:** 1) The date on which the analyses, opinions, and advice in an appraisal, review, or consulting service apply. 2) In a lease document, the date upon which the lease goes into effect. [1]

**Effective Gross Income Multiplier (EGIM):** The ratio between the sale price (or value) of a property and its effective gross income. [1]

**Effective Rent:** Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions, the rent that is effectively paid by a tenant net of financial concessions provided by a landlord. [1]

**Exposure Time:** 1) The time a property remains on the market. 2) The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market (USPAP 2016-2017-ed). [1]

**Extraordinary Assumptions:** An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. Comment: Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property, or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2016-2017 ed). [1]

**Fair Market Value:** In nontechnical usage, a term that is equivalent to the contemporary usage of market value. [1]

**Fair Share:** That portion of total market supply accounted for by a subject property. For example, a 100-key hotel in 1,000-key market has a fair share of 10%. [1]

**Fair Value:**
1. The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. (FASB)
2. The estimated price for the transfer of an asset or liability between identified knowledgeable and willing parties that reflects the respective interests of those parties. (This does not apply to valuations for financial reporting.) (IVS). [1]

**Fair Value:** The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. [2]

**Fee Simple Estate:** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. [1]

**Floor Area Ratio (FAR):** The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area. [1]

**Going-Concern Value:** 1) 73. An established and operating business having an indefinite future life. 2) 74. An organization with an indefinite life that is sufficiently long that, over time, all currently incomplete transformations [transforming resources from one form to a different, more valuable form] will be completed. [1]

**Gross Building Area (GBA):** 1) Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved. 2) Gross leasable area plus all common areas. 3) 16. For residential space, the total area of all floor levels measured from the exterior of the walls and including the super structure and substructure basement; typically does not include garage space. [1]

**Highest and Best Use:** 1) The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. 2) The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (IVS). 3) [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform Appraisal Standards for Federal Land Acquisitions) [1]

**Hypothetical Condition:** 1) 117.A condition that is presumed to be true when it is known to be false. (SVP). 2) A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2016-2017 ed.) [1]

**Income Capitalization Approach:** Specific appraisal techniques applied to develop a value indication for a property based on its earning capability and calculated by the capitalization of property income. [1]

**Inspection:** Personal observation of the exterior or interior of the real estate that is the subject of an assignment performed to identify the property characteristics that are relevant to the assignment, such as amenities, general physical condition, and functional utility. Note that this is not the inspection process performed by a licensed or certified building inspector. [1]

**Insurable Value:** A type of value for insurance purposes. [1]

**Intangible Assets:** 1) A nonmonetary asset that manifests itself by its economic properties. It does not have physical substance but grants rights and economic benefits to its owner. (IVS). 2) A nonphysical asset such as a franchise, trademark, patent, copyright, goodwill, equity, mineral right, security, and contract (as distinguished from physical assets) that grant rights and privileges, and have value for the owner. (ASA). 3) An identifiable nonmonetary asset without physical substance. An asset is a resource that is controlled by the entity as a result of past events (for ex-ample, purchase or self-creation) and from which future economic benefits (inflows of cash or other assets) are expected. [IAS 38.8] Thus, the three critical attributes of an intangible asset are: identifiability, control (power to obtain benefits from the asset), ·future economic benefits (such as revenues or reduced future costs). (IAS 38) [1]

**Intangible property:** Nonphysical assets, including but not limited to franchises, trademarks, patents, copyrights, goodwill, equities, securities, and contracts as distinguished from physical assets such as facilities and equipment. (USPAP, 2016-2017 ed.) [1]

**Intended Use:** The valuer's intent as to how the re-port will be used. (SVP) 2) The use or uses of an appraiser's reported appraisal or appraisal review assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment. (USPAP, 2016-2017 ed.) [1]

**Intended User:** 1) The party or parties the valuer intends will use the report. (SVP) 2) The client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser on the basis of communication with the client at the time of the assignment. (USPAP, 2016-2017 ed.) [1]

**Internal Rate of Return ("IRR"):** The annualized yield rate or rate of return on capital that is generated or capable of being generalized within an investment of portfolio over a period of ownership. Alternatively, the indicated return of capital associated with a projected or pro forma income stream. The discount rate that equates the present value of the net cash flows of a project with the present value of the capital investment. It is the rate at which the Net Present Value (NPV) equals zero. The IRR reflects both the return on invested capital and the return of the original investment, which are basic considerations of potential investors. Therefore, deriving the IRR from analysis of market transactions of similar properties having comparable income patterns is a proper method for developing market discount rates for use in valuations to arrive at Market Value. Used in discounted cash flow analysis to find the implied or expected rate of return of the project, the IRR is the rate of return which gives a zero net present value (NPV). See also equity yield rate (YE); financial management rate of return (FMRR); modified internal rate of return (MIRR); yield rate (Y). [1]

**Investment Value:** 1) The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. 2) The value of an asset to the owner or a prospective owner for individual investment or operational objectives. (IVS) [1]

**Leasehold Interest:** The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. [1]

**Leased Fee Interest:** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. [1]

**Liquidation Value:** The most probable price that a specified interest in real property should bring under the following conditions: 1) Consummation of a sale within a short time period; 2) The property is subjected to market conditions prevailing as of the date of valuation; 3) Both the buyer and seller are acting prudently and knowledgeably; 4) The seller is under extreme compulsion to sell; 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) A normal marketing effort is not possible due to the brief exposure time 8) Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms. [1]

**Load Factor:** A measure of the relationship of common area to useable area and therefore the quality and efficiency of building area layout, with higher load factors indicating a higher percentage of common area to overall rentable space than lower load factors; calculated by subtracting the amount of usable area from the rentable area and then dividing the difference by the usable area: [1]
Load Factor =

$$\frac{(\text{Rentable Area} - \text{Useable Area})}{\text{Usable Area}}$$

**Market Value.** The major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined.*

1. The most widely accepted components of market value are incorporated in the following definition: The most probable price that the specified property interest should sell for in a competitive market after a reasonable exposure time, as of a specified date, in cash, or in terms equivalent to cash, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, for self-interest, and assuming that neither is under duress.

2. Market value is described, not defined, in the Uniform Standards of Professional Appraisal Practice (USPAP) as follows: A type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal. Comment: Forming an opinion of market value is the purpose of many real property appraisal assignments, particularly when the client's intended use includes more than one intended user. The conditions included in market value definitions establish market perspectives for development of the opinion. These conditions may vary from definition to definition but generally fall into three categories:

- the relationship, knowledge, and motivation of the parties (i.e., seller and buyer);
- the terms of sale (e.g., cash, cash equivalent, or other terms); and
- the conditions of sale (e.g., expo- sure in a competitive market for a reasonable time prior to sale).

USPAP also requires that certain items be included in every appraisal report. Among these items, the following are directly related to the definition of market value:

- Identifications of the specific property rights to be appraised.
- Statement of the effective date of the value opinion.
- Specification as to whether cash, terms equivalent to cash, or other precisely described financing terms are assumed as the basis of the appraisal.
- If the appraisal is conditioned upon financing or other terms, specification as to whether the financing or terms are at, below, or above market interest rates and/or contain unusual conditions or incentives. The terms of above- or below-market interest rates and/or other special incentives must be clearly set forth; their contribution to, or negative influence on, value must be described and estimated; and the market data supporting the opinion of value must be described and explained.

3. The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States: The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

Buyer and seller are typically motivated;

Both parties are well informed or well advised, and each acting in what they consider their own best interests;

A reasonable time is allowed for exposure in the open market;

Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

· The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

4. The International Valuation Standards Council defines market value for the purpose of international standards as follows: The estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion. (IVS)

5. The Uniform Standards for Federal Land Acquisitions defines market value as follows: Market value is the amount in cash, or on terms reason ably equivalent to cash, for which in all probability the property would have sold on the effective date of the appraisal, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal. (Uniform Appraisal Standards for Federal Land Acquisitions) [1]

**Market Value "As If Complete" On The Appraisal Date:**
Market value as if complete on the effective date of the appraisal is an estimate of the market value of a property with all construction, conversion, or rehabilitation hypothetically completed, or under other specified hypothetical conditions as of the date of the appraisal. With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of completion, this estimate of value should reflect the market value of the property as if complete and prepared for occupancy by tenants.

**Market Value "As Is" On The Appraisal Date:** Value As Is -The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning. See also effective date; prospective value opinion.

**Market Value of the Total Assets of the Business:** The market value of the total assets of the business is the market value of all of the tangible and intangible assets of a business as if sold in aggregate as a going concern. This assumes that the business is expected to continue operations well into the future. [4]

**Marketing Time:** An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property Market Value Opinions" address the determination of reasonable exposure and marketing time.). [3]

**Net Lease:** A lease in which the landlord passes on all expenses to the tenant. See also lease. [1]

**Net Rentable Area (NRA):** 1) The area on which rent is computed. 2) The Rentable Area of a floor shall be computed by measuring to the inside finished surface of the dominant portion of the permanent outer building walls, excluding any major vertical penetrations of the floor. No deductions shall be made for columns and projections necessary to the building. Include space such as mechanical room, janitorial room, restrooms, and lobby of the floor. [5]

**Penetration Ratio (Rate):** The rate at which stores obtain sales from within a trade area or sector relative to the number of potential sales generated; usually applied to existing facilities. Also called: penetration factor. [1]

**Prospective opinion of value.** A value opinion effective as of a specified future date. The term does not define a type of value. Instead it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy. [1]

**Reconciliation:** A phase of a valuation assignment in which two or more value indications are processed into a value opinion, which may be a range of value, a single point estimate, or a reference to a benchmark value. [1]

**Reliable Measurement:**    [The IAS/IFRS framework requires that] neither an asset nor a liability is recognized in the financial statements unless it has a cost or value that can be measured reliably. [2]

**Remaining Economic Life:** The estimated period over which existing improvements are expected to contribute eco-nomically to a property; an estimate of the number of years remaining in the economic life of a structure or structural components as of the effective date of the appraisal; used in the economic age-life method of estimating depreciation. [1]

**Replacement Cost:** The estimated cost to construct, at current prices as of the effective appraisal date, a substitute for the building being appraised, using modern materials and current standards, design, and layout. [1]

**Retrospective Value Opinion:** A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." [1]

**Sales Comparison Approach:** The process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant when an adequate supply of comparable sales is available. [1]

**Scope of Work:** 1) The type of data and the extent of research and analyses. (SVP).  2) The type and extent of research and analyses in an appraisal or appraisal review assignment. (USPAP, 2016¬2017 ed.) [1]

**Stabilized value**: A value opinion that excludes from consideration any abnormal relationship between supply and demand such as is experienced in boom periods when cost and sale price may exceed the long-term value, or during periods of depression, when cost and sale price may fall short of long-term value. It is also a value opinion that excludes from consideration any transitory condition that may cause excessive construction costs, e.g., a premium paid due to a temporary shortage of supply.

**Substitution:** The principle of substitution states that when several similar or commensurate commodities, goods, services are available, the one with the lowest price will attract the greatest demand and widest distribution. This is the primary principle upon which the cost and sales comparison approaches are based. [3]

**Total Assets of a Business:**  Total assets of a business is defined by the Appraisal Institute as "the tangible property (real property and personal property, including inventory and furniture, fixtures and equipment) and intangible property (cash, workforce, contracts, name, patents, copyrights, and other residual intangible assets, to include capitalized economic profit)."

**Use Value:**
The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Use value may or may not be equal to market value but is different conceptually. [1]

[1]Appraisal Institute, *The Dictionary of Real Estate Appraisal, 6*th ed. (Chicago: Appraisal Institute 2010). [2]Appraisal Institute, *International Financial Reporting Standards for Real Property Appraiser, IFRS Website,* www.ifrs-ebooks.com/index.html. [3]Appraisal Institute, *The Appraisal of Real Estate,* 13th ed. (Chicago: Appraisal Institute 2008). [4] This definition is taken from "Allocation of Business Assets Into Tangible and Intangible Components: A New Lexicon," Journal of Real Estate Appraisal, January 2002, Volume LXX, Number 1.  This terminology is to replace former phrases such as: value of the going concern. [5]Financial Publishing Company, *The Real Estate Dictionary*, 7 ed. [6] U.S. Treasury Regulations

# CLIENT ENGAGEMENT LETTER

-----Original Message-----
From: Support <no-reply@collateral360.com>
Sent: Thursday, October 28, 2021 3:11 PM
To: Mark Haskell <mhaskell@bbgres.com>
Subject: Nano Banc ACTION REQUIRED: Bid Awarded - 21-000006-01-01V - Global Premier Regency Palms Oxnard

CAUTION: EXTERNAL EMAIL

This is an automated notification, please DO NOT REPLY to this email.

Please note that you have been selected by Daniel Chen (Nano Banc) to perform the following assignment/project:


Assignment/Project Name:   Global Premier Regency Palms Oxnard
Address:              2700 Bismark Way, Oxnard, CA 93033
Type of Work:         Appraisal Report - Commercial
# of Reports:         1
Draft Date:
Final Date:           November 25th, 2021


Bid Price:     5,000.00 USD

Client Contact: Daniel Chen
Client Email:  dchen@nanobanc.com
Property Contact Name: Christine Hanna
Property Contact Phone: 939-422-1143


Data Capture Template: Valuation default

Comments:       (none entered)

Please click on the link below to access PARCEL to Accept or Reject this Award:

Please respond by October 29th, 2021 03:00 PM PDT

To accept/reject this award:
1.  click on the following link
https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.parcelplatform.com%2FprojectDetail
%2F821043&amp;data=04%7C01%7Cmhaskell%40bbgres.com%7Ca9f98d341acb4b8d67cd08d99a5fdbc9%7C4df0
4dfdef7541fda9d08b7a2fb08016%7C1%7C0%7C637710558769092776%7CUnknown%7CTWFpbGZsb3d8eyJWIjoi
MC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=J35PEZMfYcOHxN7gse
3Jzx6aq9Ail9TsmWnZFz9fgsc%3D&amp;reserved=0

2. Locate the file on the "awaiting acceptance" tab and select either "accept" or "reject"
CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you
recognize the sender and know the content is safe.

# SUBJECT PICTURES



**Typical View of Exterior**



**Typical View of Exterior**



**Typical View of Exterior**



**Typical View of Exterior**



**Typical View of Interior**



**Typical View of Interior**



**Typical View of Interior**



**Typical View of Interior**



**Typical View of Interior**



**Typical View of Interior**



**Typical View of Theater Room**



**Typical View of Fitness Center**

# COMPARABLE LAND SALES

# BBG

**1100 West Gonzales Road**

**Land**

**Sale Comparable #1**

## PROPERTY INFORMATION



### PROPERTY TYPE

Property #: **801360**
Property Type: **Land**
Property Use: **Medical/ Dental Office**

### PROPERTY LOCATION

Address: **1100 West Gonzales Road**
City, St., Zip: **Oxnard, CA 93036**
County: **Ventura**
Tax Accounts: **200-0-431-185**

## PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| Land Area: | **1.68 Acres (73,181 SF)** | **1.68 Acres (73,181 SF)** |

## PROPERTY COMMENTS

Land Area: **3 Mile Demographics**
**Population: 156,321**
**Median HH Income: $66,525**
**Median Housing Value: $438,338**



| SALE INFORMATION | |
|---|---|

| | | |
|---|---|---|
| *Consideration:* | **$2,475,000** | **Grantor: Jaimie L Santana Family Trust** |
| *Adjustments:* | **$0** | **Grantee: Clinicas Del Camino Real, Inc.** |
| *Cash Equivalent Price:* | **$2,475,000** | **Date of Sale: 04-23-19** |
| *1st Mortgage:* | **$0** | **Sale Status: Closed** |
| *2nd Mortgage:* | **$0** | **Record info: 043339** |
| *Equity:* | **$0** | |
| *Sales Price ($/SF):* | **$33.82** | |
| *Sales Price/Acre:* | **$1,473,214** | |

| SALE ATTRIBUTES |
|---|

| SALE TRANSACTION INFORMATION |
|---|

*Verified On:* **8/2/2019**
*Verified By:* **Steve Mallasch, Coldwell Banker 805-230-3399**
*Comments:* **This was a 25K SF building that was demolished by a fire in 2017. The seller went through the Architectural review and permits based on new drawings. The buyer is using this as part of their process and must stay in the guidelines of the review in order to get the building to pass inspection. This was the purchase of land, concrete slab and columns along with infrastructure. The buyer plans on spending $2.5-$3M on a new medical building that will have multiple types of medical services to serve the community.**

# BBG

**1210-1246 S Oxnard Boulevard**

**Land**

**Sale Comparable #2**

| PROPERTY INFORMATION |
|---|



### PROPERTY TYPE

Property #: **801365**
Property Type: **Land**
Property Use: **(Unknown)**

### PROPERTY LOCATION

Address: **1210 South Oxnard Boulevard**
City, St., Zip: **Oxnard, CA 93030**
County: **Ventura**
Tax Accounts: **204-0-020-090, 204-0-020-100, 204-0-020-110, 204-0-020-210, 204-0-020-140, 204-0-020-150, 204-0-020-080, 204-0-020-280, 204-0-020-270, 204-0-020-050**

| PROPERTY SIZE | | |
|---|---|---|
| | *Gross* | *Net* |
| Land Area: | **1.56 Acres (68,045 SF)** | **1.56 Acres (68,045 SF)** |

| PROPERTY COMMENTS |
|---|

Land Area: **3 Mile Demographics**
**Population: 205,298**
**Median HH Income: $62,619**
**Median Housing Value: $404,627**

**BBG**

**1210-1246 S Oxnard Boulevard**

| SALE INFORMATION | |
|---|---|

| | | |
|---|---|---|
| Consideration: | **$2,100,000** | **Grantor: Affordable Housing Land Consultants** |
| Adjustments: | **$0** | **Grantee: Carbajal Corporation** |
| Cash Equivalent Price: | **$2,100,000** | **Date of Sale: 03-08-19** |
| 1st Mortgage: | **$0** | **Sale Status: Closed** |
| 2nd Mortgage: | **$0** | **Record info: 025331** |
| Equity: | **$0** | |
| Sales Price ($/SF): | **$30.86** | |
| Sales Price/Acre: | **$1,344,344** | |

| SALE ATTRIBUTES |
|---|

| SALE TRANSACTION INFORMATION |
|---|

*Verified On:* **8/2/2019**
*Verified By:* **Gary Cohen, Marcus & Millichap 805-351-7143**
*Comments:*

# BBG

**950 Warwick Avenue**

**Land**

**Sale Comparable #3**

## PROPERTY INFORMATION



### PROPERTY TYPE

| | |
|---|---|
| *Property #:* | **801376** |
| *Property Type:* | **Land** |
| *Property Use:* | **Multi Family - Units (Senior)** |

### PROPERTY LOCATION

| | |
|---|---|
| *Address:* | **950 Warwick Avenue** |
| *City, St., Zip:* | **Thousand Oaks, CA 91360** |
| *County:* | **Ventura** |
| *Tax Accounts:* | **525-0-092-055** |

## PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| *Land Area:* | **2.08 Acres (90,766 SF)** | **1.70 Acres (74,052 SF)** |

## PROPERTY COMMENTS

*Land Area:* **3 Mile Demographics**
**Population: 82,202**
**Median HH Income: $96,716**
**Median Housing Value: $707,694**

**BBG**                                                                        **950 Warwick Avenue**

| SALE INFORMATION |
|---|

| | | |
|---|---|---|
| *Consideration:* | **$3,400,000** | **Grantor: New Life Mission Church** |
| *Adjustments:* | **$0** | **Grantee: Silverado Thousand Oaks, LLC** |
| *Cash Equivalent Price:* | **$3,400,000** | **Date of Sale: 09-05-18** |
| *1st Mortgage:* | **$0** | **Sale Status: Closed** |
| *2nd Mortgage:* | **$0** | **Record info: 101465** |
| *Equity:* | **$0** | |
| *Sales Price ($/SF):* | **$45.91** | |
| *Sales Price/Acre:* | **$2,000,000** | |

| SALE ATTRIBUTES |
|---|

| SALE TRANSACTION INFORMATION |
|---|

*Verified On:* **8/2/2019**
*Verified By:* **Kamal Banki, Westcord Commercial Real Estate**
**805-497-4557**
*Comments:* **This parcel sold on September 5th, 2018, for $3,400,000. The parcel totals 2.08 acres but only about 1.7 acres is usable since a portion of the land is sloping. This was an off-market deal. The buyer plans on constructing a 82-bed memory care facility.**

**BBG**

**13950 Peach Hill Road**

**Land**

**Sale Comparable #4**

| PROPERTY INFORMATION |
| --- |



| PROPERTY TYPE | |
| --- | --- |
| *Property #:* | **801368** |
| *Property Type:* | **Land** |
| *Property Use:* | **Multi Family - Units (Senior)** |

| PROPERTY LOCATION | |
| --- | --- |
| *Address:* | **13950 Peach Hill Road** |
| *City, St., Zip:* | **Moorpark, CA 93021** |
| *County:* | **Ventura** |
| *Tax Accounts:* | **512-0-440-025** |

| PROPERTY SIZE | | |
| --- | --- | --- |
| | *Gross* | *Net* |
| *Land Area:* | **2.79 Acres (121,376 SF)** | **2.79 Acres (121,376 SF)** |

| PROPERTY COMMENTS |
| --- |

*Land Area:* **3 Mile Demographics**
**Population: 40,162**
**Median HH Income: $107,563**
**Median Housing Value: $697,284**



**13950 Peach Hill Road**

| SALE INFORMATION |
|---|

| | | |
|---|---|---|
| Consideration: | **$3,126,500** | **Grantor: Kim Clement Center** |
| Adjustments: | **$0** | **Grantee: Oakmont Of Moorpark, LLC** |
| Cash Equivalent Price: | **$3,126,500** | **Date of Sale: 08-23-18** |
| 1st Mortgage: | **$0** | **Sale Status: Closed** |
| 2nd Mortgage: | **$0** | **Record info: 096438** |
| Equity: | **$0** | |
| Sales Price ($/SF): | **$25.76** | |
| Sales Price/Acre: | **$1,122,053** | |

| SALE ATTRIBUTES |
|---|

| SALE TRANSACTION INFORMATION |
|---|

| | |
|---|---|
| Verified On: | **8/2/2019** |
| Verified By: | **Public Records** |
| Comments: | |

# BBG

**3110 Royal Avenue**

**Land**

**Sale Comparable #5**

## PROPERTY INFORMATION



### PROPERTY TYPE

| | |
|---|---|
| Property #: | **801370** |
| Property Type: | **Land** |
| Property Use: | **Multi Family - Units (Senior)** |

### PROPERTY LOCATION

| | |
|---|---|
| Address: | **3110 Royal Avenue** |
| City, St., Zip: | **Simi Valley, CA 93063** |
| County: | **Ventura** |
| Tax Accounts: | **634-0-181-025, 634-0-181-335** |

## PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| Land Area: | **3.18 Acres (138,669 SF)** | **3.18 Acres (138,669 SF)** |

## SALE INFORMATION

| | |
|---|---|
| Consideration: | **$3,035,000** |
| Adjustments: | **$0** |
| Cash Equivalent Price: | **$3,035,000** |
| 1st Mortgage: | **$0** |
| 2nd Mortgage: | **$0** |
| Equity: | **$0** |
| Sales Price ($/SF): | **$21.89** |
| Sales Price/Acre: | **$953,383** |

**Grantor: The Blessed Hope Chapel**
**Grantee: Oakmont of Simi Valley, LLC**
**Date of Sale: 10-26-17**
**Sale Status: Closed**
**Record info:**

## SALE ATTRIBUTES

## SALE TRANSACTION INFORMATION

| | |
|---|---|
| Verified On: | **8/2/2019** |
| Verified By: | **Nick Borrelli, Coldwell Banker Commercial 626-484-7975** |
| Comments: | **The broker involved confirmed this property was in escrow for a year and a half (540 days). This property was an offmarket transaction. The Seller was a church that planned on building a church at this location, but never came to fruition as they ended up not being able to afford to build. So the length of escrow is from the full entitlement and rezoning process.** |

COMPARABLE IMPROVED SALES

# BBG

**Estancia Senior Living**

**Retirement Home**

**Sale Comparable #1**

## PROPERTY INFORMATION



### PROPERTY TYPE

| | |
|---|---|
| Property #: | **1270870** |
| Property Type: | **Retirement Home** |
| Property Use: | **Assisted Living** |

### PROPERTY LOCATION

| | |
|---|---|
| Address: | **1735 South Mission Road** |
| City, St., Zip: | **Fallbrook, CA 92028** |
| County: | **San Diego** |
| Tax Accounts: | **104-351-47** |

### PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| Land Area: | **2.71 Acres (118,048 SF)** | **2.71 Acres (118,048 SF)** |
| Building Area: | **88,892 SF** | **88,892 SF** |
| Land/ Building Ratio: | **1.33 : 1** | |

| | |
|---|---|
| # of Units: | **104** |
| # of Stories: | **2** |
| # of Buildings: | **1** |

### BUILDING ATTRIBUTES

| | |
|---|---|
| Year of Construction: | **2021** |
| Quality: | **Good** |
| Condition: | **Good** |



**Estancia Senior Living**

| SALE INFORMATION | | |
|---|---|---|
| | | |

| | | |
|---|---|---|
| *Consideration:* | **$35,000,000** | **Grantor: Fallbrook Propco LLC** |
| *Adjustments:* | **$0** | **Grantee: Contour Companies** |
| *Cash Equivalent Price:* | **$35,000,000** | |
| *1st Mortgage:* | **$0** | **Date of Sale: 10-18-21** |
| *2nd Mortgage:* | **$0** | **Sale Status: Closed** |
| *Equity:* | **$0** | **Record info:** |
| *Sales Price ($/SF):* | **$393.74** | |
| *Sales Price/Unit:* | **$336,538** | |

| SALE ATTRIBUTES |
|---|
| |

*Occupancy At Sale:*  **28%**

| SALE TRANSACTION INFORMATION |
|---|
| |

*Verified On:* **12/2/2021**
*Verified By:* **Press Release/AK**
*Comments:* **Sale was for the 104-unit assisted living facility, Estancia Senior Living. The newly constructed 88,892 SF property was built in 2021 and sold for $35,000,000 or about $336,538 per unit, or about $393.74 per SF. The two-story property is situated on a 2.710 acre parcel. The assisted living facility is comprised of 79-assisted living units and 25-memory care units. The seller is a developer/operator specializing in multifamily development in the western US. Room rates start at $3,500 per month and increase based on level of care required. Current occupancy reported at 28%. The property opened for business in July, 2021.**



**Merrill Gardens at Bankers Hill**

**Retirement Home**

**Sale Comparable #2**

| PROPERTY INFORMATION |
|---|



| PROPERTY TYPE | |
|---|---|
| *Property #:* | **1157907** |
| *Property Type:* | **Retirement Home** |
| *Property Use:* | **Assisted Living** |

| PROPERTY LOCATION | |
|---|---|
| *Address:* | **2567 2nd Avenue** |
| *City, St., Zip:* | **San Diego, CA 92103** |
| *County:* | **San Diego** |
| *Tax Accounts:* | **533-092-04, 533-092-09** |

| PROPERTY SIZE | | |
|---|---|---|
| | *Gross* | *Net* |
| *Land Area:* | **0.70 Acres (30,492 SF)** | **0.70 Acres (30,492 SF)** |
| *Building Area:* | **89,748 SF** | **89,748 SF** |
| *Land/ Building Ratio:* | **0.34 : 1** | |
| *# of Units:* | **84** | |
| *# of Stories:* | **4** | |
| *# of Buildings:* | **1** | |

| BUILDING ATTRIBUTES | |
|---|---|
| *Year of Construction:* | **2011** |
| *Quality:* | **Good** |
| *Condition:* | **Good** |



**Merrill Gardens at Bankers Hill**

| SALE INFORMATION | |
|---|---|

| | | |
|---|---|---|
| *Consideration:* | **$34,423,000** | **Grantor: Welltower Inc** |
| *Adjustments:* | **$0** | **Grantee: AEW Capital Management** |
| *Cash Equivalent Price:* | **$34,423,000** | **Date of Sale: 09-23-20** |
| *1st Mortgage:* | **$0** | **Sale Status: Closed** |
| *2nd Mortgage:* | **$0** | **Record info:** |
| *Equity:* | **$0** | |
| *Sales Price ($/SF):* | **$383.55** | |
| *Sales Price/Unit:* | **$409,798** | |

| SALE ATTRIBUTES |
|---|

*Occupancy At Sale:*  **96%**

| SALE TRANSACTION INFORMATION |
|---|

*Verified On:*  **5/5/2021**
*Verified By:*  **KM**
*Comments:*  **Portfolio Sale, 5.1% cap rate. Occupancy was 96% at time of sale.**

# BBG

**Pacifica Senior Living Hillsborough**

**Retirement Home**

**Sale Comparable #3**

## PROPERTY INFORMATION



### PROPERTY TYPE

| | |
|---|---|
| *Property #:* | **869295** |
| *Property Type:* | **Retirement Home** |
| *Property Use:* | **Assisted Living** |

### PROPERTY LOCATION

| | |
|---|---|
| *Address:* | **11918 Central Avenue** |
| *City, St., Zip:* | **Chino, CA 91710** |
| *County:* | **San Bernardino** |
| *Tax Accounts:* | **1014-621-49, 1014-36-05, 1014-361-29** |

### PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| *Land Area:* | **3.00 Acres (130,680 SF)** | **3.00 Acres (130,680 SF)** |
| *Building Area:* | **111,012 SF** | **111,012 SF** |
| *Land/ Building Ratio:* | **1.18 : 1** | |
| *# of Units:* | **144** | |
| *# of Stories:* | **3** | |
| *# of Buildings:* | **1** | |

### BUILDING ATTRIBUTES

| | |
|---|---|
| *Year of Construction:* | **1999** |
| *Quality:* | **Good** |
| *Condition:* | **Good** |

## PROPERTY COMMENTS

*General:* **144-Bed Assisted Living and Memory Care Facility**



**Pacifica Senior Living Hillsborough**

| SALE INFORMATION |
|:---:|

| | | |
|---:|---:|:---|
| *Consideration:* | **$39,000,000** | **Grantor: TGH-Chino, LP** |
| *Adjustments:* | **$0** | **Grantee: Hsre Pacifica Hillsborough, LLC** |
| *Cash Equivalent Price:* | **$39,000,000** | **Date of Sale: 12-10-19** |
| *1st Mortgage:* | **$0** | **Sale Status: Closed** |
| *2nd Mortgage:* | **$0** | **Record info: 455063** |
| *Equity:* | **$0** | |
| *Sales Price ($/SF):* | **$351.31** | |
| *Sales Price/Unit:* | **$270,833** | |

| SALE ATTRIBUTES |
|:---:|

| SALE TRANSACTION INFORMATION |
|:---:|

*Verified On:* **3/2/2020**
*Verified By:* **Public Records**
*Comments:*

---

**BBG**

**Regency Grand at West Covina**

**Retirement Home**

**Sale Comparable #4**

## PROPERTY INFORMATION



### PROPERTY TYPE

*Property #:* **798937**
*Property Type:* **Retirement Home**
*Property Use:* **Assisted Living**

### PROPERTY LOCATION

*Address:* **150 South Grand Avenue**
*City, St., Zip:* **West Covina, CA 91791**
*County:* **Los Angeles**
*Tax Accounts:* **8277-001-028**
*Legal Description:* **P M 290-75-76 EX OF EQUESTRIAN TRAIL LOT 2**

### PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| *Land Area:* | **3.68 Acres (160,204 SF)** | **3.68 Acres (160,204 SF)** |
| *Building Area:* | **116,598 SF** | **116,598 SF** |
| *Land/ Building Ratio:* | **1.37 : 1** | |

*# of Units:* **160**
*# of Stories:* **3**
*# of Buildings:* **1**

### BUILDING ATTRIBUTES

*Year of Construction:* **2000**
*Quality:* **Good**
*Condition:* **Good**

## PROPERTY ATTRIBUTES

### Site

*Road Frontage:* **Major arterial**

### Improvements

*Construction Details:* **Wood frame**

## PROPERTY COMMENTS

*Land Area:* **3 Mile Demographics**
**Population: 133,608**
**Median HH Income: $79,949**
**Median Housing Value: $551,233**



**Regency Grand at West Covina**

| SALE INFORMATION |
|---|

| | | | |
|---|---|---|---|
| *Consideration:* | **$43,454,500** | **Grantor: BDC West Covina II, LLC** | |
| *Adjustments:* | **$0** | | |
| *Cash Equivalent Price:* | **$43,454,500** | **Grantee: KRE-ReNew Tiger Cubs Regency** | |
| *1st Mortgage:* | **$0** | **Grand LLC** | |
| *2nd Mortgage:* | **$0** | | |
| *Equity:* | **$0** | | |
| | | **Date of Sale: 06-13-19** | |
| | | **Sale Status: Closed** | |
| | | **Record info: 2019-0575251** | |
| *Sales Price ($/SF):* | **$372.69** | | |
| *Sales Price/Unit:* | **$271,591** | | |

| SALE ATTRIBUTES |
|---|

*Init. Marketing Date:*  **Unknown**

| SALE TRANSACTION INFORMATION |
|---|

*Verified On:* **7/16/2019**
*Verified By:* **Public Records**
*Comments:* **The sale is comprised of six healthcare facilities totaling 862 units located in Oregon, California and Nevada. The overall sales price was reported at $160,440,382. Regency Grand located at West Covina located at 150 S. Grand Ave. in West Covina, CA. The sales price was reported by public record at $43,454,500. The property is a three-story assisted living facility containing 129 units and 160 beds. Occupancy at the time of the sale is not available.**

# BBG

**Cypress Place**

**Retirement Home**

**Sale Comparable #5**

## PROPERTY INFORMATION



### PROPERTY TYPE

| | |
|---|---|
| *Property #:* | **799710** |
| *Property Type:* | **Retirement Home** |
| *Property Use:* | **Assisted Living** |

### PROPERTY LOCATION

| | |
|---|---|
| *Address:* | **1200 Cypress Point Lane** |
| *City, St., Zip:* | **Ventura, CA 93003** |
| *County:* | **Ventura** |
| *Tax Accounts:* | **137-0-051-055** |

### PROPERTY SIZE

| | *Gross* | *Net* |
|---|---|---|
| *Land Area:* | **1.81 Acres (78,843 SF)** | **1.81 Acres (78,843 SF)** |
| *Building Area:* | **49,500 SF** | **49,500 SF** |
| *Land/ Building Ratio:* | **1.59 : 1** | |

| | |
|---|---|
| *# of Units:* | **76** |
| *# of Stories:* | **2** |
| *# of Buildings:* | **1** |

### BUILDING ATTRIBUTES

| | |
|---|---|
| *Year of Construction:* | **2003** |
| *Quality:* | **Average/Good** |
| *Condition:* | **Average/Good** |

## PROPERTY ATTRIBUTES

### Site

*Road Frontage:* **Local street**

### Improvements

*Construction Details:* **Wood frame**

## PROPERTY COMMENTS

*General:* **76 units/ 96 beds**

*Land Area:* **3 Mile Demographics**
**Population: 87,481**
**Median HH Income: $78,606**
**Median Housing Value: $556,865**
**Daytime Employment: 54,771**



**Cypress Place**

| SALE INFORMATION | |
|---|---|

| | | |
|---|---|---|
| *Consideration:* | **$17,750,000** | **Grantor: Ventura Independent Living, LP** |
| *Adjustments:* | **$0** | **Grantee: MH Ventura IL Holdings, LLC** |
| *Cash Equivalent Price:* | **$17,750,000** | **Date of Sale: 06-04-19** |
| *1st Mortgage:* | **$0** | **Sale Status: Closed** |
| *2nd Mortgage:* | **$0** | **Record info: 061622** |
| *Equity:* | **$0** | |
| *Sales Price ($/SF):* | **$358.59** | |
| *Sales Price/Unit:* | **$233,553** | |

| SALE ATTRIBUTES | |
|---|---|

*Occupancy At Sale:* **94%**

*Init. Marketing Date:* **161 DOM**

| SALE TRANSACTION INFORMATION | |
|---|---|

*Verified On:* **7/24/2019**

*Verified By:* **Bill Melton/ Marcus & Millichap/ (909) 456-3473/ EBowen**

*Comments:*

# SUBJECT DATA

Regency Palms Oxnard
Rent Roll Report
October 2021

Facility Code: 9002
User: genexus-Gary White
Page 1 of 7

Facility #:
Date: Nov 2, 2021
Time: 11:46:52 PT

Effective Thru Date: 10/31/2021    Room Type: All    Status: All    Show Companion Beds: Empty

| Room | Resident(s) | Potential Occupancy | Room Type | Size | Market Rate | Actual Rate | Rate Type | Discount | Deposit Required | Deposit Received | Lease/Rent Start | Lease/Rent End | Move In / Estimated Move out | Status | Available Days | Occupied Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL-First Floor-101 | None | 1 | One Bedroom | | 5295.00 | | | | | | | | | Fully Available | 14 | 17 |
| AL-First Floor-102 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-103 | Willin, Shirley (1041) | 1 | Studio | | 4600.00 | 2495.00 | Private | 2105.00 | | | 9/29/2021 | | 9/29/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-104 | Aragon, Manuel (1013) | 1 | Studio | | 4600.00 | 2895.00 | Private | 1705.00 | | | 2/28/2021 | | 2/28/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-105 | Marshall, Kim (1007) | 1 | Studio | | 4600.00 | 2895.00 | Private | 1705.00 | | | 2/4/2021 | | 2/4/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-106 | Munro, Margaret (1049) | 1 | Studio | | 4600.00 | 2495.00 | Private | 2105.00 | | | 10/31/2021 | | 10/31/2021 | Occupied | 30 | 1 |
| AL-First Floor-107 | Porto, Edward (1004) | 1 | Studio | | 4600.00 | 2895.00 | Private | 1705.00 | | | 2/1/2021 | | 2/1/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-108 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-109 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-110 | None | 1 | Studio | | 5295.00 | | | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-111 | None | 1 | Studio | | 5295.00 | | | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-112 | Shute, James (Jim) (1037) | 1 | Studio | | 4600.00 | 2885.00 | Private | 1715.00 | | | 9/1/2021 | | 9/1/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-113 | None | 1 | Studio | | 4600.00 | | | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-114 | Kay, Joan (Joni) (1046) | 1 | Studio | | 4600.00 | 2495.00 | Private | 2105.00 | | 10/26/2021 | | | 10/26/2021 | Occupied | 25 | 6 |
| AL-First Floor-115 | None | 1 | Studio | | 4600.00 | | | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-116 | None | 1 | Studio | | 4600.00 | | | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-117 | None | 1 | Studio | | 4600.00 | | | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-118 | None | 1 | Studio | | 4600.00 | | | | | | | | | Fully Available | 31 | 0 |

**Regency Palms Oxnard**
**Rent Roll Report**
**October 2021**

Facility Code: 9002
User: genexus-Gary White
Page 2 of 7

Facility #:
Date: Nov 2, 2021
Time: 11:46:52 PT

Effective Thru Date: 10/31/2021   Room Type: All   Status: All   Show Companion Beds: Empty

| Room | Resident(s) | Potential Occupancy | Room Type | Size | Market Rate | Actual Rate | Rate Type | Discount | Deposit Required | Deposit Received | Lease/Rent Start | Lease/Rent End | Move In / Estimated Move out | Status | Available Days | Occupied Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL-First Floor-119 | None | 1 | Studio | | 4600.00 | | | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-120 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Available | 31 | 0 |
| AL-First Floor-121 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-122 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-123 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-124 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-125 | Przeracki, Carolyn (1006) | 1 | Studio | | 4600.00 | 2895.00 | Private | 1705.00 | | | 2/1/2021 | | 2/1/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-126 | None | 1 | Studio | | 4600.00 | 2895.00 | Private | 1705.00 | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-127 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-128 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-129 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-130 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-131 | McHolland, Barbara (1026) | 1 | Studio | | 4600.00 | 2995.00 | Private | 1605.00 | | | 7/14/2021 | | 7/14/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-132 | None | 1 | Studio | | 4600.00 | 2995.00 | Private | 1605.00 | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-133 | Korchinski, Joseph (1014) | 1 | Studio | | 4600.00 | 3450.00 | BEDA | 1150.00 | | | 2/28/2021 | | 2/28/2021 | Occupied | 0 | 31 |
| AL-First Floor-134 | None | 1 | Studio | | 4600.00 | 3450.00 | Private | 1150.00 | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-135 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-136 | None | | Studio | | 4600.00 | | Private | | | | | | | Available | 31 | 0 |

**Regency Palms Oxnard**
**Rent Roll Report**
**October 2021**

Facility #:

Facility Code: 9002
User: genexus-Gary White
Page 3 of 7

Date: Nov 2, 2021
Time: 11:46:52 PT

Effective Thru Date: 10/31/2021   Room Type: All   Status: All   Show Companion Beds: Empty

| Room | Resident(s) | Potential Occupancy | Room Type | Size | Market Rate | Actual Rate | Rate Type | Discount | Deposit Required | Deposit Received | Lease/Rent Start | Lease/Rent End | Move In / Estimated Move out | Status | Available Days | Occupied Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL-First Floor-137 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-138 | None | 1 | Studio | | 4600.00 | | | | | | | | | Available | 31 | 0 |
| AL-First Floor-139 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-140 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-141 | None | 1 | Studio | | 4600.00 | | | | | | | | | Available | 31 | 0 |
| AL-First Floor-142 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Available | 31 | 0 |
| AL-First Floor-143 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-144 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-145 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-146 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Available | 31 | 0 |
| AL-First Floor-147 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-148 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-149 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Available | 31 | 0 |
| AL-First Floor-150 | Murray, David (1042) | 1 | Studio | | 4600.00 | 2595.00 | Private | 2005.00 | | | 10/31/2021 | | 10/31/2021 | Occupied | 30 | 1 |
| AL-First Floor-151 | Nash, Rufus (1039) | 1 | Studio | | 4600.00 | 2995.00 | Private | 1605.00 | | | 9/16/2021 | | 9/16/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-152 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Available | 31 | 0 |
| AL-First Floor-153 | Robinson, Robbie (1027) | 1 | Studio | | 4600.00 | 2995.00 | Private | 1605.00 | | | 7/29/2021 | | 7/29/2021 | Occupied | 0 | 31 |
| | None | | Studio | | 4600.00 | | Private | | | | | | | Available | 31 | 0 |
| AL-First Floor-154 | Mollo, Ann (1032) | 2 | One Bedroom | | 5295.00 | 5295.00 | BEDA | 0.00 | | | 7/30/2021 | | 7/31/2021 | Fully Occupied | 0 | 31 |
| | | | | | 10590.00 | 6395.00 | | 4195.00 | | | | | | | 0 | 31 |

Regency Palms Oxnard
Rent Roll Report
October 2021

Facility Code: 9002
User: genexus-Gary White
Page 4 of 7

Facility #:
Date: Nov 2, 2021
Time: 11:46:52 PT
Effective Thru Date: 10/31/2021    Room Type: All    Status: All    Show Companion Beds: Empty

| Room | Resident(s) | Potential Occupancy | Room Type | Size | Market Rate | Actual Rate | Rate Type | Discount | Deposit Required | Deposit Received | Lease/Rent Start | Lease/Rent End | Move In / Estimated Move out | Status | Available Days | Occupied Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL-First Floor-155 | Mollo, Sal (1031) | 1 | One Bedroom | | 5285.00 | 1100.00 | BEDB | 4195.00 | | | 7/30/2021 | | 7/31/2021 | Occupied | 0 | 31 |
| AL-First Floor-156 | Zimmerman, Stanley (1020) | 1 | Studio | | 5295.00 | 5295.00 | Private | 0.00 | | | 4/20/2021 | | 4/20/2021 | Occupied | 0 | 31 |
| AL-First Floor-157 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-158 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-159 | Crowley, Richard (1036) | 1 | Studio | | 4600.00 | 2895.00 | Private | 1705.00 | | | 8/31/2021 | | 8/31/2021 | Occupied | 0 | 31 |
| AL-First Floor-160 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-161 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Available | 31 | 0 |
| AL-First Floor-198 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-199 | None | 1 | Studio | | 4600.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| AL-First Floor-200 | Mansueto, Angelo (1043) | 1 | Studio | | 4600.00 | 2995.00 | Private | 1605.00 | | | 9/30/2021 | | 9/30/2021 | Fully Occupied | 0 | 31 |
| AL-First Floor-201 | Planck, George Anne (1025) | 1 | Studio | | 4600.00 | 2995.00 | Private | 1605.00 | | | 7/10/2021 | | 7/10/2021 | Occupied | 0 | 31 |
| MC-First Floor-162 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| MC-First Floor-163 | Sławski, Carl James (1045) | 1 | Studio | | 4900.00 | 4900.00 | Private | 0.00 | | | 10/18/2021 | | 10/18/2021 | Occupied | 17 | 14 |
| MC-First Floor-164 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| MC-First Floor-165 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-166 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-167 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| MC-First Floor-168 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Fully Available | 31 | 0 |

**Facility #:**
**Date: Nov 2, 2021**
**Time: 11:46:52 PT**

**Regency Palms Oxnard**
**Rent Roll Report**
**October 2021**

Facility Code: 9002
User: genexus-Gary White
Page 5 of 7

Effective Thru Date: 10/31/2021     Room Type: All     Status: All     Show Companion Beds: Empty

| Room | Resident(s) | Potential Occupancy | Room Type | Size | Market Rate | Actual Rate | Rate Type | Discount | Deposit Required | Deposit Received | Lease/Rent Start | Lease/Rent End | Move In / Estimated Move out | Status | Available Days | Occupied Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MC-First Floor-169 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-170 | None | 1 | Studio | | 4900.00 | | | | | | | | | Fully Available | 31 | 0 |
| MC-First Floor-171 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-172 | Nicewander, Robert(Kurt) (1038) | 1 | Studio | | 4900.00 | 3450.00 | Private | 1450.00 | | | 9/16/2021 | | 9/16/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-173 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-174 | Zook, Carol (1019) | 1 | Studio | | 4900.00 | 4395.00 | Private | 505.00 | | | 3/31/2021 | | 3/31/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-175 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-176 | Frederiksen, Richard (1029) | 1 | Studio | | 4900.00 | 3450.00 | BEDA | 1450.00 | | | 7/29/2021 | | 7/29/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-177 | Robertson, Warren (1003) | 1 | Studio | | 3395.00 | 3395.00 | BEDA | 0.00 | | | 1/28/2021 | | 1/28/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-178 | Bressoud, Robin (1010) | 1 | Studio | | 4900.00 | 4395.00 | BEDA | 505.00 | | | 2/28/2021 | | 4/29/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-179 | Jorgenson, Carmen (1008) | 1 | Studio | | 4900.00 | 4395.00 | Private | 505.00 | | | 2/20/2021 | | 2/20/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-180 | Mansueto, Patricia (1035) | 1 | Studio | | 4900.00 | 3450.00 | Private | 1450.00 | | | 8/28/2021 | | 8/28/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-181 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-182 | Chutuk, Jim (1033) | 1 | Studio | | 4900.00 | 3450.00 | BEDA | 1450.00 | | | 7/30/2021 | | 7/30/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-183 | Gaston, Jerry (1005) | 1 | Studio | | 4900.00 | 4295.00 | Private | 605.00 | | | 2/1/2021 | | 2/1/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-184 | Pinsky, Beth (1047) | 1 | Studio | | 4900.00 | 2995.00 | Private | 1905.00 | | | 10/27/2021 | | 10/27/2021 | Fully Occupied | 26 | 5 |
| MC-First Floor-185 | Roberts, Edward (1015) | 1 | Studio | | 4900.00 | 3450.00 | BEDA | 1450.00 | | | 4/30/2021 | | 4/30/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-186 | Guenther, Edward (1024) | 1 | Studio | | 4900.00 | 2995.00 | Private | 1905.00 | | | 6/21/2021 | | 6/21/2021 | Fully Occupied | 0 | 31 |

Facility #:
Date: Nov 2, 2021
Time: 11:46:52 PT

Regency Palms Oxnard
Rent Roll Report
October 2021

Facility Code: 9002
User: genexus-Gary White
Page 6 of  7

Effective Thru Date: 10/31/2021    Room Type: All    Status: All    Show Companion Beds: Empty

| Room | Resident(s) | Potential Occupancy | Room Type | Size | Market Rate | Actual Rate | Rate Type | Discount | Deposit Required | Deposit Received | Lease/Rent Start | Lease/Rent End | Move In/ Estimated Move out | Status | Available Days | Occupied Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MC-First Floor-187 | Wolverton, Jeanne (1048) | 1 | Studio | | 4900.00 | 2995.00 | BEDA | 1905.00 | | | 10/28/2021 | | 10/28/2021 | Occupied | 27 | 4 |
| MC-First Floor-188 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| MC-First Floor-189 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-190 | Stone, Katherine (1050) | 1 | Studio | | 4900.00 | 2995.00 | BEDA | 1905.00 | | | 10/31/2021 | | 10/31/2021 | Occupied | 30 | 1 |
| MC-First Floor-191 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-192 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| MC-First Floor-193 | Tuzinski, Joseph (1044) | 1 | Studio | | 4900.00 | 2995.00 | BEDA | 1905.00 | | | 10/7/2021 | | 10/7/2021 | Occupied | 6 | 25 |
| MC-First Floor-194 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Fully Available | 31 | 0 |
| MC-First Floor-195 | None | 1 | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |
| MC-First Floor-196 | Carbone, Joseph (1034) | 1 | Studio | | 4900.00 | 3450.00 | BEDA | 1450.00 | | | 8/12/2021 | | 8/12/2021 | Fully Occupied | 0 | 31 |
| MC-First Floor-197 | None | | Studio | | 4900.00 | | Private | | | | | | | Available | 31 | 0 |

Facility #:

Date: Nov 2, 2021

Time: 11:46:52 PT

Effective Thru Date: 10/31/2021    Room Type: All    Status: All    Show Companion Beds: Empty

**Regency Palms Oxnard**
**Rent Roll Report**
**October 2021**

Facility Code: 9002
User: genexus-Gary White
Page 7 of 7

| | Size | Market Rate | Actual Rate | Discount | Deposit Required | Deposit Received |
|---|---|---|---|---|---|---|
| Totals | 101 Rooms | $482,270.00 | $118,515.00 | | | |
| | 102 Beds | $482,270.00 | $118,515.00 | | $0.00 | $0.00 |
| Total Occupied | Rate/sq ft. 0 | $0.00 | | | | |
| | | $171,280.00 | $118,515.00 | $52,765.00 | $0.00 | $0.00 |
| | $0.00 | $171,280.00 | $118,515.00 | $52,765.00 | | |
| % Rooms Occupied | 34.65 % | 35.52 % | | | | |
| % Beds Occupied | 35.29 % | 35.52 % | | | | |
| Total Available | Rate/sq ft. 0 | $0.00 | | | $0.00 | |
| | 66 Beds | $310,990.00 | | | | |
| | 66 Rooms | $310,990.00 | | | | |
| % Rooms Available | 65.35 % | 64.48 % | | | | |
| | 0.00 % | 64.48 % | | | | |
| % Beds Available | 64.71 % | 64.48 % | | | | |

## Budget Entry

| | T12 | B2D | Target NOI |
|---|---|---|---|
| OCC % | - | 19.0% | $3 |
| RPU | $0 | $7,136 | Budget NOI |
| RFU | $0 | $389.86 | ($1,661,840) |
| Fd PRD | $7.78 | $7.78 | Variance |
| Margin | -100.8% | | ($1,661,840) |

| | Budget Amt. | Budget As | | % of Rev | Inflation (Default) | 6.0% |
|---|---|---|---|---|---|---|
| From Revenue & Census Planner | | | | | | |
| Payroll | | per Month | 7.50 | PRD | | |
| | | % of S&W | 11.3% | | | |
| Supplies | 750 | per Month | | | 11 | |
| Food | | per Month | | | 233 | |
| Insurance | 5,054 | per Month | | 5.0% | 3711 | |
| | 233 | per Month | | | | |
| Management Fee | 6,320 | % of Revenue | | | | |
| Capital Cost | | | | | | |
| Debt Service | 100755 | | | | | |
| Replacement Reserve | 3733 | | | | | |

| | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | 12M Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Census & Statistics** | | | | | | | | | | | | | |
| Occupancy % | 5.7% | 8.0% | 10.3% | 11.1% | 13.6% | 14.0% | 17.8% | 22.1% | 25.8% | 29.4% | 33.0% | 36.6% | 19.0% |
| Total Units | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | |
| Average Units Occupied | 5.8 | 8.1 | 10.4 | 11.2 | 13.8 | 14.1 | 18.0 | 22.4 | 26.0 | 29.7 | 33.3 | 37.0 | |
| Average Resident Count | 6.3 | 9.1 | 12.5 | 13.3 | 15.7 | 15.7 | 21.8 | 26.3 | 30.6 | 34.9 | 39.2 | 43.5 | |
| Resident Days | 176 | 283 | 368 | 411 | 438 | 488 | 618 | 789 | 949 | 1,047 | 1,315 | 1,349 | |
| **Revenue** | | | | | | | | | | | | | |
| R&B - Independent Living | 9,035 | 13,120 | 17,920 | 19,055 | 17,630 | 22,625 | 31,345 | 37,810 | 43,990 | 50,170 | 56,350 | 62,530 | 381,580 |
| R&B - Assisted Living | 17,235 | 24,195 | 31,175 | 33,590 | 41,135 | 42,215 | 53,735 | 66,810 | 77,730 | 88,655 | 99,575 | 110,495 | 686,545 |
| R&B - Memory Care | 12,340 | 17,325 | 23,225 | 24,055 | 29,455 | 30,230 | 38,480 | 47,845 | 63,485 | 71,305 | 79,125 | 148,485 | 491,635 |
| R&B - Skilled Nursing | | | | | | | | | | | | | |
| Respite Care / Other | | | | | | | | | | | | | |
| Level of Care / Other | | | | | | | | | | | | | |
| SNF - Services & Charges | | | | | | | | | | | | | |
| Move In Fee | | | | | | | | | | | | | |
| Other Income | | | | | | | | | | | | | |
| Total Revenue | 46,035 | 62,065 | 78,845 | 84,125 | 95,645 | 102,495 | 130,985 | 159,890 | 184,810 | 209,735 | 234,655 | 259,575 | 1,648,860 |
| Revenue Per Occupied Unit (RPU) | 7,981 | 7,665 | 7,557 | 7,483 | 6,948 | 7,254 | 7,283 | 7,151 | 7,104 | 7,069 | 7,041 | 7,019 | 7,176 |
| Raw Food PRD | 7.59 | 7.61 | 7.65 | 7.69 | 7.73 | 7.77 | 7.80 | 7.84 | 7.88 | 7.92 | 7.96 | 7.54 | 7.78 |
| Labor Dollars PRD (Wages,OT) | 613.24 | 418.55 | 309.75 | 288.42 | 317.61 | 250.22 | 195.72 | 162.93 | 150.37 | 131.44 | 121.02 | 116.66 | 189.86 |
| Labor Dollars % of Rev | 234.5% | 190.8% | 146.9% | 140.9% | 122.2% | 119.1% | 101.0% | 80.4% | 77.2% | 65.6% | 62.7% | 59.6% | 93.6% |
| **Expenses** | | | | | | | | | | | | | |
| S&W (Labor Only) | 107,930 | 118,450 | 115,845 | 116,880 | 122,105 | 122,310 | 129,585 | 137,045 | 147,085 | 154,640 | 160,400 | 167,860 | 1,542,690 |
| S&W (Other) | 11,385 | 11,845 | 11,775 | 11,915 | 11,890 | 12,135 | 12,575 | 12,465 | 13,065 | 13,220 | 13,315 | 13,220 | 148,485 |
| Total Salaries & Wages | 119,315 | 130,295 | 127,620 | 130,455 | 128,175 | 134,240 | 144,885 | 141,050 | 155,740 | 150,545 | 160,400 | 167,860 | 1,691,175 |
| Payroll Taxes | 13,485 | 14,115 | 14,415 | 14,560 | 14,550 | 14,635 | 14,780 | 15,940 | 17,600 | 17,010 | 18,500 | 18,500 | 191,105 |
| Other Payroll Costs | 25,055 | 25,115 | 25,165 | 25,240 | 25,280 | 25,345 | 25,405 | 25,520 | 25,520 | 25,585 | 25,645 | 25,000 | 303,815 |
| Total Payroll | 157,855 | 170,135 | 167,205 | 170,425 | 168,605 | 174,755 | 186,660 | 182,455 | 198,860 | 193,140 | 204,170 | 211,830 | 2,186,095 |
| Supplies | 750 | 1,215 | 1,785 | 1,595 | 2,135 | 2,970 | 3,485 | 4,215 | 4,670 | 5,450 | 5,720 | 35,605 | |
| Food | 1,335 | 2,155 | 2,860 | 3,160 | 2,845 | 3,790 | 5,275 | 6,190 | 7,480 | 8,295 | 9,680 | 10,165 | 63,230 |
| Repairs & Maintenance | 7,765 | 7,695 | 7,775 | 7,810 | 7,800 | 7,935 | 7,980 | 7,970 | 8,010 | 8,050 | 8,080 | 93,985 | |
| Marketing & Advertising | 14,270 | 14,345 | 14,415 | 14,050 | 14,635 | 14,635 | 14,780 | 14,835 | 15,000 | 15,000 | 15,000 | 200,750 | |
| Utilities | 15,570 | 15,645 | 15,730 | 15,800 | 15,880 | 15,965 | 16,045 | 16,120 | 16,205 | 16,280 | 16,360 | 191,090 | |
| General & Administrative | 14,090 | 14,245 | 14,395 | 14,560 | 14,730 | 14,945 | 14,945 | 15,380 | 15,550 | 15,750 | 15,490 | 178,445 | |
| Property Taxes | 7,165 | 7,165 | 7,166 | 7,166 | 7,165 | 7,165 | 7,165 | 7,166 | 7,165 | 7,165 | 7,165 | 85,980 | |
| Insurance | 6,320 | 6,320 | 8,289 | 8,289 | 8,289 | 8,289 | 8,289 | 8,289 | 8,289 | 8,289 | 8,289 | 95,529 | |
| Auto Insurance | 1,010 | 3,219 | 3,219 | 3,219 | 3,219 | 3,219 | 3,219 | 3,219 | 3,219 | 3,219 | 3,219 | 34,208 | |
| Other Insurance | 5,055 | 4,815 | 4,815 | 4,815 | 4,815 | 4,815 | 4,815 | 4,815 | 4,815 | 4,815 | 4,815 | 58,351 | |
| | 255 | 255 | 255 | 255 | 255 | 255 | 255 | 255 | 255 | 255 | 255 | 3,060 | |
| Management Fee | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 | |
| Total Expenses | 240,010 | 258,410 | 254,404 | 283,944 | 256,379 | 264,314 | 278,944 | 276,679 | 295,399 | 291,229 | 304,934 | 310,574 | 3,310,709 |
| Expense Ratio (%) | 521.4% | 409.1% | 322.7% | 337.5% | 257.9% | 257.8% | 213.0% | 173.0% | 159.8% | 138.9% | 129.9% | 119.6% | 200.8% |
| Net Operating Income | (193,975) | (191,855) | (175,559) | (199,819) | (160,734) | (161,819) | (147,959) | (116,689) | (110,589) | (81,594) | (70,259) | (50,999) | (1,661,849) |
| Operating Margin (%) | -421.4% | -309.1% | -222.7% | -237.5% | -168.1% | -157.9% | -113.0% | -73.0% | -59.8% | -38.9% | -29.9% | -19.6% | -100.8% |
| **Capital Cost** | | | | | | | | | | | | | |
| Debt Service | 100,755 | 100,755 | 100,755 | 100,755 | 100,755 | 100,755 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 1,367,742 | |
| Replacement Reserve | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 44,820 | |
| Total Capital Cost | 104,490 | 104,490 | 104,490 | 104,490 | 104,490 | 104,490 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 1,412,562 | |
| Net Income | (298,465) | (296,345) | (280,049) | (304,309) | (265,224) | (266,309) | (278,896) | (247,626) | (241,526) | (212,531) | (201,196) | (181,936) | (3,074,411) |
| Return on Revenue (%) | -648.3% | -477.5% | -355.2% | -361.7% | -277.3% | -259.8% | -212.9% | -154.9% | -130.7% | -101.3% | -85.7% | -70.1% | -186.5% |

| | T12 | R20 |
|---|---|---|
| OCC % | 90.00 | 19.0% |
| RPU | $0 | $71.76 |
| Lab PRD | $189.86 | $189.85 (8.89) |
| Fd PRD | $0.00 | $5.78 $7.78 |
| Margin | - | -100.8% |

| | | Target NOI | $0 |
|---|---|---|---|
| | | Budget NOI | $0 |
| | | Variance | $(3,449,849) |
| | | | $(3,649,849) |

| | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Census & Statistics** | | | | | | | | | | | | | |
| Occupancy % | 41.5% | 46.3% | 51.2% | 56.1% | 60.9% | 65.8% | 70.7% | 75.5% | 80.4% | 85.3% | 90.1% | 95.0% | 68.2% |
| Total Units | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 1,212.0 |
| Average Units Occupied | 41.9 | 46.8 | 51.7 | 56.6 | 61.6 | 66.5 | 71.4 | 76.3 | 81.2 | 86.1 | 91.0 | 96.0 | 827.1 |
| Average Resident Count | 49.5 | 55.4 | 61.4 | 67.3 | 73.3 | 79.2 | 85.2 | 91.1 | 97.1 | 103.0 | 109.0 | 115.0 | 986.5 |
| Resident Days | 1,385 | 1,718 | 1,841 | 2,087 | 2,198 | 2,456 | 2,641 | 2,734 | 3,010 | 3,091 | 3,379 | 3,563 | 30,103 |
| Revenue Per Occupied Unit (RPU) | 7,140 | 7,134 | 7,133 | 7,136 | 7,141 | 7,149 | 7,159 | 7,170 | 7,182 | 7,196 | 7,210 | 7,225 | 7,172 |
| Raw Food PRD | 7.55 | 7.56 | 7.57 | 7.59 | 7.60 | 7.61 | 7.63 | 7.65 | 7.66 | 7.66 | 7.68 | 7.69 | 7.63 |
| Move In Fee | | | | | | | | | | | | | |
| Other Income | 676 | 677 | 678 | 680 | 681 | 682 | 683 | 684 | 685 | 686 | 687 | 689 | 8,138 |
| Labor Dollars PRD (Wages,OT) | 108.30 | 100.17 | 101.68 | 94.44 | 91.05 | 83.92 | 78.80 | 80.45 | 79.58 | 76.58 | 80.63 | 73.41 | 84.74 |
| Labor Dollars % of Rev | 50.1% | 51.5% | 50.7% | 48.8% | 45.5% | 43.4% | 40.7% | 40.2% | 41.1% | 38.2% | 41.5% | 37.7% | 43.0% |
| **Revenue** | | | | | | | | | | | | | |
| R&B - Independent Living | 125,595 | 140,795 | 156,095 | 171,495 | 186,996 | 202,598 | 208,095 | 234,110 | 250,020 | 266,033 | 282,150 | 298,372 | 2,532,561 |
| R&B - Assisted Living | 88,938 | 100,823 | 111,779 | 122,807 | 133,907 | 145,080 | 156,326 | 167,645 | 179,038 | 190,505 | 202,047 | 213,663 | 1,813,556 |
| R&B - Memory Care | | | | | | | | | | | | | |
| R&B - Skilled Nursing | | | | | | | | | | | | | |
| R&B - Respite Care / Other | | | | | | | | | | | | | |
| Level of Care / Other | 71,207 | 79,911 | 88,644 | 97,406 | 106,197 | 115,017 | 123,866 | 132,744 | 141,652 | 150,589 | 159,555 | 168,551 | 1,435,338 |
| SNF - Services & Charges | | | | | | | | | | | | | |
| Move In Fee | 11,702 | 11,741 | 11,760 | 11,780 | 11,800 | 11,819 | 11,839 | 11,859 | 11,878 | 11,898 | 11,918 | | 141,715 |
| Other Income | 676 | 677 | 678 | 680 | 681 | 682 | 683 | 684 | 685 | 686 | 687 | 689 | 8,138 |
| **Total Revenue** | 299,118 | 333,927 | 368,957 | 404,148 | 439,561 | 475,177 | 510,997 | 547,022 | 583,253 | 619,691 | 656,337 | 693,192 | 5,931,360 |
| **Expenses** | | | | | | | | | | | | | |
| S&W (Labor Only) | 149,978 | 172,078 | 187,190 | 197,097 | 200,145 | 206,103 | 208,095 | 239,530 | 239,967 | 266,033 | 272,429 | 261,596 | 2,559,950 |
| S&W (Other) | 13,046 | 13,941 | 14,558 | 14,966 | 15,099 | 15,349 | 15,441 | 15,928 | 16,722 | 16,622 | 18,062 | 17,640 | 187,374 |
| Total Salaries & Wages | 163,023 | 186,020 | 201,747 | 212,062 | 215,244 | 221,452 | 223,536 | 235,895 | 256,252 | 253,365 | 290,491 | 279,236 | 2,738,324 |
| Payroll Taxes | 18,422 | 21,010 | 22,738 | 23,963 | 24,323 | 25,024 | 25,260 | 25,935 | 28,057 | 28,631 | 32,826 | 31,914 | 309,414 |
| Other Payroll Costs | 25,042 | 25,083 | 25,125 | 25,167 | 25,209 | 25,251 | 25,293 | 25,335 | 25,378 | 25,420 | 25,462 | 25,505 | 303,270 |
| **Total Payroll** | 206,487 | 232,124 | 249,670 | 261,193 | 264,776 | 271,728 | 274,089 | 287,887 | 310,586 | 307,415 | 348,779 | 336,295 | 3,351,028 |
| Supplies | 5,883 | 7,310 | 7,847 | 8,910 | 9,401 | 10,521 | 11,331 | 11,751 | 12,958 | 13,331 | 14,595 | 15,418 | 129,255 |
| Food | 10,455 | 12,960 | 13,945 | 15,834 | 16,706 | 18,697 | 20,136 | 20,883 | 23,027 | 23,690 | 25,937 | 27,399 | 229,699 |
| Repairs & Maintenance | 7,633 | 7,645 | 14,255 | 14,301 | 7,684 | 7,697 | 7,709 | 15,658 | 7,748 | 7,761 | 7,774 | 7,788 | 172,318 |
| Marketing & Advertising | 14,229 | 14,276 | 22,788 | 15,568 | 14,348 | 15,646 | 14,396 | 14,420 | 14,492 | 15,750 | 14,468 | 14,492 | 187,906 |
| Utilities | 15,516 | 15,542 | 15,568 | 15,594 | 15,620 | 15,646 | 15,672 | 15,698 | 15,724 | 15,750 | 15,776 | 15,803 | 196,940 |
| General & Administrative | 15,309 | 15,506 | 15,704 | 15,903 | 16,103 | 16,304 | 16,507 | 16,710 | 16,915 | 17,120 | 17,327 | 17,534 | 87,700 |
| Property Taxes | 7,308 | 7,308 | 7,308 | 7,308 | 7,308 | 7,308 | 7,308 | 7,308 | 7,308 | 7,308 | 7,308 | 7,308 | 101,456 |
| Insurance | 8,455 | 8,455 | 8,455 | 8,455 | 8,455 | 8,455 | 8,455 | 8,455 | 8,455 | 8,455 | 8,455 | 8,455 | |
| GL/PL Insurance | 3,283 | 3,283 | 3,283 | 3,283 | 3,283 | 3,283 | 3,283 | 3,283 | 3,283 | 3,283 | 3,283 | 3,283 | 39,396 |
| Property Insurance | 4,911 | 4,911 | 4,911 | 4,911 | 4,911 | 4,911 | 4,911 | 4,911 | 4,911 | 4,911 | 4,911 | 4,911 | 58,936 |
| Auto Insurance | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 3,121 |
| Other Insurance | | | | | | | | | | | | | |
| Management Fee | 14,956 | 16,696 | 18,447 | 20,207 | 21,978 | 23,759 | 25,550 | 27,351 | 29,163 | 30,985 | 32,817 | 34,660 | 296,568 |
| **Total Expenses** | 306,230 | 337,628 | 358,878 | 375,375 | 382,355 | 394,462 | 401,127 | 418,160 | 446,289 | 446,265 | 493,272 | 485,138 | 4,845,307 |
| Expense Ratio (%) | 102.4% | 101.2% | 97.3% | 92.9% | 87.0% | 83.0% | 78.5% | 76.4% | 76.5% | 72.0% | 75.1% | 70.0% | 81.7% |
| **Net Operating Income** | (7,112) | (3,901) | 10,059 | 28,773 | 57,206 | 80,715 | 109,870 | 128,862 | 136,964 | 173,447 | 163,115 | 208,054 | 1,086,052 |
| Operating Margin (%) | -2.4% | -1.2% | 2.7% | 7.1% | 13.0% | 17.0% | 21.5% | 23.6% | 23.5% | 28.0% | 24.9% | 30.0% | 18.3% |
| **Capital Costs** | | | | | | | | | | | | | |
| Debt Service | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 1,526,424 |
| Replacement Reserve | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 44,820 |
| **Total Capital Cost** | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 1,571,244 |
| **Net Income** | (138,049) | (134,838) | (120,878) | (102,164) | (73,731) | (50,222) | (21,067) | (2,075) | 6,027 | 42,510 | 32,178 | 77,117 | (485,192) |
| Return on Revenue (%) | -46.2% | -40.4% | -32.8% | -25.3% | -16.8% | -10.6% | -4.1% | -0.4% | 1.0% | 6.9% | 4.9% | 11.1% | -8.2% |

|  | T12 | R30 | Target NOI |
|---|---|---|---|
| OCC % | - | $0 | 95.0% |
| RPU | $0 | $7.1% | $0 |
| Lab PRD | $189.86 | | Budget NOI |
| Fd PRD | $0.00 | $7.78 | [$1,661,840] |
| | -100.8% | $7.78 | Variance |
| | | | [$1,661,840] |

| | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Year 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Census & Statistics** | | | | | | | | | | | | | |
| Occupancy % | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% | 95.0% |
| Total Units | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 | 101.0 |
| Average Units Occupied | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 | 96.0 |
| Average Resident Count | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 |
| Resident Days | 3,219 | 3,563 | 3,449 | 3,563 | 3,449 | 3,563 | 3,563 | 3,449 | 3,563 | 3,449 | 3,563 | 3,563 | 43,957 |
| Revenue Per Occupied Unit (RPU) | 7,142 | 7,163 | 7,184 | 7,205 | 7,226 | 7,247 | 7,268 | 7,289 | 7,310 | 7,332 | 7,353 | 7,375 | 7,258 |
| Raw Food PRD | 7.70 | 7.71 | 7.73 | 7.74 | 7.75 | 7.77 | 7.78 | 7.81 | 7.81 | 7.82 | 7.83 | 7.84 | 7.77 |
| Labor Dollars PRD (Wages, OT) | 74.72 | 73.95 | 74.70 | 75.31 | 75.76 | 74.53 | 75.12 | 75.04 | 76.28 | 75.61 | 78.36 | 75.66 | 75.43 |
| Labor Dollars % of Rev | 35.1% | 38.3% | 37.4% | 38.8% | 37.7% | 38.2% | 38.4% | 37.0% | 38.8% | 37.1% | 39.6% | 38.1% | 37.9% |
| **Revenue** | | | | | | | | | | | | | |
| R&B - Independent Living | | | | | | | | | | | | | |
| R&B - Assisted Living | 299,366 | 300,364 | 301,366 | 302,370 | 303,378 | 304,389 | 305,404 | 306,422 | 307,443 | 308,468 | 309,496 | 310,528 | 3,658,995 |
| R&B - Memory Care | 214,375 | 215,090 | 215,807 | 216,526 | 217,248 | 217,972 | 218,698 | 219,427 | 220,159 | 220,893 | 221,629 | 222,368 | 2,620,191 |
| R&B - Skilled Nursing | | | | | | | | | | | | | |
| R&B - Resident Care / Other | | | | | | | | | | | | | |
| Level of Care | 168,832 | 169,113 | 169,395 | 169,677 | 169,960 | 170,243 | 170,527 | 170,811 | 171,096 | 171,381 | 171,667 | 171,953 | 2,044,653 |
| SNF - Services & Charges | | | | | | | | | | | | | |
| Move In Fee | 2,005 | 2,012 | 2,015 | 2,019 | 2,022 | 2,025 | 2,029 | 2,035 | 2,042 | | | | 24,284 |
| Other Income | 690 | 691 | 692 | 693 | 694 | 696 | 697 | 698 | 700 | 701 | 703 | | 8,354 |
| **Total Revenue** | 685,268 | 687,266 | 689,271 | 691,282 | 693,299 | 695,322 | 697,351 | 699,387 | 701,429 | 703,477 | 705,532 | 707,599 | 8,356,477 |
| **Expenses** | | | | | | | | | | | | | |
| S&W (Labor Only) | 240,479 | 263,526 | 257,604 | 268,347 | 261,273 | 265,600 | 267,701 | 271,822 | 260,728 | 279,216 | 279,216 | 269,613 | 3,164,699 |
| S&W (Other) | 16,808 | 17,742 | 17,517 | 17,958 | 17,687 | 17,873 | 17,969 | 17,624 | 18,118 | 17,726 | 18,478 | 18,106 | 213,645 |
| Total Salaries & Wages | 257,287 | 281,267 | 275,121 | 286,305 | 278,960 | 283,472 | 285,669 | 289,446 | 289,980 | 297,454 | 297,694 | 287,719 | 3,378,344 |
| Payroll Taxes | 29,074 | 31,784 | 31,089 | 32,353 | 31,523 | 32,033 | 32,281 | 31,235 | 32,768 | 31,466 | 33,440 | 32,513 | 381,757 |
| Other Payroll Costs | 25,547 | 25,590 | 25,632 | 25,675 | 25,718 | 25,761 | 25,804 | 25,847 | 25,890 | 25,933 | 25,976 | 26,019 | 309,391 |
| **Total Payroll** | 311,908 | 338,640 | 331,842 | 344,333 | 336,201 | 341,266 | 343,754 | 346,528 | 348,638 | 354,852 | 357,110 | 346,251 | 4,069,493 |
| Supplies | 13,949 | 14,789 | 14,995 | 15,521 | 15,045 | 15,573 | 15,599 | 15,651 | 15,171 | 15,703 | 15,729 | 15,703 | 183,528 |
| Food | 27,189 | 27,491 | 26,648 | 27,583 | 26,737 | 26,737 | 27,675 | 27,721 | 26,871 | 27,813 | 27,906 | 27,952 | 326,147 |
| Repairs & Maintenance | 7,787 | 7,790 | 7,813 | 7,790 | 7,852 | 7,852 | 7,865 | 7,878 | 7,891 | 7,891 | 7,918 | 7,931 | 94,302 |
| Marketing & Advertising | 14,516 | 14,540 | 14,554 | 14,589 | 14,619 | 14,637 | 14,663 | 14,686 | 14,711 | 14,735 | 14,760 | 14,784 | 175,786 |
| Utilities | 15,829 | 15,855 | 15,882 | 15,908 | 15,935 | 15,961 | 15,988 | 16,015 | 16,041 | 16,068 | 16,095 | 16,122 | 191,699 |
| General & Administrative | 17,518 | 17,552 | 17,585 | 17,619 | 17,652 | 17,652 | 17,686 | 17,754 | 17,788 | 17,822 | 17,856 | 17,890 | 212,443 |
| Property Taxes | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 89,454 |
| Insurance | 8,624 | 8,624 | 8,624 | 8,624 | 8,624 | 8,624 | 8,624 | 8,624 | 8,624 | 8,624 | 8,624 | 8,624 | 103,485 |
| GL/PL Insurance | 3,349 | 3,349 | 3,349 | 3,349 | 3,349 | 3,349 | 3,349 | 3,349 | 3,349 | 3,349 | 3,349 | 3,349 | 40,186 |
| Property Insurance | 5,010 | 5,010 | 5,010 | 5,010 | 5,010 | 5,010 | 5,010 | 5,010 | 5,010 | 5,010 | 5,010 | 5,010 | 60,115 |
| Auto Insurance | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 3,184 |
| Other Insurance | | | | | | | | | | | | | |
| Management Fee | 34,263 | 34,363 | 34,464 | 34,565 | 34,665 | 34,766 | 34,868 | 34,999 | 35,071 | 35,174 | 35,277 | 35,380 | 417,824 |
| **Total Expenses** | 456,638 | 487,789 | 479,872 | 494,766 | 484,766 | 491,494 | 494,254 | 482,870 | 499,683 | 485,766 | 500,902 | 498,117 | 5,864,169 |
| Expense Ratio (%) | 66.6% | 71.0% | 69.6% | 71.5% | 70.7% | 70.7% | 70.9% | 69.0% | 71.2% | 69.0% | 71.0% | 70.4% | 70.2% |
| **Net Operating Income** | 228,630 | 199,477 | 209,399 | 197,261 | 208,533 | 203,828 | 203,097 | 216,517 | 201,746 | 217,712 | 205,596 | 209,476 | 2,492,308 |
| Operating Margin (%) | 33.4% | 29.0% | 30.4% | 28.5% | 30.1% | 29.3% | 29.1% | 31.0% | 28.8% | 30.9% | 29.1% | 29.6% | 29.8% |
| **Capital Cost** | | | | | | | | | | | | | |
| Debt Service | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 127,202 | 1,526,424 |
| Replacement Reserve | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 3,735 | 44,820 |
| **Total Capital Cost** | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 130,937 | 1,571,244 |
| **Net Income** | 97,693 | 68,540 | 78,462 | 66,324 | 77,596 | 72,891 | 72,160 | 85,580 | 70,809 | 86,775 | 65,694 | 78,539 | 921,064 |
| Return on Revenue (%) | 14.3% | 10.0% | 11.4% | 9.6% | 11.2% | 10.5% | 10.3% | 12.2% | 10.1% | 12.3% | 9.3% | 11.1% | 11.0% |

**PROFESSIONAL QUALIFICATIONS**

# BBG

**Al Khoshbin**
**Senior Appraiser**
**Work: 714.415.0154**
**akhoshbin@bbgres.com**

## Profile

Al Khoshbin is a Senior Appraiser at BBG and has over 15 years of experience in commercial real estate, including experience with analysis of multi-family product.  He joined BBG in 2009.  His experience includes evaluating and analyzing commercial and residential properties, including retail, office, industrial, subdivisions, hospitality, religious facilities, apartment, and condominium properties in a variety of geographic areas with a concentration in California and Washington.

Prior to joining BBG, Al Khoshbin was an Appraiser at CB Richard Ellis, Inc., from 2001 to 2008.

## Professional Affiliations

General Certified Appraiser:
State of California (License #AG044624)

## Education

Bachelor of Science, Major in Real Estate
University of Florida, Gainesville, Florida

## Coursework

Appraisal Institute Courses
Appraisal Principles
Appraisal Procedures
Basic Income Capitalization
Sales Comparison Approach
Standards and Professional Practice
National USPAP Course

 VALUATION     ADVISORY     ASSESSMENT     ZONING



Business, Consumer Services & Housing Agency

# BUREAU OF REAL ESTATE APPRAISERS

# REAL ESTATE APPRAISER LICENSE

**Alireza Khoshbin**

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:      AG 044624

Effective Date:      August 17, 2020
Date Expires:      August 16, 2022

Jim Martin, Bureau Chief, BREA

3053191

THIS DOCUMENT CONTAINS A TRUE WATERMARK – HOLD UP TO LIGHT TO SEE "CHAIN LINK"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
16000 Ventura Blvd., Ste. 1000, Encino, CA 91436

A true and correct copy of the foregoing document entitled (specify): **NOTICE OF OPPOSITION AND REQUEST FOR A HEARING** will be served or was served in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On September 26, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Michael J Conway**    MConway@gblawllp.com, msingleman@gblawllp.com;scabrera@gblawllp.com
- **James R Felton**    jfelton@gblawllp.com, pstruntz@gblawllp.com;msingleman@gblawllp.com
- **Brian David Fittipaldi**    brian.fittipaldi@usdoj.gov
- **Garrick A Hollander**    ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Mike D Neue**    m.neue@geracillp.com, a.lewis@geracillp.com
- **Jeremy H Rothstein**    jrothstein@gblawllp.com, msingleman@gblawllp.com;scabrera@gblawllp.com
- **Matthew J Stockl**    mstockl@wghlawyers.com, swells@foley.com
- **United States Trustee (ND)**    ustpregion16.nd.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On September 26, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 26, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Ronald A. Clifford III
United States Bankruptcy Court
Central District of California – Northern Division
1415 State Street, Suite 233/Ctrm. 201
Santa Barbara, California 93101-2511
*via Attorney Service*

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 26, 2022 | Marleigh Singleman | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                        **F 9013-3.1.PROOF.SERVICE**
2285584.1 - 32572.0001