GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>GLOBAL PREMIER REGENCY PALMS OXNARD, L.P., a California limited partnership,<br><br>               Debtor and<br>               Debtor-in-Possession | Case No. 9:22-bk-10626-RC<br><br>Chapter 11 Proceeding<br><br>**DECLARATION OF CHRISTINE HANNA IN SUPPORT OF:**<br><br>**(1) DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO ASSESSMENT CONTRACT AND OBTAIN POST-PETITION LOAN SECURED AGAINST REAL PROPERTY**<br><br>**(2) <u>EX PARTE</u> APPLICATION FOR ORDER SHORTENING TIME FOR HEARING ON DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO ASSESSMENT CONTRACT AND OBTAIN POST-PETITION LOAN SECURED AGAINST REAL PROPERTY**<br><br>DATE:      [To be Set]<br>TIME:      [To be Set]<br>PLACE:[1]   Courtroom 201<br>               1415 State Street<br>               Santa Barbara, CA  91301 |

---

[1] The hearing on the Motion will be scheduled to be heard via Zoom.  Please check the Court's calendar just prior to the hearing to confirm. http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/.

266645

I, Christine Hanna, declare and state as follows:

1.      I am the Manager of Global Premier America #3, LLC, the general partner of Global Premier Regency Palms Oxnard, L.P., a California limited partnership and the debtor and debtor-in-possession in the above-captioned Chapter 11 proceeding (the "Debtor").  The matters set forth herein are within my own personal knowledge, and, if called upon to testify, I could and would do so competently and truthfully.

2.      I make this declaration in support of: (A) Debtor's Motion For Order Authorizing Debtor to Enter into Assessment Contract and Obtain Post-Petition Loan Secured Against Real Property (the "Motion"); and (B) Debtor's Ex Parte Application for Order Shortening Time for Hearing on Debtor's Motion For Order Authorizing Debtor to Enter into Assessment Contract and Obtain Post-Petition Loan Secured Against Real Property ("Ex Parte Application") filed by the Debtor.

### Ex Parte Application for OST

3.      The Debtor has the opportunity to eliminate the risks and significant costs associated with plan confirmation in this case, promptly emerge from Chapter 11, and pave the way toward payment to creditors.  This can be accomplished with the approval of a compromise (the "Compromise") that the Debtor has reached with its senior secured creditor, JKO Group, LLC ("JKO").  The Debtor has already filed a motion for the approval of the Compromise, which is scheduled for August 8, 2023.

4.      The Debtor cannot afford to incur the expense of litigating an anticipated hotly contest plan confirmation process, nor face the risk of the severe consequences (losing all its assets to its senior secured creditor) in the event it was unable to successfully confirm a plan of reorganization.  The Compromise eliminates the foregoing risk and costs, but again, requires DIP Financing.  Accordingly, without the proposed DIP Financing, the Debtor cannot consummate the Compromise.

266645

5.      Based on the terms of the Compromise, the Debtor must obtain Court approval and close on the DIP Financing[1] such that the Debtor is able to pay JKO prior to August 15, 2023.  Therefore, in order to successfully emerge from Chapter 11 and provide the Debtor more time to try to pay its creditors, the Debtor needs to shorten the time for the hearing on the Financing Motion such that it is heard in time to pay JKO before August 15, 2023.

6.      Based on the Court's calendar and the Court already having scheduled a hearing on the approval of the Compromise for August 8, 2023, the Debtor respectfully requests that the Court grant this Ex Parte Application and schedule the hearing on the Financing Motion for August 8, 2023.  I believe that approval of the foregoing is in the best interests of the estate.

I believe and hereby respectfully represent that good cause exists, under the circumstances of this case, for setting a hearing on the Motion on shortened notice in order to successfully restructure its debt with JKO and promptly emerge from Chapter 11, thereby providing the Debtor with an opportunity to pay its creditors. Granting the relief sought in this Ex Parte Application will effectuate the foregoing.  The Debtor has not delayed in seeking the relief sought in the Ex Parte Application as the Debtor only recently obtained the loan documents and approval from the debtor in possession lender to enable the Debtor to seek the relief requested in the Motion.

7.      If time is not shortened, the Debtor bears significant risk of losing its property and wiping out all creditors.  In light of the foregoing, I believe that good cause exists for the Court to enter an order setting a hearing date on the Financing Motion on shortened notice so that a hearing can be held on August 8, 2023.

## **DIP Financing Motion**

8.      Pursuant to the Motion, the Debtor seeks from the Court entry of an Order in a form substantially similar to the order attached hereto as **Exhibit 1** and incorporated herein by this reference.

9.      In addition, the Debtor also seeks from the Court entry of an Order authorizing the Debtor to enter into with the California Statewide Community Development Authority (the

---

[1] Capitalized terms not defined herein shall have the same meaning as set forth in the Motion or Ex Parte Application.

266645

1    "CSCDA"), as the California joint exercise of powers authority that operates the California

2    Open PACE Program, and White Oak Global Advisors, LLC ("White Oak"), as the PACE

3    Administrator (collectively, the "DIP Lender"), the Assessment Contract in substantially the

4    same form attached hereto as **Exhibit 2** and incorporated herein by this reference, and any

5    additional agreements, documents, instruments, and certificates in connection therewith and

6    necessary or desirable to perform all obligations contained therein (collectively, the "Assessment

7    Contract").

8          10.    I have reviewed the Motion and the Ex Parte Application, and to the best of my

9    knowledge, the factual representations contained therein are materially true and correct.

10          11.    The Debtor was formed in 2014 to purchase land and develop and operate an

11    assisted living/memory care facility in Oxnard, California.  Global Premier America #3, LLC

12    ("GP") is the general partner of, and has complete decision-making control over, the Debtor.[1]

13    Pursuant to the GP's Operating Agreement and amendments thereto, the Managers of the GP,

14    which are defined as Christine Hanna and Andrew Hanna, together or separately, each have full

15    authority to manage and operate the GP.[2]  Thus, I have authority to manage and operate the GP,

16    and thus, manage and operate the Debtor.  In practice, I have and continue to be the "person in

17    control" of the Debtor.  Accordingly, I have authority to file, on behalf of the Debtor, a petition

18    for relief under Chapter 11 of the Bankruptcy Code, enter into the proposed DIP Financing, and

19    file the Motion and Ex Parte Application.

20          12.    The Debtor was initially funded with $10 million of investment from foreign

21    investors, who invested in the Debtor pursuant to a program of the United States government to

22    allow foreign investors to make investments in the United States in order to obtain residency

23    status.  This program is designed to stimulate the U.S. economy through job creation and capital

---

[1] See, e.g., Section 10(a) of the Debtor's limited partnership agreement, a true and correct copy of which is attached hereto as **Exhibit 3** and incorporated herein by this reference (General Partner shall be solely responsible for the day-to-day operations of the Partnership business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith, or in connection with accomplishing the purposes of the Partnership as set forth in Section 3).

[2] See, for example, sections 1.7 and 2(e) of the First Amendment to Operating Agreement of Global Premier America #3, LLC, a true and correct copy of the GP's Operating Agreement and amendment thereto are attached collectively hereto as **Exhibit 4** and incorporated herein by this reference.

266645

1  investment.  The Debtor's successful completion and operation of this project preserves jobs,

2  protects the investment of these foreign investors, and ensures their continued residency in the

3  United States.

4          13.    The Debtor owns and since January 2021, with its wholly owned non-debtor

5  subsidiary, Global Regency Oxnard Senior Care Services LLC, a California limited liability

6  company, dba Regency Palms Senior Living, operates an assisted living/memory care facility

7  located at 1020 Bismark Way, Oxnard, California ("Property"). Regency Senior Living provides

8  housing and a full spectrum of care and services to fragile seniors in need of a moderate level of

9  medical assistance, including specialized memory care for seniors who suffer from Alzheimer's

10  Disease and other forms of dementia.  The Debtor's subsidiary employs approximately 60

11  persons.  The Debtor's sole revenue source is the rental income and distributions, if any, from its

12  sole tenant, Regency Senior Living.  Since the Debtor's completion of the development of its

13  Property and Regency Senior Living's commencement of its operations is in the relative early

14  phase of a start-up, Regency Senior Living does not yet generate sufficient profits to pay rent to

15  the Debtor.  Accordingly, the Debtor cannot currently pay its obligations to JKO.

16          14.    The proposed DIP Financing is critical to the Debtor's ability to emerge from

17  Chapter 11 and pave the way to pay its creditors.  The Debtor cannot afford to incur the expense

18  of litigating an anticipated hotly contested plan confirmation process, nor face the risk of the

19  severe consequences (losing all of its assets to its senior secured creditor) in the event it was

20  unable to successfully confirm a plan of reorganization.  The Debtor has reached an agreement

21  with its senior secured creditor, JKO, which provides for a restructuring of the Debtor's

22  obligations, and requires the DIP Financing.[1]  The agreement with JKO eliminates the risks and

23  significant costs associated with plan confirmation in this case, and paves the way for prompt

24  emergence from Chapter 11 and payment to creditors.  In order to effectuate the JKO

25  compromise and disposition of this case, the Debtor must promptly obtain DIP Financing.  I

26

27

28  [1] The Debtor has already filed a motion for approval of compromise with JKO and dismissal of case, which is
scheduled to be heard on August 8, 2023.

266645

1    believe that approval and use of the DIP Financing provides creditors with the greatest

2    opportunity for payment, and thus is in the best interest of creditors.

3        15.    On June 27, 2018, the Debtor obtained a loan from Nano Banc in the amount of

4    $15.5 million to purchase the Property and build and operate an assisted living/memory care

5    facility at the Property.  The Nano Bank loan was evidenced by, among other things, a

6    Construction Loan Agreement and Promissory Note.  In connection with the loan, the Debtor

7    provided a Deed of Trust in favor of Nano Bank.  Nano Bank also filed a UCC-1 financing

8    statement dated August 30, 2018 with the California Secretary of State.

9        16.    On March 23, 2020, the loan agreement was modified to increase the amount of

10    the Loan to $23 million.  The Debtor also executed a Commercial Security Agreement, pursuant

11    to which the Debtor granted a security interest in collateral, including inventory, accounts

12    (including but not limited to all health-care-insurance receivables), and cash.  On November 19,

13    2020, the parties modified the loan agreement to increase the loan from $23 million to $25.5

14    million, and assign a deposit account in the amount of $500,000 held at Nano Bank as additional

15    security.

16        17.    On or about April 22, 2022, Nano sold and assigned to JKO 100% of Nano's

17    interests in its claims against the Debtor.  As of the Petition Date, JKO asserts a secured claim

18    against the Debtor's Assets in the amount of approximately $28 million.  As of the Petition

19    Date, the Debtor had $64.31 in cash and $7,317.87 in accounts receivable from Regency Senior

20    Living.

21        18.    Top Tier Painting and ArtMex Artistic Design, Inc. also assert secured claims

22    against the Property in the amounts of $87,147 and $22,660, respectively. These asserted

23    secured claims are based on alleged mechanics lien rights arising from contracting services

24    provided to the Debtor.

25        19.    The Debtor has applied with, and been qualified by, the CSCDA for PACE

26    financing of up to $12,800,000 from the CSCDA's program administrator, White Oak. An

27    affiliate of White Oak will purchase the limited obligation improvement bonds sold by the

28

266645

CSCDA to provide financing to the Debtor. The following is a summary of the estimated uses of the PACE financing:

Pace Related Disbursements:
Capitalized Interest Reserve for PACE Loan:    $ 2,170,000
PACE Loan Expenses    386,471
Administrative Expenses    750,000
Working Capital for Debtor    150,000
Past due property taxes    102,581
JKO Related Disbursements:
Interest Reserve for JKO post-confirmation    1,068,000
Payment on Debt Owing to JKO    8,172,948
Total    $12,800,000

20.    The DIP Financing will enable the Debtor to restructure its debt with JKO and emerge from Chapter 11, thereby paving the way for the Debtor to pay its creditors.

21.    The following is a summary of the material terms pursuant to which DIP Lender has agreed to advance funds to the Debtor.

| | |
|---|---|
| **Financing Amount:** | The lesser of (i) $12,800,000 or (ii) 30% of Property's as-stabilized value as determined by DIP Lender in its sole discretion (the "Financing Amount"). |
| **Interest Rate:** | Fixed rate throughout the Term to be equal to the greater of: (A) 7.50%; and (B) The 10-year U.S. Treasury benchmark rate plus 3.50% |
| **Transaction Fee:** | On the Closing Date from Financing proceeds, Owner would pay to capital provider a transaction fee equal to 1.00% of the Financing Amount. |
| **Priority/Security:** | Debtor would agree to a contractual assessment on the Property that would be recorded with the local tax authority. Delinquent assessments are subject to the same process and penalties as property taxes. No personal or corporate guarantees are required for the DIP Financing. All delinquent Assessment Obligations shall be secured against the Property pursuant to California law and §364(d)(1). |
| **Use of Proceeds** | The Financing will utilize the CSCDA's three-year lookback period to refinance PACE-eligible improvements already completed to the Property. Accordingly, proceeds remaining after funding (i) Capitalized Interest and (ii) fees and costs associated with the DIP Financing may be used in accordance with Debtor's plan of reorganization (the *"Net Proceeds"*), including to repay existing indebtedness and/or fund operations. The Debtor may use the proceeds from the DIP Financing as set forth in the DIP Order and the cash flow budget attached as **Exhibit 3** to the Weissman Declaration. |
| **Target Closing Date:** | July 14, 2023, with the actual date of closing being defined as the "Closing Date." |
| **Term:** | The lesser of (i) 30 years and (ii) the cost-weighted expected useful life of funded improvements. |
| **Interest Only Period:** | Approximately seven years and two months, including the Capitalized Interest period. The exact length would be dependent upon the Closing Date. |
| **Capitalized Interest:** | Approximately $2,050,000 would be funded into a trust account at closing from the DIP Financing proceeds and used to pay interest accrued from the Closing Date to |

| | | |
|---|---|---|
| | | September 2, 2025. The actual amount of Capitalized Interest would vary depending on the Closing Date. |
| | **Assessment Payments:** | Assessment Payments will be due concurrently with ad valorem property taxes every December 10 and April 10, starting with December 10, 2025 (the "*Payment Dates*") (Assessment Payments are not due before December 10, 2025 because interest on the DIP Financing will be capitalized through September 2, 2025). |
| | | On Payment Dates up to and including September 2, 2030, no principal repayments will be required. |
| | | Starting on December 10, 2030 and throughout the remaining Term, the Debtor would be required to make payments of approximately $588,000 on each Payment Date. |
| | **Prepayment Premium:** | Prepayment of the DIP Financing would be subject to the following premiums: |
| | | Year 1: 5.0%        Year 2: 3.0% |
| | | Years 3-4: 1.0%        Thereafter: None |
| | **Setup and Servicing Fee:** | The following would be due in full and in cash so long as the DIP Financing has not been repaid in full: |
| | | • On the Closing Date, the Debtor would pay White Oak a Setup Fee equal to $1,500. The Debtor would also pay to White Oak an annual Servicing Fee equal to $1,750 per year, payable in advance with pro rata installments due on the Closing Date and each Payment Date thereafter. |
| | | • Each of the foregoing fees, once paid, would be non-refundable for any reason whatsoever. |
| | **Other Fees and Expenses:** | The Debtor would be required to pay White Oak's due diligence, legal and other related out-of-pocket DIP Financing expenses. The Debtor would also be responsible for any fees and expenses charged by CSCDA, Depositary Agent, Disbursement Agent, Bond Indenture Trustee, or other third party, including their legal fees. All such amounts would be eligible uses of DIP Financing proceeds. The following are White Oak's good-faith estimates but are subject to final determination by each respective party: |
| | | *One-Time Costs of Issuance:* |
| | | CSCDA Bond Issuance Fee        0.750% of Net Proceeds |
| | | CSCDA Legal Counsel        0.500% of Net Proceeds |
| | | PACE Program Fee        0.500% of Financing |
| | | Ventura County Recording Fee        $500 |
| | | White Oak Legal Counsel        $30,000 |
| | | Appraisal Roll-Forward        $2,500 |
| | | Miscellaneous Due Diligence        $5,000 |
| | | |
| | | *Recurring Expenses:* |
| | | Ventura County Admin Fee        0.250% surcharge to each payment |
| | | Assessment Administrator        $11,200 setup, plus $275 per year |
| | | Depositary Agent        $500 upfront, plus $1,000 per year |
| | | Disbursement Agent        $500 upfront, plus $500 per year |
| | | Bond Indenture Trustee        $2,500 setup, plus $1,750 per year |
| | **Representations and Warranties:** | Customary for transactions of this type as determined by White Oak, together with such others as may be required by White Oak following completion of its due diligence. |
| | **Property Insurance:** | The Debtor shall maintain insurance satisfactory to White Oak with respect to Property from an insurer acceptable to White Oak; however, Owner shall not be required to purchase earthquake insurance for the Property. |
| | **Collateral** | While any PACE obligations from the DIP Financing remain outstanding, White Oak |

266645

| | |
|---|---|
| **Appraisals:** | may periodically require Property appraisals for its internal accounting or other purposes.  Upon White Oak's reasonable request, the Debtor will cooperate with such collateral appraisal firm selected and paid for by White Oak. |
| **Events of Default; Remedies:** | Customary for transactions of this type as determined by White Oak.  Remedies shall be the maximum rights permitted by California law and consistent with the enforcement of delinquent property taxes under California law, including judicial foreclosure of delinquent Assessment Payments. |
| **Conditions Precedent:** | Customary for transactions of this type as determined by White Oak, together with such others as may be required by White Oak following completion of its due diligence.  Without limiting the generality of the foregoing, White Oak currently expects the following Conditions Precedent to be completed satisfactorily in its sole discretion:<br>(i)     Roll-forward of the existing Property appraisal;<br>(ii)    Environmental review of Property;<br>(iii)   Site inspection;<br>(iv)   ASHRAE II or equivalent energy study for the Property;<br>(v)    Legal due diligence;<br>(vi)   The Debtor's contemporaneous or prior exit from bankruptcy, with a pro forma, as-stabilized DSCR of 1.20x, credible plan for funding cash burn needed to reach stabilization, and other terms and conditions to be determined by White Oak;<br>(vii)  White Oak's KYC process;<br>(viii) Financing Documents; and<br>(ix)   Effectiveness of the PACE special tax assessment. |
| **Other Fees and Expenses:** | All legal, valuation, appraisal, due diligence and other fees and expenses incurred by White Oak would be paid by the Debtor. |
| **Governing Law:** | The loan documents would be prepared by CSCDA's bond counsel and legal counsel to White Oak and would be governed by the internal laws of the State of California without regard to principles of conflicts of law. |

22.     Entering into the Assessment Contract will enable the Debtor to consummate the compromise with JKO, eliminate the risks and significant costs associated with plan confirmation, and pave the way for prompt emergence from Chapter 11 and provide creditors with the greatest opportunity for payment.  I believe that entering into the Assessment Contract is a proper exercise of my business judgment.

23.     The Debtor is seeking an order allowing it to obtain financing to avoid the risk of losing the Property and restructure its obligations to JKO.  The proposed financing will enable the Debtor to sustain its operations and continue providing ongoing nursing care to patients. Creditors are receiving notice of the hearing on the Motion.

24.     The Debtor's entry into the Assessment Contract will enable the Debtor to preserve its interests in the Property and continue to provide patients with nursing care, thereby providing creditors with the greatest opportunity for recovery.  Accordingly, I believe that entering into the Assessment Contract is an exercise of my sound business judgment.

266645

25.    The DIP Lender has required that the Debtor's Limited Partnership Agreement and the GP's Operating Agreement to be amended as follows:

- Pursuant to Article 4(a) of the Debtor's Limited Partnership Agreement, the term of the partnership "shall continue until December 31, 2044…" The DIP Lender has required that the term of the partnership should be extended for an additional 30 years, through and included December 31, 2074.

- The *Operating Agreement of Global Premier America #3, LLC, A California Limited Liability Company* (inclusive of amendments thereto, the "GP Operating Agreement") currently prohibits the GP from authorizing the Debtor to incur further "indebtedness or liabilities." The GP Operating Agreement therefore needs to be amended to permit the DIP Financing.

26.    Pursuant to Article 17 of the Debtor's Limited Partnership Agreement, the General Partner has the authority to amend such agreement in order to comply with requests made by a lender, subject to certain exceptions not relevant here.

> **[T]he General Partner shall have the authority to amend this Agreement without any vote or other action by the Limited Partners; … (y) to make any changes requested by a lender that are requested or required to obtain financing** or add or delete any such provisions after repayment of any such loans provided that the adoption of such amendment (i) is for the benefit of and not adverse to the interests of the Limited Partners; (ii) is not inconsistent with provisions of this Agreement pertaining to the management and administration of the Partnership by the General Partner; and (iii) does not affect the limited liability of the Limited Partners or the status of the Partnership as a partnership for Federal income tax purposes.

27.    I do not believe that the proposed amendments to the Limited Partnership Agreement or the GP Operating Agreement require court approval. However, in an abundance of caution and as a matter of disclosure, the Debtor requests, to the extent Court approval is necessary, an order authorizing the GP to amend the Debtor's Limited Partnership Agreement and its Operating Agreement in order to comply with the requirements of the DIP Lender.

28.    JKO, the senior secured creditor in this case, has already consented to the approval of this loan.

266645

29.      There is no and has been no fraud, collusion, self-dealing nor any attempt to take grossly unfair advantage of others in the course of negotiating or obtaining the proposed DIP Financing.  The DIP Financing is not illegal, nor is there any improper purpose.  In fact, the proposed financing was designed by the state of California for the very purpose for which the Debtor seeks and has already been qualified.  The proposed DIP Financing was negotiated at arm's-length by all of the parties, including, the Debtor, CSCDA, White Oak, and JKO, each of which was represented by counsel.

I declare under penalty of perjury under the laws of the state of California and the United States of America that the foregoing is true and correct.

Executed this 24th day of July, 2023 at Irvine, California.

_____
Christine Hanna

266645

EXHIBIT 1

1   GARRICK A. HOLLANDER – State Bar No. 166316
    ghollander@wghlawyers.com
2   **WINTHROP GOLUBOW HOLLANDER, LLP**
    1301 Dove Street, Suite 500
3   Newport Beach, CA 92660
    Telephone: (949) 720-4100
4   Facsimile: (949) 720-4111

5   General Insolvency Counsel for
    Debtor and Debtor-in-Possession
6

7

8                   **UNITED STATES BANKRUPTCY COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA – SANTA BARBARA DIVISION**

10

11  | In re: | Case No. 9:22-bk-10626-RC |
12  |        | Chapter 11 Proceeding |
    | GLOBAL PREMIER REGENCY PALMS | **ORDER GRANTING DEBTOR'S MOTION** |
13  | OXNARD, L.P., a California limited | **FOR ORDER AUTHORIZING DEBTOR TO** |
    | partnership, | **ENTER INTO ASSESSMENT CONTRACT** |
14  |        | **AND OBTAIN POST-PETITION LOAN** |
15  |        Debtor and | **SECURED AGAINST REAL PROPERTY** |
    |        Debtor-in-Possession | **[11 U.S.C. §§ 363(b) and 364(d)(1)]** |
16  |        |  |
17  |        | DATE:      TBD |
    |        | TIME:      TBD |
18  |        | PLACE:[1]  Courtroom 201 |
19  |        |            1415 State Street |
    |        |            Santa Barbara, CA  91301 |
20

21

22

23

24

25

26

27
────────────────────
28  [1] The hearing on the Motion will be scheduled to be heard via Zoom.  Please check the Court's calendar just prior to
    the hearing to confirm. http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/.

EXHIBIT 1 - PAGE 1          265083

On August 8, 2023, at approximately 2:00 p.m., the Court held a hearing on the *Debtor's Motion for Order Authorizing Debtor to Enter into Assessment Contract and Obtain Post-Petition Loan Secured Against Real Property* [Docket No. ___] ("Motion") filed by Global Premier Regency Palms Oxnard, LLP, a California limited liability partnership, the debtor and debtor-in-possession in the above Chapter 11 proceeding (the "Debtor"). Garrick A. Hollander, Esq. appeared on behalf of the Debtor. All other appearances were as noted on the Court's record of the proceedings.

The Court having reviewed and considered the Motion, all evidence presented, the papers, pleadings and other documents on file in the Debtor's chapter 11 case, and the arguments and the representations of counsel, finding that proper notice of the Motion and hearing on the Motion was appropriately given, and no opposition to the Motion having been filed, and for good and sufficient cause appearing therefor, the Court hereby makes the following findings of fact, conclusions of law, and order:

**IT IS HEREBY FOUND AND DETERMINED** that:

a.      The notice given of the hearing on the Motion was sufficient under the circumstances of this case.

b.      Christine Hanna has the authority, as Manager of Global Premier America #3, LLC, a California limited liability company, the general partner of the Debtor, to act on behalf of the Debtor, to execute, enter into, and deliver the Assessment Contract and all such other documents necessary to obtain, close and consummate the DIP Financing,[1] and to perform such other and further acts as may be necessary or desirable in connection with the Assessment Contract and to close and consummate the DIP Financing.

c.      The proposed DIP Financing is critical to the Debtor's ability to emerge from Chapter 11 and pave the way to potentially pay its creditors.

d.      The DIP Financing is necessary to effectuate the compromise with JKO and pave the way for prompt emergence from Chapter 11.

---

[1] Except as otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the Motion.

EXHIBIT 1 - PAGE 2

251254

e.      Approval and use of the DIP Financing provides creditors with the greatest opportunity for payment, and thus is in the best interest of creditors.

f.      The terms and conditions of the DIP Financing, as set forth in the Motion, are, under the circumstances, the most advantageous and only funding terms currently available to the Debtor.

g.      The terms and conditions of the DIP Financing, as set forth in the Motion, are the result of arm's-length negotiations between the Debtor and the DIP Lender, and the Debtor is receiving fair consideration and reasonably equivalent value from the DIP Lender for the obligations incurred by the Debtor and the liens granted to the DIP Lender.

h.      The DIP Lender is a lender in "good faith," as that term is used in Section 364(e) of the Bankruptcy Code.

i.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of this matter constitutes a core proceeding, as defined in 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are Sections 363 and 364 of the Bankruptcy Code and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure.  Venue of the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

j.      Good and adequate cause exists for granting the Motion.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that:

1.      The findings of fact and conclusions of law of the Court set forth herein and at the hearing on the Motion shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, as made applicable herein by Bankruptcy Rule 9014, and the findings and conclusions of the Court at the Hearing are incorporated herein by reference.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and vice versa.

EXHIBIT 1 - PAGE 3          251254

2.      Except as otherwise expressly set forth herein, any formal or informal objection to Motion, to the extent not already withdrawn, waived, or settled, and all reservations of rights included therein, shall be, and hereby are overruled;

3.      The Motion is hereby granted;

4.      The Debtor is authorized to enter into with the California Statewide Community Development Authority (the "CSCDA"), as governing body for the California Open PACE Program, and White Oak Global Advisors, LLC, ("White Oak"), as the PACE Administrator (collectively, the "DIP Lender"), the Assessment Contract, and any additional agreements, documents, instruments, and certificates in connection therewith and necessary or desirable to perform all obligations contained therein (collectively, the "Assessment Contract").

5.      The Debtor is authorized to obtain the post-petition commercial PACE financing in an aggregate maximum principal amount of up to $12,800,000 (the "DIP Financing") pursuant to the terms and conditions of the Assessment Contract, the Motion, and any orders entered in connection therewith, or otherwise delivered in connection therewith.

6.      The Debtor's general partner is authorized to amend the Debtor's Limited Partnership Agreement, and Article 4(a) of the Debtor's Limited Partnership Agreement is hereby amended to extend the term of the partnership for an additional thirty (30) years, such that it "shall continue until December 31, 2074 …" subject to the other provisions of Article 4(a).  The Debtor's general partner further is authorized to amend the Operating Agreement of Global Premier America #3, LLC, A California Limited Liability Company (inclusive of amendments thereto, the "GP Operating Agreement"), and such Operating Agreement is hereby amended such that the general partner may authorize the Debtor to enter into the DIP Financing set forth herein notwithstanding the limitations set forth in Section 2(b)(4) of the First Amended to the Operating Agreement.

7.      Christine Hanna is designated as the person in control of the Debtor with authority to act on behalf of the Debtor, pursuant to 11 U.S.C. § 1107(a) and F.R.B.P. 9001(5), and in particular, authorizing Christine Hanna on behalf of the Debtor to execute and deliver the Assessment Contract and all such other documents and to perform such other and further acts as

EXHIBIT 1 - PAGE 4

251254

1    may be necessary or desirable in connection with the Assessment Contract and the closing of the

2    DIP Financing pursuant thereto;

3         8.    Pursuant to Section 364(d)(1) of the Bankruptcy Code and all applicable California

4    state law, all delinquent Assessment Obligations arising from the Assessment Contract shall be

5    secured by a lien ("DIP Lien") encumbering the Debtor's real property located at 1029 Bismark

6    Way, Oxnard, California, senior to any and all pre-petition private liens held against such property.

7    The DIP Lien shall be deemed to be properly perfected and enforceable liens upon entry of this

8    Order without any need for any recording or filing of the DIP Lien or for any other act to be taken

9    by the Debtor or by CSCDA to perfect the DIP Lien, and any delinquent Assessment Obligations

10    shall be collected, along with applicable penalties, interest and costs, in accordance with California

11    law.

12         9.    The stay provided by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure

13    shall not be applicable to the relief granted by this Order, and any documents may be executed by

14    the Debtor in order to effectuate the DIP Financing, and funds may be borrowed by the Debtor

15    pursuant to the DIP Financing, immediately in accordance with the provisions of this Order.

16         10.    The DIP Lender shall be and is hereby entitled to the protections and benefits of

17    Section 364(e) of the Bankruptcy Code in advancing funds to the Debtor pursuant to the DIP

18    Financing.

19         11.    No further notice or hearing shall be necessary to effectuate this Order.

20

21

22

23

24

25

26

27

28

-5-

EXHIBIT 1 - PAGE 5    251254

EXHIBIT 2

**CALIFORNIA STATEWIDE COMMUNITIES DEVELOPMENT AUTHORITY
OPEN PACE PROGRAM**

**ASSESSMENT CONTRACT**

This Assessment Contract (this "**Contract**") is made and entered into as of August [\_\_], 2023, by and between the California Statewide Communities Development Authority, a joint exercise of powers authority (the "**Authority**") and the record owner(s) (the "**Property Owner**") of the fee title to the real property identified on Exhibit A (the "**Property**").

**RECITALS**

WHEREAS, the Authority is a joint exercise of powers authority the members of which include numerous cities and counties in the State of California; and

WHEREAS, the Authority has established the CSCDA Open PACE Program (the "**Program**") to allow the financing or refinancing of certain distributed generation renewable energy sources, energy efficiency improvements, water efficiency improvements, seismic strengthening improvements, electric vehicle charging infrastructure and such other work, infrastructure or improvements as may be authorized by law from time to time that are permanently fixed to real property (collectively, the "**Authorized Improvements**") through the levy of contractual assessments pursuant to Chapter 29 of Part 3 of Division 7 of the Streets and Highways Code ("**Chapter 29**") and the issuance of improvement bonds under the Improvement Bond Act of 1915 (Streets and Highways Code Sections 8500 and following) (the "**1915 Act**") upon the security of the unpaid contractual assessments; and

WHEREAS, Chapter 29 provides that assessments may be levied under its provisions only with the free and willing consent of the owner of each lot or parcel on which an assessment is levied at the time the assessment is levied pursuant to a contract between the property owner and the public agency; and

WHEREAS, the Authority has conducted the proceedings required by Chapter 29 with respect to the territory within the boundaries of the city or county identified as the "**Participating Entity**" in Exhibit A; and

WHEREAS, the Authority has appointed White Oak Global Advisors, LLC as a program administrator (together with any successors or assigns, the "**Program Administrator**") for the Program as it pertains to this Contract; and

WHEREAS, the Property is located within the boundaries of the Participating Entity, and the Participating Entity has consented to (i) owners of property within its jurisdiction participating in the Program and (ii) the Authority conducting assessment proceedings under Chapter 29 and issuing bonds under the 1915 Act to finance or refinance the Authorized Improvements; and

WHEREAS, pursuant to Chapter 29, the Authority and the Property Owner wish to enter into a contract pursuant to which the Property Owner would agree to pay an assessment in order to finance or refinance the installation of the Authorized Improvements described in Exhibit A (the "**Improvements**") and the Authority would agree to provide financing, all on the terms set forth in this Contract; and

[Signature Page to Assessment Contract]

EXHIBIT 2 - PAGE 1

WHEREAS, the proposed financing will promote significant and growing opportunities for the creation and retention of employment to the California economy and the enhancement of the quality of life to residents of the Participating Entity, and will promote opportunities for the creation or retention of employment within the jurisdiction of the Participating Entity; and

WHEREAS, the proposed financing is a significant factor in maintaining the operations of the Property Owner within the jurisdiction of the Participating Entity.

NOW, THEREFORE, in consideration of the foregoing and the material covenants hereinafter contained, the Property Owner and the Authority formally covenant, agree and bind themselves and their successors and assigns as follows:

## AGREEMENT

**Section 1.**  Purpose.  The Property Owner and the Authority are entering into this Contract for the purpose of financing or refinancing the installation of the Improvements.

The Property Owner hereby agrees to construct the Improvements on the Property, or represents and warrants that the Improvements have been constructed on the Property (as the case may be), and that the Improvements will be, or are, permanently affixed to the Property (subject to casualty or condemnation and replacement of certain fixtures in the ordinary course).

**Section 2.**  The Property. This Contract relates to the Property. The Property Owner has supplied to the Authority (a) current evidence of its ownership of fee title to the Property, and the undersigned possesses all legal authority necessary to execute this Contract on behalf of the Property Owner, (b) a Phase I environmental report from a consultant reasonably acceptable to the Authority and the Program Administrator, in form and substance acceptable to the Authority and the Program Administrator and (c) if determined necessary by the Authority or the Program Administrator, a Phase II environmental report from a consultant reasonably acceptable to the Authority and the Program Administrator, in form and substance acceptable to the Authority and the Program Administrator.  The Property Owner has represented to the Authority that the Property consists of a single legal parcel as described on Exhibit A.

**Section 3.**  Contract to Pay Assessment; Prepayment; Non-Completion Assessment.

(a)  Payment of Assessment. The Property Owner hereby freely and willingly agrees to pay the assessment (the "**Assessment**") in the amount shown as the "Assessment Amount" on Exhibit B, representing the amounts being financed to (i) install or refinance the installation of the Improvements, which is shown as the "Project Amount" on Exhibit B, (ii) capitalize interest, which is shown as the "Capitalized Interest" on Exhibit B, and (iii) pay certain closing costs, as described in Section 3(c), which is shown as the "Closing Costs" on Exhibit B. The Authority will provide financing under this Contract for the benefit of the Property Owner in an amount not exceeding the Assessment Amount.  The Property Owner acknowledges that the Authority may bill the Assessment Installments separately from the County property tax bill, as needed. The Authority will obtain the money to finance or refinance the installation of the Improvements with the proceeds of California Statewide Communities Development Authority Open PACE limited obligation improvement bonds (the "**Bonds**") pursuant to an Indenture (the "**Indenture**") by and between the Authority and Wilmington Trust, National Association, as trustee (the "**Trustee**"), payable in whole or in part from the installments described below. Interest will accrue on the Assessment Amount at the interest rate set forth on Exhibit B beginning on the date on which the Authority issues the Bonds to finance or refinance the installation of the Improvements. Except as

EXHIBIT 2 - PAGE 2

otherwise set forth in this Contract, the Assessment will be paid in the installments of principal (representing the amortization of the Assessment over the period shown on Exhibit B) and interest on the unpaid principal at the rate set forth on Exhibit B.  Such installments of principal and interest are referred to collectively in this Contract as the "**Assessment Installments**" and are further described in Section 5(b).

(b)    <u>Payment of Non-Completion Assessment.</u> The Property Owner acknowledges that if, by the Completion Deadline (as shown in Exhibit B) or such later date as the Authority, in its sole discretion, determines, the Property Owner fails to install, or cause to be installed, the Improvements in compliance with the Program rules, this Contract and/or any other documents related to the Program or the Improvements, the Authority will apply the undisbursed proceeds of the Bonds that had been intended for financing the Improvements, plus any related amounts financed for capitalized interest or a debt service reserve fund deposit, to redeem the Bonds, including any redemption premium. The Property Owner hereby freely and willingly agrees to pay an additional assessment (the "**Non-Completion Assessment**") to pay (i) any costs incurred by the Authority in connection with such redemption and (ii) if applicable, all of the Authority's costs related to the release of the discharged portion of the lien of the Assessment on the Property. The Property Owner acknowledges that the Non-Completion Assessment will be levied in full by the Authority as set forth in Section 5898.30 of Chapter 29 in the first fiscal year in which the Authority is able to cause the Non-Completion Assessment to be placed on the property tax roll of the county identified at Exhibit A (the "**County**").  The Property Owner and the Authority have agreed that this Section 3(b) shall not apply because the Property Owner has already completed installation of the Improvements.

(c)    <u>Financing the Closing Costs</u>.  In addition to financing the Project Amount, the Authority will finance certain amounts, which are included in the Assessment as "Closing Costs" from a portion of the proceeds of the Bonds.

(d)    <u>Annual Administrative Fee.</u> The Property Owner hereby acknowledges that, pursuant to the 1915 Act, including Sections 8682(b) and 8682.1(a), the Authority may add amounts to any Assessment Installment in order to pay for the costs of collecting the Assessment, including the Assessment Installments, costs directly related to the administration of the Program, as determined by the Authority in its sole discretion, including but not limited to: the actual costs of preparing the annual Assessment installment collection schedules (whether by an employee of the Authority or a consultant or both), the actual costs of collecting the Assessment installments (whether by a county or otherwise); the actual costs of remitting the Assessment installments to the Trustee; actual costs of the Trustee (including its legal counsel) in the discharge of its duties under the Indenture; the actual costs of the Authority or its designee of complying with the disclosure provisions of Chapter 29, the 1915 Act, federal securities laws and the Indenture, including those related to public inquiries regarding the Assessments and disclosures to owners of the Bonds; the actual costs of the Authority or its designee related to an appeal or challenge of the Assessment; any amounts required to be rebated to the federal government; an allocable share of the salaries of the Authority staff directly related to the foregoing and a proportionate amount of Authority general administrative overhead related thereto, amounts advanced by the Authority for any administrative purpose relating to the Program, including costs related to prepayments of Assessments, costs of prosecuting foreclosure of delinquent Assessment installments, and costs related to a default on the Bonds in connection with a bankruptcy proceeding involving the Property, foreclosure, or receivership involving the Property, the annual administration of Bonds, and other administrative costs (the "**Annual Administrative Fee**"). Such additional amounts, if any, may include administrative costs that were paid from penalties and interest as a result of one or more delinquent Assessment Installments if such penalties and

EXHIBIT 2 - PAGE 3

interest otherwise would have been paid to the owners of the Bonds as additional interest. Exhibit B shows the estimated Annual Administrative Fees and the Assessment Installments; however, such estimated Annual Administrative Fees might increase if the costs of collecting the Assessment Installments or administering the Program increase. The Property Owner agrees to pay actual Annual Administrative Fees, which may be higher than such estimates. The Annual Administrative Fees, together with each Assessment Installment, the Non-Completion Assessment and the Assessment, are referred to collectively as the "**Assessment Obligations**."

(e)    Prepayment of the Assessment. Should the Property Owner wish to prepay the Assessment, in whole or in part, the Property Owner shall provide written notice to the Program Administrator, whose contact information appears in Exhibit A hereto (such notice, the "**Prepayment Notice**"). Upon receipt of the Prepayment Notice, a Prepayment statement will be prepared and provided to the Property Owner. The Assessment may be prepaid pursuant to such Prepayment statement upon the payment of (a) the amount of any delinquent installments of principal or interest on the Assessment, together with penalties accrued to the date of prepayment, plus (b) the amount of the unpaid, non-delinquent principal of the Assessment to be prepaid (the "**Assessment Prepayment Amount**"), plus (c) interest on the Assessment Prepayment Amount  through the next redemption date of the Bonds that is at least 60 days following the date of prepayment, plus (d) an amount equal to the Prepayment Premium (as defined in Exhibit B), if applicable, plus (e) a fee, if charged by the Authority or Program Administrator, for the cost of administering the prepayment and the redemption of Bonds.

The Authority shall apply the elements of the Prepayment Amount listed in clauses (a) through (d) above to the redemption of the Bonds.

In the event the Property Owner prepays the Assessment in whole, the Authority shall cause to be executed, delivered and/or recorded such instruments as are necessary in order to release the lien of such Assessment on the Property.

(f)    Unused Bond Proceeds. In the event that the Authority concludes that there are proceeds of the Bonds secured by the Assessments that will not be used to finance or refinance installation of the Improvements, including in the circumstances described in Section 3(b), the Authority shall use such proceeds to pay the redemption price of all or a portion of the Bonds. In the event that the Property Owner notifies the Authority that proceeds of the Bonds will not be used to finance or refinance the installation of the Improvements, the Authority shall use such proceeds to pay the redemption price of all or a portion of such Bonds or to make payments on the Bonds as they come due, as directed by the Authority.

(g)    Absolute Obligation. The Property Owner hereby agrees that the Assessment Obligations will not be subject to reduction, offset or credit of any kind if the Improvements fail to perform in any way or for any reason, the Bonds are refunded or for any other reason.

**Section 4.** Collection of Assessment; Lien.  The Assessment Obligations, statutory interest and penalties on any delinquent payments of the Assessment Obligations and the costs of suit (including attorneys' fees) shall constitute a lien against the Property until they are paid and shall be collected. As set forth in Chapter 29, such lien shall be coequal to and independent of the lien for general taxes.

The Property Owner acknowledges that if the Assessment Obligation for any year is not paid when due, the Authority has the right to have such delinquent installment and its associated statutory penalties and interest stripped off the secured property tax roll and immediately enforced

EXHIBIT 2 - PAGE 4

through a judicial foreclosure action that could result in a sale of the Property for the payment of the delinquent installments, associated statutory penalties and interest, and all costs of suit, including attorneys' fees.

The Property Owner acknowledges that, if the Bonds are sold to finance or refinance the Improvements, the Authority may pledge and assign this Contract and the related Assessment and lien as security for the Bonds and obligate itself, through a covenant with the owners of such Bonds, to exercise its judicial foreclosure rights with respect to delinquent Assessment Obligations under circumstances specified in such covenant.  Such a covenant would typically provide that, no later than a specific date in each year, the Authority will determine whether the Property is delinquent in the payment of any portion of the Assessment Obligations and, if so, will commence, or cause to be commenced, judicial foreclosure proceedings against the Property, including collection actions preparatory to the filing of any complaint, but will file the complaint by a specific date acceptable to the Bond owner(s).

**Section 5.**  Financing or Refinancing of the Improvements.

(a)  Contract to Finance or Refinance Improvements. The Authority hereby agrees to use the Assessment, together with the Annual Administrative Fee, to finance or refinance the installation of the Improvements, including the payment of the Authority's costs of administering the Program, subject to the Property Owner's compliance with the conditions for such financing or refinancing established by the Authority.  The proceeds of such financing or refinancing may be used to pay for the ownership of the Improvements or, subject to the requirements of Chapter 29, pay or prepay for the lease of the Improvements or the energy or other output of the Improvements, which Improvements may be owned for tax purposes or otherwise by a third-party.

(b)  Assessment Installments. The Property Owner agrees to the issuance of the Bonds by the Authority to finance or refinance the installation of the Improvements.  The interest rate used to calculate the interest component of the Assessment Installments is identified on Exhibit B.

**Section 6.**  Term; Contract Runs with the Land; Subdivision.

(a)  Except as otherwise set forth in this Contract, this Contract shall expire upon the payment or prepayment in full of the Assessment Obligations.

(b)  This Contract establishes rights and obligations (including without limitation the obligations of Property Owner to pay Assessment installments) that are for the benefit of the Property, and therefore, such rights and obligations run with the land pursuant to California Civil Code Section 1462.

(c)  The Property shall not be subdivided without the consent of the Program Administrator. If the Property is subdivided while the Assessment Obligations remain unpaid, the Assessment Obligations will be assigned to each of the newly-created parcels on a pro rata basis, calculated on the relative assessed value of each newly-created parcel, unless the Authority, in its sole discretion, determines that the Assessment Obligations should be allocated in an alternate manner.

**Section 7.**  Recordation of Documents. The Property Owner hereby authorizes and directs the Authority to cause to be recorded against the Property in the office of the County Recorder the various notices and other documents required by Chapter 29 and other applicable

EXHIBIT 2 - PAGE 5

laws to be recorded against the Property, including but not limited to the Notice of Assessment and Payment of Contractual Assessment Required.

The Assessment Installments and related Annual Administrative Fee will be placed on the County property tax roll each "**Tax Year**" (being the period beginning July 1 and ending the immediately succeeding June 30), commencing with the first Tax Year for which the Assessment Installments and related Annual Administrative Fee are placed on the Property Owner's property tax bill prior to the applicable tax roll deadline  (the "**Initial Tax Year on Roll**").  The Initial Tax Year on Roll is identified on Exhibit B.

**Section 8.**  <u>Notice</u>. The Property Owner hereby agrees to provide written notice to any subsequent purchaser of the Property of the obligation to pay the Assessment Obligations pursuant to this Contract.

**Section 9.**  <u>Waivers, Acknowledgment and Contract</u>. Because this Contract reflects the Property Owner's free and willing agreement to pay the Assessment Obligations and consent to the levy of the Assessment secured by a lien on the Property following a noticed public hearing, the Property Owner hereby waives any otherwise applicable requirements of Article XIIID of the California Constitution or any other provision of California law for an engineer's report, notice, public hearing, protest or ballot.

The Property Owner hereby waives its right to repeal the Assessment by initiative or any other action, or to file any lawsuit or other proceeding to challenge the Assessment, the Assessment Obligations or any aspect of the proceedings of the Authority undertaken in connection with the Program. The Property Owner hereby agrees that it and its successors in interest to fee title in the Property shall be solely responsible for the installation, operation and maintenance of the Improvements.  The Property Owner hereby acknowledges that the Property Owner will be responsible for payment of the Assessment Obligations regardless of whether the Improvements are properly installed, operated or maintained or perform as expected.

The Property Owner hereby agrees that the Authority is entering into this Contract solely for the purpose of assisting the Property Owner with the financing or refinancing of the installation of the Improvements, and the Authority, the Program Administrator, the owners of the Bonds and the Participating Entity have no responsibility of any kind for, and shall have no liability arising out of, the installation, operation, financing, refinancing, maintenance or performance of the Improvements. Based upon the foregoing, the Property Owner hereby waives the right to recover from and fully and irrevocably releases the Authority, the Program Administrator, the owners of the Bonds and the Participating Entity and any and all agents, employees, program administrators, attorneys, representatives and successors and assigns of the Authority, the Program Administrator, the owners of the Bonds and the Participating Entity from any and all losses, liabilities, claims, damages (including consequential damages), penalties, fines, forfeitures, costs and expenses (including all out-of-pocket litigation costs and attorney's fees), relating to the subject matter of this Contract that the Property Owner may now have or hereafter acquire against the Authority, the Program Administrator, the owners of the Bonds, the Participating Entity and any and all agents, employees, program administrators, attorneys, representatives and successors  and assigns of the Authority, the Program Administrator, the owners of the Bonds and the Participating Entity.

If the foregoing waivers and agreements are subject to Section 1542 of the California Civil Code or similar provisions of other applicable law, it is the intention of the Property Owner that the foregoing waivers and agreements will be effective as a bar to any and all losses, liabilities, claims,

EXHIBIT 2 - PAGE 6

damages (including consequential damages), penalties, fines, forfeitures, costs and expenses (including all out-of-pocket litigation costs and attorney's fees), of whatever character, nature and kind, known or unknown, suspected or unsuspected,  and Property Owner agrees to waive any and all rights and benefits conferred upon the Property Owner by the provisions of Section 1542 of the California Civil Code or similar provisions of applicable law.  Section 1542 reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

BY INITIALING BELOW, PROPERTY OWNER HEREBY WAIVES THE PROVISIONS OF SECTION 1542 SOLELY IN CONNECTION WITH THE MATTERS THAT ARE THE SUBJECT OF  THE FOREGOING WAIVERS AND RELEASES.

Property Owner(s) Initials:    _____

The waivers, releases and agreements set forth in this Section 9 shall survive termination or expiration of this Contract and the final payment or defeasance of the Bonds.

Section 10.  Indemnification.  The Property Owner agrees to indemnify, defend, protect, and hold harmless the Authority, the Program Administrator, the owners of the Bonds, and the Participating Entity and any and all agents, employees, program administrators, attorneys, representatives  and successors and assigns of the Authority, the Program Administrator, the owners of the Bonds or the Participating Entity from and against all losses, liabilities, claims, damages (including consequential  damages), penalties, fines, forfeitures, costs and expenses (including  all r out-of-pocket litigation costs and attorney's fees) and any demands of any nature whatsoever related directly or indirectly to, or arising out of or in connection with, (i) the Property Owner's participation in the Program, (ii) the Assessment,  (iii) the Improvements,  (iv) the Bonds, (v) any act or omission of the Property Owner or any of its agents, contractors, servants, employees, tenants or licensees in connection with the Property or the Improvements, the operation of the Property or the Improvements, or the condition, environmental or otherwise, occupancy, use, possession, conduct or management of work done in or about, or from the planning, design, acquisition, installation or construction of, the Property or the Improvements or any part thereof, (vi) any lien or charge upon payments by the Property Owner to the Authority and the Trustee hereunder, or any taxes (including, without limitation, all ad valorem taxes and sales taxes), assessments, impositions and other charges imposed on the Authority or the Trustee in respect of any portion of the Property or the Improvements, (vii) any violation of any Environmental Regulations (as defined below) with respect to, or the release of any Hazardous Substances (as defined below) from, the Property or the Improvements or any part thereof, (viii) any untrue statement or misleading statement or alleged untrue statement or alleged misleading statement of a material fact made by the Property Owner contained in any of the documents relating to the Bonds, or any omission or alleged omission of any material fact necessary to be stated therein in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading, (ix) the Trustee's acceptance or administration of the trust of the Indenture, or the exercise or performance of any of its powers or duties thereunder or under any of the documents relating to the Bonds to which it is a party or (x) any other fact, circumstance  or event related to the subject matter of this Contract, regardless of whether such

EXHIBIT 2 - PAGE 7

losses, liabilities, claims, damages (including consequential damages), penalties, fines, forfeitures, costs and expenses (including all out-of-pocket litigation costs and attorney's fees) accrue before or after the date of this Contract.

For purposes of this Section, Environmental Regulations and Hazardous Substances have the following meaning:

"Environmental Regulations" means any federal, state or local law, statute, code, ordinance, regulation, requirement or rule relating to dangerous, toxic or hazardous pollutants, Hazardous Substances or chemical waste, materials or substances.

"Hazardous Substances" means (a) any oil, flammable substance, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other wastes, materials or pollutants which (i) pose a hazard to the Property or to persons on or about the Property or (ii) cause the Property to be in violation of any Environmental Regulation; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls, or radon gas; (c) any chemical, material or substance defined as or included in the definition of "waste," "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," or "toxic substances" or words of similar import under any Environmental Regulation including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 USC §§ 9601 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 USC §§ 6901 et seq.; the Hazardous Materials Transportation Act, 49 USC §§ 1801 et seq.; the Federal Water Pollution Control Act, 33 USC §§ 1251 et seq.; the California Hazardous Waste Control Law ("HWCL"), Cal. Health & Safety Code §§ 25100 et seq.; the Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code §§ 25300 et seq.; the Underground Storage of Hazardous Substances Act, Cal. Health & Safety Code §§ 25280 et seq.; the Porter-Cologne Water Quality Control Act (the "Porter-Cologne Act"), Cal. Water Code §§ 13000 et seq., the Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and Title 22 of the California Code of Regulations, Division 4, Chapter 30; (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or agency or may or could pose a hazard to the health and safety of the occupants of the Property or the owners and/or occupants of property adjacent to or surrounding the Property, or any other person coming upon the Property or adjacent property; or (e) any other chemical, materials or substance which may or could pose a hazard to the environment.

The provisions of this Section 10 shall survive termination or expiration of this Contract and the final payment or defeasance of the Bonds.

**Section 11.**  Right to Ongoing Information.  The Property Owner hereby grants each of the Authority and the Program Administrator and their agents and representatives the right to examine and copy any documentation relating to the Improvements as well as documents relating to the financial operation of the Property, including operating statements, rent rolls, appraisals, and similar documents and information.

The Property Owner hereby grants each of the Authority and the Program Administrator and their agents and representatives the right to enter the Property to inspect the Improvements, at any reasonable time, upon reasonable notice. The foregoing access shall be performed in a manner consistent with applicable patient privacy laws and in no event shall the Authority or the

EXHIBIT 2 - PAGE 8

Program Administrator, or their agents and representatives have access to the personal information of the residents of the facility.

In addition, at the Authority or the Program Administrator's request, the Property Owner shall secure and deliver to Authority and Program Administrator an appraisal of the Property prepared by an appraiser approved by the Program Administrator in its sole discretion; provided, however, if the Property Owner is not in default under this Contract, the Authority and the Program Administrator will not request any such appraisal more than one time in a 12-month period.

**Section 12.** Carbon Credits.  The parties hereby agree that any carbon credits attributable to the Improvements shall be owned by the Property Owner.

**Section 13.** Program Application.  The Property Owner hereby represents and warrants to the Authority that the written information supplied by Property Owner or its representatives to the Authority or the Program Administrator in connection with its request for financing is true and correct in all material respects as of the date hereof.

**Section 14.** Additional Covenants.

(a)      Insurance. The Property Owner hereby covenants for the benefit of the Authority to maintain fire and other risk insurance and public liability insurance with respect to the Property, in commercially reasonable amounts and with the property insurance equal to the lesser of (i) the full replacement value of the Property (determined at least once every 24 months) or (ii) the outstanding principal amount of any loans on the Property and the unpaid principal amount of the Assessment and any outstanding debt secured by a deed of trust on the Property.  In addition to the foregoing, the Property Owner agrees to cause the Authority and its successors and assigns to be named as "additional insureds" on all casualty and general liability insurance policies that the Property Owner maintains on the Property, and to cause the Authority, as issuer of the Bonds, and its successors and assigns, to be named as "lender's loss payable" and "loss payee" on all property insurance that the Property Owner maintains on the Property. The Property Owner will deliver the policies or certificates of insurance in form reasonably satisfactory to the Authority, including stipulations, to the extent reasonably available in the marketplace, that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to the Authority, with such policies or certificates provided on or before the date of issuance of the Bonds and at least annually on or before July 1 of each year thereafter or prior to the expiration or renewal date of an applicable policy.  Each insurance policy also shall include an endorsement providing that coverage in favor of the Authority will not be impaired in any way by any act, omission or default of the Property Owner or any other person (except non-payment of premium). The Property Owner will provide the Authority with a  "lender's loss payee" endorsement in connection with the property insurance policy in favor of the Authority, as issuer of the Bonds. Notwithstanding the foregoing, in the event the Property Owner fails to timely pay all premiums on all insurance policies required under this Contract, the Program Administrator shall have the right (but not the obligation) to place and maintain the insurance required to be placed and maintained by the Property Owner hereunder and treat the amounts expended therefor as an Administrative Expense.

Subject to the terms of the separate Loan Agreement between the Property Owner and JKO Group LLC, a Delaware limited liability company ("Lender"), if the Property Owner receives any property insurance proceeds attributable to the Property during the term of this Contract the Property Owner shall use such proceeds to prepay the Assessment Obligations.

EXHIBIT 2 - PAGE 9

(b)    Reporting. Following completion of the installation of the Improvements and through the term of this Contract, Property Owner shall provide Property operating statements to each of the Authority and the Program Administrator within 30 days of receiving a written request for such statements, but no more frequently than one time each calendar month.

(c)    Use of Project. The Property Owner shall not use any portion of the Improvements for any business activity that violates any Federal or State law. No portion of the proceeds of the Bonds shall be used to finance or refinance any facility, place or building to be used primarily for sectarian instruction or study or as a place for devotional activities or religious worship.

**Section 15.**    Non-Liability of Authority; Waiver of Personal Liability.

(a)    The Authority shall not be obligated to pay the principal (or redemption price) of or interest on the Bonds, except from the Assessment and other moneys and assets received by the Authority pursuant to this Contract.  Neither the faith and credit nor the taxing power of the State or any political subdivision thereof (including the Participating Entity), nor the faith and credit of the Authority is pledged to the payment of the principal (or redemption price) of or interest on the Bonds.  The Authority shall not be liable for any costs, expenses, losses, damages, claims or actions, of any conceivable kind on any conceivable theory, under or by reason of or in connection with this Contract, the Bonds or the Indenture, except only to the extent amounts are received for the payment thereof from the Property Owner under this Contract.

(b)    The Property Owner hereby acknowledges that the Authority's sole source of moneys to repay the Bonds (whether by maturity, redemption, acceleration or otherwise) will be the Assessment, together with amounts on deposit in and investment income on certain funds and accounts held by the Trustee under the Indenture.

(c)    The Property Owner acknowledges that the Participating Entity shall not be liable for any costs, expenses, losses, damages, claims or actions, of any conceivable kind on any conceivable theory, under or by reason of or in connection with, the Bonds.

(d)    No member, officer, agent or employee of the Participating Entity or the Authority or any director, officer, agent or employee of the Property Owner shall be individually or personally liable for the payment of any principal (or redemption price) of or interest on the Bonds or any sum hereunder or under the Indenture or be subject to any personal liability or accountability by reason of the execution and delivery of this Contract; but nothing herein contained shall relieve any such member, director, officer, agent or employee from the performance of any official duty provided by law or by this Contract.

**Section 16.**    Amendment. Except as set forth in Section 5(b), this Contract may be modified only by the written agreement of the Authority and the Property Owner. A modification of this Contract must be approved in writing by the owner(s) of any Bonds secured by the Assessments if the amendment will adversely impact the owner(s) of the Bonds.

**Section 17.**    Binding Effect; Assignment. This Contract inures to the benefit of and is binding upon the Authority, the Property Owner and their respective successors and assigns. The Authority has the right to assign any or all of its rights and obligations under this Contract without the consent of the Property Owner.  The Authority intends to delegate certain of its functions under this Contract to the Program Administrator and may pledge and assign this Contract to the Trustee as security for the Bonds.  The obligation to pay the Assessment Obligations set forth in this Contract is an obligation of the Property, and no agreement or action of the Property Owner will

EXHIBIT 2 - PAGE 10

be competent to impair in any way the Authority's rights under this Contract or applicable law, including, but not limited to, the right to pursue judicial foreclosure of the Assessment lien or the right to enforce the collection of the Assessment Obligations, any installment thereof or any other amount due and payable by the Property Owner under this Contract.

**Section 18.**  Exhibits. Exhibits A and B attached to this Contract are incorporated into this Contract by this reference as if set forth in their entirety in this Contract.

**Section 19.**  Severability. If any provision of this Contract is held invalid or unenforceable by any court of competent jurisdiction, such holding will not invalidate or render unenforceable any other provision of this Contract.

**Section 20.**  Corrective Instruments. The Authority and the Property Owner agree that they will, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements hereto and such further instruments as may reasonably be required in order to carry out the expressed intention of this Contract.

**Section 21.**  Governing Law: Venue. This Contract shall be construed in accordance with and governed by the laws of the State of California applicable to contracts made and performed in the State of California.  This Contract shall be enforceable in the State of California, and any action arising hereunder shall (unless waived by the Authority in writing) be filed and maintained in the Superior Court of California, County of Sacramento; provided, however, that actions to foreclose delinquent Assessment Installments and Annual Assessment Administrative Fees will be filed and maintained in the Superior Court of California in the County identified in Exhibit A or as otherwise required by law.

**Section 22.**  Counterparts. This Contract may be executed in several counterparts, each of which is an original and all of which constitute one and the same instrument.

**Section 23.**  Electronic Signatures.

(a)     The parties hereto acknowledge and agree that this Contract may be executed by one or more electronic means (hereinafter referred to as "**Electronic Signatures**"). Each party hereto agrees that Electronic Signatures provided by such party shall constitute effective execution and delivery of this Contract by such party to all other parties to or relying on this Contract. Each party hereto agrees that Electronic Signatures shall constitute complete and satisfactory evidence of the intent of such party to be bound by those signatures and by the terms and conditions of this Contract as signed.  Each party agrees that Electronic Signatures shall be deemed to be original signatures for all purposes.

(b)     Each party hereto agrees to accept Electronic Signatures provided by any and all other parties to this Contract as (i) full and sufficient intent by such parties to be bound hereunder, (ii) effective execution and delivery of this Contract and (iii) constituting this Contract an original for all purposes, without the necessity for any manually signed copies to be provided, maintained or to exist for back up or for any other purpose.

(c)     If Electronic Signatures are used to execute this Contract, each party hereto hereby accepts the terms of, and intends and does sign, this Contract by its Electronic Signature hereto.

**Section 24.**  Contract Documents.

EXHIBIT 2 - PAGE 11

(a)      Property Owner understands and acknowledges that this Contract consists of the entire agreement between Property Owner and the Authority.

(b)      Property Owner hereby represents, warrants, acknowledges and agrees that it has had sufficient time to review and has reviewed this Contract (including its exhibits) and has had the opportunity to ask any questions of the Authority that Property Owner may have with respect hereto.

**Section 25.**  Possibility of Default under Current Mortgage (or Other Indebtedness); Potential Inability to Refinance Mortgage or Transfer Assessment.  BEFORE SIGNING THIS CONTRACT, THE PROPERTY OWNER SHOULD CAREFULLY REVIEW ANY MORTGAGES, DEEDS OF TRUST, LOAN AGREEMENTS OR OTHER SECURITY INSTRUMENTS WHICH AFFECT THE PROPERTY OR TO WHICH THE PROPERTY OWNER IS A PARTY.  ENTERING INTO THIS CONTRACT WITHOUT THE CONSENT OF THE PROPERTY OWNER'S EXISTING LENDERS COULD CONSTITUTE AN EVENT OF DEFAULT UNDER SUCH MORTGAGES, DEEDS OF TRUST, LOAN AGREEMENTS OR OTHER SECURITY INSTRUMENTS. DEFAULTING UNDER A MORTGAGE, DEED OF TRUST, LOAN AGREEMENT OR OTHER SECURITY INSTRUMENT COULD HAVE SERIOUS CONSEQUENCES TO THE PROPERTY OWNER, WHICH COULD INCLUDE THE ACCELERATION OF THE PROPERTY OWNER'S REPAYMENT OBLIGATIONS.

IN WITNESS WHEREOF, the Authority and the Property Owner have caused this Contract to be executed in their respective names by their duly authorized representatives, all as of the date identified in the first paragraph of this Contract.

**AUTHORITY:**

**CALIFORNIA STATEWIDE COMMUNITIES DEVELOPMENT AUTHORITY**


By:    _____
Name: James Hamill
Title:   Authorized Signatory

The following are the authorized signatories of the Property Owner:


**Global Premier Regency Palms Oxnard, LP**,
a California limited partnership

By:      **Global Premier America #3, LLC**,
a California limited liability company
Its: General Partner

By:_____
Name: Christine Hanna
Title: Manager

EXHIBIT 2 - PAGE 12

**EXHIBIT A**

**DESCRIPTION OF PROPERTY; DESCRIPTION OF IMPROVEMENTS;
AND NOTICE INFORMATION**

**Description of Property:**

Property Owner(s) Name(s):  Global Premier Regency Palms Oxnard, LP
Property Address:                   1020 Bismark Way, Oxnard, CA 93003
APN(s):                                   221-0-063-185
Participating Entity:                 City of Oxnard

County:                                   Ventura County

Property Legal Description:

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF OXNARD, IN THE COUNTY
OF VENTURA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 20 TO 27 INCLUSIVE, OF TRACT NO. 1570-1, IN THE CITY OF OXNARD, COUNTY OF
VENTURA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 43 PAGES 57, 58 AND 59 OF
MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OF THE OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND
UNDER SAID LAND, WITHOUT HOWEVER, ANY RIGHT OF ENTRY ON THE SURFACE OF SAID
PROPERTY OR THE SUBSURFACE THEREOF TO A DEPTH OF 500 FEET MEASURED VERTICALLY
FROM SAID SURFACE.

**Description of Improvements:**

The Improvements include the following:

| Improvement | Amount* |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| **Total** | $[_____] |

* Eligible costs exceed financed amount.

A-1

EXHIBIT 2 - PAGE 13

**Notice Information:**

Program Administrator Contact Information:

White Oak Global Advisors, LLC
3 Embarcadero Center, Suite 550
San Francisco, California 94111
Attn: Troy Beatty, General Counsel

Property Owner Contact Information:

Global Premier Regency Palms Oxnard, LP
1900 Main Street, Suite 315
Irvine, CA 92614
Attn: Christine Hanna
christine@geb5.com

Lender Contact Information (for notices of default sent by the Program Administrator):

JKO Group LLC
21700 W Oxnard Street, #1160
Woodland Hills, CA 91367
Attention: Stephen Fenster
Phone: (310) 387-1612
Email: sfenster@schwartz-fenster.com

EXHIBIT 2 - PAGE 14

**EXHIBIT B**

**SCHEDULE OF ASSESSMENT INSTALLMENTS AND ESTIMATED ANNUAL ADMINISTRATIVE FEES:**

The Assessment Installments are based on amounts set forth below in the Summary of Assessment Terms.

| Tax Year | Principal (a) | Interest (b)*** | Assessment Installments (a) + (b) | Administrative Expenses (c)* | Total (a) + (b) + (c) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Assess-ment Amount**: | $[_____] | | | Total Payment | $[_____] |

*[Includes][Does not include] annual collection fee charged by the Tax Collector of the County of Ventura. Subject to increase as provided in Section 3(d) of the Contract.

**Assessment Amount accounts for interest accrued from Closing Date to September 2, 2025 (the "Capitalized Interest").

***Does not include Capitalized Interest. Such interest was financed and deposited into the Capitalized Interest Account established under the Indenture.

B-1

EXHIBIT 2 - PAGE 15

**Summary of Assessment Terms:**

The schedule of the Assessment Installments above is based on the amounts listed in the table below.

| | |
|---|---|
| Project Amount[1] | $[10,399,110.39] |
| Capitalized Interest[2] | $[2,006,556.61] |
| Closing Costs | $[394,333.00] |
| Assessment Amount (Project Amount + Capitalized Interest + Closing Costs) | $[12,800,000.00] |
| Interest Rate | 7.50% |
| Completion Deadline | N/A |
| Final Maturity Date | 09/02/2053 |
| Initial Tax Year on Roll | 2025-26 |

**Prepayment Terms**:

The prepayment premium is set forth in the following chart:

| **Date of Assessment Contract:** August [__], 2023<br>**Closing Date:** August [__], 2023 | |
|---|---|
| **Date of Bond Redemption** | **Prepayment Premium\*** |
| Commencing on the day after the Closing Date and continuing through the first anniversary of the Closing Date | 5.00% of the Assessment Prepayment Amount |
| Commencing on the day after the first anniversary of the Closing Date and continuing through the second anniversary of the Closing Date | 3.00% of the Assessment Prepayment Amount |
| Commencing on the day after the second anniversary of Closing Date and continuing through the fourth anniversary of the Closing Date | 1.00% of the Assessment Prepayment Amount |
| Commencing on the day after the fourth anniversary of the Closing Date and continuing thereafter | 0.00% of the Assessment Prepayment Amount |

**Interest Accrual Method:**

Interest on the Assessment Installments will be computed on the basis of the actual number of days in a calendar year divided by three hundred and sixty (360).

**Reserve Fund Deposit**:  $0

---

[1] The "Project Amount" is the maximum amount that the Authority will finance under this Contract for the Improvements described on Exhibit A.

[2] Interest will be capitalized through September 2, 2025.

EXHIBIT 3

EXHIBIT "A"

LIMITED PARTNERSHIP AGREEMENT

OF

**GLOBAL PREMIER REGENCY PALMS OXNARD, LP**

_____

   THE LIMITED PARTNERSHIP INTERESTS EVIDENCED BY THIS LIMITED PARTNERSHIP AGREEMENT (THE "**AGREEMENT**") HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933 (THE "**1933 ACT**") OR PURSUANT TO APPLICABLE STATE SECURITIES LAWS ("**BLUE SKY LAWS**").  ACCORDINGLY, THE LIMITED PARTNERSHIP INTERESTS CANNOT BE RESOLD OR TRANSFERRED BY ANY PURCHASER THEREOF WITHOUT REGISTRATION OF THE SAME UNDER THE 1933 ACT AND THE BLUE SKY LAWS OF SUCH STATE(S) AS MAY BE APPLICABLE, EXCEPT IN A TRANSACTION WHICH IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND THE BLUE SKY LAWS OR WHICH IS OTHERWISE IN COMPLIANCE THEREWITH.  IN ADDITION, THE SALE OR TRANSFER OF SUCH LIMITED PARTNERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

_____

   **THIS LIMITED PARTNERSHIP AGREEMENT OF GLOBAL PREMIER REGENCY PALMS, OXNARD, LP** (the "Agreement") is made as of April 18, 2014, by and among Global Premier America #3, LLC, a California limited liability company (the "General Partner"), and the Limited Partners.

   **NOW, THEREFORE,** the parties hereto hereby agree as follows:

   **1.**  **FORMATION.** A Certificate of Limited Partnership for the formation of GLOBAL PREMIER REGENCY PALMS OXNARD, LP (the "Partnership") pursuant to the Act was filed with the Secretary of State of California on April 7, 2014 evidencing the formation of the Partnership.

   **2.**  **NAME AND PLACE OF BUSINESS.** The business of the Partnership shall be conducted under the name of GLOBAL PREMIER REGENCY PALMS OXNARD, LP; provided, however, that the General Partner may, in its sole discretion, change the name of the Partnership at any time and from time to time, except that in no event shall the name of the Partnership include the name or initials of any Limited Partner or any name or initials which are substantially similar thereto. The principal place of business of the Partnership shall be 1020 Bismark Way, Oxnard, California 93033.  The initial office of the Partnership shall be at 2010 Main Street, Suite 1250, Irvine, California 92614; provided, however, that the General Partner may change such address in its sole discretion. The General Partner shall deliver written notice to the Limited Partners of any change in location.

   **3.**  **PURPOSE.** The principal purpose of the Partnership is to develop, renovate, remodel, own, and manage an assisted living and memory care facility that will include a private and semi-private senior residential units (the "Assisted Living Memory Care Facility"), resident food services and catering (the "Food Services"), and home health care services (the "HHC Business").  The Partnership will organize three subsidiary limited liability companies (the "Subsidiary Companies") that will conduct the operations of the Assisted Living Memory Care Facility, the Food Services, and the HHC Business (hereinafter collectively referred to as the "Facilities") and will conduct the business of the Partnership through these Subsidiary Companies:

- Global Regency Oxnard Senior Care Services, LLC will operate the Assisted Living Memory Care Facility, a residential facility for seniors with a mixture of 105 private and semi-private rooms for a proposed occupancy of 158 beds;

- Global Regency Oxnard Food Services, LLC will operate the Food Services providing resident food services in the Facilities and catering to the local community outside of the Facilities; and

- Global Regency Oxnard Home Health Care Services, LLC will operate the HHC Business, a separate portion of the Facilities providing office space for the administration of the HHC Business operating as a franchisee of Interim HealthCare Inc. and including a broad array of in-home care and in-home health care services including permanent and temporary placement of nursing and other health care personnel, non-medical support and companion care services, and health care-related home medical equipment, products, and supplies.

The Partnership may engage in any and all general business activities related or incidental to its business purpose as described herein.  The Partnership may also engage in such other activities as may be reasonably incident or appropriate to furthering the business purpose of the Partnership.

**4.    TERM OF PARTNERSHIP; FILINGS: AGENT FOR SERVICE OF PROCESS.**

(a)    <u>Term.</u> The Partnership commenced on April 7, 2014, and shall continue until December 31, 2044, unless sooner terminated as herein provided or by operation of law.

(b)    <u>Certificate of Limited Partnership.</u> A Certificate of Limited Partnership has been filed with the Secretary of State of California in accordance with the Act. The General Partner shall amend the Certificate of Limited Partnership from time to time, as required by the Act. The General Partner shall also qualify the Partnership to do business in any other jurisdiction as may be required under the laws of such jurisdiction.

(c)    <u>Agent for Service of Process.</u> The registered agent for the Partnership may be changed from time to time by the General Partner in its sole and absolute discretion, subject to applicable law.

**5.    DEFINITIONS.** The following terms shall have the meanings set forth below:

(a)    "Act" shall mean the provisions of the Uniform Limited Partnership Act of 2008, as amended from time to time, as set forth in California Corporations Code Section 15900 et seq.

(b)    "Adjusted Capital Account Deficit" shall mean, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after crediting to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations and debiting to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c)    "Adjusted Capital Contribution" of a Partner shall mean the Capital Contributions of a Partner, reduced (but not below zero) by (i) distributions to such Partner pursuant to Section 9(a) hereof, (ii) allocations of tax credits, if any, to such Partner, and (iii) Net Losses allocated to such Partner.

(d)      "Affiliate" shall mean any Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with another designated Person.

(e)      "Available Cash Flow" shall mean funds provided from the Partnership's operations without deductions for depreciation, but after deducting funds used to pay all expenses and debts, including payments to service Secured Debt, if any, of the Partnership, administrative operational expenses, debt payments, capital improvements, and less the amount set aside by the General Partner, in the exercise of its sole discretion, for reserves.

(f)      "Bankruptcy" shall mean:

1.      The commencement of any voluntary proceedings under the United States bankruptcy laws which is not vacated or dismissed within 60 days following the commencement thereof;

2.      The failure to terminate any involuntary proceeding under said laws within 60 days following the commencement thereof;

3.      A general assignment for the benefit of creditors; or

4.      The issuance of a charging order against the interest of any person without the removal thereof within 60 days following said issuance.

(g)      "Capital Account" shall mean an account established for each Partner and determined in accordance with Section 1.704-1(b) of the Regulations.  The Capital Accounts shall be adjusted in order to reflect allocations of Depreciation and gain and loss as computed for book purposes. Upon the transfer of any Partner's Unit(s), the Capital Account of the transferor Partner shall carry over to the transferee Partner.

(h)      "Capital Contribution" shall mean cash a Partner contributes to the Partnership as capital in that Partner's capacity as a Partner pursuant to an agreement between the Partners.

(i)      "Capital Event" means the finance, refinance, sale, exchange or other disposition of the Project or any other portion thereof, including conversion or condemnation of the real property or any portion thereof.

(j)      "Closing" shall mean the closing of the sale of 24 Units pursuant to the Offering.

(k)      "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(l)      "Depreciation" with respect to the Partnership's indirect interest in any property shall mean the Partnership's allocable share of depreciation, amortization, and other cost recovery deductions taken into account in computing the taxable income and loss of the Partnership.

(m)      "Distributions" shall mean that portion from Available Cash Flow and the Net Proceeds from a Capital Event, or that the General Partner determines should be paid to the Partners.

(n)      "EB-5 Program" shall mean Title 8 of the U.S. Code, Section 1153(b) et. seq. and Title 8, Code of Federal Regulations Part 204.6 et. Seq.

(o)      "Early Release Amount" shall mean that portion of a Limited Partner's Capital Contribution that a Limited Partner agrees to have the Escrow Agent release to the Partnership prior to

the approval of such Limited Partner's I-526 Petition to allow the business of the Partnership to go forward.

(p)    "Economic Interest" shall have the meaning set forth in Section 10(h)(i).

(q)    "Escrow Agent" shall mean Granite Escrow Services, Inc., 1400 Newport Center Drive, Suite 250, Newport Beach, California 92660.

(r)    "Fiscal Year" shall mean the fiscal year of the Partnership, determined in accordance with Section 706(b) of the Code.

(s)    "General Partner" shall mean Global Premier America #3, LLC, a California limited liability company, as well as any other person or entity who has been admitted to the Partnership as a General Partner in accordance with this Agreement, or a person or entity who has been admitted as a General Partner pursuant to applicable law.

(t)    "Gross Income" shall mean the Partnership's distributive share of items of income and gain only, unreduced by the Partnership's distributive share of items of deduction and loss from the Partnership, and any other items of income and gain generated by the Partnership.

(u)    "Limited Partners" shall mean collectively those individuals and entities admitted to the Partnership as a limited partner in accordance with this Agreement, or an assignee of a Partnership interest in the Partnership who has become a Limited Partner pursuant to applicable law. "Limited Partner" shall mean any of the Limited Partners.

(v)    "Majority in Interest of the Limited Partners" shall mean those Limited Partners owning more than 50% of the outstanding Units in the Partnership.

(w)    "Net Proceeds" means net proceeds derived by the Partnership from a Capital Event or dissolution after payment or allowance for the expenses incurred in connection with such Capital Event or dissolution and after payment or allowance for existing indebtedness (but not including any outstanding Secured Debt), the discharge of any other expenses or liabilities of the Partnership and the establishment of appropriate reserves, all as determined by the General Partner, in its sole discretion.

(x)    "Net Profits" and "Net Losses" shall mean the net profits or net losses, respectively, of the Partnership as determined on the basis of the accrual accounting method at the close of the Fiscal Year by the Partnership's accountants in accordance with consistently applied Federal income tax principles, and as set forth on the information return filed by the Partnership for Federal income tax purposes.

(y)    "Nonrecourse Deductions" shall mean the Partnership deductions that are characterized as "nonrecourse deductions" pursuant to Regulations Section 1.704-2(c).

(z)    "Offering" shall mean the initial offering of Units to investors as described in Section 6(a) made in accordance with the terms of the Confidential Private Offering Circular of the Partnership dated April 18, 2014 or any subsequent amendment thereto (the "Offering Circular").

(aa)    "Participation Percentage" shall mean for each Limited Partner his pro rata share of 70% (based on percentage ownership of Units) and 30% to the General Partner.

(bb)    "Partner" shall mean a General Partner or a Limited Partner. The term "Partners" shall refer collectively to the General Partner and to the Limited Partners.

(cc)    "Partner Nonrecourse Deductions" shall mean the Partnership deductions that are characterized as "partner nonrecourse deductions" pursuant to Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

(dd)    "Partnership Property" means that certain parcel of real property located at 1020 Bismark Way, Oxnard, California 93033, as improved or remodeled in accordance with the Partnership's business plan.

(ee)    "Person" shall mean any individual, partnership, corporation, trust, limited liability company or other entity.

(ff)    "Project" shall mean the development, improvement, renovation, remodel, ownership, and operation of an assisted living and memory care facility that will include private and semi-private senior residential units (the "Assisted Living Memory Care Facility") and offices for the HHC Business on the Partnership Property.

(gg)    "Regulations" shall mean the Income Tax Regulations promulgated under the Code, including Temporary and Proposed Regulations, as such Regulations may be amended from time to time, including corresponding provisions of succeeding Regulations.

(hh)    "Secured Debt" shall mean the debt that may arise from loan proceeds using the Project or the Partnership Property as security for the loan.

(ii)    "Termination Date" shall mean the date on which the Offering terminates.

(jj)    "Transfer" shall mean any encumbrance, gift, assignment, pledge, hypothecation, sale or other transfer of all or any portion of a Partnership interest.

(kk)    "Units" shall mean collectively the Limited Partner Interests in the Partnership and "Unit" shall mean one Limited Partner Interest.  The Partnership shall offer 24 Units to the Limited Partners.

(ll)    "USCIS" shall mean the U.S. Citizenship and Immigration Services.

6.    **OFFERING OF UNITS.**

(a)    <u>Initial Offering of Limited Partnership Interests.</u> The Partnership initially intends to offer and sell 24 Units for a cash purchase price of US $500,000 per Unit, and to admit as Limited Partners the persons whose subscriptions for a minimum of one Unit (US $500,000) are accepted by the General Partner (who may refuse to admit any person or persons as Limited Partners for any reason whatsoever).  Each subscriber for Units shall be admitted as a Limited Partner upon the General Partner's execution of the Subscription Agreement.

(b)    <u>Admission of Additional Limited Partners.</u> The General Partner may in its discretion from time to time following the Offering, and upon such terms as the General Partner deems appropriate, offer and sell Units, without further consent of the Limited Partners, including but not limited to the admission of a new Limited Partner to replace a Limited Partner who ceases to participate in the EB-5 Program as described in Section 12(i) below.  Without limiting the generality of the foregoing, any such Units may be issued in one or more classes, or in one or more series of any of such classes, with designations, preferences and relative participating, option or other special rights, powers and duties, including rights, powers and duties senior to units previously issued to our Partners, all as shall be determined by the General Partner in its sole discretion and without the approval of any Limited Partner.

### 7.    PARTNERSHIP CAPITAL CONTRIBUTIONS.

(a)    <u>Capital Contribution of the General Partner.</u> The General Partner, as its capital contribution, will assign to the Partnership (i) its rights under the Lease Agreement dated April 8, 2014 for the Property, (ii) its rights under the Purchase Agreement dated April 8, 2014 for the Property, and (iii) its rights to US $1,000,000 of the purchase price for the Property originally due to Urban Planning Consultants, Inc., an affiliate of the General Partner of the Partnership, which rights have been assigned to the General Partner.  The General Partner may also make Capital Contributions in connection with the purchase of Units at its sole discretion.  The General Partner will be treated as a Limited Partner with respect to all Units purchased and owned by the General Partner.

(b)    <u>Capital Contribution of the Limited Partners.</u> The Limited Partners shall make initial Capital Contributions to the Partnership of US $500,000 (one Unit) in connection with the Offering.  No Limited Partner shall be required to make further contributions to the Partnership.

(c)    <u>Interest on Contributions.</u> No interest shall be paid by the Partnership on any Capital Contribution made by any Partner to the Partnership.

(d)    <u>Use of Capital Contributions.</u> Capital Contributions shall be used as determined by the General Partner exclusively for the Partnership Property and the Project and no other purposes, including but not limited to the acquisition, development, and improvement of the Partnership Property and the operation of the Project as described in the Offering Circular.

(e)    <u>Limited Liability of Limited Partners.</u> Except as may otherwise be provided under applicable law, no Limited Partner shall be bound by, or personally liable for, the expenses, liabilities or obligations of the Partnership.

(f)    <u>Return of Capital.</u> Except as provided in this Section 7(f), no Partner shall have the right to withdraw or reduce such Partner's Capital Contribution or to receive any distributions, except as a result of dissolution. No Partner shall have the right to demand or receive property other than cash in return for such Partner's Capital Contributions.  Limited Partners may withdraw as a Limited Partner and have his or her Capital Contribution returned only under the following circumstances:

(i)    If a Limited Partner fails to file the I-526 petition with the USCIS within 90 days of the date the Limited Partner is approved for admission to the Partnership by the General Partner, such Limited Partner shall have the right to a return of his or her Capital Contribution.   Upon written notice to the General Partner of his or her desire to withdraw as a Limited Partner, the General Partner will cause the Escrow Agent to return the denied Limited Partner's Capital Contribution within 90 days of the written notice from the Limited Partner to the General Partner.

(ii)    If a Limited Partner's I-526 petition is denied by the USCIS, the General Partner will cause the Escrow Agent to return the denied Limited Partner's Capital Contribution within 90 days of the written notice from the Limited Partner to the General Partner.

(iii)    If a Limited Partner's I-485 application or immigrant visa application is denied after the I-526 petition is approved, the Partnership will return the Capital Contribution.  If there are insufficient funds available in the Partnership's general operating account to refund the Capital Contribution to the denied Limited Partner, then such refund may be delayed until there are funds in the Partnership's general operating account to enable the Partnership to pay the refund. The Partnership must use its best efforts to substitute the denied Limited Partner with a new Limited Partner in accordance with the provisions of Section 6(b) below and return the denied Limited Partner's Capital Contribution when such new Limited Partner's I-526 Petition is approved by the USCIS.

(iv)    If a Limited Partner has agreed with the Partnership to allow the Early Release Amount to be released by the Escrow Agent to the Partnership and such Limited Partner's I-526

petition is subsequently denied by the USCIS, the General Partner will cause the Escrow Agent to return that portion of the denied Limited Partner's Capital Contribution still being held by the Escrow Agent for the benefit of the denied Limited Partner within 90 days of written notice from the Limited Partner to the General Partner. The Partnership will return the balance of the Capital Contribution as set forth in subsection (iii) above.

(v)     The Partners agree that the Escrow Agent shall not be liable to the denied Limited Partner or be responsible for refunding any portion of the Capital Contribution not in the Capital Contribution Escrow Account following the release of the Capital Contribution after the approval of a Limited Partner's I-526 petition or as a result of an Early Release.

(vi)     Upon the full return of a Limited Partner's Capital Contribution he or she will cease to be a Limited Partner of the Partnership.

(vii)     In the circumstance set forth in this Section 7(f), no interest will be paid on the Capital Contribution being returned to a Limited Partner.

(g)     _Number of Limited Partners._ There shall be no more than 99 Limited Partners of the Partnership, in accordance with the requirements for an exemption under Section 3(c)(1) from the registration requirements of the Investment Company Act of 1940. Further, the number of Limited Partners must be within the limitations of the EB-5 Program administered by the U.S. Citizenship and Immigration Services ("USCIS").

8.     **ALLOCATIONS.**

(a)     _Allocation of Net Profits._ For each Fiscal Year, Net Profits shall be allocated as follows:

(i)     First, in the event that any class of partners has an aggregate negative capital account balance and another class of partners has an aggregate positive capital account balance, to the class of partners with the negative balance, pro rata in accordance with their negative Capital Accounts, up to the amount necessary to cause the aggregate capital account balance of that class to equal zero;

(ii)     Second, in the event that any one or more individual partners has a negative capital account balance, to those individual partners with the negative balances, pro rata in accordance with their negative Capital Accounts, up to the amount necessary to cause their individual capital account balances to equal zero;

(iii)     Third, in such a manner and amount as is necessary to cause the positive Capital Account balances of the Partners to be equal to their deemed liquidation distributions (taking into account all prior Distributions), determined as if the Partnership were dissolved and liquidated and (A) the Partnership's assets were sold for their fair market value; (B) the Partnership's liabilities were paid; and (C) the Partnership's remaining cash were distributed in accordance with the provisions applicable; and

(iv)     Thereafter, 70% to the Limited Partners (pro rata, in accordance with their respective ownership of Units) and 30% to the General Partner.

(b)     _Allocation of Net Losses._ For each Fiscal Year, Net Losses shall be allocated 70% to the Limited Partners (pro rata, in accordance with their respective ownership of Units) and 30% to the General Partner.

(c)     _Qualified Income Offset._ In the event any Limited Partner unexpectedly receives an adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(4)(4), (1) or

(6), items of income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any deficit in said Limited Partner's Capital Account as quickly as possible. For purposes of this Section 8(d), the Limited Partner's Capital Account, as of the end of the relevant Fiscal Year, shall take into account the adjustments described in Regulations Sections 1.704- 1(b)(2)(ii)(c1)(4), (5) and (6), any amount of any deficit Capital Account balance which the Limited Partner is obligated to restore, and any amount of any deficit Capital Account balance which the Limited Partner is deemed obligated to restore pursuant to the Regulations promulgated under Section 704(b) of the Code.

(d)    Special Allocation of Interest Expense. Notwithstanding anything contained herein to the contrary, any item of interest expense attributable to a loan by the General Partner to the Partnership shall be allocated solely to the General Partner.

(e)    Allocations of Book Items. All items of book income, gain, loss and deduction shall be allocated among the Partners in the same percentage that Net Profits and Net Losses are allocated for the same Fiscal Year, or as otherwise provided by the Regulations promulgated under Section 704(b) of the Code.

(f)    Tax Restrictions. In order to preserve and protect the determinations and allocations provided for in this Section 8, the General Partner shall have the authority to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Section 8 to the extent that, upon advice of tax counsel, allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in this Section 8 would cause the determinations and allocations of each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by Section 704(b) of the Code and regulations promulgated thereunder.  Any allocation made pursuant to this Section 8(g) shall be deemed to be a complete substitute for any allocation otherwise provided for in Section 8, and no amendment of this Agreement or approval of any Partner shall be required.

(g)    Allocation of Nonrecourse Deductions.  Nonrecourse Deductions for each Fiscal Year shall be allocated among the Partners in accordance with their respective Participation Percentages.

(h)    Allocation of Partner Nonrecourse Deductions.  Partner Nonrecourse Deductions for each Fiscal Year shall be allocated among the Partners as required by Regulations Section 1.704-2.

(i)    Gross Income Allocation.  In the event any Partner has an Adjusted Capital Account Deficit at the end of any Fiscal Year, items of Gross Income shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this Paragraph shall be made if and only to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for herein have been tentatively made as if this Paragraph were not in this Agreement.

(j)    Minimum Gain Chargeback.  Prior to any allocation hereunder and subject to the exceptions set forth in Regulations Section 1.704-2(f), in the event that there is a net decrease in the partnership minimum gain during a Partnership Fiscal Year, each Partner shall be allocated items of Gross Income for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease (which share of such decrease shall be determined in accordance with Regulations Section 1.704-2(g)).  It is intended that this subsection shall constitute a "minimum gain chargeback" as provided by Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(k)    Partner Nonrecourse Debt Minimum Gain Chargeback.  Prior to any allocation hereunder (other than Section 8(k)) and subject to the exceptions set forth in Regulations Section 1.704-2(i)(4), in the event that there is a net decrease in the Partner nonrecourse debt minimum gain during a Partnership Fiscal Year, each Partner with a share of such Partner nonrecourse debt minimum gain

(determined in accordance with Regulations Section 1.704-2(i)(5)) shall be allocated items of Gross Income for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease (which share of such decrease shall be determined in accordance with Regulations Section 1.704-2(i)(4)).  It is intended that this subsection shall constitute a "chargeback of partner nonrecourse debt minimum gain" as provided by Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(l)    Depreciation.  Subject to Section 8(n), Depreciation of the Partnership for any Fiscal Year (to the extent such Depreciation does not constitute a Nonrecourse Deduction or Partner Nonrecourse Deduction in such Fiscal Year) shall be specially allocated to the Partners in accordance with their respective Participation Percentages.

(m)    Loss Limitation.  Subject to Section 8(o) hereof, the Net Losses and Depreciation allocated pursuant to Section 8(b) and 8(l) shall not exceed the maximum amount of such items that can be allocated without causing any Limited Partner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year taking into account the special allocations of Section 8(d) and 8(j) for such Fiscal Year.

(n)    Interest Income.  Any interest income recognized by the Partnership in connection with the payment of a Capital Contribution will be allocated to the Limited Partner making such payment.

9.    **DISTRIBUTIONS.**

(a)    Distribution of Available Cash Flow.  Available Cash Flow shall be distributed 70% to the Limited Partners, pro rata in accordance with their respective ownership of Units, and 30% to the General Partner.  Distributions of Available Cash Flow will generally be made once annually. Distributions of Available Cash Flow shall not be taken out of Capital Contributions made by Limited Partners.

(b)    Distribution of Net Proceeds from a Capital Event.  Net Proceeds from a Capital Event shall be distributed 100% to the Limited Partners up to their Adjusted Capital Contributions; thereafter, Net Proceeds from such Capital Event shall be distributed 70% to the Limited Partners, pro rata in accordance with their respective ownership of Units, and 30% to the General Partner. Distributions from a Capital Event will generally be made on a one-time basis in the event of a financing or sale of Partnership Property.  Distributions of Net Proceeds from a Capital Event shall not be taken out of Capital Contributions made by Limited Partners.

(c)    To Whom Distributions Are Made. Unless named in this Agreement or unless admitted as a Substitute Limited Partner as provided herein, no person or entity shall be considered a Partner in the Partnership. All Transfers of interests by the Limited Partners shall be subject to Article 12 hereof, and, until admitted as a Substitute Limited Partner thereunder, no assignee shall have any right as a Limited Partner herein, including, but not limited to, the right to acquire any information regarding the Partnership, or to inspect the Partnership books, or to vote on any matter presented to the vote of Limited Partners, whether or not such assignee is otherwise entitled to distributions as assignee. Any payment by the Partnership to the person shown on the Partnership records as a Limited Partner, or to such Limited Partner's legal representatives, or to a named assignee of the right to receive distributions, shall acquit the Partnership and the General Partner of all liability to any other person who may be interested in such payment by reason of an assignment by a Limited Partner or for any other reason.

(d)    Distributions Not Guaranteed.  Distributions are not guaranteed, but will be made in accordance with the foregoing paragraphs of this Section 9 and the discretion of the General Partner.

EXHIBIT 3 - PAGE 9

10.     **POWERS AND DUTIES OF THE PARTNERS.**

(a)     Powers of the General Partner. The General Partner and its management shall devote such time to the Partnership as shall be necessary to conduct the Partnership business. Subject to the remaining provisions of this Agreement, the General Partner shall be solely responsible for the day-to-day operations of the Partnership business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith, or in connection with accomplishing the purposes of the Partnership as set forth in Section 3.

(b)     Management Decisions. Subject to the rights to formulate policy and to vote of the Limited Partners set forth herein, with respect to the day-to-day management, conduct and operation of the Partnership business, the decisions of the General Partner shall prevail.

(c)     Independent Activities of Partners. Except as provided elsewhere herein, any of the Partners, General or Limited, may engage in or possess an interest in other business ventures of every nature and description, including businesses that compete with the Partnership, independently or with others.

(d)     Tax Matters Partner. The Manager of the General Partner shall be the designated "Tax Matters Partner" of the Partnership, as that term is defined in the Code.

(e)     Execution of Documents. Except as otherwise authorized by the General Partner, each check, contract, deed, lease, promissory note, deed of trust, escrow instruction, bond, release or any other documents of any nature whatsoever, in any way pertaining to this Partnership or on behalf of the Partnership, shall be signed by the General Partner.

(f)     Liability; Indemnification.  Neither the General Partner nor any of its members, officers, agents, employees, successors and assigns shall be liable, responsible or accountable in damages or otherwise to the Partnership or to the Limited Partners for any acts performed or omitted to be performed by the General Partner in connection with the Partnership, except to the extent that such acts or omissions constitute actual fraud, gross negligence or willful misconduct.  The Partnership shall indemnify and hold harmless the General Partner and its members, officers, agents, attorneys, employees, successors and assigns from and against all losses, liabilities, damages, judgments, settlements and expenses (including legal fees) (collectively, "Damages") incurred as a result of actions against the General Partner in its capacity as general partner of the Partnership, except to the extent a court of competent jurisdiction determines that the actions of the General Partner constituted actual fraud, gross negligence or willful misconduct. Notwithstanding the foregoing, the Partnership shall not indemnify the General Partner with respect to any Damages for which the General Partner receives insurance proceeds carried for the benefit of the Partnership or the General Partner. The indemnification provided herein is in addition to and not a limit on any other right of contribution or indemnity which otherwise exists under any contract or under applicable law in favor of the General Partner.

(g)     Reimbursement of Expenses. The Partnership shall reimburse the General Partner for reasonable expenses incurred by it in managing the business of the Partnership. The General Partner will endeavor to have Partnership expenses billed directly to the Partnership whenever feasible.

(h)     Transfer of Economic Interest.

(i)     Without the consent of any Limited Partner, the General Partner may Transfer all or any portion of the economic rights associated with its General Partner interest (including, without limitation, rights to distributions and allocations of income, gain, loss, deduction, credit or similar items) (collectively, the "Economic Interest"); provided, however, any such Transfer shall be on the condition that upon the removal and replacement of the General Partner in accordance with Section 13, such Economic Interest shall be deemed transferred to the replacement General Partner. Any other Transfer by the General Partner of its interest in the Partnership following the date of this Agreement

shall be effective only: (A) upon the consent of a Majority in Interest of the Limited Partners, and (B) if applicable, upon the admission of a successor or additional General Partner, as the case may be. Except as provided otherwise in this Agreement, the General Partner may not, without the consent of a Majority in Interest of the Limited Partners, Transfer or delegate its obligations under this Agreement and shall continue to be responsible for those obligations. The transferee or other person receiving a disposition shall have only the rights of an assignee of an Economic Interest.

(ii)     The Transfer of all or any part of the General Partner's Economic Interest in accordance with the provisions of this Agreement will not: (A) cause the dissolution of the Partnership, (B) cause the General Partner to cease being the General Partner of the Partnership, or (C) provide the Limited Partners with the right to remove the General Partner as general partner.

(iii)     The provisions of this Section 10(h) apply notwithstanding any other provision in this Agreement to the contrary, and are in addition to any rights of the General Partner set forth in this Agreement.

11.     **RIGHTS OF LIMITED PARTNERS.**

(a)     <u>Powers of Limited Partners</u>.   Limited Partners shall participate in policy formulation activities and have the following rights, duties and powers normally granted to limited partners under the Act.

(b)     <u>Voting Rights.</u>   The following shall require the vote or written consent of the General Partner and a Majority in Interest of the Limited Partners:

(i)     Merger or combination of the Partnership with any other entity; and

(ii)     Sale of all or substantially all of the assets of the Partnership.

(c)     <u>No Authority to Act on Behalf of Partnership.</u> Except as may otherwise be provided in this Agreement, no Limited Partner shall, in the capacity of a Limited Partner, take part in or interfere in any manner with the conduct or control of the business of the Partnership, or have any right or authority to act for or on behalf of the Partnership.

(d)     <u>Right to Inspect the Partnership's Books and Reports.</u>   The Partnership's books and records shall be open to the inspection and examination of the Limited Partners or their duly authorized representatives at all reasonable times after reasonable advance notice has been given to the General Partner of an intention to inspect the books and records.  Upon request, a Limited Partner will, at the Partnership's expense, be provided with (i) a current list of the full name and last known business or residence address of each Limited Partner set forth in alphabetical order together with the Capital Contribution and the number of Units owned by each Limited Partner; (ii) a copy of the Certificate of Limited Partnership and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been issued, (iii) copies of the original Partnership agreement and all amendments thereto; and (iv) a copy of such other records as the Partnership, by law, is required to maintain.

12.     **RESTRICTIONS ON TRANSFER BY LIMITED PARTNERS; GENERAL PARTNER'S RIGHT TO PURCHASE LIMITED PARTNERS' INTEREST.**

(a)     <u>General.</u> No transfer of, or offer to transfer, a Limited Partner interest, in whole or in part, shall be made: (i) which could cause a termination of the Partnership for Federal income tax purposes; (ii) which alone or in conjunction with the transfer of other Limited Partner interests, might adversely affect, or tend to affect adversely, the characterization of the Partnership as a partnership for Federal income tax purposes; (iii) which could result in the assets of the Partnership being considered by law to be assets of employee benefit plans and therefore subjecting those assets to the fiduciary

standards of the Employee Retirement Income Security Act of 1974, as amended; (iv) which violates the Securities Act of 1933, as amended, and any rules promulgated thereunder and any similar state "Blue Sky" laws; or (v) without the written consent of the General Partner, which may be withheld in its sole discretion. Notwithstanding the foregoing, a Limited Partner may, without the General Partner's consent, transfer all or a portion of such Limited Partner's Units to a member of that limited partner's immediate family or a trust or other entity created or controlled by that limited partner or a member of that limited partner's immediate family; provided, however, that in no event may any sale, assignment or transfer be made if it would violate any of clauses (i) through (iv) of this Section or violate Section 7(h), or which would violate the EB-5 Program requirements.  Specifically, a Limited Partner under the EB-5 Program may not transfer his/her interest unless he/she ceases to participate in the EB-5 Program.

(b)    <u>Assignee.</u> Subject to Section 12(a), a transferee of the Partner's interest shall become a mere assignee if all of the following conditions are satisfied:

(i)    If the General Partner shall so request, the transferor shall deliver to the General Partner an opinion of counsel in form and substance satisfactory to the General Partner and counsel for the Partnership to the effect that each of the conditions set forth in Section 12(a) have been satisfied.

(ii)    The transferee shall have paid the Partnership a reasonable fee set by the General Partner for processing transfers. A fee of no more than US $3,000 plus out of pocket costs for legal and other expenses shall be deemed reasonable.  Notwithstanding the foregoing, no fee shall be payable for a transfer to an heir of a Limited Partner upon the death of the Limited Partner.

(iii)    The transferor and any transferee shall have executed, acknowledged and delivered to the General Partner an instrument of assignment satisfactory to the General Partner and its counsel.

(c)    <u>Substitute Partners.</u> Subject to Section 12(a), a transferee of any Limited Partner's interest may become a "Substitute Limited Partner" in place of the transferor of such interest if, in addition to satisfying all of the applicable requirements set forth herein for an assignee, all of the following conditions are satisfied:

(i)    The transferor and any transferee shall have executed, acknowledged and delivered to the General Partner such instruments of transfer, assignment and agreement to be bound by the terms of this Agreement as are satisfactory to the General Partner and its counsel.

(ii)    The General Partner has determined, in its sole discretion, that the Limited Partner meets the requirements for an investment in the Partnership, as determined by the General Partner.

(d)    <u>Rights of Assignee.</u> An assignee who does not become a Substitute Limited Partner has no right to request any information or account of the Partnership, to inspect the Partnership books, or to vote on any of the matters as to which a Limited Partner would be entitled to vote pursuant to this Agreement. A mere assignee shall be entitled only to receive the allocations of Net Profits, Net Losses and other items and share of cash distributions to which his transferor would otherwise be entitled.

(e)    <u>Division of Allocations and Distributions.</u>   If any Partnership interest, or part thereof, is transferred during any accounting period in compliance with the provisions of this Agreement, Net Profits, Net Losses, each item thereof and all other items attributable to such interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any convention permitted by law selected by the General Partner. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the

transferee. Solely for purposes of making such allocations and distributions, the Partnership shall recognize such Transfer not later than the end of the calendar month during which the provisions of Section 12(a), (b) and/or (c) are satisfied, provided that if the Partnership does not receive (a) a notice stating the date such interest was transferred, and (b) such other information as the General Partner may reasonably require, within 30 days after the end of the accounting period during which the Transfer occurs, then all of such items shall be allocated and all distributions shall be made to the person who according to the books and records of the Partnership on the last day of the accounting period during which the Transfer occurred was the owner of the Partnership interest. Neither the Partnership nor the General Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section, whether the General Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership interest.

(f)     <u>Agreement Applies to Transferred Interest.</u> Each Partner agrees that notwithstanding the provisions for the Transfer of any interest contained herein, the interest, when and if transferred, shall remain subject to all of the terms and conditions of this Agreement.

(g)     <u>Heirs, Devisees and Legatees.</u> The heirs, devisees and legatees of a deceased Limited Partner shall have the rights of a transferee of a Limited Partner, subject to administration of such deceased Limited Partner's estate, and may become Substitute Limited Partners in lieu of the deceased Limited Partner upon compliance with all of the conditions of this Agreement required for such substitution.

(h)     <u>No Dissolution.</u> If a Limited Partner Transfers all or any part of his interest without complying with the provisions of this Agreement, such action shall not cause or constitute a dissolution of the Partnership.

(i)     <u>General Partner's Right to Purchase.</u> The General Partner shall have the right to purchase the Units of Limited Partnership Interest from the Limited Partners upon the earlier of when a Limited Partner has ceased to participate in the EB-5 Program or the granting of a Limited Partner's I-829 petition for removal of conditions, the General Partner has the right to purchase the Limited Partner's Partnership Interests.  The General Partner will determine whether and for what amount to acquire any or all of the Limited Partnership Interests based on the fair market value of the Limited Partnership Interests as determined by the General Partner in its sole discretion.

## 13.     <u>WITHDRAWAL AND ADDITION OF A GENERAL PARTNER.</u>

(a)     <u>Withdrawal of a General Partner.</u> The withdrawal of the General Partner shall require the consent of a Majority in Interest of the Limited Partners, and shall not be permitted prior to the removal of conditions on residence for each Limited Partner under the EB-5 Program, except those Limited Partners who cease to participate in the EB-5 Program.

(b)     <u>Addition of a General Partner.</u> The addition of an additional General Partner shall require the consent of a Majority in Interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may admit additional General Partner(s) without the vote or consent of the Limited Partners (i) if required to assure the continued classification of the Partnership as a limited partnership for Federal income tax purposes or (ii) if such additional General Partner is a not for profit entity admitted to obtain a real estate tax exemption for the Partnership.

## 14.     <u>DISSOLUTION AND WINDING UP OF THE PARTNERSHIP.</u>

(a)     <u>Dissolution of Partnership.</u> The Partnership shall be dissolved upon the occurrence of any of the following events, but in no event prior to the removal of conditions on permanent residence for Limited Partners admitted under the EB-5 Program, except for those Limited Partners who ceased to participate in the EB-5 Program:

1.    The vote or written consent of a Majority in Interest of the Limited Partners together with the written consent of the General Partner;

2.    The date of receipt in cash by the Partnership of the entire proceeds from a sale or other disposition by the Partnership of all, or substantially all, of the Partnership's property, provided that if such a sale is made for consideration payable in whole or part over a period of time, such date shall be the date upon which all payments therefor shall have been received;

3.    The removal, Bankruptcy, dissolution or other cessation to exist as a legal entity of the last General Partner, unless, within 60 days after the occurrence of any such event, a Majority in Interest of Limited Partners elects to continue the business of the Partnership and elect a successor General Partner; or

4.    Expiration of the term of the Partnership as set forth in Section 4(a) hereof.

(b)    <u>Continuation of Partnership.</u> If a Majority in Interest of Limited Partners elect to continue the business of the Partnership and elect a successor General Partner in accordance with Section 14(a)(3), the successor General Partner shall assume the obligations of the former General Partner and shall indemnify the former General Partners and hold them harmless from and against any and all loss, damage, liability and expense, including costs and reasonable attorneys' fees, which the former General Partners may be incur by reason of or in connection with any of the debts, obligations or liabilities of the Partnership theretofore or thereafter made, incurred or created.

(c)    <u>Winding Up of the Partnership.</u> Upon dissolution of the Partnership, the General Partner shall wind up the affairs and liquidate the assets of the Partnership in accordance with the provisions of this Section.  Net Profits and Net Losses and all other Partnership items shall be allocated until the liquidation is completed in the same ratio as such items were allocated prior thereto. The proceeds from liquidation of the Partnership when and as received by the Partnership shall be utilized, paid and distributed in the following order:

1.    First, to pay expenses of liquidation and the debts of the Partnership to third parties other than the Partners;

2.    Next, to pay the debts of the Partnership owing to Partners;

3.    Next, to the establishment of any Cash Reserves; and

4.    Finally, to the Partners in accordance with the provisions of Section 9.

(d)    <u>Right To Receive Partnership Property.</u> The Limited Partners shall have no right to demand or receive any Partnership Property other than cash in return for their Capital Contributions to the Partnership, and each Limited Partner agrees to and shall look solely to the assets of the Partnership for the return of such Limited Partner's Capital Contributions. If the assets of the Partnership remaining after discharge of the debts and liabilities of the Partnership are insufficient to return the then unreimbursed Capital Contributions of a Limited Partner, such Limited Partner shall not have, and hereby waives, any recourse against the General Partner. The winding-up of the affairs of the Partnership and the distribution of its assets shall be conducted exclusively by the General Partner, who is hereby authorized to do any and all acts and things authorized by law for such purposes at the expense of the Partnership. If there is no General Partner, the winding-up of the affairs of the Partnership shall be conducted as otherwise provided by law.

### 15.    BOOKS AND RECORDS.

(a)    Books of Account. The General Partner shall, at the Partnership's sole cost and expense, keep adequate books of account of the Partnership wherein shall be recorded and reflected, in accordance with a method of accounting determined by the General Partner, all of the Capital Contributions and all of the income, expenses and transactions of the Partnership and a list of the names and addresses, and interests in the Partnership held by the Partners in alphabetical order.

(b)    Accounting and Reports.

1.    The General Partner shall, at the Partnership's sole cost and expense, cause Federal and state returns for the Partnership to be prepared and filed with the appropriate authorities, and shall furnish to the Limited Partners, within 60 days after the close of each Fiscal Year of the Partnership, such financial information with respect to each Fiscal Year as shall be reportable for Federal and state income tax purposes.

2.    Unless required by applicable law, the Partnership will not file quarterly or annual reports with any governmental authorities. Within 120 days after the close of each Fiscal Year, the General Partner will provide to Limited Partners audited financial statements prepared by the Partnership's accountants in accordance with generally accepted accounting principles.

(c)    Banking. All funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partner. All withdrawals therefrom shall be made upon checks signed by the General Partner.

(d)    Accountants. The General Partner shall select the accountants for the Partnership.

### 16.    WAIVER OF ACTION FOR PARTITION. Each of the Partners hereby irrevocably waives, during the term of the Partnership, any right such Partner may have to maintain any action for partition with respect to any property of the Partnership.

### 17.    AMENDMENTS. This Agreement may be modified or amended at any time in writing by the General Partner and a Majority in Interest of the Limited Partners.  Notwithstanding anything contained herein to the contrary the General Partner shall have the authority to amend this Agreement without any vote or other action by the Limited Partners:  (1) to modify the allocation provisions of this Agreement to comply with Section 704(b) of the Code; (2) to add to the representations, duties, services or obligations of the General Partner or its Affiliates for the benefit of the Partners; (3) to cure any ambiguity or mistake, correct or supplement any provision in this Agreement that may be inconsistent with any other provision, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the existing provisions of this Agreement; (4) to delete or add any provision of this Agreement required to be so deleted or added by the staff of the Securities and Exchange Commission or by a state "Blue Sky" Commissioner or similar official, which addition or deletion is deemed by such commission or official to be for the benefit or protection of the Limited Partners or is required to cause the Partnership not to be classified as a "publicly traded partnership"; (5) to reflect the addition or substitution of Limited Partners or the reduction of the Capital Accounts upon the return of capital to the Partners; (6) to reconstitute the Partnership under the laws of another state if beneficial; or (7) to change the name and/or principal place of business of the Partnership.  In addition, notwithstanding anything contained herein to the contrary the General Partner shall have the authority to amend this Agreement without any vote or other action by the Limited Partners; (x) to decrease the rights and powers of the General Partner (so long as such decrease does not impair the ability of the General Partner to manage the Partnership and conduct its business affairs); or (y) to make any changes requested by a lender that are requested or required to obtain financing or add or delete any such provisions after repayment of any such loans provided that the adoption of such amendment (i) is for the benefit of and not adverse to the interests of the Limited Partners; (ii) is not inconsistent with provisions of this Agreement pertaining to the management and

administration of the Partnership by the General Partner; and (iii) does not affect the limited liability of the Limited Partners or the status of the Partnership as a partnership for Federal income tax purposes. Notwithstanding anything to the contrary contained herein, no amendment under which any of the following occurs shall be effective unless such amendment is approved by the vote or written consent of all Limited Partners:

       (a)      Converts a Limited Partner into a general partner; or

       (b)      Modifies the limited liability of a Limited Partner.

The General Partner shall have the authority to execute, acknowledge, and deliver any and all instruments to effectuate the provisions of this Section, including the execution, acknowledgment and delivery of any such instrument by the attorney-in-fact for the General Partner under a special or limited power of attorney, and to take all such actions in connection therewith as the General Partner shall deem necessary or appropriate with the signature of the General Partner acting alone.  The General Partner shall provide written notice of any amendment to all Limited Partners.

       **18.**      <u>**EQUITABLE RELIEF.**</u> It is agreed that the rights granted to the parties hereunder are of a special and unique kind and character and that, if there is a breach by any party of any material provision of this Agreement, the other parties would not have an adequate remedy at law. It is expressly agreed, therefore, that the rights of the parties hereunder may be enforced by equitable relief as is provided under the laws of the State of California.

       **19.**      <u>**NOTICES.**</u> Any and all notices, demands or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party only if served either personally or by facsimile transmission or if deposited in the United States first class mail, certified or registered, postage prepaid. If such notice, demand or other communication is served personally, service shall be conclusively deemed made at the time of such personal service. If such notice is sent by facsimile transmission, service shall be conclusively deemed made at the time of written confirmation of receipt. If such notice, demand or other communication is given by mail, such shall be conclusively deemed given 72 hours after the deposit thereof in the United States mail addressed to the party to whom such notice, demand or other communication is to be given at the address set forth in the records of the Partnership. Any party hereto may change its address for the purpose of receiving notices, demands and other communications as herein provided by a written notice given in the manner aforesaid to the other party or parties hereto.

       **20.**      <u>**PARTNERSHIP MEETINGS.**</u>

       (a)      <u>Annual Meeting</u>.  Shall be held for record-keeping purposes.

       (b)      <u>Call and Place of Meetings.</u> Meetings of the Partners may be called at the principal executive office of the Partnership or at any place designated by the General Partner at the call and pursuant to the written request of any General Partner or of Limited Partners representing more than 10% of the outstanding Units of the Partnership for consideration of any of the matters as to which Limited Partners are entitled to vote pursuant to the terms of this Agreement.  This subsection shall not apply to a meeting to remove or replace the General Partner.

       (c)      <u>Notice of Meeting.</u> Immediately upon receipt of a written request to the General Partner requesting a meeting pursuant to Section 21(a) on a specific date (which date shall not be less than 15 nor more than 60 days after the receipt of the request by the General Partner), the General Partner shall immediately give notice to all Partners entitled to vote. Valid notice shall be given not less than 10 nor more than 60 days prior to the date of the meeting, and shall state the place, date and hour of the meeting and the general nature of the business to be transacted. No business other than the business stated in the notice of the meeting may be transacted at the meeting. Notice shall be given in accordance with the provisions of Article 20 hereof.

(d)    Quorum. At any duly held or called meeting of Partners, a Majority in Interest of Limited Partners represented in person shall constitute a quorum. The Partners present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough Limited Partners to leave less than a quorum, if any action taken, other than adjournment, is approved by the owners of the requisite number of Units.

(e)    Adjournment of Meetings. A meeting at which a quorum is present may be adjourned to another time or place and any business which might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, that meeting may be adjourned by the vote of a Majority In Interest of the Limited Partners represented in person.  Notice of the adjourned meeting need not be given to Partners entitled to notice if the time and place thereof are announced at the meeting at which the adjournment is taken, unless the adjournment is for more than 45 days or if, after the adjournment, a new record date is fixed for the adjourned meeting, in which case notice of the adjourned meeting shall be given to each Partner of record entitled to vote at the adjourned meeting.

(f)    Meetings Not Duly Called, Noticed or Held. The transactions of any meeting of Partners, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice, if a quorum is present at that meeting, in person, and if, either before or after the meeting, each of the persons entitled to vote, not present in person, signs either a written waiver of notice, a consent to the holding of the meeting or an approval of the minutes of the meeting.

(g)    Waiver of Notice. Attendance of a Partner at a meeting shall constitute waiver of notice, except when that Partner objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

(h)    Consent to Action Without Meeting. Any action that may be taken at any meeting of the Partners may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Partners having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Partners entitled to vote thereon were present and voted; provided, however removal and replacement of the General Partner may not be taken without a meeting of the Limited Partners.

(i)    Conduct of Meeting. The General Partner shall have full power and authority concerning the manner of conducting any meeting of Partners, including, without limitation, the determination of Limited Partners entitled to vote at the meeting, the existence of a quorum, the conduct of voting, and the determination of any controversies, votes or challenges arising in connection with or during the meeting. The General Partner shall designate a person to serve as chairman of the meeting and shall further designate a person to take the minutes of the meeting, in either case including, without limitation, an officer of the General Partner.  All minutes shall be kept with the records of the Partnership maintained by the General Partner.

**21.    UNIT CERTIFICATES.**

(a)    Form of Unit Certificates. If the General Partner deems it necessary or appropriate for the Units of the Partnership to be evidenced by a physical instrument, it may adopt a form of Unit Certificate to represent the Units. Each Unit Certificate shall be signed in the name of the Partnership by the General Partner and shall certify the number of Units owned by the Limited Partner. Any or all of the signatures on a Unit Certificate may be facsimile. There shall also appear conspicuously on the Unit Certificates (i) a statement to the effect that the Units are subject to restrictions upon Transfer; and (ii) any required Federal or state securities legends. The Units shall be issued only in registered form.

(b)    Issuance of Unit Certificates. If a form of Unit Certificate has been adopted by the General Partner, each Limited Partner shall be entitled to be issued a Unit Certificate certifying the number of Units owned by the Limited Partner. The Unit Certificates shall be deemed issued when signed by the General Partner on behalf of the Partnership and delivered to the Limited Partners or their designees. If the General Partner elects to adopt Unit Certificates, Limited Partners may transfer their Units only be endorsing and delivering to assignees the Unit Certificate relating to their Units, subject to the additional requirements of Article 12 hereof. If the endorsement is on a separate document, Limited Partners must deliver to assignees both the document and the Unit Certificates relating to their Units.

(c)    Lost, Stolen or Destroyed Unit Certificates. The Partnership may issue a new Unit Certificate in place of any previously issued Unit Certificate alleged to have been lost, stolen or destroyed, and the General Partner may require the Limited Partner owning the lost, stolen or destroyed Unit Certificate (or the Limited Partner's legal representative) to give the Partnership a bond (or other adequate security) sufficient to indemnify it against any claim that may be made against it (including any expense or liability) on account of the alleged loss, theft or destruction of any Unit Certificate or the issuance of such new certificate.

(d)    Surrender and Cancellation of Unit Certificates. When this Agreement is amended in any way affecting the statements contained in any Unit Certificate representing outstanding Units, or it otherwise becomes desirable for any reason, in the discretion of the General Partner, to cancel any outstanding Unit Certificate and to issue a new Unit Certificate conforming to the rights of the Limited Partner holding the Unit Certificate, the General Partner may order any Limited Partners holding an outstanding Unit Certificate to surrender and exchange them within a reasonable time to be fixed by the general Partner. The order may provide that a Limited Partner holding any Unit Certificates so ordered to be surrendered is not entitled to vote or to receive cash distributions or exercise any of the other rights of a Limited Partner until the Limited Partner has complied with the order, but such order shall operate to suspend such rights only after notice and until compliance. The duty of a Limited Partner to surrender any outstanding Unit Certificate shall also be enforceable by civil action.

## 22.    POWER OF ATTORNEY.

(a)    Grant of Power. Each Limited Partner hereby makes, constitutes, and appoints the General Partner, any successor individual general partner or president of a successor corporate general partner, and Global Premier America, LLC, d.b.a. Global Premier America Regional Center (the "Subscriber Representative"), with full power of substitution and re-substitution, his agent and attorney-in-fact for him and in his name, place, and stead and for his use and benefit, to certify, acknowledge, swear to, file, and/or record this Agreement or a certificate thereof and to sign, execute, certify, acknowledge, swear to, file, and/or record any other instruments that may be required in connection with the formation of the Partnership, any amendment of this Agreement, the day-to-day conduct of the Partnership's business or the dissolution and winding up of the Partnership under the laws of the State of California or any other jurisdiction, including without limitation instruments (1) to reflect the exercise by the General Partner of any of the powers, authorizations, or rights granted to him under this Agreement or the taking by the General Partner of any action that it is required, authorized, or permitted to take hereunder; (2) to reflect any amendments made to this Agreement or the cancellation of this Agreement upon the dissolution of the Partnership; (3) to make filings under fictitious-name statutes or other filings required by the Partnership; (4) to reflect the admission to the Partnership of any additional or substituted limited partners, in the manner prescribed in this Agreement; (5) to complete, execute, and file on behalf of a Limited Partner a UCC-1 to perfect a security interest in the Limited Partner's interest in the Partnership; (6) to fill in any missing information on any subscription document executed by the Limited Partners, including but not limited to, amending any nonmonetary term or filling the date on any promissory note or any other subscription documents, in order to conform same to the terms of this Agreement; (7) to cause the Partnership to be qualified to do business in or, if required, to exist as a partnership under the laws of any jurisdiction in which it may conduct business; and (8) any other instruments that may be required of the Partnership or of the Partners or deemed desirable by the General Partner. Each Limited Partner authorizes such attorney-in-

EXHIBIT 3 - PAGE 18

fact to take any further actions that such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every acts or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Limited Partner might or could do if personally present and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. Each of the Limited Partners waives any and all defense that may be available to the Limited Partners to contest, negate, or disaffirm the actions of the General Partner under the power of attorney herein granted.

(b)    <u>Nature of Power</u>.  The power of attorney granted pursuant to Section 22(a):

(1)    is a special power of attorney coupled with an interest and is irrevocable;

(2)    may be exercised by such attorney-in-fact by listing the names of all of the Limited Partners who are to be parties to any agreement, certificate, instrument, or document, with the single signature of such attorney-in-fact together with the recital that it acts as attorney-in-fact for all of them; and

(3)    shall survive the death, bankruptcy, or mental incapacity of any Limited Partner, to the extent he or she may legally contract for such survival, or the transfer or assignment by such Partner of any Unit(s), except that where such transfer or assignment is of the last remaining Unit(s) held by such Partner and the transferee or assignee thereof has the right to be and with the consent of the General Partner is admitted as a substituted Limited Partner, the power of attorney given by the transferor shall survive such transfer or assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge, swear to, and file any agreement, certificate, instrument, or document necessary to effect such substitution.

(c)    <u>Execution of Additional Documents</u>.  Upon request of the General Partner, each Limited Partner shall promptly execute all certificates and other documents necessary or desirable for the General Partner to accomplish all such filings, recordings, publications, and other acts as the General Partner determines may be appropriate to comply with (1) the requirements for the formation, operation, amendment, or dissolution, as the case may be, of a limited partnership under the laws of the State of California; and (2) similar requirements of applicable law in all other jurisdictions with the Partnership may conduct business.

23.    <u>**MISCELLANEOUS.**</u>

(a)    <u>Applicable Law.</u> This Agreement shall, in all respects, be governed by the laws of the State of California applicable to agreements executed and to be wholly performed within the State of California.

(b)    <u>Severability.</u> Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail; but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law. If any provision of this Agreement shall be held to be invalid, the same shall not affect the validity, legality or enforceability of the remainder of this Agreement.

(c)    <u>Further Assurances.</u> Each of the parties hereto shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

(d)  Successors and Assigns. All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.

(e)  Number and Gender. In this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so requires.

(f)  Entire Agreement. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)  Non-Waiver: Consents. No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)  Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)  Captions. The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)  Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

*(The remainder of this page is intentionally blank; the signature page follows.)*

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
  Christine Hanna, Manager

Limited Partners:

Hou Xiao Liang
(Signature)

HOV XIAO LIANG
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" - Page 21 of 21

EXHIBIT 3 - PAGE 21

(f)    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    <u>Non-Waiver: Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____    WANG WEN HAI
(Signature)

_____
WANG WENHAI
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 22

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 23

(f)    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    <u>Non-Waiver; Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
    Christine Hanna, Manager

Limited Partners:

_____ Zhou Haixia
(Signature)

_____ ZHOU HAIXIA
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 24

(f)    Entire Agreement. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    Non-Waiver: Consents. No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    Captions. The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
    Christine Hanna, Manager

Limited Partners:

_____
(Signature)

姜艳涛  JIANG YANTAO
_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 25

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 26

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____

Christine Hanna, Manager

Limited Partners:

*Aifang Feng*
(Signature)

*Aifang Feng*
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 27

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

Qiao hong Li
(Signature)

Qiao hong Li
(Printed Name)

_____
(Signature)

_____
(Printed Name)

exhibit "A" - Page 21 of 21

EXHIBIT 3 - PAGE 28

(f)  Entire Agreement. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)  Non-Waiver: Consents. No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)  Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)  Captions. The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)  Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By:  _____
　　　Christine Hanna, Manager

Limited Partners:

丁寒　DING HAN
_____
(Signature)

丁寒　DING HAN
_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" - Page 20 of 20

EXHIBIT 3 - PAGE 29

(f)    Entire Agreement. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    Non-Waiver; Consents. No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    Captions. The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

黃柏 Huang Yang
(Signature)

黃柏 HUANG YANG
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 30

(f)    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    <u>Non-Waiver; Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
    Christine Hanna, Manager

Limited Partners:

_____ ZHU CHANGLING
(Signature)

ZHU   CHANGLING
_____
(Printed Name)


_____
(Signature)


_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 31

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

*Hou Lin Qiang*
(Signature)

*HOU LIN QIANG*
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 32

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
            Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 33

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
     Christine Hanna, Manager

Limited Partners:

_____ Yao Xu
(Signature)

_____ Yao Xu
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 34

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

BIRJANDI    MOHAMMADSADEGH
(Printed Name)


_____
(Signature)


_____
(Printed Name)

EXHIBIT 3 - PAGE 35

(f)     Entire Agreement. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)     Non-Waiver: Consents. No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)     Captions. The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)     Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By:  _Hanna_____
      Christine Hanna, Manager

Limited Partners:

_Suran Liu_____
(Signature)

_Suran Liu_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 36

(f)    <u>Entire Agreement</u>. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    <u>Non-Waiver; Consents</u>. No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    <u>Parties in Interest</u>. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
       Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_Qi Lu_
(Printed Name)

_____
(Signature)

_Xiao Shang_
(Printed Name)

EXHIBIT 3 - PAGE 37

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first
hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
        Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 38

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
　　Christine Hanna, Manager

Limited Partners:

张环芳　　Sun Huanfang
_____
(Signature)

孙环芳　　SUN HUANFANG
_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 39

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

**General Partner:**

GLOBAL PREMIER AMERICA #3, LLC

By:  _____
Christine Hanna, Manager

**Limited Partners:**

_____
(Signature)

Wu Bibo
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 40

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

Qiu Zihan
_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

EXHIBIT 3 - PAGE 41

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
       Christine Hanna, Manager

Limited Partners:

_____
(Signature)

ZHANG, MEIYU
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 42

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

Wang Chao
_____
(Signature)

WANG CHAO
_____
(Printed Name)

Wang Chao
_____
(Signature)

WANG CHAO
_____
(Printed Name)

EXHIBIT 3 - PAGE 43

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _Channa_____
    Christine Hanna, Manager

Limited Partners:

罗泠泠 Luo LingLing
(Signature)

罗泠泠 LUO LING LING
(Printed Name)

_____
(Signature)

_____
(Printed Name)

EXHIBIT 3 - PAGE 44

EXHIBIT 4

## OPERATING AGREEMENT

### OF

### GLOBAL PREMIER AMERICA #3, LLC

**THIS OPERATING AGREEMENT** (the "Agreement") is made and entered into and effective as of February 27, 2014 (the "Effective Date").

### RECITALS:

**WHEREAS,** CHRISTINE HANNA formed a limited liability company named GLOBAL PREMIER AMERICA #3, LLC (the "Company") by filing the Articles of Organization of the Company with the Secretary of State of California on February 27, 2014;

**NOW THEREFORE,** in consideration of the covenants and the promises made herein, the parties hereby agree as follows:

### SECTION 1: DEFINITIONS

1.1    **"Agreement"** means this Operating Agreement of GLOBAL PREMIER AMERICA #3, LLC dated February 27, 2014.

1.2    **"Articles of Organization"** means the Articles of Organization forming this LLC filed with the State of California and recorded as filed on February 27, 2014.

1.4    **"Capital Account"** means the amount of the Member's Capital Contribution, as adjusted, including but not limited to increases due to profits or additional contributions and decreases due to losses and distributions.

1.5    **"Capital Contribution"** means any contribution of value, including but not limited to cash, property, assets, etc., by the Member to the capital of the Company.

1.6    **"Distributable Cash"** shall mean the amount of cash derived from the Company's net revenues after expenses, less the amount of a reasonable reserve for future expenses, as determined by the Manager in her sole discretion.

1.7    **"Manager"** means CHRISTINE HANNA, who shall manage and operate the Company in accordance with the terms of this Agreement.

1.8    **"Member"** means GLOBAL PREMIER AMERICA or any other person or entity who owns any Interest in the Company.

EXHIBIT 4 - PAGE

1.9    **"Statute"** means the California Revised Uniform Limited Liability Company Act as found in Section 17701.01 et seq. of the California Corporations Code, as amended, modified or supplemented from time to time or any corresponding provisions of succeeding law.

1.10    **"Units"** means an ownership interest in the Company issued to the Member for its Capital Contribution. The authorized number of Units is 100,000.

## SECTION 2:  FORMATION

2.1    **Name**.  The name of the Company is GLOBAL PREMIER AMERICA #3, LLC.  The Manager shall operate the business of the Company under such name of the Company or such other name or names as the Manager or the Member approves to promote the business of the Company, provided that such names do not violate the Statute.

2.2    **Principal Office**.  The Company's principal place of business will be 2010 Main Street, Suite 1250, Irvine, California 92614 or any other location determined by the Manager.

2.3    **Term**. The Company shall exist for a period of 50 years from the date of the filing of its Articles of Organization unless sooner terminated or dissolved in accordance with its Articles of Organization or this Agreement.

2.4    **Business Purpose**.  The purpose of the Company is to manage Global Premier Regency Palms Oxnard, LP, located at 2010 Main Street, Suite 1250, Irvine, California 92614 (the "Partnership"), and such other business that the Company may lawfully engage in related to the Partnership.

2.5    **Agent for Service of Process**.  The agent for service of process for the Company is Mark Butler, 1300 Bristol Street, Suite 160, Newport Beach, California 92660 or any other natural person or qualified entity with an office in the State of California as determined by the Manager.

## SECTION 3:  MEMBERSHIP

3.1    **Members**.  The initial Members of the Company are GLOBAL PREMIER AMERICA, LLC, who shall own 100,000 Units. No other members shall be admitted to the Company without the consent of the Members.

3.2    **Liability to Third Parties**.  The Members shall not be liable for the debts, obligations or liabilities of the Company to a third party unless the Members agree in writing to be liable.

EXHIBIT 4 - PAGE

3.3     **Authority**.  The Members have no authority or power to act for or on behalf of, to bind, or to incur any liability on behalf of the Company except as provided in this Agreement and any other written agreements entered into with the Company.

## SECTION 4:  CAPITAL ACCOUNTS

4.1     **Capital Accounts**.  A Capital Account shall be established and maintained for the Members, maintained in accordance with generally accepted accounting principles.

## SECTION 5:  ALLOCATION OF PROFITS AND LOSSES AND DISTRIBUTIONS

5.1     **Net Losses**. The Members will be allocated all of the Net Losses for each fiscal year of the Company.

5.2     **Net Profits**.  The Members will be allocated all of the Net Profits for each fiscal year of the Company.

5.3     **Cash Distributions** The Members will be allocated all of the Cash Distributions for each fiscal year of the Company.

## SECTION 6:  MANAGER AND MEMBER DUTIES AND ACTIONS

6.1     **Manager's Duties; Replacement Manager**.  The Manager shall supervise and direct the day-to-day operations of the Company as are reasonably necessary to accomplish the business purposes of the Company.  The Manager shall also have the rights and duties set forth in this Agreement. If the Manager resigns or is unable to function as a Manager due to death or disability, the Members shall appoint a replacement Manager.  The Manager may act and adopt resolutions from time to time evidencing decisions of the Manager without a meeting as permitted by the Statute.

6.2     **Action by the Members**.  Meetings of Members shall be held in accordance with the provisions of the Statute.  The Members may act and adopt resolutions from time to time evidencing decisions of the Members without a meeting as permitted by the Statute.

## SECTION 7:  BOOKS AND RECORDS

EXHIBIT 4 - PAGE

7.1 **Maintenance of Books and Records**.  The Company shall establish and maintain appropriate books and records of the Company in accordance with generally accepted accounting principles.  There shall be kept at the principal office of the Company and the registered office of the Company such books and records required by the Statute.

7.2 **Fiscal Year.**  The Company's fiscal year shall end on December 31st.

## SECTION 8:  TAXATION

8.1 **Tax Year.**  The Company's taxable year shall end on December 31st.

8.2 **Tax Matters Partner.**  The Manager shall be the Tax Matters Partner pursuant to Code Section 6231 to represent the Company.

## SECTION 9:  INDEMNIFICATION

9.1 **Indemnification Generally.**  The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he, she, or it is or was a Manager, Member, employee or agent of the Company (individually an "Indemnified Party)"), or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Manager and the Members jointly determine that the Indemnified Party acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company.

9.2 **Indemnification in a Criminal Matters.**  With respect to any criminal action proceeding, has no reasonable cause to believe his, her or its conduct was unlawful.  The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his, her or its conduct was lawful.

## SECTION 10:  AMENDMENTS

10.1 **Amendments by Member.**  This Agreement may be adopted, amended, altered, or repealed only by the written consent of the Members.

EXHIBIT 4 - PAGE

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

*MANAGER:*

**CHRISTINE HANNA**

*MEMBERS:*

**GLOBAL PREMIER AMERICA, LLC**

By: _____
Christine Hanna
Manager

By: _____
Andrew  Hanna
Manager

Page 5 of 5

EXHIBIT 4 - PAGE

## FIRST AMENDMENT TO OPERATING AGREEMENT OF
## GLOBAL PREMIER AMERICA #3, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

THIS FIRST AMENDMENT TO THE OPERATING AGREEMENT OF **GLOBAL PREMIER AMERICA #3, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (the "Company"),** is made, adopted and executed this 27th day of September, 2017 by the undersigned persons. All of the capitalized words and terms in the Amendment shall have the meaning ascribed to them in the Operating Agreement of **GLOBAL PREMIER AMERICA #3, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY**.

Amendments. The Company's Operating Agreement is amended as follows:

1. Section 1.7 - **"Manager"** means CHRISTINE HANNA and ANDREW HANNA, who, together or acting separately, shall each have full authority to manage and operate the Company in accordance with the terms of this Agreement.

2. Notwithstanding anything to the contrary contained in this Agreement, so long as the Loan (defined herein below) remains outstanding, the following terms shall govern:

(a)     The Company is General Partner of Global Premier Regency Palms Oxnard, LP, a California limited partnership (the "Partnership");

(b)     The Company, as General Partner of the Partnership, agrees that the Partnership (1) is organized solely for the limited purpose of acquiring, owning, improving, leasing, managing, operating, holding for investment and selling or otherwise disposing of the Property and doing only those things necessary in connection therewith, (2) shall not engage in any other business unrelated to the Property, (3) shall have no other purpose unrelated to the Property, (d) shall not own or acquire any real property other than the real estate included in the Property or any personal (tangible or intangible) property other than personal property included in the Property or in furtherance of the purposes of the Property and the Partnership as stated herein, and (4) shall not incur, create, or assume any indebtedness or liabilities, secured or unsecured, direct or contingent, other than (i) the Loan, and (ii) unsecured indebtedness that represents trade payables or accrued expenses occurring in the normal course of business of owning and operating the Property; and the General Partner shall take no action in contradiction of the foregoing. **"Loan"** means the loan evidenced by that certain Promissory Note Secured by Deed of Trust, in the original principal sum of $12,500,000 to be executed by the Company as General Partner of the Partnership in favor of IBORROW FINANCE LOAN FUND I, a Delaware limited partnership (**"Lender"**);

(c)     If an event of default under the documents evidencing and securing the Loan exists and is continuing, no consent of any Member will be required for the **General Partner** to take any of the actions described in this Agreement;

7924025

EXHIBIT 4 - PAGE

(d)    The **General Partner** may be replaced as General Partner of the Partnership by only (1) a guarantor under the Loan, or (2) such other party as may be reasonably acceptable to Lender, which party will be required to guaranty the Loan under the same terms as the then existing guarantor(s); and

(e)    The Company shall be the sole **General Partner** of the Partnership with complete control over all decisions on behalf of the Partnership.

3. Ratification. The Company's Operating Agreement, as amended, is hereby ratified, confirmed and approved by the Member(s). The undersigned hereby affirms that they are the Manager of the Company and the Manager of the sole member and that the facts stated in this First Amendment to the Company's Operating Agreement are true.

_____ Manager
Andrew Hanna

_____ Manager
Christine Hanna

7924025

EXHIBIT 4 - PAGE

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1301 Dove Street Suite 500, Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled: **DECLARATION OF CHRISTINE HANNA IN SUPPORT OF: (1) DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO ASSESSMENT CONTRACT AND OBTAIN POST-PETITION LOAN SECURED AGAINST REAL PROPERTY (2) EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR HEARING ON DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO ASSESSMENT CONTRACT AND OBTAIN POST-PETITION LOAN SECURED AGAINST REAL PROPERTY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 24, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Michael J Conway - MConway@gblawllp.com, msingleman@gblawllp.com; rsoll@gblawllp.com
- James R Felton - jfelton@gblawllp.com, pstruntz@gblawllp.com; msingleman@gblawllp.com
- Brian David Fittipaldi - brian.fittipaldi@usdoj.gov
- Garrick A Hollander - ghollander@wghlawyers.com, jmartinez@wghlawyers.com; svillegas@wghlawyers.com
- Mike D Neue - m.neue@geracillp.com, a.lewis@geracillp.com
- Jeremy H Rothstein - jrothstein@gblawllp.com, msingleman@gblawllp.com; rsoll@gblawllp.com
- Matthew J Stockl - mstockl@wghlawyers.com, jmartinez@wghlawyers.com; svillegas@wghlawyers.com
- United States Trustee (ND) - ustpregion16.nd.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**:  On **July 24, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.  **SEE ATTACHED SERVICE LIST**

**3.  SERVED BY OVERNIGHT MAIL,** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 24, 2023 | Silvia Villegas | /s/ Silvia Villegas |
|---|---|---|
| Date | Printed Name | Signature |

266645

**Debtor**
Global Premier Regency Palms Oxnard
c/o Christine Hanna Reg Agent
1900 Main Street, Suite 315
Irvine, CA 92614

United States Trustee (LA)
915 Wilshire Blvd., #1850
Los Angeles, CA 90017

**Global Premier Regency
Palms Oxnard
Master Mailing List 260314**

Global Premier America, LLC
c/o Christine Hanna Reg Agent
1900 Main Street, Suite 315
Irvine, CA 92614

Global Regency Oxnard Senior
Care Services, LLC
1900 Main Street, Suite 315
Irvine, CA 92614

Global Premier Development, Inc.
c/o Registered Agents Inc.
Registered Agent
1401 21st Street, Suite R
Sacramento, CA 95811

Andrew Hanna
1900 Main Street, Suite 315
Irvine, CA 92614

Christine Hanna
1900 Main Street Suite 315
Irvine, CA 92614

Northern Division
1415 State Street,
Santa Barbara, CA 93101-2511

Allied Senior Living Resources Attn: Corporate
Officer
107 N Relno Rd #145
Newbury Park, CA 91320-371

20 Largest Creditor
Global Bancorp
c/o Nina Celia Hanna (Registered Ag
1900 Main Street, Suite 315
Irvine, CA 92614

20 Largest Creditor
GMEP Engineering
~~Attn: Corporate Officer~~
~~3 MacArthur Place Suite 855~~
~~Santa Ana, CA 92707~~
Moved, New Address Below
Rtd Mail 10/22 New Address Below

20 Largest Creditor
Hanson Bridgett LLP
Attn: Corporate Officer
425 Market Street, 26th Floor
San Francisco, CA 94105

20 Largest Creditor
Cohn Reznick
Attn: Kash Hussain
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067
Rtd Mail 1/2023 UTF

20 Largest Creditor
Herc Rentals, Inc.
Attn: Corporate Officer
27500 Riverview Center Blvd.
Bonita Springs, FL 34134

20 Largest Creditor
Global Realty & Investment Corp.
Attn: Corporate Officer
1900 Main Street Suite 315
Irvine, CA 92614

20 Largest Creditor/Secured
Direct Supply, Inc.
Attn: Corporate Officer
6635 W. Champions Way
Milwaukee, WI 53223

20 Largest Creditor
Art Mex Artistic Iron
Attn: Corporate Officer
1247 Mercantile St Suite B
Oxnard, CA 93030

20 Largest Creditor
GCW Consulting
Attn: Corporate Officer
4206 Great Plains Dr NE
Salem, OR 97305

20 Largest Creditor
JTC USA Holdings
Attn: Corporate Officer
50 W. San Francisco St Suite 300
San Jose, CA 95113

20 Largest Creditor
StudioSix5
Attn: Corporate Officer
811 Barton Springs Road Suite 800
Austin, TX 78704

20 Largest Creditor/Secured
Top Tier Painting
Attn: Corporate Officer
301 E Wooley Rd
Oxnard, CA 93030

20 Largest Creditor
Pacific Rim Law Group
Attn: Corporate Officer
7700 Irvine Center Dr, #800
Irvine, CA 92618

20 Largest Creditor
Wilshire Pacific Capital Advisors,
Attn: Eric J. Weissman
8447 Wilshire Blvd., Suite 202
Beverly Hills, CA 90211

20 Largest Creditor
Pinnacle Surety
Attn: Corporate Officer
151 Kalmus Dr Suite A-201
Costa Mesa, CA 92626

20 Largest Creditor
St. George Construction
Attn: Corporate Officer
7839 Adwen Street
Downey, CA 90241

20 Largest Creditor
GMEP Engineering
Attn: Corporate Officer
20341 Irvine Ave. D3
Newport Beach, CA 92660

Assisted Living Connections
Attn Corporate Officer
Glenn Podell / Kelila Heller
5412 Mark Ct.
Agoura Hills, CA 91301

BrandConnex, LLC
Attn: Corporate Officer
99 Wood Avenue South
Suite 304
Iselin, NJ 08830-2715

CohnReznick LLP
c/o Jeanna Spezzacatena
c/o CohnReznick LLP
14 Sylvan Way 3rd Fl
Parsippany NJ 07054-3835

Bestway Laundry Solutions
Attn: Corporate Officer
1035 East Third Street
Corona, CA 92879-7476

CDF Labor Law LLP
Attn: Corporate Officer 18300 Von Karman
Ave Suite 800
Irvine, CA 92612

Cohn Reznick
Attn: Kash Hussain
21600 Oxnard Street, Suite 700
Woodland Hills, CA 91367

Secured
Direct Supply, Inc.
c/o CSC Lawyers Incorp. Svs.
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833

Employment Dev. Dept.
Bankruptcy Group MIC 92E
PO Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section MS: A-340
PO Box 2952
Sacramento, CA 95812-2952

Secured
Herc Rentals, Inc.
c/o C T Corporation System (Register
330 N. Brand Blvd. Ste 700
Glendale, CA 91203

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Secured
JKO Group, LLC
Attn: Corporate Officer
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403

Secured
JKO Group LLC
Attn: Steve Fenster
15303 Ventura Blvd #1650
Sherman Oaks, CA 91403

Secured
JKO Group, LLC
c/o Capital Services, Inc.
Registered Agent
108 Lakeland Ave.
Dover, DE 19901

Los Angeles County Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

Magdy Hanna
1900 Main Street, Suite 315
Irvine, CA 92614

Contempo Creations
Attn: Corporate Officer
3943 Irvine Blvd , #208
Irvine, CA 92602-2400

Michael Best & Friedrich LLP
Attn: Stephen A. Aguilar, Esq.
620 Congress Ave, Suite 200
Austin, TX 78701

Secured
Nano Banc
Attn: Aman Haseeb
7755 Irvine Center Drive, #300
Irvine, CA 92618

National Affordable Communities Inc
Attn: Christine Hanna
1900 Main Street, Suite 315
Irvine, CA 92614

State Board of Equalization
Sp. Operations, Bkcy Team,
MIC: 74
PO Box 942879
Sacramento, CA 94279-0074

State Board of Equalization
Acct. Information Group, MIC: 29
PO Box 942879
Sacramento, CA 94279-0029

Secured
Top Tier Painting, Inc.
c/o Jorge Antonio Galarza
(Registered Agent)
2051 Via Veneto
Camarillo, CA 93010

Ventura County
Treasurer-Tax Coll.
800 S. Victoria Ave.
Ventura, CA 93009

W.W. Grainger, Inc.
Attn: Kimberly Fara, Sp. Coll Assoc
401 South Wright Road
Janesville, WI 53546

Attorneys for St. George Construction, Inc.
GERACI LAW FIRM
Attn: Mike Neue, Esq.
90 Discovery
Irvine, CA 92618

Meridian Senior Living, LLC
Attn: Robert Sweet, EVP
~~1300 Spring Street, Suite 205~~
~~Annapolis, MD 21401~~
Rtd Mail 11/2022 UTF

Coastal Occupational
Attn: Corporate Officer
1901 Outlet Center Dr #100
Oxnard, CA 93036-0669

Connie De La Rosa
9452 Telephone Rd 276
Ventura, CA 93004-2600

Caring.com
Attn: Corporate Officer
PO Box 7689
San Francisco, CA 94120-7689

Grainger Inc.
Attn: Corporate Officer
DEPT 885855025
Palatine, IL 60038-0001

Green MEP Engineering Consulting
20341 Irvine Ave D3
Newport Beach, CA 92660-0228

HD Supply Facilities Maintenance
Attn: Corporate Officer
PO Box 509058
San Diego, CA 92150-9058

JKO Group, LLC
2549 Eastbluff Dr #720
Newport Beach, CA 92660-3500

One on One Sherpa LLC
Attn: Corporate Officer
PO Box 749405
Atlanta, GA 30374-9405

PointClickCare Technologies Inc.
Attn: Corporate Officer
PO BOX 674802
Detroit, MI 48267-4802

Jackson Lewis PC
Attn: Corporate Officer
PO Box 416019
Boston, MA 02241-6019

Nursecore Management
Services-NY
Attn: Corp Officer
DEPT# 41753
Dallas, TX 75265

Polly Boothe
G5 Search Marketing Inc
Attn: Corp Officer
P O Box 843274
Dallas, TX 75284-3274

Sea Breeze Landscapes
Attn: Corporate Officer
PO Box 4204
Chatsworth, CA 91313-4204

Sysco Ventura, Inc
Attn: Jessica Lindgren/Corp Officer
1390 Enclave Parkway
Houston, TX 77077-2025

The Home Depot Pro
Attn: Corporate Officer
PO Box 404284
Atlanta, GA 30384-4284

The Home Depot Pro Institutional - Bankruptc
801 West Bay Street
Jacksonville, FL 32204-1605

(p)LOS ANGELES COUNTY TREASURER
AND TAX COLLE
ATTN BANKRUPTCY UNIT
PO BOX 54110
LOS ANGELES CA 90054-0110